IN THE UNITED STATES DISTRCIT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JACQUES RIVERA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| REYNALDO GUEVARA, | ) |
| STEVE GAWRYS, DANIEL NOON, | ) |
| JOHN GUZMAN, JOSEPH FALLON, | ) No. |
| JOSEPH SPARKS, PAUL ZACHARIAS, | ) |
| GILLIAN MCLAUGHLIN, JOHN | ) |
| LEONARD, EDWARD MINGEY, | ) |
| RUSSELL WEINGART, and the ESTATE | ) **JURY TRIAL DEMANDED** |
| OF ROCCO RINALDI, Chicago Police | ) |
| Detectives; and the CITY OF CHICAGO, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff JACQUES RIVERA, by his undersigned attorneys, for his complaint against former Police Detectives REYNALDO GUEVARA, STEVE GAWRYS, DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, RUSSELL WEINGART, the ESTATE OF ROCCO RINALDI and the CITY OF CHICAGO, alleges as follows:

### INTRODUCTION

1. Plaintiff Jacques Rivera spent more than 20 years in a maximum-security prison for the murder of Felix Valentin, a crime he did not commit. In August and September 1988, the Police Officer Defendants—Chicago Detectives and Gang Crimes Officers—conspired among themselves and with others, known and unknown, to prosecute Plaintiff for Valentin's murder, while indifferent to the fact that he was innocent. As a result of the Defendants' actions, Plaintiff

was convicted of first-degree murder and sentenced to eighty years imprisonment in the Illinois Department of Corrections.

2. The Defendants conspired to fabricate false evidence and manipulate the identification of the sole eyewitness to the attack, a twelve-year-old child named Orlando Lopez, who falsely claimed that Plaintiff was responsible for shooting Valentin. The Defendants also concealed the fact that Lopez told authorities before Plaintiff was charged that Plaintiff was not the killer. There was no physical evidence connecting Plaintiff to the crime and, thus, without the defendants' concealment of evidence, falsification of evidence and manipulation of Lopez, Plaintiff would never have been convicted.

3. On June 23, 2011, at an evidentiary hearing held before the Circuit Court of Cook County, Lopez acknowledged under oath that he had never been able to identify Plaintiff as the murderer. On the basis of this testimony, the Circuit Court ordered that Plaintiff receive a new trial. Thereafter, the State's Attorney's Office dropped all charges against Plaintiff. Plaintiff was released from custody on October 4, 2011.

4. Plaintiff now seeks compensation for the incalculable hardship and injury he suffered as a result of the Defendants' egregious misconduct.

**JURISDICTION AND VENUE**

5. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution, as well as the deprivation of rights under Illinois state law.

6. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. § 1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

**PARTIES**

7.     Plaintiff Jacques Rivera, a 47-year-old Latino man, is a citizen of the United States and resides in the City of Chicago.

8.     Defendant City of Chicago is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

9.     At all relevant times hereto, Defendants Reynaldo Guevara (Star No. 16345), Steve Gawrys (Star No. 16899), Daniel Noon (Star No. 5410), John Guzman (Star No. 8728), Joseph Sparks (Star No. 14879), Paul Zacharias (Star No. 15994), and Joseph Fallon (Star No. 5351) were members of the Chicago Police Department and assigned to the Gang Crimes Unit of Area Five, known as "Gang Crimes North." Each of these defendants conspired with the Violent Crimes investigators and with other persons, known and unknown, to conceal and fabricate evidence, manipulate the eyewitness's identification, and maliciously prosecute Plaintiff for Valentin's murder

10.    Defendants Gillian McLaughlin (Star No. 8086), and John Leonard (Star No. 5629) were members of the Chicago Police Department and assigned to Area Five's Violent Crimes Unit. McLaughlin and Leonard were the lead investigators on the Valentin case and conspired with the Gang Crimes officers, and with other persons, known and unknown, to conceal and fabricate evidence, manipulate the eyewitness's identification, and maliciously prosecute Plaintiff for Valentin's murder.

11.    Defendants Sergeant Russell Weingart (Star No. 865) and Sergeant Edward Mingey (Star No. 1731) were members of the Chicago Police Department and assigned to Area Five's Violent Crimes Unit. Weingart and Mingey were, at all relevant times, supervisors of the

3

Police Officer Defendants. They facilitated, condoned and approved the constitutional violations committed by the Police Officer Defendants.

