
EXHIBIT D

# ADDENDUM TO THE REPORT TO THE LEGISLATURE OF THE STATE OF ILLINOIS: THE ILLINOIS PILOT PROGRAM ON SEQUENTIAL DOUBLE-BLIND IDENTIFICATION PROCEDURES

## I. Introduction

On March 17, 2006, the results of a ground-breaking field study of data collected from hundreds of photo and live eyewitness identifications from three Illinois jurisdictions were published in a *Report to the Legislature Of the State of Illinois: The Illinois Pilot Program on Sequential Double-blind Identification Procedures* ("Report"). It was the first major field study of eyewitness identification procedures, providing data beyond the sequential, double-blind procedures. A month later, on April 20-21, Loyola University of Chicago School of Law sponsored a conference, *New Policies, New Practices: Fresh Perspectives on Eyewitness Identification* ("Conference"), that brought together researchers, judges, lawyers, police and policy-makers, for a thought-provoking discussion of the Report and its implications for the future of eyewitness identification. Many who attended the Conference expressed hope that the Report and the Conference represented a turning point for eyewitness identification, reinvigorating the potential for comprehensive field studies urged by the Department of Justice in 1999. The Conference attendees also expressed the shared goal of achieving accurate and reliable eyewitness identifications in our criminal justice system.

Faced with this first field study, many have embraced with enthusiasm an examination of real-life data. Yet, there also has arisen a resistance to the study by some proponents of the sequential, double-blind procedures. Due to the confusion caused by this resistance, conference attendees urged that this Addendum be posted to address the issues being raised. Hopefully, this

Addendum will allow us to focus on the Illinois study in a constructive manner to guide further research and practice and reach a better understanding of eyewitness identification.

## II. The Illinois Protocols Are Properly Designed to Address A Legitimate Question

Advocates of the sequential, double-blind identification procedure recommend this procedure on the ground that it results in fewer false identifications than the traditional (simultaneous, non-blind) method of conducting photo or live lineups. Based upon this recommendation, the Illinois legislature mandated that Illinois law enforcement study the "efficacy of the sequential, double-blind procedure." There is nothing in the legislation that talks about evaluating *simultaneous blind* lineups or blind administrators independent of sequential presentation. The question for Illinois law enforcement, as a direct result of the legislation, was how the sequential, double-blind method compared to the *current* lineup procedures in the field, both in terms of identification rates and implementation. In other words, would the proposed method yield better results than the current method and, if so, what were the costs of implementing the proposal?

Despite this legitimate question, critics now suggest that Illinois should have explored how the sequential, double-blind method compared to the simultaneous, double-blind method, neither of which is currently being used in the field. Had the Illinois Pilot Program compared these two hypothetical procedures, law enforcement now would be asking the very legitimate question, "what does such a study tell us about the identification and implementation issues faced in changing our current method of lineup identification to the recommended method?"

There are many variations of eyewitness identification procedures that could have been explored and compared, and that should be explored and compared in future field studies. These

2

include, among others: comparisons with the sequential procedure where a witness is instructed to stop after making an identification, comparisons with the sequential method where the witness is instructed to view all of the photos or persons before making an identification (e.g., the Hennepin County procedure); comparing a non-blind sequential procedure (which isolates the presumed safeguard of relative judgement) with a non-blind simultaneous method; comparing the effect of a blind administrator with the effect of Illinois' model written instructions to the witness ("you should not assume that the administrator knows who is the suspect, you do not have to pick anyone and the suspect may not even be in the lineup"); and comparing the effect of a blind administrator, a non-blind administrator and self-administered computer arrays. It is not feasible to implement a single field study that would evaluate all the different possible variations. Indeed, that is why the Report called for further field studies, a sentiment echoed at the Conference. Because advocates of the sequential, double-blind method recommended this procedure as optimal and the Illinois legislation required pilot testing of this specific procedure, the Illinois Pilot Program compared this recommended procedure with current eyewitness identification procedures.

    The comparison is scientifically sound. In fact, some of the academic experiments upon which the researchers rely to demonstrate the superiority of the sequential double-blind method used the same comparison of the sequential, double-blind method to the simultaneous, non-blind procedures. If critics discredit the Illinois field study because it is "confounding," i.e., it involved two variables, sequential and blind, then they also must discredit as equally confounded those academic studies involving a package of variables that have not been unbundled. *See* McQuiston-Surrett, Malpass & Tredoux, *Sequential vs. Simultaneous Lineups: A Review of Methods, Data and Theory* (2006), posted at www.eyewitness.utep.edu. More importantly, the

3

purpose of the Illinois field study was not to isolate the effect of one factor upon lineup results. The purpose of the Illinois field study was to determine whether sequential, double-blind lineups were superior to the current methods in the field. *See* Malpass, Notes on the Illinois Pilot Program on Sequential Double-Blind Identification Procedures (2006), posted at www.eyewitness.utep.edu. *See also* Ebbesen (2006), Comments on IL Simultaneous v. Sequential Lineup Field Test, www.psy.ucsd.edu/~eebbesen/SimSeqIL.htm.

