IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JACQUES RIVERA,                )
       Plaintiff,          )
  vs.                          ) No. 12 CV 4428
REYNALDO GUEVARA, ET AL.,      )
       Defendants.         )

The deposition of DANIEL R. NOON, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Frances S. Lucente, Certified Shorthand Reporter of the State of Illinois, at 750 North Lake Shore Drive, Chicago, Illinois, on February 13, 2014, at the hour of 10:07 o'clock a.m.

Reported by:  Frances S. Lucente, CSR

License No.:  084-004005

1

```
 1      Q.   You can describe --
 2      A.   You do an activity report after your tour
 3  of duty to show what you did out there for eight
 4  hours.  We called it a humper.  The department
 5  called it an activity report for the night.  If you
 6  did something like that, you should indicate in
 7  your humper that you, in fact, did some type of a
 8  photo thing.  I don't remember me doing it -- very
 9  seldom -- hardly ever.  In fact, I don't remember
10  the last time I did it.
11      Q.   A hump report?
12      A.   No, did a photo thing, a photo spread --
13  years and years ago.
14      Q.   So if you had an identification through a
15  photo spread, you would write it in a hump report
16  to be relayed to the next shift?
17      A.   Uh-huh -- I should.
18      Q.   But there would be no indication of the
19  photo that was chosen on the actual photo spread
20  that you put in the inventory box?
21      MS. GOLDEN:  Object to foundation.
22      THE WITNESS:  To my recollection, you would
23  indicate the identification made on the humper --
24  picked out picture of Mr. X.  I don't recall making
```

91

```
 1   BY MS. VAN BRUNT:
 2       Q.   If somebody made an identification of a
 3   suspect, what would you do then?
 4       MS. GOLDEN:  Object to foundation.
 5       THE WITNESS:  Indicate that an ID was made out
 6   of a photo book.
 7   BY MS. VAN BRUNT:
 8       Q.   On the actual photo book you would make
 9   an --
10       A.   No.
11       Q.   Sorry.  I'm confused.  How would you
12   indicate that?
13       A.   You'd indicate it in your humper at the
14   end of the night that a tentative ID was made in
15   Photo Book 14, Picture Number So-And-So.
16       Q.   So in the hump report you would say this
17   witness picked out this individual in the gang
18   book, identified by the picture number; is that
19   right?
20       A.   Normally, yes.
21       Q.   What would happen to the actual photo?
22   Would it be inventoried in any way?
23       A.   You didn't take the book apart, no.  It
24   would stay in the book.
```

111

1    Q.    Would you make a photocopy of that page
2  where the witness was?
3    A.    Depending, you could.
4    Q.    Would you make a photocopy of the page
5  that contained the photo that the witness had
6  identified?
7    A.    You could if you wanted to.
8    Q.    Did you do that as a regular matter?
9    A.    I don't recall if I did or didn't in every
10  case.
11    Q.    Did you do it sometimes?
12    A.    I don't remember completely if I did or
13  did not.
14    Q.    If you did do so, what would happen --
15    A.    I know I would indicate the book and the
16  photo number in my humper.  As to do I recall
17  making a photocopy -- I don't recall that.
18    Q.    If you did make such a photocopy, what
19  would you do with it?
20    MS. GOLDEN:  Object to foundation.
21    THE WITNESS:  I don't really remember making
22  photocopies of the book.
23  BY MS. VAN BRUNT:
24    Q.    So that's not likely something you did?

112

```
 1      Q.   And what was the third type of report you
 2   mentioned?
 3      A.   Well, the humper, the synoptic -- that's
 4   it.
 5      Q.   Department report did you say?
 6      A.   No, I meant the humper.  I confused you.
 7   Excuse me.
 8      Q.   What would happen to the hump reports
 9   after you finished filling them out for one shift?
10      MS. GOLDEN:  I object to form.
11      MS. BENJAMIN:  Object to foundation.
12      THE WITNESS:  At the end of your tour of duty,
13   you'd fill it out and give it to your sergeant.
14   BY MS. VAN BRUNT:
15      Q.   And what would the sergeant do with it?
16      MS. GOLDEN:  Object to foundation.
17      THE WITNESS:  Admin -- you have to ask them.
18   BY MS. VAN BRUNT:
19      Q.   He would give it to admin, is that what
20   you're saying?
21      A.   I don't know what he would do with it.
22   I'd give it to my sergeant.
23      Q.   And the purpose of it was for use by the
24   next shift to see what had been done in the
```

127

1  investigation, is that right?