13. Defendant Estate of Rocco Rinaldi is joined as the successor in interest to Sergeant Rocco Rinaldi (Star No. 2073), who is deceased. Rinaldi was a member of the Chicago Police Department and assigned to Area Five's Violent Crimes Unit. Rinaldi was, at all relevant times, a supervisor of the Police Officer Defendants. He facilitated and approved the constitutional violations committed by the Police Officer Defendants.

13. Each of the individual Defendants is sued in his or her individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this complaint.

## PLAINTIFF'S FACTUAL ALLEGATIONS

### The Murder of Felix Valentin and the Initial Police Investigation

14. On the afternoon of August 27, 1988, 16-year-old Felix Valentin, a member of the Campbell Boys street gang, was shot ten times while sitting in the driver's seat of a car in an alley near the 3300 block of West Cortland in the City of Chicago. Immediately prior to the shooting, the perpetrator had pulled up behind Valentin in a car driven by another man. After shooting Valentin, the perpetrator returned to his vehicle and fled the scene of the crime. Valentin died from his wounds eighteen days later, on September 14, 1988.

15. Defendants McLaughlin and Leonard were assigned to investigate the shooting. Because the attack was believed to be gang-related, Gang Crimes North Officer-Defendants Guevara, Gawrys, Noon, Guzman, Sparks, and Zacharias were called in to assist.

16. On or about August 31, 1988, Area Five Detectives Letrich and Moriarty interviewed Valentin at the hospital. Valentin informed Letrich and Moriarty that both the

4

person who shot him and the driver of the getaway car were members of the Imperial Gangsters street gang. Letrich and Moriarty showed Valentin the Imperial Gangsters "gang book," which contained pictures of suspected Imperial Gangsters members, and Valentin identified one Jose Rodriguez as his assailant and one Phillip Nieves as the getaway driver. Rodriguez was taken into custody on August 31, 1988 but Nieves was never located.

## Manipulation of a Child Eyewitness, Concealment of Evidence and Fabrication of Evidence

17. The only witness to Valentin's shooting, besides Valentin himself, was a twelve-year-old boy named Orlando Lopez, who was hiding in the alley where Valentin was shot at a distance of 30 to 50 feet from the shooting. Defendants McLaughlin and Leonard, along with Guevara, Gawrys, and the other Gang Crimes Defendants, interviewed Lopez on multiple occasions between August 29, 1988 and September 14, 1988.

18. At one of these meetings, on or about August 29, 1988, McLaughlin and Leonard, working in concert with Guevara and his Gang Crimes team (Noon, Guzman, Sparks, and Zacharias), showed Lopez a gang book that contained exclusively pictures of persons believed to be members of the Latin King street gang. They did so despite the fact that there was no evidence to suggest that a Latin King had committed the attack on Valentin. Plaintiff was pictured in the book shown to Lopez. Lopez had never before met or seen Plaintiff. Using suggestive tactics, these Defendants manipulated Lopez into picking out Plaintiff's picture from the gang book and falsely identifying Plaintiff as Valentin's shooter. None of the Defendants' suggestive tactics were documented in a police report or otherwise disclosed to Plaintiff. Rinaldi, the Defendants' supervisor, approved and ratified the Defendants' actions.

19. Based on Lopez's manipulated identification, Defendant Guevara, along with Leonard, McLaughlin, Fallon, Sparks, and Zacharias, arrested Plaintiff for the first time on or

5

about August 30, 1988. At the time of Plaintiff's arrest, there was no physical evidence connecting Plaintiff to the crime. Nevertheless, Rinaldi approved the false arrest and allowed Plaintiff to be detained without probable cause.

20. Plaintiff was placed in a line-up on September 1, 1988. Plaintiff was falsely informed that he was placed in this line-up solely to serve as a "filler." Jose Rodriguez, whom Valentin had identified as his assailant, was apprehended and also placed in the line-up. Lopez was unable to identify either Plaintiff or Rodriguez and both were released without charges. No police record was ever made of this failed line-up and Plaintiff was never informed that Lopez had viewed the line-up and failed to identify him. Instead, the Defendants falsified police records to make it appear that Lopez had not viewed the line-up.

21. After the first line-up, Lopez encountered the actual shooter on the streets of his neighborhood. Lopez identified the man as an Imperial Gangster, the same gang as the assailant, according to Valentin. Upon seeing the shooter face-to-face, Lopez became certain that his identification of Plaintiff from the Latin King gang book had been false.