The Illinois study adhered to the suggested protocols of the originator of the sequential, double-blind method, Professor Gary Wells, who offered the following advice on his website to law enforcement in December 2004:

> Police jurisdictions might be interested in collecting data on their current lineup procedures or on new procedures that they implement. *Perhaps, for example, they want to compare new procedures to old procedures.* ...I have prepared this brief outline to help guide the process.

Wells, G., "Notes on Protocol for Collecting Data on Actual Lineups for Pilot Projects," (December 2004), (emphasis added). This document (which was still posted on Professor Wells' website as of the date of this Addendum) further discussed the differences that law enforcement agencies should expect to see between the blind and the non-blind procedures being tested:

> From the double-blind lineup, we might expect that the average confidence of a witness who picked a filler would actually be higher in the double-blind condition than in the non-blind condition...In contrast, we might expect the average confidence of a witness who picked the suspect to be lower in the double-blind condition than in the non-blind condition.

(Emphasis in original) ("Wells Notes on Protocols").

The protocols used in Illinois also mirror the archival comparison being undertaken by Professor Nancy Steblay in analyzing the data from the pilot program in Hennepin County, Minnesota ("HC"). In 2005, Professor Steblay began collecting data from a group of HC

4

traditional lineups predating the implementation of the sequential, double-blind procedures in HC, for comparison with the sequential, double-blind procedures collected through the HC pilot program.[1]

The Illinois Pilot Study was properly designed to answer the question: how do the current procedures compare with the proposed procedures, both in terms of identification rates and

---

[1] Both Professors Wells and Steblay since have posted critiques of the Illinois protocols, disavowing prior knowledge of the protocols. The statement that each had prior knowledge of the protocols but did not object was not intended as an attack on the personal integrity of either of these two professors. The statement that these professors knew of the protocols is based upon the following: In response to a June 2004 request, Professor Wells suggested protocols but never raised the issue of including simultaneous blind lineups. In e-mail exchanges over the next few months, the only mention of incorporating simultaneous, double-blind procedures in the Pilot Program was raised not by Professor Wells but by the Program Director, noting that it would be interesting to test that procedure, too, but that it was too much for the Pilot Program to address at that time. Professor Wells neither objected nor otherwise responded to that point and, just a few months later, posted "Wells Notes on Protocols," described above. On June 21, 2005, Professor Steblay noted her archival comparison of traditional (non-blind) lineups to sequential, double-blind lineups but stated that the Illinois "control comparisons are better." Any continued dispute on this point is simply irrelevant to the fact that the Illinois protocols were proper to answer the question posed, and serves only to distract from the invaluable field data provided by the Illinois Pilot Program. Therefore, it is in the best interests of moving forward to call this issue a "misunderstanding" and not address it further.

implementation? There are other questions to be asked by future field studies, such as how blind administrators alone affect simultaneous lineups or whether blind sequential methods prove superior to blind simultaneous methods. However, the Illinois Pilot Program was not intended to answer those questions and any attempt to discredit the Illinois study on that basis is misguided. The first study in the nation to collect data on hundreds of photo arrays and live lineups of real cases, involving real crimes, real victims and real witnesses, simply cannot be discounted by those who seek to better understand eyewitness identification and achieve accurate and reliable eyewitness identifications in our criminal justice system.

### III. The Illinois Data Cannot Be Dismissed Based Upon A Hypothesis of Police Influence

Some proponents of the sequential, double-blind lineups also have resisted thoughtful analysis of the Illinois data by summarily attributing the lower filler identification rates for the simultaneous lineups in the Illinois study to improper police influence, i.e., the police led the witnesses to the suspects and away from the fillers in the simultaneous lineups. Police influence over identifications is one explanation for the data, but not the only or most likely explanation. The Report raised the issue of police influence (page 45) and suggested that it, like other possible explanations for lower filler identification rates, should be the subject of "future studies."[2] It is

---

[2]To clarify for the few who raised it, the statement on page 45 of the Report that "there is no scientific basis" to attribute the Illinois data to police influence was not intended as a dismissal of the *possibility* of police influence. The Assistant AG from California had no trouble articulating at the Conference what most readers interpreted that portion of the Report to mean: there is no empirical evidence to prove that the Illinois data is the result of police influence, and

wholly unscientific, however, to dismiss the study on the basis of an unsupported hypothesis.