2       MS. VAN BRUNT:  I object to form.

3       THE WITNESS:  The humper?

4       MS. VAN BRUNT:  Yes.

5       MS. BENJAMIN:  Object to form.

6       THE WITNESS:  The humper was to show what you

7  did for eight hours out there.

8  BY MS. VAN BRUNT:

9       Q.   What was the purpose of it?

10      MS. BENJAMIN:  Objection, foundation.

11      THE WITNESS:  As testified to, your activities

12 for the last eight hours on the street.

13 BY MS. VAN BRUNT:

14      Q.   Would the sergeant then review your

15 activities?

16      MS. GOLDEN:  Object to foundation.

17      THE WITNESS:  Whatever he did as a supervisor.

18 I wasn't a supervisor.  I don't know what they do.

19 BY MS. VAN BRUNT:

20      Q.   But you would make a humper for every

21 single shift?

22      A.   Yes, ma'am.

23      Q.   Did you make humpers while you were at the

24 14th District as well?

128

```
 1   investigation, yes, normally.
 2        Q.   So the Detective Division could access
 3   those notes about the witness interview if they
 4   came down and looked at your hump form?
 5        A.   If they wanted to, yes.
 6        Q.   Okay, but they didn't have to?
 7        A.   I don't know what they did or didn't have
 8   to do.
 9        Q.   But you didn't provide that form directly
10   to them as a regular practice?
11        A.   Not that I know of.
12        Q.   Were there RD numbers on the hump reports?
13        A.   On the humper report itself, the RD would
14   be included in the case that you were working on,
15   that's correct.  That doesn't have an RD number
16   per se on the piece of paper.
17        Q.   I'm confused.  What does that mean?
18        A.   Like a case report has got an RD number --
19   every case.
20        Q.   Right.
21        A.   A humper is not a case report.  A humper
22   is just an activity report.  There's no number
23   assigned to that particular document.  It's like
24   this piece of paper with what you did for eight
```

138

1  hours.  There's no number assigned.
2      Q.  Well, how would you identify what case it
3  was related to?
4      A.  You'd indicate the RD number of the case
5  you were investigating and talking about.
6      Q.  On the form, okay.  I think I understand
7  you, but is it just a form with a bunch of lines on
8  it that you write whatever you want in it?
9      MS. GOLDEN:  Object to form.
10      THE WITNESS:  The appearance sounds like what
11  you just said -- a form with lines on it, and you'd
12  fill out the blanks.
13  BY MS. VAN BRUNT:
14      Q.  Were there different sections of the
15  report?
16      A.  Other than the top being who you are, your
17  beat number, car number and the date, then there's
18  a narrative portion which just has lines that you
19  fill in.  Then you sign the bottom, and your
20  sergeant signs the bottom.
21      Q.  So it just says narrative and that's it?
22      A.  Yes, ma'am.
23      Q.  I think you said this, but did you receive
24  any training in regards to note-taking?

139

```
 1   the Detective Division as well?
 2        MS. GOLDEN:  Object to form, foundation.
 3        THE WITNESS:  Sometimes detectives would send
 4   us a copy if they were closing stuff, not always.
 5   Sometimes you had to go get it, depending on the
 6   case.
 7   BY MS. VAN BRUNT:
 8        Q.   So in this instance, we've already
 9   established that McLaughlin and Leonard authored
10   this Sup Report, Exhibit 3; is that right?
11        MS. GOLDEN:  Object to form.
12        THE WITNESS:  I particularly don't remember how
13   we would have gotten their report.
14   BY MS. VAN BRUNT:
15        Q.   Okay.  But would you have gotten this
16   report?
17        MS. GOLDEN:  Object to form.
18        THE WITNESS:  Normally, you would like to have
19   it in the files.
20   BY MS. VAN BRUNT:
21        Q.   Would it be combined with the General
22   Offense Report?
23        A.   I believe so.
24        Q.   And where would that file be kept?
```

165

EXHIBIT N

1    A.    In the admin office.

2    Q.    In the same area where the hump reports 3 were kept?

4    A.    That's correct.

5    Q.    Would you ever take that file out and 6 bring it with you while you were conducting an 7 investigation?

8    A.    I can't speak for other people. Myself, 9 personally?

10    Q.    Yes.

11    A.    If I thought it would do me any good -- I 12 don't know.

13    Q.    For reference purposes, for instance?

14    A.    Depending on the case, if I thought I 15 could use something off of it.

16    Q.    And then what would you do with it when 17 you were done with it at the end of --

18    MS. GOLDEN: Object to form and foundation.

19    THE WITNESS: Back to the files.

20 BY MS. VAN BRUNT:

21    Q.    Back to the file room in the admin 22 section?

23    A.    That's correct.

24    Q.    If you were doing an investigation and

166