22. From September 1st until September 15th, the Defendants did not take any further action in the investigation. On September 15, 1988, the day after Valentin died in the hospital from his wounds, Rinaldi directed the Police Officer Defendants to "continue the investigation." In accordance with this directive, Guevara and Gawrys arrested Plaintiff for a second time, though they still had no evidence implicating him in the shooting.

23. That same day, Lopez was brought into Area Five to view a line-up in which Plaintiff was required to participate. Before viewing the line-up, Lopez informed Guevara and another person whose identity is not known to Plaintiff at this time that he had seen the real shooter on the streets and that Plaintiff was not the perpetrator. Guevara and the other individual

6

disregarded this information. They used unduly suggestive tactics to manipulate Lopez into picking Plaintiff out of the line-up. At no time did Guevara or any other officer document in a police report what Lopez had said about his identification prior to the line-up or their manipulation of him during the line-up. That information was concealed from Plaintiff. Defendant Weingart ratified and approved the Defendants' misconduct.

24. In the face of police pressure and manipulation, Lopez falsely identified Plaintiff as Valentin's killer. Following Lopez's line-up identification, Plaintiff was charged with murder.

25. On September 16, 1988, one day after Lopez falsely identified Plaintiff in the second line-up, Defendants Guevara and Gawrys drafted a false supplementary report and inserted it in the case file. The report contained statements that were false and intentionally fabricated in order to solidify the case against Plaintiff. The report was signed by Defendant Mingey, who knew that the statements contained therein were manufactured, but nonetheless approved the report.

## Plaintiff's Wrongful Conviction

26. In April 1990, following a bench trial in the Circuit Court of Cook County, Plaintiff was wrongfully convicted of the murder of Felix Valentin. On July 9, 1990, Plaintiff was sentenced to an 80-year term of imprisonment in the Illinois Department of Corrections. Defendant Guevara was called as a prosecution witness at that trial and testified falsely in furtherance of the scheme to convict Plaintiff of murder without regard to Plaintiff's guilt or innocence.

27. Neither Plaintiff nor his criminal defense counsel was aware at the time of Plaintiff's criminal trial of the concealment of evidence, fabrication of evidence, and

7

manipulation of the eyewitness that is set forth in this Complaint. Had these facts been disclosed, Plaintiff would not have been convicted.

### Plaintiff's Exoneration

28. Throughout his wrongful incarceration, Plaintiff tirelessly attempted to establish that he was innocent and wrongfully convicted of the Valentin murder. His direct appeal, *pro se* post-conviction petitions, and federal *habeas corpus* petition were all denied. In 2010, the Northwestern Center on Wrongful Convictions filed a successor post-conviction petition on Plaintiff's behalf, alleging that Plaintiff was innocent of the murder. An evidentiary hearing was held on this petition at which Orlando Lopez testified that he had falsely identified Plaintiff as the perpetrator at the criminal trial and described some of the circumstances leading to that false identification.

29. Following this hearing, on September 13, 2011, Cook County Circuit Court Judge Neera Walsh vacated Plaintiff's conviction, finding Lopez's testimony to be credible. Rather than retrying Plaintiff, the Cook County State's Attorney's Office elected to dismiss all charges against Plaintiff.

30. After spending twenty-one years in Stateville Correctional Center, Plaintiff was released from custody on October 4, 2011.

### Plaintiff's Damages

31. Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff spent more than twenty years of his life imprisoned for a crime of which he was innocent. He woke up each day with this reality, not knowing whether he would ever succeed in proving the wrongfulness of his conviction and incarceration.

8

32. Over the course of his two decades of imprisonment, Plaintiff was separated from his wife and his three children, the youngest of whom was only five months old when Plaintiff was incarcerated. Plaintiff lost the chance to raise, care for, and mentor his children, who were adults by the time Plaintiff was released from prison.

33. Plaintiff, who was working at the time of his arrest, was also deprived of the opportunity to engage in productive labor and support his family. Without Plaintiff's earnings following his arrest and incarceration, his family struggled to survive.

34. As a result of the Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful incarceration.

**Policy and Practice of Prosecuting Innocent Persons in Violation of Due Process**

35. The Chicago Police Department is responsible for scores of miscarriages of justice. In the period from 1986 to the present, there are no fewer than 67 documented cases in which Chicago Police Detectives amassed "evidence" against an innocent person and then caused the Cook County State's Attorney's Office to charge and convict that person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

36. The false charges against innocent persons include numerous cases in which Chicago Police Officers used the very same tactics that Guevara and the other individual Defendants employed against Plaintiff in this case, including: (a) coercion and manipulation of eyewitnesses in order to obtain false eyewitness identifications; (b) coercion and manipulation in order to influence witness testimony; (c) fabrication of evidence; (d) concealment of

9

exculpatory information; and (e) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

37. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

38. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff.