In examining the reasons for the lower filler (and higher suspect) identification rates in the Illinois simultaneous lineups, researchers should take into account the following factors:

1. In the Illinois study, suspect identifications in simultaneous lineups was 15% higher than in the sequential, double-blind lineups. This differential is exactly the same as the difference in known accurate identifications in simultaneous and sequential procedures in the academic studies, where blind administration has not been identified as a differentiating factor. It is logical to consider that the same factors account for these same differentials. Researchers have not attributed the 15% difference in accuracy rates in their experiments to administrator influence and, therefore, there is no objective basis to attribute the same 15% difference in suspect rates in real life to administrator influence pointing witnesses toward the suspects.

---

perhaps further studies will offer empirical evidence of the actual reasons for such data.

2. The low filler identification rate seen in the Illinois simultaneous non-blind lineups is similar to the low filler identification rates seen in simultaneous non-blind lineup data collected over a six-year period in Queens, New York.[3] In the Queens lineups, a prosecutor was always present. If systematic inadvertent police influence had occurred in the Queens lineups, then the inadvertent influence was too subtle for the prosecutors to notice (and object to) and therefore likely was too subtle for the witnesses to notice, much less understand and follow.[4] The Queens

---

[3]There has been some question raised as to why the filler identification rates in both the Chicago and Evanston simultaneous lineups were reported as zero. Although there were in fact filler identifications in simultaneous lineups in those two jurisdictions, those filler identifications were tentative and therefore under the coding employed by the two analysts, were not reported as actual filler identifications. Similarly, such tentative identifications would not be considered actual identifications in the criminal justice system.

[4]At the Conference, some advocated for blind administrators to address "inadvertent" cues by police during a lineup, but never explained what those influential inadvertent cues are. Instead, advocates of blind administrators have referred to the case of *Newsome v. City of*

8

data certainly raises questions as to whether low filler rates in Illinois and other real life data can be attributed to police influence.[5]

3. By law, Illinois law enforcement officers are required to provide model instructions to the witness, in a writing signed by the witness. These instructions include the admonitions that the suspect may not be in the lineup, that the witness need not make any choice and that *the witness should not assume that the administrator knows who the suspect is*. Some research has demonstrated that such warnings have the effect of decreasing false identification rates, and that the effect may equal that of using a blind administrator. *See, e.g.,* Meissner, C.A., Tredoux, C.G., Parker, J.F. & MacLin, O.H., *Eyewitness Decisions in Simultaneous and Sequential Lineups: a Dual Process Signal Detection Theory Analysis*, Memory & Cognition, 33: 783-792

---

*Chicago*, but that case involved allegations of *deliberate misconduct* rather than inadvertent cues.

[5]It has been suggested that the low filler rates seen in the Queens and Illinois live lineups are attributable to sometimes showing a witness a photo array prior to viewing the live lineup and, therefore, the witness simply recognize the suspect from the photo rather than the crime. This phenomenon, known as "photo bias," may be yet another influencing factor which has nothing to do with improper police influence or blind administrators. It should be noted that, unlike a photo array, a live lineup occurs only after probable cause has been established and, therefore, live lineups inherently have a greater rate of guilty suspects than do photo arrays. Also, it may be that an offender is recognized more readily in person than from a photo, which may be old or of poor quality. Hopefully, all of these and other possible explanations for the low filler rates will be thoroughly explored along with the hypothesis of police influence.

9

(2005). The resistance of advocates of blind administrators to acknowledging other methods of addressing police influence over eyewitnesses must be overcome, as studies of these methods would provide invaluable practical applications.

    4. Many of the filler choices in the sequential lineups in Illinois came from multiple offender cases, which constituted 40% of the crimes in the Pilot Program. In addition, many of the filler choices in sequential lineups were made prior to the appearance of the suspect; the rate of filler choices in sequential lineups made after the appearance of the suspect initially appears to be equal to the rate of the filler choices in simultaneous lineups. *See* Ebbesen, www-psy.ucsd.edu/~eebbesen/SimSeqIL.htm These patterns suggest that the higher rate of filler choices in the sequential lineups may be the result of factors other than the blind administrator. These potential issues should be examined before suggesting that the Illinois data is simply the result of police influence.