39. The City of Chicago and the Chicago Police Department has never investigated any of the 67 cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

40. Prior to and during 1988, the year in which Plaintiff was falsely charged with the Valentin murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The former Chicago Police Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago

Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

41. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

42. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

43. Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case, including the manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are approximately 40 known cases in which Guevara has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced eyewitnesses and fabricated and concealed evidence, as he did in this case. Guevara engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

11

44. The City of Chicago and its Police Department failed in 1988 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

   a. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

   b. The need to refrain from manipulation or potentially coercive conduct in relation to witnesses, and child eyewitnesses in particular.

   c. The risks of wrongful conviction and the steps police officers should take to minimize these risks.

   d. The risks of engaging in tunnel vision during an investigation.

   e. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

45. The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

46. The City's failure to train, supervise and discipline its officers, including repeat offenders such as Defendant Guevara, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case.

Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

47. The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

48. The policies and practices described in the foregoing paragraphs were consciously approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

## COUNT I
## 42 U.S.C. § 1983 – Due Process

49. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein

50. As more fully described above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments.

51. The Police Officer Defendants deliberately withheld exculpatory evidence from Plaintiff during the pendency of his criminal proceedings, up to and including the time of Plaintiff's conviction. The Police Officer Defendants also manipulated and coerced the sole eyewitness and, in this way and others, fabricated false evidence that was used to secure Plaintiff's conviction.

52. The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

53. Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Felix Valentin. Thus, the Police Officer Defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's unjust criminal conviction.

54. The Police Officer Defendants also continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been released, Plaintiff would not have spent over twenty years in prison for a crime he did not commit.

55. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

56. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT II
### 42 U.S.C. 1983 – Conspiracy

57. Plaintiff repeats and realleges all of the paragraphs in this complaint as if set forth herein.

58. All of the individual Police Officer Defendants and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and which would have led to his more timely exoneration of the false charges; to fabricate evidence; to manipulate witnesses; and to conceal their misconduct, all in violation of Plaintiff's constitutional rights, as described above.

59. In this manner, the Police Officer Defendants, acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

60. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

61. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

62. As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated. He suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT III
### 42 U.S.C. § 1983 – Failure to Intervene

63. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

64. In the manner described above, one or more of the individual Police Officer Defendants and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

65. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

66. As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT IV
### 42 U.S.C. § 1983 – *Monell* Policy Claim

67. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

68. The actions of all the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the constitutional violations alleged above.

69. The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

70. As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

71. The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

## COUNT V
### State Law Claim – Malicious Prosecution

72. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

73. All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

74. The Defendants accused Plaintiff of murdering Felix Valentin, knowing that he was innocent of the crime. All of the individual Defendants fabricated evidence, manipulated the sole eyewitness, and withheld material exculpatory evidence. The individual Defendants knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

75. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

76. As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## Count VI
## State Law Claim – Civil Conspiracy

77. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein

78. As described more fully in the preceding paragraphs, the individual Defendants, acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

79. In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

80. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

81. As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

### Count VII
### State Law Claim – Intentional Infliction of Emotional Distress

82. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

83. The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

84. The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

85. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

86. As a proximate result of the Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

### Count VIII
### State Law Claim – Respondeat Superior

87. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

88. When they committed the acts alleged in this Complaint, the individual Defendants were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

89. Defendant City of Chicago is liable as principal for all torts committed by its agents.

## Count IX
## State Law Claim – Indemnification

90. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

91. Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based upon the employees' misconduct committed within the scope of their employment activities.

92. The individual Defendants are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff Jacques Rivera prays that this Court enter judgment in his favor and against Defendants Reynaldo Guevara, Steve Gawrys, Daniel Noon, John Guzman, Joseph Fallon, Joseph Sparks, Paul Zacharias, Gillian McLaughlin, John Leonard, Edward Mingey, Russell Weingart, the Estate of Rocco Rinaldi, and the City of Chicago, awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.

                                        Respectfully submitted,

                                        **JACQUES RIVERA**

                                        By:   /s/ Locke E. Bowman
                                                     One of his attorneys

Locke E. Bowman
Alexa Van Brunt
Roderick MacArthur Justice Center
Northwestern University School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844

Jon Loevy
Loevy & Loevy
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900