    Proponents of the theory that police systematically influence eyewitnesses' identification choices are resistant to examining whether and to what extent real victims and real witnesses, with real motivations, understand and follow alleged inadvertent cues by police administrators. It may very well be demonstrated that the lower number of filler choices in the Illinois simultaneous lineups is the result of police influence, but without thoughtful consideration and thorough analysis of all possible hypotheses, this assumption is scientifically unsupported and is not a basis to dismiss the Illinois study as invalid.

## IV. The Brooklyn Data

    Since the release of the Illinois Report, the New York City Police Department at a recent conference reported preliminary data collected in Brooklyn, New York, which sheds further light on the subject of police influence over lineup identifications. The Brooklyn data addresses the

10

effect of blind administration independent of the sequential presentation.

In 2005, the New York City Police Department collected data from 1,052 live lineups held in the borough of Brooklyn, all conducted by the simultaneous presentation. Of these live lineups, 1,010 were conducted according to the simultaneous non-blind ("traditional") method. These 1,010 non-blind lineups resulted in just under 69% suspect choices, just over 1% filler identifications and 30% no identifications. During this same time period, Brooklyn conducted an additional 42 "take out" lineups, meaning the suspects were *writted* out of prison through a court-ordered warrant and brought to the police station for a live lineup. These 42 "take out" lineups were presented according to the simultaneous method but were conducted by a blind administrator. These 42 double-blind lineups resulted in approximately 71% suspect choices, zero filler identifications and 29% no identifications.

## V. Other Jurisdictions

The Office of the Attorney General of New Jersey requested that this Addendum clarify that the New Jersey law enforcement survey was "self-initiated ...to gauge how the guidelines were being utilized and whether or not there were departments who needed assistance with their implementation of sequential, double-blind procedures."

The North Carolina Innocence Commission requested that this Addendum clarify that North Carolina law enforcement has implemented the sequential double-blind identification procedures not because the Innocence Commission recommended these procedures, but because the Innocence Commission's recommendation of these procedures was adopted by the Standards and Training Division of the North Carolina Justice Academy Basic Law Enforcement Training.

There were questions raised at the Conference about whether the Report accurately stated the sequential lineup pilot protocols in Hennepin County. The Hennepin County Assistant

11

Prosecutor confirmed in his presentation at the Conference, as well as at a subsequent conference in Washington, D.C., that the HC protocols instructed witnesses viewing the sequential photo arrays that any identification should be made only after viewing all of the photos, just as stated in the Report. This major difference from the sequential presentation contemplated by the research is not addressed in the analysis of the HC data and should be addressed prior to that data being posted on the website of the National Institute of Justice. The analysis of the HC data also included the identifications by witnesses who previously knew the suspect, which artificially inflated suspect choices and deflated filler identifications in the sequential lineups. Hopefully this, too, will be addressed prior to posting the data on the website of the National Institute of Justice.[6]

### VI. Other corrections and acknowledgments

Thank-you to the New York Police Department for allowing this Addendum to include the preliminary Brooklyn data. Also, the initial Report acknowledged Deputy Attorney General Lori Linskey of the Office of the New Jersey Attorney General by the wrong name, which is now corrected.

### VII. Conclusion

---

[6]In making comparisons to the Illinois data, Professor Steblay unofficially recalculated the HC data to exclude the previously known suspects, presenting a more helpful picture of the HC data.

12

The overriding sentiment at the Conference is that we all want reliable and accurate eyewitness identification procedures. Field studies such as the Illinois Pilot Program provide valuable and necessary information about eyewitness identification procedures. It is illogical to leap from academic research to policy without implementing field studies to test the application of the research in the real world, yet there has been little demand for field studies in the years since the Department of Justice encouraged them. In this post-DNA age, when we have learned the value of questioning a variety of sciences and demanding proof of their accuracy, we should not shy away from applying the same rigorous standard here. The experts from the Illinois Pilot Program are continuing to analyze the data and see significant trends emerging. It is important to adopt an open-minded, non-divisive examination of this first undertaking of a major field study, so that we can be encouraged to work together toward further study and improvements. Dismissing the data with sweeping rhetoric contributes to the mistrust that has stymied field studies in the past. The Report makes 10 recommendations for future research for improving eyewitness identification, which were well-received at the Conference.[7] We should not miss this crucial opportunity to view the Illinois field study as a turning point to pursue these, as well as other, avenues of improving eyewitness identification.

Sheri H. Mecklenburg
Program Director

Dated: June 19, 2006

---

[7] Some have expressed concerns over the Report's "conclusions." The Report raised issues, offered hypotheses and made recommendations, but offered no "conclusions."

13