**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | Case No. 12 C 4428 |
| *Plaintiff*, | ) | |
| | ) | Hon. Joan B. Gottschall, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Hon. Mary M. Rowland, |
| | ) | Magistrate Judge |
| *Defendants*. | ) | |
| | ) | JURY TRIAL DEMANDED |

**PLAINTIFFS' CONSOLIDATED RESPONSE IN
OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS**

# EXHIBIT 25A

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


JACQUES RIVERA,                    )
          Plaintiff,               )
      vs.                          )  No. 12 CV 04428
REYNALDO GUEVARA, STEVE            )
GAWRYS, DANIEL NOON, JOHN          )
GUZMAN, JOSEPH FALLON,             )
JOSEPH SPARKS, PAUL                )
ZACHARIAS, GILLIAN                 )
MCLAUGHLIN, JOHN LEONARD,          )
EDWARD MINGEY, RUSSELL             )
WEINGART, and the ESTATE OF        )
ROCCO RINALDI, Chicago             )
Police Detectives; and the        )
CITY OF CHICAGO,                   )
          Defendants.              )



          The VIDEOTAPED deposition of
     STEPHEN GAWRYS called for examination pursuant
     to Notice and the Rules of Civil Procedure for
     the United States District Courts pertaining to
     the taking of depositions, taken before Jamye
     Giamarusti, a Certified Shorthand Reporter,
     within and for the County of Cook and State of
     Illinois, at 311 North Aberdeen Street,
     Suite 200B, Chicago, Illinois, on January 21,
     2014, at the hour of 10:19 a.m.




     Reported by:  Jamye Giamarusti, CSR

     License No.:  084-004183

```
 1      APPEARANCES:

 2              LOEVY & LOEVY, by

 3              MR. RUSSELL AINSWORTH,

 4              MR. STEVE ART

 5              312 North May, Suite 100

 6              Chicago, Illinois  60607

 7              (312) 243-5900

 8                  Representing the Plaintiff;

 9

10              THE SOTOS LAW FIRM, P.C., by

11              MS. ELIZABETH EKL

12              550 East Devon, Suite 150

13              Itasca, Illinois  60143

14              (630) 735-3300

15                  Representing the Defendant,

16                  Reynaldo Guevara;

17

18              ROCK FUSCO CONNELLY, LLC, by

19              MS. EILEEN ROSEN

20              321 North Clark Street, Suite 2200

21              Chicago, Illinois  60654

22              (312) 494-1000

23                  Representing the City of Chicago.

24
```

1                        I N D E X

2    WITNESS                        EXAMINATION

3    STEPHEN GAWRYS

4      By Mr. Ainsworth (Direct)          6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    E X H I B I T S

 2    NUMBER                    MARKED FOR ID

 3    Deposition Exhibit

 4    No. 1                     125

 5    No. 2                     126

 6    No. 3                     145

 7    No. 4                     155

 8    No. 5                     163

 9    No. 6                     223

10    No. 7                     226

11    No. 8                     230

12    No. 9                     256

13    No. 10                    260

14    No. 11                     261

15    No. 12                    262

16    No. 13                    265

17    No. 14                    271

18    No. 15                    271

19    No. 16                    272

20    No. 17                    279

21    No. 18                    286

22    No. 19                    286

23    No. 20                    286

24    No. 21                    289
```

```
 1                    (Witness sworn.)

 2            THE VIDEOGRAPHER:  Here begins

 3    Tape No. 1 on the videotaped deposition of

 4    Steve Gawrys in the matter of Jacques Rivera

 5    versus Reynaldo Guevara, et al., in the United

 6    States District Court for the Northern District

 7    of Illinois Eastern Division; Case No. 12 C

 8    4428.

 9                 This deposition is being held at

10    311 North Aberdeen, Chicago, Illinois on

11    January 21st, 2014, at approximately 10:19.

12                 My name is Walter Cwik, and I'm a

13    certified legal video specialist in association

14    with Merrill Corporation.

15                 The court reporter today is Jamye

16    Serritella in association with Siebert &

17    Associates.

18                 Will counsel please introduce

19    themselves for the record.

20            MR. AINSWORTH:  This is Russell

21    Ainsworth appearing on behalf of the plaintiff.

22            MS. EKL:  Elizabeth Ekl, E-k-l, on

23    behalf of deponent, as well as the individually

24    named police officer defendants.
```

1    MS. ROSEN:  Eileen Rosen on behalf of

2  defendant, City of Chicago.

3                    (Witness sworn.)

4    THE COURT REPORTER:  Raise your right

5  hand please, sir.

6        Do you solemnly swear the

7  testimony you're about to give will be the

8  truth, the whole truth and nothing but the

9  truth.

10    THE WITNESS:  I do.

11        STEPHEN GAWRYS,

12  called as a witness herein, having been first

13  duly sworn, was examined and testified as

14  follows:

15            DIRECT EXAMINATION

16  BY MR. AINSWORTH:

17    Q.   Would you please state and spell your

18  name for the record.

19    A.   Stephen, S-t-e-p-h-e-n; last name is

20  Gawrys, G-a-w-r-y-s.

21    Q.   How many times have you been

22  previously deposed?

23    A.   Once.

24    Q.   And was that in the matter of Juan

1    Johnson versus City of Chicago?

2         A.    Yes, it was.

3         Q.    That was some years ago, correct?

4         A.    Yeah.  It was a while back.

5         Q.    I just want to go over the ground

6    rules again so that we're both clear on what

7    the rules are, okay?

8         A.    Uh-huh, yes.

9         Q.    The first thing we ask you to do is to

10   keep your answers out loud with a yes or no if

11   the question calls for it rather than uh-huh or

12   uh-huh.

13        A.    Sorry.

14        Q.    Okay?

15        A.    Okay.

16        Q.    The second thing I ask is that you

17   wait until I'm done asking my question before

18   beginning your answer so that we're not talking

19   at the same time.

20        A.    Okay.

21        Q.    And in return, I will try to wait

22   until you're done with your answer before

23   beginning my next question so Jamye doesn't

24   start kicking us.

1       A.   Okay.  Good.

2       Q.   I'm going to ask that if you don't

3 understand any of my questions that you ask me

4 to re-ask the question, rephrase the question,

5 or in some way indicate to me that you do not

6 understand the question.

7       A.   Okay.

8       Q.   The flipside of that is that if you

9 answer a question, I'll assume you've

10 understood my question as I've posed it; fair?

11       A.   Fair.

12       Q.   If you need a break at any time,

13 please let us know.  All I ask is that you

14 answer any question that's pending before

15 taking a break.

16       A.   Okay.

17       Q.   Have you ever testified in federal

18 court before?

19       A.   No.

20       Q.   Did you testify at the Juan Johnson

21 civil trial?

22       A.   No, I did not.

23       Q.   Why not?

24       A.   I was out of the country working.

1      Q.   What job were you on?

2      A.   I was a contracted by the -- well,

3    originally, I was contracted by a university to

4    work in Trinidad as an adjunct professor, and I

5    worked with the Ministry of National Security

6    there as an advisor to police service in

7    establishing a gang unit down there.

8              So my duties were to put it

9    together as part of the police service.

10     Q.   Which university did you contract with

11   for that work?

12     A.   Oh, gosh, I can't remember.  It was on

13   the East Coast in Virginia.  I can't remember.

14   I forgot.

15     Q.   Were you asked to teach classes at a

16   university in Trinidad initially?

17     A.   No.  There was no teaching.  I did

18   training for the unit, specifically for that

19   unit.

20     Q.   Did the Ministry of National Security

21   contract with the university to provide -- to

22   have you provide the services?

23     A.   Originally, yes; and after nine

24   months, my contract ended and then the Office

1     of Ministry of National Security asked me if I

2     wanted to stay on another year.  So I agreed to

3     another contract and stayed another year.

4          Q.   Approximately when was that when you

5     worked for the Ministry of National Security in

6     Trinidad?

7          A.   I left in 2008 about the middle of the

8     month.  Oh, George Mason University.  That's

9     what it was.  Sorry.  It just came to me.

10    And --

11         Q.   Middle of which month, sir?

12         A.   January.  Sorry.  January 8th, '08.

13         Q.   When you say you left, you left the

14    United States or you left Trinidad?

15         A.   No.  I left the United States.  I

16    retired from the police department.  I

17    originally had to go to George Mason to fill

18    out paperwork and administrative things, and

19    then grabbed a plane and flew down to Trinidad

20    after a few days there.

21         Q.   Did you create any training materials

22    for the Ministry of National Security?

23         A.   I had some training materials with me,

24    and I created a few others while I was there.

1    Q.   Do you still have those training

2  materials that you used with the Ministry of

3  National Security?

4    A.   I left it there.  I left it with them

5  so that they can use it.

6    Q.   What materials did you have here that

7  you brought with you?

8    A.   Here?  What did I have?  Street Stops.

9  It's the American version.  Down there in

10  Trinidad, they're under British law, which is

11  not a whole different than what we have here.

12           But everything is reversed as far

13  as driving, the steering wheel is on the other

14  side, you drive on the other side of the road

15  from what we do.

16           So the lesson plan had to be

17  adjusted, and that's what I did down there.

18           MR. AINSWORTH:  Can we go off the

19  record just one second?

20           MS. EKL:  Sure.

21           THE VIDEOGRAPHER:  We're going off the

22  record at 10:25.

23               (WHEREUPON, a discussion was held

24                 off the Record.)

1          THE VIDEOGRAPHER:  Back on the record

2   at 10:27.

3   BY MR. AINSWORTH:

4       Q.   Sergeant, I thought you said that you

5   brought some training materials with you down

6   to Trinidad; is that correct?

7       A.   Yes.

8       Q.   What training -- so you brought

9   training materials about street stops?

10      A.   Yes, I did.

11      Q.   What other training materials did you

12   bring with you?

13      A.   Offhand I can't remember.  I don't

14   know.  I brought that one with me and -- but I

15   had to adjust it, like I said, when I was down

16   there according to what their roads are.

17      Q.   Where did you obtain the training

18   materials that you brought with you?

19      A.   I was in the Training Division for

20   seven years, and I wrote that course while I

21   was in the Training Division.

22      Q.   Did you have the materials with you at

23   home from the Training Division?

24      A.   Yes, I had a copy.

1      Q.   Did you bring a copy of the materials

2  that you had with you to Trinidad?

3      A.   Yes, I did.

4      Q.   Do you still have a copy of those

5  training materials at home?

6      A.   I might have it on a disc or

7  something.  I'm not sure.  I would have to

8  look.

9      Q.   I ask that you not destroy any

10  training materials that you have.

11      A.   Okay.

12      Q.   Can you do that?

13      A.   Yeah, sure.

14      Q.   And if we request them, we'll talk to

15  your counsel.

16      A.   Okay.  No problem.

17      Q.   What other -- and so when did you

18  return from Trinidad?

19      A.   I returned in July of 2010.

20      Q.   Have you had any other employment

21  since July of 2010?

22      A.   No.

23      Q.   Are you currently retired?

24      A.   Yes.  I've retired in a way, but I'm

1    looking still.

2        Q.   What kind of employment are you

3    pursuing?

4        A.   Oh, I don't know.  I have nothing

5    specific.  Maybe an investigative position.

6        Q.   Have you taken any steps to obtain

7    such a position?

8        A.   Yes.

9        Q.   What steps have you taken?

10        A.   I have applied with, let's see,

11    Attorney General's Office with the state, the

12    city, I think the county; and I also applied

13    with the County Assessor's Office.  It's an

14    investigative position, which I have not heard

15    any results back yet.

16        Q.   Have you heard back from the AG's

17    office?

18        A.   Yeah.  Everything was denied, all the

19    other positions I applied for.

20        Q.   When you say the city, was that the

21    City of Chicago?

22        A.   Yes.

23        Q.   In what capacity with the City of

24    Chicago?

```
 1          A.    Attorney General's Office for the

 2     general counsel or --

 3          Q.    The --

 4          A.    What do you call it?

 5          Q.    The graph department, the inspector

 6     general?

 7          A.    Inspector general.  That's it.

 8                MS. ROSEN:  Did you call it the graph

 9     department?

10                MR. AINSWORTH:  Yes.

11     BY MR. AINSWORTH:

12          Q.    Sir, are you a high school graduate?

13          A.    Yes.

14          Q.    When did you graduate high school?

15          A.    1971.

16          Q.    Did you have any full-time employment

17     post high school?

18          A.    Full time pardon me?

19          Q.    Employment --

20                MS. EKL:  Other than --

21     BY MR. AINSWORTH:

22          Q.    -- after you graduated from high

23     school?

24          A.    Oh, yeah.  Let's see.  I went to DeVry
```

1    Institute of Technology.  I graduated from

2    there with a technician's degree, and I was

3    working for a company called Lawry Electronics

4    that made musical organs.  And I worked there

5    for, I don't remember, a few years.

6              And then I took the police exam

7    and got called by them and that's when I

8    started my police career.

9        Q.    Did you ever serve in the military?

10       A.    No, I did not.

11       Q.    Did you ever apply to serve in the

12   military?

13       A.    Did I what?

14       Q.    Ever apply to serve in the military?

15       A.    No, I did not.

16       Q.    What sort of technician's degree did

17   you obtain?

18       A.    Electronic technician.

19       Q.    Did you apply to be a member of any

20   other police force other than Chicago?

21       A.    No.

22       Q.    Did you apply to be a member of any

23   law enforcement agency other than the Chicago

24   Police Department?

1          A.    No.

2          Q.    Did you ever work as a security guard?

3          A.    Yeah, I did a part-time job somewhere,

4    many years ago.  It was downtown at the

5    Burberry store.  I did one night.  It was

6    enough for me.

7          Q.    Why did you only do one night?

8          A.    I didn't care for it.  It was all

9    midnight shift, midnight on.

10         Q.    What year did you -- or when were you

11   hired by Chicago Police Department?

12         A.    November 1st of 1977.

13         Q.    Did you attend the academy?

14         A.    Yes, I did.

15         Q.    How long did you attend the academy

16   for?

17         A.    Gosh, I'm not sure.  Probably, back

18   then -- well, I'm just guessing, I'm not sure,

19   maybe nine months, something like that.

20         Q.    Did you begin your tour at the academy

21   with other police officers?

22         A.    Oh, yes.

23         Q.    Did you end your time at the academy

24   at the same time that the police officers you

1      began with when they ended?

2          A.   Yes.

3          Q.   What was your first assignment after

4      graduating from the academy?

5          A.   I went -- I was assigned to the 2nd

6      District police district, which was at 51st and

7      Wentworth.

8          Q.   And what were your duties at the 2nd

9      District?

10         A.   It was patrol division duties.

11         Q.   And how long did you remain in that

12     capacity at the 2nd District?

13         A.   I would say, since '77, probably

14     around 1980, '81.

15         Q.   How did your duties change in either

16     1980 or '81?

17         A.   I went to a unit called Special

18     Operations Group, Area 1.

19         Q.   Did you remain at the same physical

20     location at 51st and Wentworth?

21         A.   Yes, I did.  It was just down the

22     hall, the unit.

23         Q.   Why did -- if you know, why did you

24     get transferred to the Special Operations Group

1     at that time?

2          A.    It was -- I was working with a

3     gentleman in the 2nd District.  Obviously, we

4     call an old-timer, who had been on the job for

5     a while since I was pretty new, just a few

6     years on the job, and we worked kind of steady

7     there for a while, a couple of months.

8                    And we were just talking in the

9     car, you know, between assignments, and he

10    asked me what I wanted to do on the job.

11                   I said:  I have no idea.  I just

12    take it as it comes.

13                   And he said:  Do you ever think

14    about going to Special Operations Group down

15    the hall?  I says:  No.  I says, I don't know

16    anybody on the job.

17                   So he says:  Well, I heard

18    they're going to have an opening maybe soon.

19    So, he says:  I know the boss there.  Why don't

20    I bring you in, and I'll introduce you to him.

21    I said:  Fine.  Okay.

22                   So we went in the station, and he

23    brought me down the hall and introduced me to

24    the commander of the unit and that was about

1    it.

2             And I said:  Oh, okay, thanks.

3    And that was it.

4             So a few days later, maybe a week

5    later, I got a phone call, too.  I filled out

6    some form or something like that.

7             And then he said, we got a spot

8    open for you if you'd like to take it.  I said:

9    Okay.  So that's how I started there.

10    Q.   Who was the -- what was the

11    commander's name?

12    A.   I'm not sure.  I think it might have

13    been Frank Radke.

14    Q.   What were your duties with the Special

15    Operations Group at Area 1?

16    A.   Special Operations Group was a

17    mission-activated unit.  We would go into

18    problem areas on the south side.

19             At the time, there were I believe

20    three separate units.  There was one on the

21    south side, one up north, and one on the west

22    side out of Area 4.

23             So Area 1 we took care of the

24    whole south side.  So if a district was having

1    unusual problems, burglaries, robberies, things

2    like that, whatever it may be, any type of

3    patterns, crime patterns come out, they would

4    send us into the district to work and assist

5    that district with whatever happened.

6         Q.    Would you patrol in plain clothes or

7    in uniform --

8         A.    Uniform.

9         Q.    -- when you were at the Special

10   Operations Group?

11        A.    Uniform.

12        Q.    Same uniform as your patrol officers?

13        A.    Yes.

14        Q.    How long did you serve in that

15   capacity in the Special Operations Group?

16        A.    Let's see.  I think around 1984, took

17   a test for gang specialist and got promoted to

18   that position.

19        Q.    When were you promoted to gang

20   specialist?

21        A.    1984, 85.

22        Q.    How long after you took the test were

23   you promoted?

24        A.    I'm not sure.  Couldn't tell you.

1      Q.    Was it within a year?

2      A.    Oh, yeah.  It was within a year.

3      Q.    When you made gang specialist, where

4   were you assigned?

5      A.    At Belmont and Western, which at the

6   time was called Area 3, I believe.

7      Q.    Area 6?

8      A.    Maybe Area 6, yeah.

9      Q.    Were you assigned --

10      A.    Now, it's Area 3, I think.  I'm not

11   sure.  It's been a while.

12      Q.    Were you assigned to Gang Crimes

13   North?

14      A.    Yes, it was.

15      Q.    Were you assigned to whatever the

16   detective area was there or were assigned to

17   Gang Crimes North?

18      A.    Gang Crimes North.

19      Q.    How long were you assigned to Gang

20   Crimes North?

21      A.    Until 1990.

22      Q.    What happened in 1990?

23      A.    1990, I got promoted to detective.

24      Q.    Did you sit for any detective exam?

1      A.   Yes.

2      Q.   And how long after you sat for the

3 detective exam did you get promoted?

4      A.   I have no idea.  I don't know.

5 Couldn't give you a timeframe.

6      Q.   Were there any of your fellow officers

7 from the special operations group at Area 1 who

8 then you ended up working alongside at Gang

9 Crimes North?

10     A.   Yes.   John Guzman.  I think that was

11 it.

12     Q.   It's not Sparks?

13     A.   No.

14     Q.   Not Fallon?

15     A.   No.

16     Q.   Not Zacharias?

17     A.   No.

18     Q.   Not Rey Guevara?

19     A.   No, not Rey Guevara.

20     Q.   Not Dan Noon?

21     A.   No.

22     Q.   What were your duties as a gang crimes

23 specialist?

24     A.   Duties were to investigate gang crimes

1    related, mainly murders, shootings.

2              We were also to gather

3    intelligence on gangs in which we had to leave.

4    I think they called them synoptic reports at

5    the time, and I believe that was every six

6    months we had to submit a report on specific

7    gangs that we were assigned.

8         Q.   Did your pay change when you were made

9    detective?

10        A.   It changed when I was a gang

11   specialist.  I don't think it changed too much

12   as a detective.  I think it was about the same,

13   because it was an investigative position.

14        Q.   Did gang crimes specialists have the

15   same authority as a detective when you were a

16   specialist as far as you could tell?

17             MS. ROSEN:  Objection, form, vague.

18             MS. EKL:  You can answer.

19             THE WITNESS:  I can answer.

20             MS. ROSEN:  Oh, sorry.

21             THE WITNESS:  No, I'm just -- no.

22   There's different duties involved.

23   BY MR. AINSWORTH:

24        Q.   I understand you had different duties,

1    but did you have the same authority as far as

2    determining how you wanted to investigate a

3    case or what you wanted to do in terms of

4    investigation?

5            MS. ROSEN:  Objection, form, vague.

6            THE WITNESS:  Well, it depends what

7    you're talking about.  I mean, you use the same

8    investigative techniques, but then it changes.

9    BY MR. AINSWORTH:

10       Q.   Did you have the same discretion as a

11   specialist as you did as a detective to follow

12   up on leads that you developed during your

13   investigation?

14       A.   Yes, I did follow-up leads.

15       Q.   When you made specialist, were you

16   provided with any additional training by the

17   Chicago Police Department?

18       A.   I'm not sure, I think there was

19   something, but it might have been a lot of it

20   on-the-job type training.  As you go along, you

21   learn you're with other guys, like, Sparks and

22   Fallon and that, and you work with them.

23       Q.   What is a synoptic report?

24       A.   A synoptic report was you're assigned

```
 1    a gang and you need -- you were required to

 2    monitor that gang's activities.

 3                    And that is, you're getting the

 4    leaders, you're looking at the structure, their

 5    cars, their girlfriends, where they live, who's

 6    coming in and out of prison and when, things

 7    like that.

 8         Q.   What's a summary report?

 9         A.   As far as what summary report?

10         Q.   Have you ever used that term, summary

11    report?

12              MS. ROSEN:  Objection, form.

13              THE WITNESS:  Summary report as to

14    what?

15    BY MR. AINSWORTH:

16         Q.   I'm just wondering whether you --

17         A.   The gang reports, the synoptic

18    reports.

19         Q.   I'm just wondering whether that was a

20    term that you used in your duties as a Chicago

21    police officer?  Would you use the term

22    "summary report"?

23              MS. EKL:  Objection, foundation as to

24    time.
```

```
 1                THE WITNESS:  Well, you're making

 2      summaries on reports, if that's what you mean.

 3      BY MR. AINSWORTH:

 4         Q.   Well, I'm just wondering whether that

 5      was a term that you used back when you were a

 6      specialist?

 7                MS. ROSEN:  Objection.

 8      BY MR. AINSWORTH:

 9         Q.   Did you use a summary report?

10                MS. ROSEN:  Objection, form, vague.

11                MS. EKL:  Same, objection.

12                THE WITNESS:  I'm not sure.

13      BY MR. AINSWORTH:

14         Q.   When you were a specialist, did you

15      receive any training as to how to conduct --

16      how to show gang books to people?

17         A.   I don't remember any training like

18      that.

19         Q.   What was your practice as far as

20      showing if you had a witness who had witnessed

21      a gang related crime and you wanted to show

22      them a photo album of potential gang members,

23      how would you go about showing them that book

24      when you were a specialist?
```

 1      A.   Well, it would depend on the

 2    circumstances.   That's the first thing.

 3      Q.   Let's say it was a circumstance where

 4    you knew the identity of the perpetrator's

 5    gang?

 6           MS. EKL:   Objection, calls for

 7    speculation, incomplete hypothetical.   You can

 8    answer.

 9           THE WITNESS:   If you knew a specific

10    gang, maybe whatever was written on a case

11    report or whatever, then you would obviously

12    pull those, find out what section maybe the

13    gang was from.

14               Because you take a gang like the

15    Latin Kings, and they have different sections.

16    So you would pull the books down from there and

17    pull those books out and put them down in front

18    of the witness and tell them to start looking

19    at the photos.

20    BY MR. AINSWORTH:

21      Q.   When you -- how would you determine --

22    well, strike that.

23               You mentioned which section of

24    the gang.   And there's some street gangs from

1    Chicago that have very large territories,

2    correct?

3         A.   Correct.

4         Q.   How would you be able to tell from

5    looking at the gang books which section went

6    with which book?

7         A.   You wouldn't.

8         Q.   So then how would you go about knowing

9    which book or which set of photos to show to a

10   witness if you wanted to narrow it to a

11   specific section?

12        A.   You wouldn't.  I don't remember if you

13   could do that.  It was just a gang book.

14        Q.   Well, in your answer to my previous

15   question, you mentioned that you would want to

16   know what section it was before showing the

17   gang books to the witness.

18              So, my question to you is, why

19   would you want to know what section of the gang

20   you were looking for before showing the gang

21   book to the witness?

22        A.   Well, by section, I mean, if -- well,

23   you couldn't distinguish between sections like

24   that.  I probably used the wrong word there.

1    But what gang and where this gang is located,

2    would tell you which gang it is, and then you

3    just start with those books and show them.

4                    But there wasn't -- I don't

5    remember ever having specific books for a

6    specific section.

7        Q.   Would you turn the pages for the

8    witness or would you have the witness turn the

9    pages himself or herself?

10                   MS. EKL:  I'm sorry.  I wanted to pose

11   an objection.  Objection, foundation as to

12   time, incomplete hypothetical, calls for

13   speculation.

14                   You can answer.

15                   THE WITNESS:  No.  We just put the

16   book down and let them view it, turn the pages.

17   BY MR. AINSWORTH:

18       Q.   Would they start from any particular

19   place in the book?

20       A.   The front of the book.

21       Q.   Would they always start at the front?

22       A.   Yes.

23       Q.   And if you had more than one book for

24   a particular gang, would you start with the

1   first book of the -- or the first volume of

2   that gang's books?

3            MS. EKL:  Again, objection, calls for

4   speculation, incomplete hypothetical.

5                 You can answer.

6            THE WITNESS:  You just start with

7   whatever book is first on the shelf.

8   BY MR. AINSWORTH:

9       Q.   What do you mean by you start with

10  what --

11      A.   Well, I didn't pick any specific book

12  out.

13      Q.   Let me finish my question.

14      A.   Sorry.

15      Q.   What do you mean by you just start

16  with the first book on a shelf?

17      A.   Well, like I said, the gangs might

18  have -- we used an example as the Kings, Latin

19  Kings.  They may have, I don't know, maybe six

20  books.

21                 So you would just pull whatever

22  first book is there in that section and bring

23  it down.

24      Q.   What do you mean in that section?

1          A.   Well, on the shelf.  There might be

2     six in a row.  So you just take the first one

3     and let them start and start bringing down the

4     other ones so that that witness or whatever can

5     start going through all the books.

6          Q.   So are you saying that you would see

7     six volumes in your hypothetical of a

8     particular gang and you might grab book number

9     five and begin there?

10               MS. ROSEN:  Objection, foundation.

11               THE WITNESS:  You could.

12     BY MR. AINSWORTH:

13          Q.   Why would you begin with book five as

14     opposed to book one?

15               MS. ROSEN:  Objection, form --

16               MS. EKL:  Objection, form, foundation,

17     calls for speculation, incomplete hypothetical,

18     form.

19               THE WITNESS:  No reason.

20     BY MR. AINSWORTH:

21          Q.   Why would you start at the front, or

22     why would you have the witness start at the

23     front of each book that they were looking at?

24          A.   Seemed like a logical place to start.

1      Q.  Did you want to ensure that they would

2  look at each of the photographs and not skip

3  some?

4      A.  Oh, sure.

5      Q.  So would you agree with me that it

6  would be logical to start with the first book

7  of a gang?

8           MS. ROSEN:  Objection, foundation.

9           THE WITNESS:  Maybe they're not put

10  back on the shelf in order.  I don't know.  I

11  never really looked.

12  BY MR. AINSWORTH:

13      Q.  So, if the books were on the shelf out

14  of order, that might be a circumstance where

15  you would give the witness not the first

16  volume, is that what you're saying?

17           MS. ROSEN:  Objection, foundation.

18           THE WITNESS:  Correct.

19  BY MR. AINSWORTH:

20      Q.  Where would you have the witness --

21  well, strike that.

22           During your time as a specialist,

23  did you show gang books to witnesses?

24      A.  Yes.

1      Q.   And where would you do that?

2           MS. EKL:  Objection, form, foundation.

3           THE WITNESS:  In the office.

4   BY MR. AINSWORTH:

5      Q.   Which office?

6      A.   Gang Crimes North office.

7      Q.   Anywhere else that did you it?

8      A.   Sometimes in the office -- I mean, in

9   the car.

10     Q.   Anywhere else other than your office

11  at Gang Crimes North or the car?

12     A.   Could be someone's house, a hospital.

13  I can't think of anyone else right now.

14     Q.   Did you ever do it at one of the

15  areas?

16     A.   Could have.  I'm not sure.

17     Q.   Do you recall ever doing it at one of

18  the areas?

19     A.   Not offhand, no.

20     Q.   Do you recall showing gang books to a

21  witness at another police station?

22     A.   Probably did, but I can't remember an

23  instance when I did.

24     Q.   If a witness identified a photograph

1    from the gang book, would you document that

2    fact?

3        A.   Yes.

4        Q.   How would you document that fact?

5        A.   Make a note.

6        Q.   And where would you make a note?

7        A.   On a piece of paper.

8        Q.   And then what would do you with that

9    note?

10       A.   Well, then we would put it in a

11   report, notify the detective division.

12       Q.   When you say you put it in a report,

13   what kind of report are you talking about?

14       A.   A supplementary report.

15       Q.   And for these questions, I'm asking

16   about your time as a gang crimes specialist.

17       A.   Yes.

18       Q.   And let's just use the year 1988.

19       A.   Right.

20       Q.   And so you would put it in a

21   supplemental report, correct?

22       A.   Correct.

23       Q.   And you would notify a detective?

24       A.   Yes.

1    Q.   Would you do anything else to document

2    the fact that a witness had picked out a

3    photograph from a gang book?

4    A.   No, I don't think so.

5    Q.   What would you do with your note after

6    you created your supplemental report?

7    A.   Shred it.

8    Q.   Is that what you do with all of your

9    notes when you were a gang crimes specialist?

10        MS. ROSEN:  Objection, foundation.

11        MS. EKL:  Objection, form, assumes

12   facts not in evidence.  Go ahead.

13        THE WITNESS:  Yes.

14   BY MR. AINSWORTH:

15        Q.   Is that what you were trained to do as

16   a gang crime specialist?

17        MS. ROSEN:  Objection, form,

18   foundation.

19        THE WITNESS:  I don't think it was

20   training.  It was just there's no need for it.

21   BY MR. AINSWORTH:

22        Q.   Is that what you would see other

23   specialists do on the job?

24        MS. ROSEN:  Objection, form,

```
 1    foundation.
 2              MR. AINSWORTH:  Let me rephrase the
 3    question.
 4    BY MR. AINSWORTH:
 5         Q.   In 1988 -- or strike that.
 6              When you became a gang crime
 7    specialist, you were paired with a more
 8    experienced specialist, right?
 9         A.   Correct.
10         Q.   Did you as part of your on-the-job
11    training learn from them that once you were
12    done with your notes that you would shred them?
13              MS. ROSEN:  Objection, form,
14    foundation.
15              THE WITNESS:  Correct.
16    BY MR. AINSWORTH:
17         Q.   And is that what you did during the
18    entirety of your time as a gang crimes
19    specialist with your notes?
20         A.   Correct.
21              MS. ROSEN:  Objection, form.
22    BY MR. AINSWORTH:
23         Q.   And so what would you document?
24              MR. AINSWORTH:  Off the record for a
```

1     second.

2                          (WHEREUPON, a discussion was held

3                          off the Record.)

4          THE VIDEOGRAPHER:  We're going back on

5     the record at 11:02.

6     BY MR. AINSWORTH:

7          Q.   Sergeant, what would you write down

8     when you were documenting that a witness had

9     identified a perpetrator from a gang book?

10         MS. EKL:  Objection, form, vague.

11         THE WITNESS:  Let's see.  Obviously,

12    the book number, page number, and the photo

13    letter.  I believe they were four pictures on a

14    page on one side, and they were A, B, C, D.

15    BY MR. AINSWORTH:

16         Q.   Would you remove the photograph from

17    the book that had been picked out by the

18    witness?

19         A.   No.

20         Q.   Would you photocopy the page on which

21    the perpetrator's photograph appears?

22         A.   I don't think so.  I don't remember

23    ever doing it.

24         Q.   Would you take any steps to preserve

1    the photograph that the witness had identified

2    from the gang book?

3              MS. EKL:  Objection, form, vague.

4              THE WITNESS:  Preserve.  I -- could

5    you explain that a little more?

6    BY MR. AINSWORTH:

7        Q.   Sure.  In your time as a police

8    officer, have you learned that sometimes the

9    wheels of the criminal justice system move

10   slowly?

11       A.   Yeah.

12             MS. ROSEN:  Objection, form.

13   BY MR. AINSWORTH:

14       Q.   Sometimes you might make an arrest and

15   then it's two or three years or more before

16   you're actually testifying at a trial?

17       A.   Yes.

18       Q.   And sometimes those gang books would

19   be updated; is that right?

20       A.   Oh, sure.

21       Q.   You wouldn't have photographs in 1988

22   of gang members from 1962; is that fair to say?

23             MS. ROSEN:  Objection, form.

24             THE WITNESS:  No, I don't think so.

1    BY MR. AINSWORTH:

2        Q.    Didn't have a whole bunch of people

3    wearing bell bottoms and --

4        A.    No.

5        Q.    -- big mutton chops?

6                So the photographs would be

7    updated in those gang books from time to time,

8    right?

9        A.    Right.

10       Q.    And so if somebody at a criminal trial

11   wanted to know which photograph the witness had

12   picked out from the gang book, how would they

13   know which photograph had been picked out from

14   the gang book?

15       A.    Usually the books were kept intact,

16   and they were left in one area.  And removing

17   the picture, I don't know.  I mean, other

18   pictures could be obtained.  But I know what

19   you're saying, that specific one on show up.

20       Q.    So might there be multiple pictures of

21   the same person in the gang book?

22       A.    I don't think so, no.

23       Q.    How would the gang books be updated?

24       A.    Just add books, additional books to

1    make more.

2         Q.   So is it possible that in previous --

3    strike that.

4              Is it possible then the same

5    person's photograph could appear in multiple

6    books?

7              MS. EKL:  Objection, calls for

8    speculation.

9              THE WITNESS:  I haven't seen it.  I

10   mean, that's not something I did.  That's an

11   administrative position.

12   BY MR. AINSWORTH:

13        Q.   Was that something that you did?

14        A.   Change pictures or play with the books

15   or update them, that wasn't my job, that was

16   the staff, administrative staff there.

17        Q.   So you never saw the same person's

18   photograph repeated among the books; is that

19   fair to say?

20        A.   Yeah, I don't remember seeing it.

21        Q.   So, it seems to me there's two ways to

22   update the gang books.  One is to, when you

23   have a more recent photograph of somebody,

24   remove the old photo and replace it with the

1    newer photo; or you can simply tack on at the

2    end by just adding photographs, newer

3    photographs of gang members into new books.

4                Do you know which method the

5    department used to update their books?

6            MS. EKL:  Objection.

7            MS. ROSEN:  Objection, form.

8            THE WITNESS:  No, I don't.

9    BY MR. AINSWORTH:

10       Q.  Did any supervisor ever ask you to

11    preserve the photograph that had been picked

12    out of a gang book?

13       A.  I don't remember that.

14       Q.  In any case that you had, did you ever

15    make a photocopy of the page where a witness

16    had identified a gang member?

17            MS. EKL:  Objection, asked and

18    answered.

19            THE WITNESS:  I don't remember doing

20    that.

21    BY MR. AINSWORTH:

22       Q.  Did you ever remove a page from a

23    book, from the gang book to preserve how the

24    photograph looked?

1          MS. EKL:  You can answer.

2          THE WITNESS:  Pardon me?

3          MS. EKL:  You can answer.

4          THE WITNESS:  No.

5    BY MR. AINSWORTH:

6          Q.   And in any case that you worked, did

7    you ever take a photograph of the page where a

8    witness had identified a gang member from a

9    gang book?

10          MS. EKL:  Objection, asked and

11    answered twice already.

12               You can answer again.

13          THE WITNESS:  A picture of the book?

14    BY MR. AINSWORTH:

15          Q.   A picture of the page?

16          MS. ROSEN:  Did you say take a picture

17    of the page?

18          MR. AINSWORTH:  A photograph, yes.

19          THE WITNESS:  No, I don't remember

20    ever doing that.

21    BY MR. AINSWORTH:

22          Q.   And so in any case, did you ever

23    preserve in any way how the picture appeared or

24    the photograph appeared in a gang book when a

1    witness had identified that photograph of a

2    gang member as a perpetrator in a crime?

3            MS. EKL:  Objection, asked and

4    answered.

5            THE WITNESS:  I don't understand what

6    you're --

7    BY MR. AINSWORTH:

8       Q.   Sure.

9            When I say preserve, I mean in

10   some way ensure that if somebody later on

11   wanted to see the photograph that was used for

12   the identification, that they would be sure to

13   have it by either inventorying that page or

14   putting it into the case file or in some way

15   preserving the photograph in the condition that

16   it was in at the time that the identification

17   was made; do you understand that?

18           MS. ROSEN:  Objection, form.

19           THE WITNESS:  I would be speculating.

20   I would just be speculating.  But you would

21   just order another photo.

22   BY MR. AINSWORTH:

23      Q.   Well, my question right now is, do you

24   understand that that's what I mean by

1  preservation?

2      A.   Yeah.  Are you asking me if I would

3  take that picture out of the book?

4      Q.   Well, there's various ways that you

5  could do it.  One way is to remove the

6  photograph from the book, another is to remove

7  the page from the book, another is to take a

8  photograph of the photograph, another is to

9  make a photocopy of the book, and there may be

10  other ways that you as a police officer have

11  that I'm not aware of.

12              And I'm just wondering if you

13  took any -- in any case, if you ever took any

14  method to preserve the photograph that had been

15  identified in a gang book?

16              MS. EKL:  Objection, form.

17              THE WITNESS:  No.

18  BY MR. AINSWORTH:

19      Q.   How did you learn how to show the gang

20  books to witnesses?

21      A.   Just watching other gang specialists

22  do it.

23      Q.   Part of the on-the-job training?

24      A.   I would say so.

1       Q.   Did you have a field training officer

2  when you were a specialist, gang crimes

3  specialist?

4       A.   No.

5       Q.   Did you have a mentor within the gang

6  crimes specialist unit?

7       A.   No, I didn't have a mentor.

8       Q.   Did you have a partner when you were

9  in gang crimes as a specialist?

10      A.   Eventually, yes.

11      Q.   How about initially?  Were you

12  partnered with any senior specialists?

13      A.   Yes.

14      Q.   Who were they?

15      A.   I believe my first day was with Fallon

16  and Sparks.

17      Q.   Any other more senior officers that

18  you were partnered with when you were a

19  specialist?

20      A.   Maybe Danny Noon.

21      Q.   Anyone else?

22      A.   Not that I can remember.

23      Q.   How long was it until you had a

24  partner?

1          A.    I don't know.  I couldn't tell you.

2          Q.    Was it more than a year?

3          A.    No, I don't think so.

4          Q.    Who was your first regular partner

5     when you were assigned to gang crimes?

6          A.    Rey Guevara.

7          Q.    Did you have any other regular

8     partners while you were assigned to gang

9     crimes?

10          A.    Regular partners, no, not that I

11     remember.

12          Q.    For how long were you and Rey Guevara

13     partners?

14          A.    Let's see.  Maybe about five and a

15     half years maybe, around there approximately.

16          Q.    When you were a gang crimes

17     specialist, did you ever receive any training

18     as to how to conduct a photo array?

19          A.    I don't remember any training.

20          Q.    When you were a gang crimes

21     specialist, did you ever conduct a line-up?

22     Sorry.

23                    When you were a gang crimes

24     specialist, did you ever receive training as to

1    how to conduct a line up?

2          MS. EKL:  Objection as to form,

3    specifically what type of line-up you're

4    referring to.

5    BY MR. AINSWORTH:

6        Q.   In-person line-up.

7        A.   No, I don't remember anything like

8    that.

9        Q.   Did you conduct photo arrays while you

10    were a gang crimes specialist?

11        A.   Photo arrays?

12        Q.   Yes.

13        A.   Yes.

14        Q.   How did you learn how to conduct photo

15    arrays?

16        A.   Just from watching other guys do it.

17        Q.   What was a photo array?

18        A.   One suspect and a total of five

19    pictures.

20        Q.   When you were a gang crimes specialist

21    in 1988, if you wanted to conduct a photo

22    array, where would you obtain the photographs

23    to conduct the photo array?

24        A.   We had in the unit, I believe, some

1  loose photos that you can use as fillers for

2  your suspect picture.

3      Q.   Apart from those loose photos in the

4  unit, would you obtain photographs from any

5  other place to use a fillers back in 1988?

6      A.   I can't remember if there was any

7  other place.

8      Q.   Where were the loose photos kept at

9  gang crimes?

10     A.   It was just a box.

11     Q.   Where was that box?

12     A.   In the photo room.

13     Q.   Is that the same room where the gang

14  books were?

15     A.   Yes.

16     Q.   When you say there were loose photos,

17  would these be CB photos or what kind of

18  photographs would these be?

19     A.   All kinds from what I remember,

20  Polaroids, CB photos.  That's about all I

21  remember.

22     Q.   If an identification was made from a

23  photo array back in 1988, how would you

24  document that fact?

1       A.   Like I said earlier, it was just, make

2  a note of it, notify the detective division,

3  and then leave a supplementary report as to the

4  identification.

5       Q.   Would you have the witness sign the

6  photograph if they made an identification of a

7  perpetrator?

8       A.   Sign the picture?

9       Q.   Yes.

10      A.   I did.

11      Q.   You would sign it?

12      A.   Not me, no.

13      Q.   Sorry.  You would have the witness

14  sign it?

15      A.   Yes.

16      Q.   Would they write the role that the

17  perpetrator played in the crime on the

18  photograph?

19      A.   No.

20      Q.   Where would you have the witness sign

21  the photograph?

22      A.   Usually on the back.

23      Q.   Would you sign it as well to witness

24  that fact, or would you just have the witness

1     sign it?

2         A.   I don't remember signing it also.

3         Q.   While you were gang crimes specialist,

4     what kinds of crimes would you investigate?

5         A.   Any crime that was deemed gang

6     related.

7         Q.   Would you investigate burglaries?

8         A.   Sometimes.  Not a lot.

9         Q.   Aggravated batteries?

10        A.   Yes.

11        Q.   Homicides?

12        A.   Yes.

13        Q.   Did you conduct in-person line-ups

14     while you were a gang crimes specialist?

15        A.   No.

16        Q.   Was there ever an occasion where you

17     were the person who conducted an in-person

18     line-up?

19        A.   No.

20        Q.   Do you know why that was?

21        A.   When what was?

22        Q.   Do you know why that was?

23        A.   Well, responsibilities are to

24     Detective Division actually does physical

1     line-ups, especially on major cases, anything

2     that goes to responsibility of the Detective

3     Division.

4           Q.   If a person viewed a photo array and

5     did not make an identification of anyone, how

6     would you document that fact?

7           A.   I can't.  It would be hard to answer

8     that.

9           Q.   Well, would you document that fact,

10    that a witness viewed a photo array and did not

11    make an identification?

12          A.   It's still a little vague.

13          Q.   Which part are you having trouble with

14    just so I can rephrase?

15          A.   Well, is there a suspect that we know

16    is in a book or in a photo?  Well, you said

17    photo array.

18          Q.   Yes.  I'm talking about a photo array

19    where you have one suspect and a total of five

20    photographs.

21          A.   Right.

22          Q.   So under that scenario in 1988, if

23    somebody views that photo array and does not

24    make an identification of anyone, would you

1    document that fact?

2         A.   Well, the question I would have, is

3    there a suspect in that photo array?

4         Q.   Yes.  One suspect and five total

5    photographs.

6         A.   Yes, then I would.

7         Q.   And how would you go about documenting

8    that fact?

9         A.   Supplementary report is usually how it

10   goes.

11        Q.   And would you write I believe the term

12   is negative identification?

13        A.   That's good words, yeah.  I don't

14   remember what words we used.  It was just, you

15   know --

16        Q.   If a witness -- did you ever have it

17   happen in a photo array that a witness would

18   identify one of your fillers as opposed to the

19   perpetrator?

20        A.   I can't remember an incident, but I'm

21   sure it did.

22        Q.   And would you document that fact if a

23   witness identified a filler as opposed to a

24   suspect from a photo array?

1  A. Yes.

2  Q. And in 1988, how would you go about

3 documenting that fact?

4  A. Well, once again, you would make out

5 the five pictures or whatever that were shown

6 and leave a report on it.

7  Q. Would you document it as a negative

8 identification?

9    MS. EKL: Objection, form.

10    THE WITNESS: No. Just that this

11 witness or whatever picked out this photo.

12 BY MR. AINSWORTH:

13  Q. And would you -- so what language

14 would you use to indicate that the witness

15 picked out a filler?

16  A. You know, I don't know specific

17 language. Something to the effect that, shown

18 a photo array, suspect was in there, in the

19 photo array and did not pick it, picked picture

20 number whatever.

21  Q. Why would you document the fact that

22 the witness picked a filler as opposed to a

23 suspect?

24  A. Just as a matter of record, that

1    witness couldn't pick out a suspect that we

2    thought was in a photo array.

3        Q.   Would you have the witness sign the

4    back of the photograph that they picked out if

5    they picked out a filler?

6        A.   I don't remember.

7        Q.   About how often would it happen that a

8    witness would pick out a filler from a photo

9    array?

10        A.   Couldn't tell you.  I have no idea.

11        Q.   Was it as often as half of the time,

12    or was it less often than that?

13          MS. EKL:  Objection, form.

14          THE WITNESS:  I don't know.  What's

15    half?

16    BY MR. AINSWORTH:

17        Q.   Half is one out of every two times?

18        A.   Well, okay.  Well, no, I don't think

19    so.

20        Q.   When you say you don't think so, do

21    you think it was more than that or less than

22    that?

23        A.   It was less than half.

24        Q.   Can you give me some estimate as to

1    how much less than half of the time did you

2    have witnesses pick out fillers --

3             MS. EKL:  Objection.

4    BY MR. AINSWORTH:

5        Q.    -- from the photo array back in 1988?

6             MS. ROSEN:  Him personally?

7             MR. AINSWORTH:  Yes.

8             MS. EKL:  Objection, calls for

9    speculation.  Go ahead.

10            THE WITNESS:  I couldn't tell you.  I

11    have no idea.

12    BY MR. AINSWORTH:

13        Q.    You can't -- so zero to 50 you can't

14    give me any estimate in that --

15        A.    No.  I couldn't give you an estimate.

16        Q.    -- as to how often fillers were

17    identified?

18        A.    No, because I can't remember off the

19    top of my head.

20        Q.    I should have asked you this when I

21    began.

22               Are you on any medication, or do

23    you have any medical condition that might

24    interfere with your ability to give full and

1      accurate and truthful testimony here today?

2           A.   No.

3           Q.   Are you on any medication --

4           A.   Yes.

5           Q.   -- that's prescribed?

6           A.   Yes.

7           Q.   What medication are you currently on?

8           A.   Blood pressure, cholesterol.

9           Q.   Any other medication that you take on

10     a daily basis?

11          A.   No.

12          Q.   Has anyone mentioned to you that your

13     memory is particularly poor or worse than

14     normal?

15          A.   No.

16          Q.   Have you ever thought to yourself that

17     your memory is not very good?  Strike that

18     question.  That's poor.

19               Do you feel as you sit here today

20     that your memory is not as good as other people

21     of your age?

22               MS. ROSEN:  Objection, form.

23               THE WITNESS:  No, I haven't thought

24     about it.  I couldn't give you an answer.

1    BY MR. AINSWORTH:

2        Q.   Well, I'm asking you to think now.

3             Do you think now that your memory

4    is worse than other people of your same age?

5        A.   I have no idea.

6             MS. ROSEN:  Objection, form.

7             MS. EKL:  Foundation.

8    BY MR. AINSWORTH:

9        Q.   And no doctor has ever said to you

10   that you have a problem with your memory or

11   something like that?

12       A.   No.

13       Q.   Is that correct?

14       A.   Correct.

15       Q.   How did you learn how to conduct photo

16   arrays when you were a gang crimes specialist?

17       A.   Just watching other guys do it.

18       Q.   If a witness made a positive

19   identification from a photo array, that means

20   they identified somebody, would you inventory

21   those photographs?

22       A.   Yes.

23       Q.   If the witness identified a filler

24   from the photo array, would you still inventory

1    those photographs?

2          A.    I don't think so, no.

3          Q.    Why not?

4          A.    Well, it would depend then again.  You

5    have other witnesses, victims, you might want

6    to show them those pictures.  Eventually, yeah,

7    you would inventory it.

8          Q.    At the conclusion of your

9    investigation?

10         A.    I think so, yeah.

11         Q.    When you're at Area 1 in a Special

12   Operations Group, were you able to partner with

13   John Guzman?

14         A.    Yes.

15         Q.    For how long?

16         A.    I can't remember.

17         Q.    More than a year?

18         A.    I don't know.  I don't know.  It might

19   have been right around there.

20         Q.    Was that towards the end of your time

21   there or beginning of your time?

22         A.    I don't know.  Maybe the middle of the

23   time there.  I'm not sure.  I don't know.

24         Q.    Do you have any post high school

1    educational experience apart from DeVry?

2         A.   Any what type of?

3         Q.   Post high school.

4         A.   Yes.

5         Q.   What post high school education do you

6    have apart from DeVry?

7         A.   I have an MBA management.

8         Q.   Where did you obtain that from?

9         A.   St. Xavier University.

10        Q.   When did you obtain that?

11        A.   2004, I believe.

12        Q.   Did the department pay for your MBA?

13        A.   Yes.

14        Q.   What was your highest rank that you

15   obtained with the Chicago Police Department?

16        A.   Sergeant.

17        Q.   When in 1990 did you make sergeant --

18   did you make detective?

19        A.   In 1990?  You know, I don't know.  It

20   was around June, I believe.  We were a class

21   that was held up in the courts.

22             We -- officially sent to classes,

23   training classes or whatever.  And then

24   everything was put on hold by the courts, and

```
1    we waited a couple of weeks I think it was.
2    I'm not sure about that.
3                   But there was this delay before
4    we were let out and given our assignments.
5         Q.   So you went to class, but you could
6    not serve as detective; is that what you're
7    saying?
8         A.   Right.  We couldn't.  Everything was
9    on hold.
10        Q.   So what did you guys do for those few
11   weeks?
12        A.   Just other classes, a lot of breaks.
13   There wasn't much they could do with us.  They
14   couldn't send us back from what I understood,
15   or move us forward, so we were kind of stuck in
16   limbo there.
17        Q.   Who did you go to -- strike that.
18                  Were you assigned to Area 5 upon
19   making detective?
20        A.   Yes.
21        Q.   Did you go to detective school with
22   anyone else who was assigned to Area 5?
23        A.   Yes.
24        Q.   Who would you go to school with who
```

1    was assigned to Area 5?

2            A.    Rey Guevara.

3            Q.    Anyone apart from Rey Guevara?

4            A.    I can't think of anybody else.

5    That's, like, from gangs or?

6            Q.    No.  Who went to detective school with

7    you.

8            A.    I can't think of anybody right now.

9            Q.    While you were assigned to Area 5 as

10   detective, were there any of your fellow

11   officers from when you were a gang crimes

12   specialist who were also working alongside you

13   as a detective?

14           MS. EKL:  Objection, form,

15   specifically to worked alongside.

16           THE WITNESS:  No.  Just Rey, I

17   believe.

18   BY MR. AINSWORTH:

19           Q.    Did you and Rey Guevara sit for the

20   detective exam at the same time?

21           A.    I have no idea.

22           Q.    You were promoted to detective at the

23   same time?

24           A.    Yes.

1        Q.   Do you know whether it was June or

2   August of 1990 that you made detective?

3        A.   I'm not sure.

4        Q.   When you were assigned to Area 5 were

5   you given a partner?

6        A.   No.  Once again, you're working with

7   somebody else that's more seasoned.

8        Q.   When you were a gang crimes

9   specialist, what hours did you work?

10       A.   Different hours.  There were two

11   shifts in the unit.

12       Q.   And so would one shift work days and

13   then after the next police month switch to

14   evenings?

15       A.   Not necessarily.

16       Q.   So how did it work?

17       A.   The unit was separated in -- with gang

18   specialists, but it also had gang tactical

19   officers.  I'm not sure if they rotated or not.

20   Some did, some didn't.  It was kind of up in

21   the air.

22       Q.   When you say they, who are you

23   referring to?

24       A.   Well, you have the gang tactical

1    officers.

2            Q.    How about you?  Did you rotate?

3            A.    I did once in a while, yes.

4            Q.    Well, what watch were you on primarily

5    when you were a gang crimes specialist?

6            A.    Primarily probably evenings.

7            Q.    What were your typical hours when you

8    worked evenings as a gang crimes specialist?

9            A.    Let's see.  Roll call was at 5:30 in

10   the evening and you worked until 2:00 in the

11   morning.

12           Q.    Were there other gang crime

13   specialists who were primarily assigned to

14   days?

15           A.    I don't remember.

16           Q.    How many people would attend your roll

17   calls when you were at gang crimes as a

18   specialist?

19           A.    A number?  I have no idea.

20           Q.    Did you have roll call with the

21   tactical officers and the specialists together?

22           A.    Yes.

23           Q.    How many gang crimes specialists were

24   there at Gang Crimes North when you were there?

```
 1          A.    I don't know.  I have no idea.

 2          Q.    Was it as many as 50?

 3          A.    No.  It wasn't 50.

 4          Q.    Can you give me some kind of range?

 5          A.    I'm guessing ten.

 6          Q.    When you made detective, were you --

 7     strike that.

 8                      At some point, were you assigned

 9     a partner when you made detective?

10          A.    Yes.

11          Q.    And who was your first partner?

12          A.    Rey Guevara.

13          Q.    And when did you and Rey Guevara

14     become partners at Area 5?

15          A.    I couldn't tell you.  I don't

16     remember.

17          Q.    Do you know how long it was after you

18     made Detective that you and Rey Guevara were

19     partnered again?

20          A.    No, I couldn't tell you.

21          Q.    Do you know why it was that you and

22     Rey Guevara were partnered again at Area 5?

23          A.    Because we were partners in gangs.

24          Q.    Whose decision was it to have you and
```

1    Rey Guevara partnered?

2         A.    I don't know.

3         Q.    For how long were you and Rey Guevara

4    partners at Area 5?

5         A.    You know, I don't know because we

6    separated, and I worked with other people.

7         Q.    Well, why did you separate?

8         A.    I waited for a different shift.

9         Q.    What shift did you go to?

10        A.    It could have been any of the three,

11   midnights, days, afternoons.

12        Q.    Did you recall which one it was?

13        A.    I worked them all.

14        Q.    Why was it that you went to a

15   different shift than Rey Guevara?

16        A.    Well, midnight crew had a -- they had

17   their steady detectives there.  I don't know

18   how many worked steady midnights, but they had

19   to take a turn on midnights, everybody, at

20   least once every, I don't know, three months or

21   so.

22              So, you take your turn on

23   midnights for a month or so.

24        Q.    So, are you saying that you would be

1    regular partners with Rey Guevara, then it

2    would become your turn to take a month on -- or

3    a turn on midnights, you would go to midnights

4    for a bit, and then you would be partnered back

5    up with Rey Guevara?

6         A.   Yeah, or he -- I don't know if he did

7    midnights.  I'm not sure.  I couldn't.  Because

8    we separated, and I worked with other

9    detectives on different watches.

10        Q.   What watch was Rey Guevara assigned to

11   while you were at Area 5 and he was at Area 5?

12             MS. EKL:  Objection, form.

13             THE WITNESS:  I think mainly he was on

14   the third watch.

15   BY MR. AINSWORTH:

16        Q.   And are you saying that you moved

17   around from the first to second to third watch

18   while you were a detective?

19        A.   Every once in a while, yes.

20        Q.   Where were you primarily -- which

21   watch were you primarily assigned to while you

22   were a detective at Area 5?

23        A.   Primarily, I don't know.  I went back

24   and forth between days and afternoons.

1      Q.   Why did you go back and forth between

2    days and afternoons?

3      A.   I didn't want to work a steady third

4    watch because I have a family, and I wanted to

5    be home in the evenings to be with the kids and

6    activities, things like that.

7      Q.   How many kids did you have back then?

8      A.   Two.

9      Q.   When Rey Guevara was a detective at

10   Area 5 with you, how many kids did he have?

11     A.   Two.

12     Q.   Do you know how many kids he has now?

13     A.   Rey, I kind of think it was 13.

14     Q.   Did he have 11 kids since the time

15   that you were detectives at Area 5?

16     A.   I have no idea.

17     Q.   When did you leave Area 5 as a

18   detective?

19     A.   1996.

20     Q.   Was Rey Guevara still a detective at

21   that time?

22     A.   Yes.

23     Q.   Did he still have two kids at that

24   time?

1          A.    Did I have?

2          Q.    Did he still have two kids at that

3     time?

4          A.    Oh, I don't know.  He had more.  I

5     don't know what the count was.

6          Q.    Did you meet any of the mothers of his

7     children?

8          A.    Yes, I did.  I think I met one, one or

9     two, briefly.

10         Q.    Which ones did you meet?

11         A.    I have no idea.  I don't know their

12    names.  I don't think I could pick them out

13    today.

14         Q.    Could Rey Guevara have as many as 16

15    children?

16         A.    How many?

17         Q.    16.

18               MS. EKL:  Objection, calls for

19    speculation.

20               MS. ROSEN:  Objection, relevance.

21               THE WITNESS:  I don't know.

22    BY MR. AINSWORTH:

23         Q.    While you were assigned to Area 5, did

24    you have any other regular partners other than

1    Rey Guevara?

2         A.   Yes.

3         Q.   Who else did you have as a partner?

4         A.   I had Tony Riccio and William

5    Johnston.

6         Q.   R-i-c-c-i-o?

7         A.   Yes.

8         Q.   How did your job duties change in

9    1996?

10        A.   Well, my job changed.  I was a

11   supervisor then.

12        Q.   Did you make sergeant?

13        A.   Yes.

14        Q.   When in 1996 did you make sergeant?

15        A.   I believe it was June.

16        Q.   Where were you assigned as a sergeant?

17        A.   Assigned to the 22nd District.

18        Q.   How long were you assigned to the 22nd

19   District?

20        A.   Maybe just over a year, around a year.

21        Q.   And then how did your duties change?

22        A.   I was transferred to the Training

23   Division.

24        Q.   When you were at the 22nd District,

1    was that a patrol position?

2         A.   Yes, it was.

3         Q.   When you were transferred to the

4    Training Division, where were you physically

5    housed?

6         A.   I was a sergeant in the Construction

7    Design and Quality Control Section.

8         Q.   Where was that located?

9         A.   In the academy.

10        Q.   On Harrison -- or on Jackson?

11        A.   Jackson.

12        Q.   And what were your duties at the

13   Training Division?

14        A.   I was supervising the research and

15   writing of lesson plans.

16        Q.   Was it all lessons plans that you were

17   supervising or was there a particular type of

18   lesson plan?

19        A.   No.   It was all of them.   We were

20   redoing the whole thing.

21        Q.   Did you -- were you in the process of

22   redoing the whole thing during the entirety of

23   your time assigned to the Training Division?

24        A.   Yeah, I would say so.   Yeah, it was a

1    continuing process.

2         Q.   Did you teach any classes yourself

3    when you were assigned to the Training

4    Division?

5         A.   Yes, I did.

6         Q.   What classes did you teach?

7         A.   Street stops, some domestic violence

8    courses.  I can't remember any others right

9    offhand.

10        Q.   Did you teach any classes related to

11   gangs?

12        A.   No, I did not.

13        Q.   Did you teach any classes regarding

14   witness identifications?

15        A.   No.

16        Q.   For how long were you assigned to the

17   Training Division?

18        A.   Almost seven years.

19        Q.   Did your duties at the Training

20   Division change over those seven years or did

21   you have the same duties?

22        A.   I had a number of duties.

23        Q.   What were the number of duties that

24   you had?

1    A.   Well, besides the research of the

2  lesson plans, it was training staff members and

3  research and writing, putting lessons plans

4  together.

5              I also had the testing department

6  and supervised that, the test, for the classes

7  for the recruits.

8              I was the home-room supervisor at

9  any time for two classrooms at a time, recruit

10  classes.

11              I also ran the integrated

12  exercises, which was part of their training

13  which took up most of my time.

14    Q.   I take it that the lesson plans were

15  for recruits, right?

16    A.   Yes.

17    Q.   So this is the basic academy that the

18  recruits go through?

19    A.   Yes.

20    Q.   Did you do any training with regard to

21  more advanced members of the department?

22    A.   Yes.

23    Q.   What training did you do with regard

24  to the more advanced members of the department?

1       A.   We -- well supervise the integrated

2   exercises for sergeants, lieutenants, and a

3   little bit for field training officers.

4       Q.   What about for detectives?

5       A.   No, did not.

6       Q.   Did you oversee any lesson plans or

7   training materials with regard to making

8   witness identifications?

9       A.   I don't remember anything like that,

10   no.

11       Q.   Did you oversee any lesson plans or

12   conduct any trainings with regard to how to

13   investigate gang involved crimes?

14       A.   No, not me specifically.  There were

15   lesson plans to that, but I didn't teach it.

16       Q.   While you were assigned as a

17   specialist in gang crimes, were you assigned to

18   a gang, particular gang?

19       A.   Yes.

20       Q.   To which gang were you assigned?

21       A.   I was assigned to the Latin Kings at

22   Leavitt and Schiller.  And also, let's see, the

23   Insane Unknowns, they were Armitage and Damen.

24                   Those are the sections that I

1    mentioned, the streets.

2        Q.   Any other gangs that you were assigned

3    to while you were a gang crimes specialist?

4        A.   No.

5        Q.   When were you assigned to the Latin

6    Kings, for what time period?

7        A.   I couldn't give you a time period.  I

8    don't know.

9        Q.   Were you assigned to the Latin Kings

10   at the same time you were assigned to the

11   Insane Unknowns?

12       A.   Yes, I believe so.

13       Q.   Was that towards the beginning of your

14   time at gang crimes or was it towards the end

15   of your time?

16       A.   No.  It was towards the beginning.

17   You know, I don't know exactly when it started.

18   Maybe a year after I got there.  I'm guessing.

19   I don't know.

20       Q.   Why did you stop being assigned to the

21   Latin Kings?

22       A.   Why did I what?

23       Q.   Why did you stop being assigned to the

24   Latin Kings?

1          A.    I wasn't.

2          Q.    Well, were you still assigned to the

3    Latin Kings when you made detective?

4          A.    Yes.   Then it stopped.

5          Q.    All right.   And how about for the

6    Insane Unknowns?   Were you assigned to the

7    Insane Unknowns until you stopped being a gang

8    crimes specialist?

9          A.    Yes.

10         Q.    Did you start investigating the Latin

11   Kings and the Insane Unknowns at the same time?

12         A.    I don't understand when.

13         Q.    Poor question.

14               While you were a gang crimes

15   specialist, were you assigned to investigate

16   the Latin Kings and the Insane Unknowns at the

17   same start time?

18         A.    Investigate is probably the wrong

19   word.   I mean, investigations took me there

20   maybe.

21         Q.    I mean, when you were specializing in

22   a particular gang, when you were given that

23   assignment --

24         A.    Was to monitor them.

1        Q.   Okay.  When you were monitoring those

2   gangs, were you assigned to monitor both of

3   those gangs, the Latin Kings and the Insane

4   Unknowns at the same time?

5        A.   Correct.

6        Q.   Prior to working on the Felix Valentin

7   case, did you know Jacques Rivera?

8        A.   No.

9        Q.   Did you know him to be a member of any

10   gang?

11        A.   Didn't know him.

12        Q.   Did you know him to hold rank within

13   any gang?

14        A.   Didn't know him.

15        Q.   Did you ever testify as an expert in

16   gangs?

17        A.   Once.

18        Q.   And when was that?

19        A.   I have no idea.  I couldn't tell you.

20        Q.   Which court was it in?

21        A.   It was at 26th and California.  That's

22   all I could tell you.

23        Q.   Do you know why it was that you were

24   asked to testify about a gang issue?

1          A.    No, I don't know.

2          Q.    What gang issue were you asked to

3     testify about?

4          A.    I don't remember.  I couldn't tell

5     you.  I don't remember.

6          Q.    Do you know which gang it was?

7          A.    No, I don't.

8          Q.    Do you know the state's attorney who

9     was asking you to testify?

10         A.    No.

11         Q.    Was it a state's attorney?

12         A.    Yes.

13         Q.    Did you review any documents in

14    preparation for today's deposition?

15         A.    Yes.

16         Q.    What documents did you review?

17         A.    Several of them.  A lot of them.

18         Q.    Which ones?

19         A.    Specifically?

20         Q.    Yes.

21         A.    Supp reports, original reports.

22         Q.    Just give me --

23         A.    Pardon me?

24         Q.    Categories.

```
1                         So you reviewed supp reports you
2      said?
3              A.    Yes.
4              Q.    What was the next thing you said?
5              A.    The original case report.  What else
6      was there?  Line-up reports, my report.
7              Q.    Any other documents that you reviewed
8      in preparation for today's deposition?
9              A.    Not offhand.  I can't remember.
10             Q.    Did you review any photographs?
11             A.    Yes.
12             Q.    What were the photographs of?
13             A.    It was an array of pictures, photos.
14             Q.    How many photos were in that array?
15             A.    I think five.
16             Q.    Any other photographs that you
17     reviewed?
18             A.    There were a couple others.  Just
19     scene photos, one scene photo, I think, I'm not
20     sure.
21             Q.    Any other photographs that you
22     reviewed?
23             A.    No, not that I remember.
24             Q.    Who were the authors of the supp
```

1    reports that you reviewed?  You said you

2    reviewed your report, correct?

3        A.   Yes.

4        Q.   Did you review supplemental reports by

5    any other author?

6        A.   Yeah.  It was, let's see, Dorsch and

7    Boyle, detectives, McLaughlin and Leonard.

8    That's all I remember right now.

9        Q.   Any other documents that you reviewed

10   from preparation for today's deposition?

11       A.   No, I don't think so.

12       Q.   Did you review any transcripts?

13       A.   Transcripts.  Yeah, I looked at

14   transcripts.  Yeah, I did.

15       Q.   Which transcripts did you review?

16       A.   I looked at one for Juan Johnson case.

17       Q.   Who was the transcript of, whose

18   testimony?

19       A.   Let's see.  I think it was Rey's, Rey

20   Guevara's.

21       Q.   Did you review your own testimony from

22   the Juan Johnson case?

23       A.   Only -- well, I did a dep.  I didn't

24   do -- it wasn't the trial, so.

1        Q.   So did you review your deposition

2    testimony?

3        A.   I don't think I read the whole thing.

4    There was an excerpt, part of it.

5        Q.   Which part?

6        A.   I don't know.  I'm not sure what it

7    was.

8        Q.   What was the content of that part?

9        A.   I can't remember.

10       Q.   And you said you reviewed Rey

11   Guevara's trial testimony from the Juan Johnson

12   civil trial; is that right?

13       A.   Yes.

14       Q.   Did you review any other transcripts

15   from that trial?

16       A.   No, I can't think of any.

17       Q.   Did you review any transcripts of

18   anybody's testimony?

19       A.   Not that I remember, no.

20       Q.   Did you review any other deposition

21   transcripts?

22       A.   No.

23       Q.   Did you look at any police reports

24   regarding cases other than the Felix Valentin

1    homicide?

2         A.   Yes, I did.

3         Q.   Which other police -- which other

4    cases did you look at police reports for?

5         A.   There were a number of -- I can't

6    remember the names of them that were brought up

7    on past cases that I think you're calling

8    witnesses on, and what those cases were in

9    general.

10        Q.   Can you give me an idea of how many

11   police reports you reviewed on cases other than

12   the Felix Valentin homicide?

13        A.   I think two.

14        Q.   Two police reports or two cases?

15        A.   Two cases.

16        Q.   Do you know who the victim was in

17   those cases or the perpetrator?

18        A.   I don't remember.

19        Q.   Who were the police officers involved

20   in those cases that you reviewed?

21        A.   I think, well, Rey was one of them,

22   Rey Guevara.  He was on cases, obviously, I

23   was.  I can't remember anybody else offhand.

24        Q.   Did you learn about the verdict in the

```
 1   Juan Johnson civil case?

 2        A.   Yes.

 3        Q.   How did you learn about it?

 4        A.   I think Rey told me.

 5        Q.   What did Rey say?

 6        A.   Well, we talked about the case just

 7   briefly and then mentioned some dollar amount.

 8        Q.   What did he say about the case?

 9        A.   They had certain -- they weren't

10   allowed to talk about gang stuff in the case.

11        Q.   Did he say anything else about the

12   case?

13        A.   That was the main thing that I

14   remember.

15        Q.   When was the last time you spoke to

16   Rey Guevara?

17        A.   I think last week.

18        Q.   Where did you guys talk?  Was it over

19   the phone or in-person?

20        A.   Over the phone.

21        Q.   And who called who?

22        A.   I think I called him.

23        Q.   Why did you call him?

24        A.   Just to say "hi".
```

1     Q.    Let him know you're giving a

2    deposition here?

3          A.    I think he may have known that, that I

4    was coming.

5          Q.    Why do you think he may have known

6    that?

7          A.    Just from his -- because he gave one.

8          Q.    But from your conversation, Rey -- was

9    it apparent to you that he knew that you were

10   giving your deposition this week?

11         A.    You know, I don't think he exactly

12   knew, you know, like, oh, I know you're going

13   this day, but I told him what days I was going.

14         Q.    When did you tell him what day you

15   were being deposed?

16         A.    That I had a pre-dep meeting on the

17   20th or Monday, and then today I have the

18   deposition.

19         Q.    When did you tell him that you were

20   going to be -- was that in the conversation

21   last week?

22         A.    Yes.

23         Q.    In the past year how often have you

24   and Rey talked?

1          A.    Not much.  Four, five times.

2          Q.    Then why was it last week that you

3    chose to give him a call?

4          A.    No specific reason.

5          Q.    When was the last time you saw Rey

6    Guevara in-person?

7          A.    Christmastime.

8          Q.    How did you come about to see him at

9    around Christmastime?

10         A.    We all met on the north side, a lot of

11   us, other detectives that are retired and guys,

12   just a Christmas party.

13         Q.    Where was it held?

14         A.    What's it called?  A small little bar

15   on the north side on Central.  I don't remember

16   the name.  It's got letters.  Some kind of

17   letters and then bar, tavern.

18         Q.    Rey Guevara was there?

19         A.    Yes.

20         Q.    Was it just Area 5 detectives who were

21   there or from your group or were there other

22   police officers?

23         A.    No, there was other policemen there,

24   a couple guys I didn't even know.

```
 1            Q.   Was there anybody from your time as a
 2      gang crimes specialist who was there?
 3                 MS. ROSEN:   Other than Rey?
 4                 MR. AINSWORTH:   Yes.
 5                 THE WITNESS:   Oh, yeah.   There was
 6      Sergeant Mingey, Ed Mingey.   He was in gangs
 7      there, and Sergeant Biebel.   I think that's it
 8      that I could remember right now.
 9      BY MR. AINSWORTH:
10            Q.   Noon wasn't there?
11            A.   Pardon me?
12            Q.   Was Noon there?
13            A.   No, he was not.
14            Q.   Was Sparks there?
15            A.   No.
16            Q.   Was Fallon there?
17            A.   No.
18            Q.   Was Zacharias there?
19            A.   No.
20            Q.   Was Guzman there?
21            A.   No.
22            Q.   Did Rey Guevara tell you that he was
23      asserting his Fifth Amendment rights?
24            A.   After he did it.
```

1    Q.    What did he say about that?

2    A.    Not much.  Just that.  Mainly we

3  talked about parking, how bad it is.

4    Q.    Did you ask him why he was taking the

5  fifth?

6    A.    No, I didn't ask him.

7    Q.    When you spoke to -- and when was it

8  that he told you that he was taking the fifth?

9    A.    The day I talked to him.  He already

10  had appeared here.

11    Q.    You mean last week?

12    A.    Yes.

13    Q.    Was that the first time you learned

14  that he was taking the fifth, or did you

15  already know that?

16    A.    I think that was the first time or

17  something might have been mentioned in the

18  lawyer's office.

19    Q.    I'm not asking conversations you had

20  with your lawyers.  I'm just asking if you knew

21  or not?

22    A.    If I what?

23    Q.    If you knew or not whether Rey Guevara

24  was taking the fifth?

1                MS. EKL:  Just to be clear, during

2    what time period?  Now that we're three

3    questions ahead.

4    BY MR. AINSWORTH:

5        Q.   At the time that you spoke to Rey last

6    week?

7        A.   Did I know?

8        Q.   Yes.

9        A.   I had an idea.

10       Q.   Have you spoken to anyone from the FBI

11   within the last two years?

12            MS. EKL:  Objection, foundation,

13   vague.

14           THE WITNESS:  No, not that I know.

15   That guy might be the FBI.

16   BY MR. AINSWORTH:

17       Q.   Have you been questioned by any law

18   enforcement agency with regard to your

19   activities as a Chicago police officer since

20   2010?

21       A.   No.

22       Q.   Have you met with any lawyers from the

23   law firm of Sidley Austin with regard to your

24   activities as a Chicago police officer?

1      A.   No.

2      Q.   Are you aware that lawyers from the

3 office of -- or from Sidley Austin have been

4 hired by the City of Chicago to investigate

5 allegations of wrongdoing by Rey Guevara?

6      A.   No, I don't know nothing about it.

7      Q.   Did you work with Joe Miedzianowski?

8 How do you pronounce his last name?

9      A.   Miedzianowski.  Did I work with him?

10      Q.   Yes.

11      A.   No.  I was in the unit, but, no, I

12 didn't work with him.

13      Q.   Did you ever work at the same scene as

14 Joe Miedzianowski?

15      A.   I think maybe once, if I remember.

16      Q.   Were you present when Joe

17 Miedzianowski was arrested?

18      A.   No.

19      Q.   Were there two other officers from

20 your unit who were arrested at about the same

21 time as Joe Miedzianowski?

22      A.   I don't know about it, no.  All I knew

23 was John Gilligan.

24      Q.   Were you aware that your partner, Rey

1    Guevara, was being investigated by the FBI in

2    conjunction with the criminal acts submitted by

3    Joe Miedzianowski?

4              MS. EKL:  Objection, form, assumes

5    facts not in evidence.

6              THE WITNESS:  No.  I have no idea.

7    BY MR. AINSWORTH:

8        Q.   You've never seen the FBI report

9    regarding Rey Guevara's activities with Joe

10   Miedzianowski?

11       A.   No, never seen anything.

12       Q.   Do you recall investigating the Felix

13   Valentin shooting?

14       A.   What shooting?  I'm sorry.

15       Q.   Felix Valentin shooting.  He was the

16   victim in the case in which Jacques Rivera was

17   ultimately convicted?

18       A.   I don't remember a whole lot of the

19   case, no.

20       Q.   Do you remember any of the case?

21       A.   Now, yeah, after reading some of the

22   reports.  That's the only way.

23       Q.   Were you ever contacted during the

24   pendency of the post-conviction proceedings to

1    testify in the Valentin case?

2        A.   No.

3        Q.   Did you ever meet with any state's

4    attorney during the post conviction process to

5    talk about the Valentin case?

6        A.   No.

7        Q.   What do you recall now about your role

8    in investigating the Valentin shooting?

9        A.   Just what I'm reading from reports.

10       Q.   Does reading the reports spark any

11   independent memories in your mind as to the

12   activities you took as a police officer

13   investigating the Valentin shooting?

14       A.   No.

15       Q.   How about those two other cases whose

16   police reports you reviewed, do you have any

17   recollection of those two cases?

18       A.   No, I do not.

19       Q.   So, even after you read those police

20   reports, that didn't spark any memories?

21       A.   No, it didn't.

22           MR. AINSWORTH:  Could we go off the

23   record?

24           THE VIDEOGRAPHER:  Going after you the

1    record at 12:01.

2                (WHEREUPON, a short break was

3                  taken.)

4        THE VIDEOGRAPHER:  Here begins tape

5    No. 2.  We're going back on the record at

6    12:11.

7    BY MR. AINSWORTH:

8        Q.  The police reports that you reviewed

9    for other cases in preparation for today's

10   deposition, was one of those cases the case

11   involving Juan and Henry Johnson that was the

12   subject of Juan Johnson's lawsuit against Rey

13   Guevara?

14        A.  You asked case report?

15        Q.  It's my understanding that you

16   reviewed two cases involving two other --

17   strike that.

18          It's my understanding that you

19   reviewed police reports regarding two other

20   cases in preparation for today's deposition,

21   correct?

22        A.  Correct.

23        Q.  Was one of those cases the case in

24   which Henry and Juan Johnson were charged with

1      crimes?

2             A.    No.   I don't believe so, no.

3             Q.    What did Rey Guevara tell you last

4      week about his deposition?

5             A.    Nothing.   That he took the fifth and

6      then he said come early, get a parking spot,

7      you're going to be looking.   So that's

8      basically what we talked about.

9             Q.    Did he tell you that he was -- well,

10     strike that.

11                  Did he tell you that he was being

12     falsely accused in the Jacques Rivera case?

13            A.    No.

14            Q.    Did he tell you anything about the

15     Valentin shooting?

16            A.    No.

17            Q.    Did you tell him anything about the

18     Valentin shooting case?

19            A.    No.

20            Q.    Did you tell him not to worry about it

21     because he did nothing wrong or anything like

22     that?

23            A.    No.   The only thing I told him was I

24     didn't remember it, and he didn't remember it

1    either.  That was it.

2         Q.    Did he tell you he didn't remember the

3    case?

4         A.    Yes.

5         Q.    Did he tell you whether or not he

6    testified in the post-conviction proceedings?

7         A.    No.

8         Q.    Did you believe him when he told you

9    he didn't remember the case?

10        A.    Yes.

11        Q.    How did you learn that Jacques

12   Rivera's conviction had been overturned?

13        A.    I think I was notified that there was

14   a case against us.

15        Q.    About a lawsuit?

16        A.    Yes.

17        Q.    You didn't see any media coverage of

18   the event?

19        A.    No.

20        Q.    When you received notification that

21   you had been sued, did you talk to Rey Guevara

22   about it outside the presence of your counsel?

23             MS. EKL:  Objection, vague.  Did he

24   talk to Rey Guevara about the lawsuit?

1          MR. AINSWORTH:  Yes.

2          THE WITNESS:  Oh, yeah, yeah.

3    BY MR. AINSWORTH:

4      Q.   What did you and Rey talk about

5    when -- after you received notice of the

6    lawsuit, but outside the presence your counsel?

7      A.   That we didn't remember the case.

8      Q.   Did he tell you that he had testified

9    in 2010 about this particular case?

10     A.   No.

11     Q.   When I say this particular case, I

12   mean the case in which Jacques Rivera was

13   convicted of the murder of Felix Valentin?

14     A.   No, don't remember that.

15     Q.   Does it surprise you if you learned

16   that Rey Guevara testified in 2010 about what

17   happened during his investigation of the Felix

18   Valentin homicide?

19          MS. EKL:  Objection, form.

20          THE WITNESS:  Repeat it, please.

21   BY MR. AINSWORTH:

22     Q.   Would it surprise you to learn that

23   Rey Guevara testified in 2010 about his

24   activities during the investigation of the

1     Felix Valentin homicide?

2               MS. EKL:  Objection, form.

3               THE WITNESS:  Surprise me?  Only that

4     I thought the case was over.

5     BY MR. AINSWORTH:

6          Q.    Why did you think the case was over?

7          A.    He was convicted and sent to prison.

8          Q.    I guess what I mean is would it

9     surprise you to learn that he testified about

10    the case in 2010 when he told you in 2012 that

11    he didn't remember the case?

12              MS. EKL:  Objection, form.

13              THE WITNESS:  No, I didn't know.

14    BY MR. AINSWORTH:

15         Q.    I understand that you didn't know.  It

16    was just whether or not it surprised you?

17              MS. EKL:  Objection, form.

18              You're saying whether or not it

19    surprised you, and he's already testified that

20    he didn't know.  So it couldn't have surprised

21    him because he didn't know it.  So that's my

22    objection.  Sorry.  I don't know if you're

23    misspeaking.

24              THE WITNESS:  I'm sorry.  Where are we

1    at here?  I'm confused now.

2    BY MR. AINSWORTH:

3        Q.   Did Rey Guevara tell you he didn't

4    know who Jacques Rivera was when he talked

5    about the lawsuit?

6            MS. EKL:  Objection, foundation.

7    BY MR. AINSWORTH:

8        Q.   After -- the first conversation you

9    had after you were sued?

10       A.   No, didn't say that.

11       Q.   Did he say he didn't know anything

12   about the case or he didn't remember anything

13   about the case?

14       A.   He didn't remember the case.

15       Q.   Did you talk with Rey Guevara about

16   Orlando Lopez?

17       A.   No.

18           THE WITNESS:  Objection, foundation.

19   BY MR. AINSWORTH:

20       Q.   Outside of the presence of your

21   counsel, have you ever talked with Rey Guevara

22   about the eyewitness in the Felix Valentin

23   case, Orlando Lopez?

24       A.   No, not that I remember.

1       Q.   Outside the presence of your counsel,

2   did you ever talk with Rey Guevara since being

3   served with the lawsuit about Jacques Rivera?

4       A.   No, because either one of us

5   remembered anything about the case.

6       Q.   How did you know that Rey Guevara

7   didn't remember anything about the case?

8       A.   He told me.

9       Q.   What did he tell you?

10      A.   He said:  I don't remember this case.

11      Q.   Did he express surprise that he was

12   being sued in a case he didn't remember?

13      A.   I don't know.  I have no idea.

14      Q.   Were you confused as to why you were

15   being sued?

16      A.   Yes.

17      Q.   Did you ask Reynaldo why you guys were

18   being sued?

19      A.   Yeah.  We -- briefly about it that the

20   witness recanted.

21      Q.   How did you know that?

22      A.   I think we found out from -- from the

23   attorneys when they told us.

24      Q.   Did Rey Guevara tell you that the --

1      A.   Or Rey told me.  I'm not sure.

2      Q.   Let me get the question out.

3      A.   Okay.

4      Q.   When you spoke to Rey Guevara for the

5  first time after being sued in this case, did

6  Rey tell you that the witness in Jacque's case

7  had recanted?

8      A.   He may have, but I'm not sure.

9      Q.   Did he explain to you how he didn't

10  remember the case but at the same time he

11  remembered that the main witness against

12  Jacques Rivera had recanted?

13         MS. EKL:  Objection, form.

14         THE WITNESS:  No.

15  BY MR. AINSWORTH:

16      Q.   Did you ask him if you don't remember

17  the case, how did you know that the witness

18  recanted?

19      A.   Didn't ask him.

20      Q.   Does that suggest to you that maybe it

21  wasn't Rey Guevara who told you that Orlando

22  Lopez had recanted?

23         MS. EKL:  Objection, form.

24         THE WITNESS:  No, not necessarily.

```
1    BY MR. AINSWORTH:

2         Q.   Why do you say that?

3         A.   He may have been told by the

4    attorneys.

5         Q.   Did you talk with any of the other

6    defendants in the lawsuit about what they

7    remember of the case outside the presence of

8    your counsel?

9         A.   No.

10        Q.   How many times have you met with your

11   lawyers?

12        A.   Three times, I think.

13        Q.   One time was yesterday, correct?

14        A.   Right.

15        Q.   Who was present for that meeting, not

16   what was said, just who was present?

17        A.   Yeah.  Let's see, there was a

18   gentleman by the name of Andrew, Caroline

19   Golden, Elizabeth Ekl yesterday.

20        Q.   Anyone else there?

21        A.   No.

22        Q.   Anyone else participate by phone?

23        A.   Pardon me?

24        Q.   Anyone participate by phone?
```

1          A.    No, not that I know of.

2          Q.    When was the last time that you met

3     with your counsel?

4          A.    Yesterday.

5          Q.    Sorry.  Before that.

6          A.    Oh, before that.  It was a while ago,

7     several months.

8          Q.    Who was present for that meeting?

9               MS. EKL:  I'm going to object at this

10    point in time.  You're not asking him about

11    what he did to prepare for this deposition.  I

12    think you're starting to get to the point where

13    you're invading attorney/client privilege.

14                   You're not entitled to know about

15    everything meeting and who was present.

16                   If you're asking what he did to

17    prepare for today, that's one thing.  But, in

18    general, I think you're starting to walk a fine

19    line.

20    BY MR. AINSWORTH:

21         Q.    The fact of -- you understand, sir,

22    that I'm not asking about anything that was

23    said.  Just the fact that you meet with an

24    attorney is not privileged by the --

1          MS. EKL:  I'm just putting that out

2     there.  I don't know where you're going with

3     this.  I think it has absolutely no relevance

4     to this deposition or this case, but --

5          MR. AINSWORTH:  Very good.

6     BY MR. AINSWORTH:

7          Q.   When was the last time that you --

8     several months ago, who was present for that

9     meeting?

10         A.   There were two gentlemen.  One was

11    named Jeff and the other one I don't know.  I

12    don't remember his name.

13         Q.   Jim maybe?

14         A.   I have no idea, couldn't tell you.

15         Q.   And was it just yourself or was anyone

16    else present who was not a lawyer?

17         A.   It was just me.

18         Q.   Were the two gentlemen lawyers?

19         A.   I'm assuming.

20         Q.   Was it out in Itasca?

21         A.   Yes.

22         Q.   Was anyone on the phone for that

23    meeting?

24         A.   No, I don't remember anyone on the

 1    phone.

 2         Q.    The first time you met with your

 3    lawyers, who was present?

 4         A.    Well, Rey was there, Guevara, myself,

 5    I'm not sure.  Maybe Caroline Golden.  I'm not

 6    sure.

 7         Q.    Were there any other defendants

 8    present apart from yourself and Rey Guevara at

 9    that first meeting?

10         A.    No.

11         Q.    When was the first time you spoke to

12    any of the defendants in this lawsuit apart

13    from Rey and Ed Mingey?

14         A.    I saw Ed at the Christmas party, Ed

15    Mingey.

16         Q.    And you mentioned that.

17               I'm saying apart from those two,

18    when was the last time you spoke to -- well,

19    let's just take them down the line.

20               When was the last time you spoke

21    to Dan Noon?

22         A.    Oh, God, years.  I have no idea.

23         Q.    When was the last time you spoke to

24    John Guzman?

1          A.    Many years.

2          Q.    When was the last time you spoke to

3     Sparks, Joe Sparks?

4          A.    Long time, same thing.

5          Q.    When was the last time you spoke with

6     Fallon?

7          A.    Oh, my God, a long time ago, couldn't

8     even tell you.

9          Q.    When was the last time you spoke to

10    Zacharias?

11         A.    A long time also.

12         Q.    When you say a long time ago, how long

13    is it --

14         A.    Years.

15         Q.    -- for Zacharias?

16         A.    I'm saying years.

17         Q.    How many years?

18         A.    Gosh, I don't know.  Well, probably

19    when I was back as a detective.

20         Q.    Do you know who Rocco Rinaldi is?

21         A.    Yes.

22         Q.    He was your sergeant at Area 5?

23         A.    Yes, he was.

24         Q.    Did you know him before you went to

1      Area 5?

2           A.   No.

3           Q.   When was the last time you spoke to

4      him?

5           A.   Don't know.  Probably when I was a

6      detective.

7           Q.   When was the last time you spoke to

8      Gillian McLaughlin?

9           A.   It's been a number of years.

10          Q.   How many?

11          A.   Maybe back when I was a detective.

12     That was it, or no, she made -- I think she

13     made sergeant.  Maybe I talked to her after

14     that, in the academy, I think.  I'm not sure.

15          Q.   When was the last time you spoke to

16     John Leonard?

17          A.   It's been a while.  A long time, a

18     number of years.

19          Q.   When you say a number of years, what

20     do you mean?

21          A.   Well, I left the detective division in

22     '96, and I can't remember seeing him after

23     that.

24          Q.   When was -- do you know Russ Weingart?

1      A.    Yeah, I know the name.  Right.

2      Q.    When was the last time you spoke with

3  him?

4      A.    Couldn't even tell you.  Many years,

5  and I really didn't talk to him that much when

6  he was in Area 5.

7      Q.    Did you go to Rey Guevara's, any of

8  his weddings?

9      A.    No.

10      Q.    Did you talk with him about his

11  divorce?

12      A.    No.

13      Q.    Do you know he had a divorce?

14      MS. EKL:  I'm going to object at this

15  point in time.  I know that relevance isn't

16  typically a proper objection at a deposition.

17  But at this point, you're getting very far

18  afield and you're getting into personal things

19  that Rey himself would not be -- I would

20  instruct him not to answer.

21          So, to the extent that you're

22  getting into Rey's divorces and whether or not

23  this witness has knowledge of those divorces,

24  I'm going to object and instruct him not to

1    answer, unless you can provide a basis for why

2    that would in some way lead to admissible or

3    relevant information in this case.

4           MR. AINSWORTH:  It goes to bias and

5    also goes to potential witnesses in the case.

6    BY MR. AINSWORTH:

7       Q.   So, I'm going to ask you the question,

8    sir.

9           Did you know that Rey Guevara was

10    going through a divorce?

11           MS. EKL:  Objection, foundation as to

12    time.

13           MS. ROSEN:  When?  Now?

14    BY MR. AINSWORTH:

15       Q.   At any point in time?

16       A.   Yes, I did.

17       Q.   Do you know the names of any of his

18    romantic partners?

19           MS. EKL:  Again, I'm going to object.

20    This is harassing.  There's absolutely no

21    relevance whatsoever.  It does not provide any

22    information that would even lead to admissible

23    evidence.

24           I think you're harassing both Rey

```
1     Guevara, and you're also harassing Mr. Gawrys

2     who is here to testify about this case.

3             THE WITNESS:  What's the question

4     again?

5     BY MR. AINSWORTH:

6        Q.   Do you know the names of any of the

7     people that Rey Guevara had a romantic

8     relationship with?

9        A.   One.

10       Q.   What is her name?

11       A.   Mary.

12       Q.   Do you know her last name?

13       A.   His current wife.

14       Q.   His current wife?

15       A.   Right.

16       Q.   Do you know -- are you aware that Rey

17    Guevara had a romantic relationship with a

18    woman whose son was a Maniac Latin Disciple, do

19    you know who I'm talking about?

20       A.   No.

21       Q.   You've never heard that before?

22       A.   No.

23       Q.   Is that correct, you never heard that

24    before?
```

1       A.   Yeah.   I never heard that before.

2       Q.   Do you know that Rey Guevara used to

3  have women observe court proceedings to watch

4  testimony?

5            MS. EKL:  Objection, form, foundation

6  assumes facts not in evidence, relevance.

7  BY MR. AINSWORTH:

8       Q.   Did you know that?

9       A.   No, I did not know that.

10      Q.   Have you ever heard that before?

11      A.   No, never.

12      Q.   Have you ever had a girlfriend attend

13  a court proceeding in a case that you're

14  working on when you're a witness and have been

15  excluded from the courtroom?

16      A.   Have I?

17      Q.   Yes.

18      A.   No.

19      Q.   Would you ever think to do that?

20      A.   No.

21      Q.   Did you ever attend any of Rey

22  Guevara's weddings?

23           MS. EKL:  Objection, asked and

24  answered.  You already asked this question.  He

1    already said no.

2            MR. AINSWORTH:  I didn't recall.  You

3    can keep your tone down.

4    BY MR. AINSWORTH:

5        Q.   Go ahead, sir.

6        A.   No.

7        Q.   Did Rey Guevara attend any of your

8    weddings?

9            MS. ROSEN:  Objection, form,

10   foundation.

11           THE WITNESS:  No.

12   BY MR. AINSWORTH:

13       Q.   What about Officer Guzman, did you

14   ever attend his wedding or he attend yours?

15       A.   He didn't attend mine.  I don't think

16   I attended his, no.

17       Q.   What about Officer Noon, did you

18   attend his wedding and did he attend yours?

19       A.   No.

20       Q.   How about Officer Sparks, did he

21   attend your wedding and you attend his?

22       A.   No.

23       Q.   How about Officer Fallon, did you

24   attend his wedding and did he attend yours?

1          A.   No.

2          Q.   And Officer Zacharias, did you attend

3    any of his weddings, did he attend any of

4    yours?

5          A.   No.

6          Q.   And for Detective Leonard, did you

7    attend any of his weddings or did he attend

8    yours?

9          A.   No.

10          Q.   And for Officer McLaughlin, did you

11    attend any of her weddings and did she attend

12    any of yours?

13          A.   No.

14          Q.   When you were partnered with Rey

15    Guevara, did you used to go to his house?

16          A.   Yes.

17          Q.   How often would you go to his house?

18          A.   Once or twice.

19          Q.   In the entire time that you were

20    partnered with Rey Guevara, you only went to

21    his house once or twice?

22          A.   Well, there was -- he lived at two

23    different places.  Once -- a couple times on

24    the north side when he lived there, and then on

1    the south side when he bought his house.

2         Q.   And did he used to come to your house?

3         A.   Yes, he would come to my house.

4         Q.   How often would he come to your house

5    while you were partners with him?

6         A.   Three or four times.

7         Q.   Why were you guys at your house on

8    those three or four times?

9         A.   I don't know.  I couldn't give you an

10   answer, just dropping by.

11        Q.   Would you go to the bar near Belmont

12   and Western with Rey Guevara after work?

13        A.   Which bar?

14        Q.   Well, did you ever go to a bar near

15   Belmont and Western after work?

16        A.   Yes.

17        Q.   What was name of it?

18        A.   I have no idea what the name was.

19        Q.   I'll tell you after lunch.

20             And would you go there sometimes

21   with Rey Guevara?

22             MS. EKL:  Objection, form, foundation.

23             THE WITNESS:  I believe I did.

24

```
 1    BY MR. AINSWORTH:

 2         Q.   Why do you believe you did?

 3         A.   Well, we worked together, but I think

 4    maybe twice I went there, once, I'm not sure.

 5         Q.   In the entire time that you worked at

 6    Gang Crimes North, you only went to that bar

 7    once or twice?

 8         A.   That's it.

 9         Q.   Why was that?

10         A.   I'm not a drinker.  I'm not a bar

11    person.

12         Q.   Did you arrest Jacques Rivera?

13         A.   I believe that was what -- which time?

14         Q.   I don't know.  I'm just wondering did

15    you arrest him ever?

16              MS. EKL:  Objection, foundation.

17              THE WITNESS:  Yes.

18    BY MR. AINSWORTH:

19         Q.   On how many occasions did you arrest

20    him?

21         A.   Once.

22         Q.   When was that?

23         A.   I don't remember the date.

24         Q.   Where was he when you arrested him?
```

1        A.    I don't remember that.

2        Q.    Who was present when you arrested him?

3        A.    I believe I was with Rey.

4        Q.    Was anyone else present?

5        A.    I don't remember.

6        Q.    Was this the kind of situation where

7    you put handcuffs on the guy and transported

8    him to the station or was it a situation where

9    you asked the guy to accompany you back to the

10   station and they come willingly?

11       A.    Just accompany.

12       Q.    And did you tell him exactly what it

13   was about when you arrested him, or when you

14   asked him to accompany you back to the station?

15            MS. EKL:  Objection, form, vague.

16            THE WITNESS:  Gave him a reason.

17   BY MR. AINSWORTH:

18       Q.    What was the reason?

19       A.    I don't remember.  I know it's in the

20   reports.

21       Q.    The reason is in the reports, the

22   reason that you gave to Jacques Rivera is in

23   the reports?

24       A.    I believe so.

1       Q.   Which report are you referring to?

2       A.   I'm not sure which one.

3       Q.   How did you learn about the Felix

4  Valentin shooting?

5       A.   How did I learn about it?

6       Q.   Yes.

7       A.   I don't understand what you mean as

8  far as?

9       Q.   Felix Valentin was shot, and I'll

10  represent to you that it happened on

11  August 27th, 1988, and I'm just wondering how

12  you learned that Felix Valentin had been shot?

13       A.   I don't remember.  I don't know.

14       Q.   You worked on the Felix Valentin

15  investigation prior to asking Jacques Rivera to

16  accompany you to the police station; is that

17  right?

18       A.   Correct.

19       Q.   What activities did you undertake to

20  investigate the Felix Valentin shooting?

21             MS. ROSEN:  Total?  In total?

22             MR. AINSWORTH:  Yes.

23             MS. EKL:  Objection, form, vague.

24             THE WITNESS:  Everything we did?

1     BY MR. AINSWORTH:

2          Q.    Whatever you can recall, sir.

3          A.    I can't remember.

4          Q.    You can't remember a single action you

5     took with regard to the Felix Valentin

6     investigation or shooting investigation?

7          A.    I know I made a report out, but

8     specifically I don't know.

9          Q.    How many times was Jacques Rivera

10    arrested?

11               MS. EKL:  Objection, foundation.

12               THE WITNESS:  When?  All of his life?

13    BY MR. AINSWORTH:

14         Q.    Sorry.  You're right.  Thank you.

15               How many times was Jacques Rivera

16    arrested in the course of the Felix Valentin

17    shooting investigation?

18         A.    Once.  Well, he was brought in twice

19    from what I read in the reports.

20         Q.    And how many line-ups were held in the

21    course of the -- physical line-ups were held in

22    the course of the Felix Valentin shooting

23    investigation?

24               MS. ROSEN:  Objection, foundation.

1                     THE WITNESS:  One.

2    BY MR. AINSWORTH:

3        Q.   How many line-ups were you present for

4    during the course of the Felix Valentin

5    shooting investigation?

6        A.   Depends what you mean by present.  Was

7    I in the room with the witness?  Was I -- it's

8    hard for me to answer.  I need a little --

9    clarify.

10       Q.   Were there times when you were

11   physically in the room for a line-up?

12       A.   Sometimes, yes.

13       Q.   Were there times when you were where

14   you would observe the line-up from outside the

15   room?

16            MS. EKL:  You're talking about

17   generally?

18            MR. AINSWORTH:  Generally, yes.

19            MS. EKL:  Just want to make sure.

20            THE WITNESS:  Well, you can't observe

21   the line-up from outside the room.  It's a door

22   that has smoked glass on it.

23   BY MR. AINSWORTH:

24       Q.   Would you -- when I said -- when I

1     asked you if you were present for the line-up,

2     you were a little confused?

3                        Is it sometimes that you bring a

4     witness to the line-up room, but you don't

5     actually go in, did that happen?

6          A.   Yes.

7          Q.   And so is that why you were confused?

8     Sometimes you're present in the area, but

9     you're not actually in the room?

10         A.   Correct.

11         Q.   Do you recall if you were actually

12    present in the room at the time the line-up

13    occurred in the Felix Valentin homicide

14    investigation?

15         A.   I don't remember that.

16         Q.   How do you know that there was only

17    one line-up?

18         A.   Just from reading reports.

19         Q.   You have no other basis to say that?

20         A.   No, I don't remember the case.

21         Q.   Did you ever talk to Orlando Lopez

22    during the course of your investigation of the

23    Felix Valentin shooting?

24         A.   I don't think so.

1        Q.   Why don't you think so?

2        A.   I don't remember it.

3        Q.   And that's the reason why you say you

4   don't think so because you don't remember it?

5        A.   Right.

6        Q.   Did you talk to the victim, Felix

7   Valentin, during the course of the Felix

8   Valentin shooting investigation?

9        A.   I don't remember talking to him.

10       Q.   Did you ever go visit him?

11       A.   I believe I did, but I don't remember

12   it.

13       Q.   Why do you say you believe you did?

14       A.   From the reports, we made visits to

15   the hospital, but I don't remember going there.

16       Q.   Is your report -- well, in the reports

17   that you reviewed of the Felix Valentin

18   shooting investigation, was there anything in

19   those reports that was inaccurate?

20       A.   Not that I know, no.

21       Q.   Was your report about going to see

22   Felix Valentin in the hospital inaccurate?

23       A.   No, I don't think so.

24       Q.   Do you recall going to see Felix

```
1    Valentin in a hospital on a bed that was moving
2    back and forth, side to side?
3         A.   No, I don't remember that.
4         Q.   Do you remember going to see Felix
5    Valentin in a hospital where he was paralyzed
6    and unable to speak, but you communicated with
7    him through nonverbal measures or he used
8    nonverbal measures to communicate with you?
9         A.   No, I don't remember that.
10        Q.   Did that ever happen in your career
11   that you went to a hospital and had to
12   communicate with a victim of a crime using
13   nonverbal means?
14        A.   Yes.
15        Q.   On how many occasions did that happen?
16        A.   I couldn't tell you.  I don't know.
17        Q.   More than once?
18        A.   It was more than once, yes.
19        Q.   More than five times?
20        A.   Possibly.  I would say so, yes, I
21   couldn't remember specifics.
22        Q.   More than ten times?
23        A.   I don't know.  Now you're getting up
24   there.  That's a high number.  I don't think
```

1    so.

2        Q.   In those cases where somebody was

3    communicating with you nonverbally, how would

4    you communicate with them?  What system would

5    you work out?

6        A.   A lot of times we -- if they could

7    just blink their eyes.  So, one blink was

8    either yes or no, and two blinks was either yes

9    or no.  However, we did it.

10               Maybe moving a finger, tapping a

11    finger once or twice.  That's about it.  It

12    just depends on their condition, what

13    extremities they can use.

14        Q.   Have you ever shown the gang book to

15    somebody who is in that condition?

16        A.   Yes.

17        Q.   How did you go about showing somebody

18    who is only able to communicate nonverbally

19    because of an injury, how would you show them

20    the gang book?

21        A.   Well, you explain to them that we're

22    going to show them a book, page-by-page, and

23    that however it was set up to say yes or no,

24    and then stand there with the book open and go

1    page-by-page and hold it in front of them.

2         Q.   So you would physically turn the pages

3    for them?

4         A.   Uh-huh, yes.

5         Q.   And you would hold the book in a place

6    where they could see it?

7         A.   Yes.

8         Q.   Have you ever visited somebody in a

9    hospital who was moving side to side in a bed,

10   in a hospital bed, to keep their lungs clear?

11        A.   I remember that, but I don't know who.

12        Q.   How many times do you remember that

13   happening?

14        A.   Just like once.

15        Q.   Did you show that person any

16   photographs?

17        A.   You know, I don't know.  I don't

18   remember.

19        Q.   Did you know the area of the shooting

20   in this case, the 3200 block of West Cortland?

21        A.   Yes, I know where it's at.

22        Q.   Had you been there before?

23        A.   Yes.

24        Q.   In 1988, did you know which gang

1       territory that was?

2               A.      I believe that was Folks territory.

3               Q.      Do you know which faction of the Folks

4       controlled that area at that time?

5               A.      I'm not sure, but I think Imperial

6       Gangsters.

7               Q.      Do you know who were rivals of the

8       Imperial Gangsters in that area at that time in

9       1988, I'm talking about August of 1988?

10              A.      Yes.

11              Q.      Who?

12              A.      That would be the Latin Kings.

13              Q.      Anyone else?

14              A.      Sometimes they might be fighting

15      between themselves, Folks, even though on paper

16      they're aligned together, but there might be

17      some kind of riff going between them, but

18      mainly it would be the Kings.

19              Q.      Are you saying the Kings simply

20      because the Kings are People and --

21              A.      Right.

22              Q.      -- the IGs are Folks; is that correct?

23              A.      Yes, that's correct.

24              Q.      You don't know of any particular feud

1      that was going on in August of 1988 between the

2      Imperial Gangsters who hung out on Cortland and

3      the Latin Kings who were in the area?

4           A.   No.

5           Q.   That's correct?

6           A.   That's correct.

7           Q.   Do you remember talking to a Felix

8      Valentin in this case while he was on a

9      ventilator?

10          A.   No, I don't remember.

11          Q.   Did you show any photo arrays to any

12     witnesses in this case?

13          A.   Don't remember.

14          Q.   Did you show any singular photographs

15     to anybody in this case, that is, just showing

16     them a photograph of a person without any other

17     photographs alongside it?

18          A.   No, I don't remember.

19          Q.   Do you recall taking gang books to the

20     hospital to investigate this case?

21          A.   No, I don't.

22          Q.   In this case, I mean, the Valentin

23     shooting investigation.

24          A.   Don't remember.

1      Q.   When you were a Gang Crimes

2   Specialist, would you and Detective Guevara, or

3   Gang Crimes Specialist Guevara at the time

4   coordinate your furloughs?

5           MS. EKL:  Objection, form,

6   specifically the word "coordinate."

7           THE WITNESS:  No.

8   BY MR. AINSWORTH:

9      Q.   Would you have the same off days as

10  Gang Crime Specialist Guevara in 1988?

11     A.   I believe we did, yes.

12     Q.   That was because you were partners?

13     A.   Yes.

14          MR. AINSWORTH:  Let's mark this as

15  Exhibit No. 1.

16                  (WHEREUPON, Deposition Exhibit No.

17                   1 was marked for identification.)

18  BY MR. AINSWORTH:

19     Q.   Showing you what has been marked as

20  Exhibit No. 1, this is a three-page document --

21          MS. EKL:  There's actually an extra

22  page.

23          MS. ROSEN:  It's actually four pages.

24  Did that mean for that to be there?

1      MR. AINSWORTH:  Yes.  Sorry.

2   BY MR. AINSWORTH:

3      Q.   Four-page document Bates numbered CPD

4   0019 through CPD 0022.

5           MS. EKL:  And I would just object to

6   the characterization of it as a document since

7   it appears to be two separate reports.

8   BY MR. AINSWORTH:

9      Q.   So, I'm going to ask you, was the

10  first three pages of this Exhibit No. 1, was

11  that one of the police reports that you

12  reviewed?

13          Actually, why don't we just take

14  off the Page 4, make it a separate exhibit.

15  It's going to be easier to talk about.

16          MS. ROSEN:  So you're making the GPR

17  Exhibit No. 2.

18          MR. AINSWORTH:  Yes.

19              (WHEREUPON, Deposition Exhibit No.

20               2 was marked for identification.)

21  BY MR. AINSWORTH:

22     Q.   For the record, Exhibit No. 2 would be

23  a one-page document Bates numbered CPD 0022.

24          And Exhibit No. 1 is three pages

1    Bates numbered CPD 0019 through 21.

2              So, looking just at Exhibit

3    No. 1, was this one of the documents that you

4    reviewed in preparation for today's deposition?

5              Do you recall the question?

6         A.   You asked me if I read this report?

7         Q.   Is this one of the reports that you

8    reviewed?

9         A.   Yes and no.

10        Q.   Why do you say that?

11        A.   I looked at the front of it and the

12   second page, but not -- I didn't read the whole

13   thing.  My name is not on there.

14        Q.   Have you now reviewed that report?

15        A.   Yes.

16        Q.   So turning to the second page of this

17   Exhibit No. 1, under investigation, the third

18   paragraph down states:

19              On today's date, attempts were

20   made to locate the eyewitness, Lopez comma

21   Orlando, in order to have the subject view a

22   line-up.  Numerous visits to witnesses'

23   residents prove negative and family indicated

24   they were unaware of his whereabouts..."

1                    Do you see that?

2          A.    Yes.

3          Q.    Did you make efforts to visit Orlando

4    Lopez at his residence?

5                    MS. EKL:  Objection, form.

6                    THE WITNESS:  Did I?

7    BY MR. AINSWORTH:

8          Q.    Yes.

9          A.    No.

10         Q.    How do you know that?

11         A.    On this date?

12         Q.    On the date indicated in the report.

13         A.    September?

14         Q.    August 31st.  The report is dated on

15   September 1st at 1:00 a.m., correct, or

16   submitted on that date?

17         A.    Yes.

18         Q.    So discussing activities that took

19   place on August 31st, correct?

20         A.    Probably, yes.

21                    MS. ROSEN:  Objection, form.

22                    MS. EKL:  Calls for speculation.

23   BY MR. AINSWORTH:

24         Q.    So, I'm going to ask you first for

1      October -- August 31st, 1988, did you make

2      efforts to locate Orlando Lopez on that date?

3            A.   No.

4            Q.   How do you know that?

5            A.   I don't remember doing it.

6            Q.   So is it that you didn't do it, or is

7      it that you simply don't recall doing it?

8            A.   I don't recall.

9            Q.   Did you make efforts to locate Orlando

10     Lopez on any date other than August 31st, 1988?

11           A.   I don't remember.

12           Q.   Had you worked with Detective Leonard

13     or McLaughlin prior to August 31st, 1988?

14           A.   I would say, yes.

15           Q.   Why would you say yes?

16           A.   Well, just because we worked with them

17     quite a bit.

18           Q.   You mean Detectives Leonard and

19     McLaughlin?

20           A.   Yes.

21           Q.   And what is quite a bit?  How many

22     cases did you work with them?

23           A.   Oh, I don't know.  I have no idea.  I

24     couldn't tell you.

1        Q.   Was it once a month or was it more

2   than once a month?  Was it less than once a

3   month?

4        A.   I would say less than once a month.

5        Q.   Did you work on locating fillers for

6   the line-up that was to be held on August 31st,

7   1988?

8        A.   No, I don't remember that at all.

9        Q.   So as you're saying no, you didn't do

10   it, or, no, you just don't recall?

11        A.   I don't recall.

12        Q.   While you were a Gang Crime

13   Specialist, did you sometimes locate fillers on

14   the street to volunteer to be part of a

15   line-up?

16        A.   Yes.

17        Q.   How would you go about doing that?

18        A.   You just look for -- well, you first

19   check the lockups, if there were subjects

20   already in custody that pretty much matched the

21   description of a suspect.

22        Q.   In this case, at least initially,

23   there's more than one eyewitness, is that

24   right, the victim and Orlando Lopez?

1      A.   Yes.

2      Q.   If a photo array was shown to the

3 victim and no identification was made, would

4 you inventory that photo array?

5      A.   It depends.

6      Q.   And what does it depend on?

7      A.   If there was a suspect in there.

8      Q.   And let's say there was a suspect in

9 that photo array?

10     A.   Then, yes.

11     Q.   Why would you inventory the photo

12 array if nobody was picked out of the photo

13 array?

14     A.   Because the -- he's -- if you know you

15 have a suspect by whatever means prior to

16 showing the victim, if that's a positive, and

17 he doesn't and then you show it to the victim

18 and the victim doesn't, well, then it's a

19 negative, but you have to show that.

20     Q.   What if the witness could not view the

21 photographs because of the witness' condition,

22 would you inventory the photographs?

23     A.   If he didn't view it?

24     Q.   If he was unable to view it, because

1    he was medically unable to view it?

2        A.   No.

3        Q.   You would not inventory the

4    photographs?

5        A.   No.

6        Q.   Why wouldn't you inventory the

7    photographs?

8        A.   We haven't done anything with them,

9    the photos.

10        Q.   So, taking a look at the bottom

11    paragraph on that page, it generally states

12    that the detectives brought six photographs to

13    the victim's hospital bed; do you see that?

14        A.   Yes.

15        Q.   And it states in the last sentence on

16    that page, as photos were being shown to

17    victims, it appeared that the victim was having

18    a difficult time focusing on the photos; do you

19    see that?

20        A.   Yes.

21        Q.   Victim's eyes were constantly tearing

22    and detectives inquired of the staff of

23    victim's medication at the time.  Detectives

24    learned that victim had been placed on a

1     morphine drip for the pain.  It should also be

2     noted that the victim was in constant motion

3     (side-to-side) as the whole bed moved to help

4     keep the lungs from filling with fluid.  Staff

5     indicated that victim presently in danger of

6     contracting pneumonia.

7                 It was then decided to cease the

8     photo identification until later in the week;

9     when the physician indicated that the tubes

10    would be removed from victim's throat.

11                Do you see that, sir?

12         A.   Yes.

13         Q.   Would you have inventoried the

14    photographs if you had shown the photo array to

15    the victim and the victim was unable to view

16    the photo array because of his medical

17    condition?

18                MS. EKL:  Objection, asked and

19    answered, form, calls for speculation.

20                THE WITNESS:  No, I wouldn't.

21    BY MR. AINSWORTH:

22         Q.   Did you show any photographs to the

23    victim on August 31st, 1988?

24         A.   No, I don't remember doing it.

```
1          Q.    Were you at the hospital, Cook County
2     Hospital, on August 31st, 1988?
3          A.    I don't remember it.
4          Q.    Taking a look at the names that are
5     listed on the third page of Exhibit 1, are any
6     of those names familiar to you?
7          A.    Just the one that says Jacques Rivera
8     and Jose Rodriguez.
9          Q.    And how is Jacques Rivera familiar to
10    you?  How is that name familiar to you?
11         A.    He's a suspect.
12         Q.    Suspect in what?
13         A.    In this aggravated battery at this
14    time.
15         Q.    And how about Jose Rodriguez, how was
16    his name familiar to you?
17         A.    Just from reports.
18         Q.    When you're referring to reports, what
19    reports are you referring to?
20         A.    Oh, I don't know.  I read it somewhere
21    in one of these reports.  His name came up.
22    Well, right here, the front page of this one,
23    Exhibit 1.
24         Q.    So reports related to the Felix
```

1 Valentin shooting investigation?

2   A. Yes.

3   Q. Do you have an opinion as to the guilt

4 or innocence of Jacques Rivera in the shooting

5 of Felix Valentin?

6   A. Right now?

7   Q. Yes.

8   A. Based on the facts, he was guilty.

9   Q. And so what facts?  Why --

10   A. His statement.

11   Q. Why do you believe he was guilty?

12   A. Because of the witness statement.

13   Q. Which witness statement?

14   A. Orlando.  What was the name?  Lopez.

15 Not on there.

16   Q. Orlando Lopez is his name?

17   A. Lopez.  Sorry.

18   Q. Are there any other facts that leads

19 you to conclude that Jacques Rivera is guilty

20 of the shooting of Felix Valentin?

21   A. Right off now, no.

22   Q. Are you relying on any statements by

23 the victim in saying that Jacques Rivera was

24 guilty?

1    A.    Well, that's part of it, that
2    identification.
3    Q.    What identification?
4    A.    I believe in a line-up, physical
5    line-up.
6    Q.    Who identified it?
7    A.    He did, Orlando Lopez.
8    Q.    Orlando Lopez identified Jacques
9    Rivera in a physical line-up, is that what
10   you're saying?
11   A.    Yes.
12   Q.    Apart from Orlando Lopez's
13   identification of Jacques Rivera in a line-up,
14   are there any other facts underlying your
15   belief that Jacques Rivera is guilty?
16   A.    Not that I can remember right now.
17   Q.    And so I ask you, are you relying on
18   any statements by the victim for your belief
19   that Jacques Rivera is guilty?
20   A.    Only that I know he picked his photo
21   out --
22   Q.    How do you know that --
23   A.    -- in a line-up.
24   Q.    And Orlando Lopez is not the victim in

1    the case; do you understand that?

2            A.    No, the witness.

3            Q.    The witness is Felix Valentin -- so

4    the victim is Felix Valentin, correct?

5            A.    Correct.

6            Q.    Are you saying that Felix Valentin

7    picked out Jacques Rivera in a line-up?

8            A.    No, I didn't say that.  Did I?

9            Q.    Well, let's just be totally clear.

10                   Are you relying on any statements

11   by the victim, Felix Valentin, in your belief

12   that Jacques Rivera is guilty?

13           A.    In one -- I think it was my report,

14   supp report stated that they picked a photo out

15   in a hospital.

16           Q.    That Felix Valentin did?

17           A.    Yes.

18           Q.    And is that another basis for your

19   belief that Jacques Rivera is guilty?

20           A.    It would.

21           Q.    Is there any other basis for your

22   belief that Jacques Rivera is guilty?

23           A.    No.

24           Q.    Are you aware that Jacques Rivera was

1    granted a certificate of innocence?

2         A.   I don't understand that.

3         Q.   Do you know that the Court, Cook

4    County Circuit Court has granted Jacques Rivera

5    a certificate of innocence saying that he is

6    innocent of this murder?

7              MS. ROSEN:  Are you asking if he knows

8    that fact?

9              MR. AINSWORTH:  Yes.

10             MS. ROSEN:  Oh, okay.

11             THE WITNESS:  Yeah, I heard it.

12   BY MR. AINSWORTH:

13        Q.   Does that factor into your belief that

14   Jacques Rivera is either innocent or guilty of

15   the murder?

16        A.   Well, I mean, if the Court is issuing

17   that, I mean, it would be a shame.  I mean, I

18   would feel bad for him that he went to prison

19   for this crime and now everything is recanted.

20   But at the time, that's the facts we had and

21   that we went with.

22        Q.   So that's why I'm asking you.

23             As you sit here today now on

24   January 21st, 2014, do you have a belief as to

1    whether Jacques Rivera was guilty or innocent

2    of the murder of Felix Valentin?

3         A.   What's the reason for the issuing that

4    innocence if the Court issued it?

5         Q.   I'm just asking you, sir, do you have

6    a belief?

7         A.   Well, my belief would be on the reason

8    that he was issued that --

9         Q.   Well, not knowing the reason --

10        A.   -- innocence.

11        Q.   Yes.  Not knowing the reasons, sir, as

12   you sit here today, do you have a belief as to

13   his guilt or innocence?

14        A.   Well, I can't answer it.  I mean, I

15   don't know how without knowing the reason that

16   he was being released by the Court and found

17   innocent.

18        Q.   So, you don't have a belief as to his

19   guilt?

20        A.   Well, originally, I thought I believed

21   he was guilty.

22        Q.   That's why I'm asking you.  As you sit

23   here today --

24        A.   Today?

1      Q.   Yes.  Do you have a belief as to --

2      A.   I don't know.  I don't know.  It

3  depends.  I mean, you want a specific -- I

4  can't give it to you.

5      Q.   Can you tell me yes or no is Jacques

6  Rivera guilty of the murder of Felix Valentin?

7           MS. ROSEN:  Objection, asked and

8  answered.  He just said I don't know.

9           THE WITNESS:  Again, why did the Court

10  issue that?

11  BY MR. AINSWORTH:

12      Q.   Do you know, sir?  Do you know if he's

13  guilty or innocent?

14           MS. EKL:  Objection, asked and

15  answered.

16           THE WITNESS:  Well, originally, I

17  believe he was guilty by the facts of the case.

18  BY MR. AINSWORTH:

19      Q.   I'm asking you as you sit here today,

20  do you know?

21           MS. ROSEN:  Objection, asked and

22  answered.

23           THE WITNESS:  I don't know.

24

1    BY MR. AINSWORTH:

2        Q.   Do you have any independent

3    recollection that either Jacques Rivera or Jose

4    Rodriguez were suspects in the Valentin

5    shooting?

6        A.   Independent?

7        Q.   Yes.  Meaning, without -- apart from

8    what's written on the page, do you recall

9    either Jacques Rivera or Jose Rodriguez being a

10   suspect?

11       A.   No.

12       Q.   Did you know an Officer Nieves?

13       A.   No.

14       Q.   Served on the Mayor's detail?

15       A.   No.

16       Q.   Do you have an opinion as to Rey

17   Guevara's ability as a police Officer?

18       A.   Opinion?

19       Q.   Yes.

20       A.   I think he's a good policeman.

21       Q.   What do you think of his abilities as

22   a report writer?

23       A.   He needed a little practice.

24       Q.   Who was a report writer, you or Rey?

1      A.    Probably me.

2      Q.    Why do you say probably you?

3      A.    I don't know.  I'm not that good

4   either but --

5      Q.    Do you think you were better than Rey?

6      A.    I think so, yeah.

7      Q.    Do you have an opinion as to the

8   abilities of Bill Dorsch as a police officer?

9      A.    Bill Dorsch?

10     Q.    Yes.

11     A.    No.  I thought he was a good

12  detective.  He was very thorough.

13     Q.    Did you ever have a problem with Bill

14  Dorsch?

15     A.    No.

16     Q.    Do you recall an incident where Bill

17  Dorsch became angry with Rey Guevara because

18  Guevara pointed out to a witness which photo he

19  should pick out from a photo array?

20         MS. EKL:  Objection, form, foundation.

21         THE WITNESS:  I don't know anything

22  about that.  Don't know.

23  BY MR. AINSWORTH:

24     Q.    Do you remember the case involved two

1    juvenile witnesses whose had written down a

2    license plate several months after a murder had

3    taken place?

4              MS. EKL:  Objection, form, foundation,

5    assumes facts not in evidence.

6              THE WITNESS:  No, I don't know

7    anything about that.

8    BY MR. AINSWORTH:

9         Q.   Do you remember the case involved a

10   person who was charged with murder until the

11   two juveniles the next day recanted and said

12   that they had been paid to identify a person

13   falsely?

14             MS. EKL:  Objection, form, foundation,

15   assumes facts not in evidence.

16             THE WITNESS:  Didn't know anything

17   about it.

18   BY MR. AINSWORTH:

19        Q.   Have you read any of the news reports

20   about allegations of misconduct against Rey

21   Guevara?

22        A.   Yes.  I did see something in the paper

23   about it.

24        Q.   Are you surprised that there's so many

1    allegations of misconduct committed by your

2    former partner, Rey Guevara?

3              MS. EKL:  Objection, form.

4              MS. ROSEN:  Objection, form.

5              THE WITNESS:  Yes.

6    BY MR. AINSWORTH:

7         Q.    Did you ever observe Rey Guevara

8    commit any act of misconduct regarding a

9    witness identification?

10        A.    No.

11        Q.    Never?

12        A.    Never.

13        Q.    Did you ever observe Rey Guevara use

14   force against a suspect inside a detective

15   area?

16        A.    No.

17        Q.    Did you ever see Rey Guevara use force

18   against a suspect inside a police station?

19        A.    No.

20        Q.    Did you ever see Rey Guevara use force

21   against a witness inside a police station?

22        A.    No.

23        Q.    Did you ever see Rey Guevara show a

24   single photograph to a -- of a suspect to a

145

1    witness shortly before they viewed a photo

2    array or a line-up?

3        A.   Never, no.

4        Q.   Did you ever observe Rey Guevara tell

5    a witness who to pick out from a photo array or

6    line-up?

7        A.   No.

8               (WHEREUPON, Deposition Exhibit No.

9               3 was marked for identification.)

10   BY MR. AINSWORTH:

11       Q.   Showing you what has been marked as

12   Exhibit No. 3, this is a three-page document

13   Bates numbered CPD 0025 through CPD 0027.

14          Do you see that, sir?

15      A.   Yes.

16      Q.   This is a report submitted on

17   September 15, 1988; would you agree?

18      A.   Yes.

19      Q.   What action did you take in regard to

20   investigating the Felix Valentin shooting

21   between August 31st and the date of this

22   report, September 15, 1988?

23      A.   We brought Jacques Rivera into the

24   station, into Area 5.

1      Q.    When did you do that?

2      A.    Well, it would be 15, September.

3      Q.    Why did you bring him in on that date?

4      A.    I don't know.  I don't have a reason

5   other than it's a follow-up from now reporting

6   that it was a murder -- homicide.

7      Q.    Were you looking for Jacques Rivera

8   prior to that time but couldn't find him?

9      A.    I don't remember.

10     Q.    Were you looking for the witness

11  Orlando Lopez prior to September 15 but

12  couldn't find him?

13     A.    I don't remember.

14     Q.    Did you bring Orlando Lopez to the

15  police station on September 15 to view a

16  line-up?

17     A.    I can't remember if I did or not.

18     Q.    Did your partner, Rey Guevara,

19  transport Orlando Lopez to the station for the

20  line-up on September 15, 1988?

21     A.    Don't remember.

22     Q.    Did you question Jacques Rivera on

23  September 15, 1988?

24     A.    I don't remember doing that.

1       Q.   Is there any reason why you wouldn't

2  question Rey Guevara?

3       A.   I wouldn't question who?

4       Q.   Is there any question why you wouldn't

5  question Jacques Rivera if you were --

6          MS. EKL:  Do you want to try again?

7  Is there any reason, you'll want to start over.

8          MR. AINSWORTH:  Agreed.

9  BY MR. AINSWORTH:

10      Q.   Why wouldn't you question Jacques

11  Rivera when you arrested him on September 15,

12  1988?

13         MS. EKL:  Objection, form, assumes

14  facts not in evidence, and calls for

15  speculation.

16         THE WITNESS:  That's the detectives'

17  main job there to do that.  That's their

18  responsibility to take a statement from him if

19  he wishes to give one.

20  BY MR. AINSWORTH:

21      Q.   So you left that to the detectives?

22      A.   Yes.

23      Q.   Did you ever go to Mozart School to

24  try to locate Orlando Lopez?

1      A.    I don't remember that.

2      Q.    Do you know where Mozart School was?

3      A.    No.  I was just thinking about where

4  it was.  I don't know.

5      Q.    If you were trying to find a

6  12-year-old witness, is one of the things that

7  you would do as a gang crimes specialist to

8  find out what school they attended?

9      A.    Yes.

10      Q.    Could you go to the school and locate

11  the child if they were enrolled in the school?

12          MS. EKL:  Objection, foundation, calls

13  for speculation.

14          THE WITNESS:  Would I do it?

15  BY MR. AINSWORTH:

16      Q.    Have you done that?

17      A.    Well, I don't think you could take a

18  child out of the school without guardian

19  approval.

20      Q.    Have you ever waited until the school

21  let out to transport a juvenile witness to the

22  police station?

23          MS. ROSEN:  Like pick him up after

24  school?

1           MR. AINSWORTH:  If they're willing,

2  yes.

3           MS. ROSEN:  Objection, form,

4  foundation.

5           THE WITNESS:  I don't remember doing

6  it.

7  BY MR. AINSWORTH:

8      Q.  Do you recall asking Orlando Lopez's

9  mother what school he attended?

10     A.  Don't remember that.

11     Q.  In 1988, could you interview a

12  12-year-old witness without his mother present?

13     A.  I wouldn't do it, no.

14     Q.  Why not?

15     A.  You had to have a youth officer

16  present, if you couldn't find a guardian.

17     Q.  So if you couldn't have a guardian,

18  then you would have a youth officer present --

19     A.  Yes.

20     Q.  -- to protect your child's interest;

21  is that right?

22     A.  But I would wait for a guardian.

23     Q.  You would want to have a guardian

24  there with a child that young?

1      A.   Usually, yes.

2      Q.   Would you have a 12-year-old child

3  view a line-up without a parent or guardian

4  present?

5           MS. ROSEN:  Objection, form, vague.

6           MS. EKL:  Calls for speculation.

7           THE WITNESS:  Would I have him do it?

8  BY MR. AINSWORTH:

9      Q.   Yes.

10     A.   Sure.

11     Q.   Without a parent or guardian present?

12          MS. ROSEN:  Objection, form, vague.

13          THE WITNESS:  I would have a youth

14  officer present.

15  BY MR. AINSWORTH:

16     Q.   Would you try to have a parent or

17  guardian present?

18     A.   Oh, sure, yes.

19     Q.   Why?

20     A.   It's just -- well, he's a juvenile for

21  one thing.

22     Q.   So, what about the fact that he's a

23  juvenile?

24     A.   Well, I mean, people could say he was

```
 1    intimidated by the police into doing something

 2    or whatever.

 3         Q.   Let me just re-ask the question.

 4              What about the fact that he was a

 5    juvenile means that you personally would have a

 6    parent or -- would want to have a parent or

 7    guardian present if this juvenile was viewing a

 8    line-up?

 9         A.   Would I or?

10         Q.   Why would you?

11         A.   Why would I?

12         Q.   Yes.

13         A.   Because he's a juvenile.  It's just --

14    I think it was required by policy, if I

15    remember right, to have any time a juvenile was

16    in the station, have a youth officer present

17    with the juvenile.

18         Q.   And why would you --

19         A.   Just to watch proceedings.

20         Q.   And why would you want to have a

21    parent or guardian as your first choice over a

22    youth officer?

23         A.   So the parents know what's going on.

24         Q.   It is also to prevent any allegation
```

1     that the witness, the juvenile witness was

2     intimidated or influenced by the police in

3     their identification?

4          A.   Another reason.

5          Q.   Would you agree with that?

6          A.   Yes.

7          Q.   Was that something that the department

8     trained you on; that is, that if you're

9     bringing juveniles to the police station you

10    should have a parent or guardian present, or if

11    you can't find them, then at least have a youth

12    officer present?

13         A.   I don't remember if it's policy.  If

14    they're in custody, yes, you have to.  If you

15    can't find a parent or guardian, then you have

16    to have a youth officer present to represent

17    the juvenile.  But as a witness, I'm not sure.

18         Q.   And you understand I'm asking about in

19    1988, not in today's policies?

20         A.   Yes.

21         Q.   And in 1988, were you aware that

22    there's special circumstances that you have to

23    be aware of when you're doing with juvenile

24    witnesses?

1           MS. EKL:  Objection, form, vague.

2           THE WITNESS:  No.

3    BY MR. AINSWORTH:

4       Q.   Were you aware in 1988 that juveniles,

5    particularly as you get younger juveniles, are

6    more easily intimidated by police officers?

7           MS. EKL:  Objection.

8           MS. ROSEN:  Objection, form.

9           MS. EKL:  Objection, form, foundation.

10          THE WITNESS:  Did I what?  Did I

11   understand that?

12   BY MR. AINSWORTH:

13      Q.   Yes.

14      A.   It's a thought.  I think I mentioned

15   it.

16      Q.   And were you aware in 1988 that

17   juveniles as compared with adults are more

18   easily influenced by police officers?

19          MS. EKL:  Objection, form, foundation.

20          THE WITNESS:  Could be.  Depends on

21   the juvenile.  How old is he?

22   BY MR. AINSWORTH:

23      Q.   12-year-old.

24      A.   Could be.

1      Q.   Probably so the younger you get the

2  more likely they could be influenced by a

3  police officer?

4         MS. ROSEN:  Objection, form.

5         MS. EKL:  Objection, form, foundation.

6  BY MR. AINSWORTH:

7      Q.   Is that correct?

8      A.   I don't know.

9      Q.   Why did you ask how old the witness

10  was?

11      A.   Well, as they get older, you know,

12  they get into 15-years-old and up, and 14,

13  especially in some areas they're pretty

14  knowledgeable of what's going on.

15      Q.   What about a 12-year-old who had never

16  been arrested before?  Would you have concerns

17  with that witness about making sure the witness

18  didn't feel either intimidated or influenced by

19  police presence?

20         MS. EKL:  Objection, form, foundation,

21  incomplete hypothetical.

22         MS. ROSEN:  Objection, form.

23         THE WITNESS:  It's a possibility.

24

1 BY MR. AINSWORTH:

2   Q. When you're a gang crimes specialist,

3 would you sometimes order a criminal history

4 report about a suspect that you had?

5   A. Yes.

6   Q. Why would you do that?

7   A. Just to see their background.

8   Q. Why would you want to know their

9 background?

10   A. What I was dealing with.

11   MR. AINSWORTH:  Let's mark this as

12 Exhibit No. 4.

13       (WHEREUPON, Deposition Exhibit No.

14       4 was marked for identification.)

15 BY MR. AINSWORTH:

16   Q. Showing you what has been marked as

17 Exhibit No. 4.  This is a one-page document

18 Bates numbered CPD 0012.

19     Sir, when you ordered a criminal

20 history report or a rap sheet on a particular

21 person, would you order that from the

22 identification section?

23   MS. ROSEN:  Objection, foundation as

24 to time.

1    BY MR. AINSWORTH:

2         Q.   In 1988?

3         A.   Yes.

4         Q.   And they would then put a stamp on the

5    rap sheet and send it over to you at gang

6    crimes?

7              MS. EKL:  Objection, foundation, calls

8    for speculation.

9              MS. ROSEN:  Objection.

10             THE WITNESS:  Yes.

11   BY MR. AINSWORTH:

12        Q.   Was this a criminal history report

13   that you ordered?

14             MS. EKL:  Just to be clear, you're

15   talking about Exhibit No. 4?

16             MR. AINSWORTH:  Exhibit No. 4, yes.

17             THE WITNESS:  I don't remember doing

18   it, no.

19   BY MR. AINSWORTH:

20        Q.   Was it a criminal history report that

21   your partner, Rey Guevara, ordered?

22        A.   I don't remember him doing it, no.

23        Q.   When you made an arrest, would you be

24   in charge of typing on, you know, updating the

1    rap sheet?  Was that something that you were

2    involved in?

3         A.   No.

4         Q.   Do you know who was responsible for

5    typing the arrests onto the rap sheet?

6              MS. ROSEN:  Objection, foundation.

7              THE WITNESS:  No.

8              MS. ROSEN:  The foundation objection

9    was to the word typing, by the way, because you

10   looked at me funny.

11   BY MR. AINSWORTH:

12        Q.   And do you know who -- strike that.

13              And in your experience, when the

14   identification section received a request for a

15   criminal history report, they would stamp it

16   the same day that they provided that report; is

17   that correct?

18             MS. ROSEN:  Objection, foundation.

19             MS. EKL:  Objection, form, calls for

20   speculation, foundation.

21             THE WITNESS:  Not sure.

22   BY MR. AINSWORTH:

23        Q.   Why weren't you sure?

24        A.   I don't know how their procedures were

1    or are.

2        Q.   Do you know what the writing issued on

3    inquiry by name check only refers to on this

4    document, Exhibit No. 4?

5        A.   No, I don't.  No.

6        Q.   Would you sometimes request a criminal

7    history report for an individual without having

8    a date of birth or an IR number for that

9    person?

10       A.   It would be hard to find them.  I

11   think that's one of the identifiers they use,

12   especially a date of birth.  IR number you

13   don't.  You can get away with it I think and

14   they might find it.

15       Q.   Would you sometimes do a name check on

16   people when you were detective?

17          MS. EKL:  Objection, form.

18          THE WITNESS:  Yes.

19   BY MR. AINSWORTH:

20       Q.   What is a name check?

21       A.   Date of birth, name, address.

22       Q.   And for those of us who are not police

23   officers, could you just explain to us what a

24   name check is.

1        A.    You're just checking for any warrants,

2    or stop orders on them, on this person that

3    you're name checking.

4        Q.    And so if you're doing a name check,

5    does that mean radioing in the identifiers that

6    you have about a particular person?

7        A.    As much as you have, yes.

8        Q.    Where would you radio that to?

9        A.    Over your police radio.

10        Q.    Let's talk about back in 1988.

11              Would you radio that to dispatch

12    or would you radio it to someone else if you're

13    trying to find out information -- background

14    information about a particular person in doing

15    a name check?

16        A.    You can go through dispatch.

17        Q.    Anywhere else you can go through?

18        A.    You can go through a computer.

19        Q.    So you could do it yourself or you

20    could --

21        A.    Yes.

22        Q.    Or you can call it in to have somebody

23    else do it?

24        A.    Yes.

1      Q.   Back in 1988 did you have a computer

2   at Gang Crimes North where you could check

3   somebody's background?

4      A.   Not sure.  You know, I don't think so.

5      Q.   Why don't you think so?

6      A.   I don't remember seeing one there.

7      Q.   Could you go up to Area 6 and do a

8   computer search on somebody to find out about

9   their background back in 1988?

10      A.   You can do a name check on them.

11   Yeah, you could go upstairs or you can go to

12   the, what is it, the 19th District was right

13   there on the first floor down the hall.

14      Q.   So both of those places the 19th

15   District and Area 6 had computers where you

16   could do a -- run a name check yourself?

17      A.   Yes.

18      Q.   If you ran a name check through the

19   computer, would that give you a printout back

20   in 1988?

21      A.   Printout?

22      Q.   Yes.  Or would you just see the text

23   on the screen?

24      A.   I think you could print it out.

1        Q.   How would you go about getting

2  something like what's on Exhibit 4 back in

3  1988?

4        A.   You would have to go through the

5  identification section.

6        Q.   How would you contact the

7  identification section?

8        A.   You would have to make out a request

9  form with identifiers and submit it.

10       Q.   Could you do it over the air like by

11  calling them?

12       A.   I don't think so, no.

13       Q.   Where would you get the slip to fill

14  out, request the information?

15       A.   At the identification section.

16       Q.   Where was the identification section

17  located back in 1988?

18       A.   I think they were at 11th Street at

19  the time the old police station.

20       Q.   11th and State?

21       A.   Yes.

22       Q.   And did you have inter-department mail

23  that would go over there that you would fill

24  out a request and send it over or did you

1    physically go down there and request it?

2          A.    You can do either, I believe.

3          Q.    Go ahead.

4          A.    You could send a slip in through the

5    mail or you can go down there and get it and

6    they would send it back to you through the

7    mail.

8          Q.    What hours was the identification

9    section?

10         A.    What was the what?  I'm sorry.

11         Q.    What hours was the identification

12   section open back in 1988?

13         A.    I think it was 24 hours.

14         Q.    So you would go any time night or day?

15         A.    Yes.

16         Q.    Were you aware of any other criminal

17   investigation regarding Jacques Rivera that was

18   going on in August of 1989 apart from the Felix

19   Valentin shooting?

20         A.    What year?

21              MR. AINSWORTH:  I said '89, didn't I?

22   BY MR. AINSWORTH:

23         Q.    Were you aware of any other criminal

24   investigation in which Jacques Rivera was a

1    suspect in August of 1988?

2        A.   No.

3        Q.   So the only one you were aware of was

4    the Felix Valentin shooting investigation?

5        A.   Yes, as I remember.

6        Q.   Were you aware of any criminal

7    investigation involving Jacques Rivera prior to

8    August of 1988?

9        A.   No.

10         MR. AINSWORTH:  Let's mark this as

11   Exhibit No. 5.

12               (WHEREUPON, Deposition Exhibit No.

13               5 was marked for identification.)

14   BY MR. AINSWORTH:

15        Q.   Showing you what has been marked as

16   Exhibit No. 5, this is a two-page document

17   Bates numbered CPD 0028 and 0029; do you see

18   that?

19        A.   Yes.

20        Q.   On the second page, it has a listing

21   next to persons present during line-up, and it

22   has four names there; do you see that at the

23   top?

24        A.   Yes.

1          Q.    And is it your testimony that

2    sometimes that would mean you're in the room

3    and sometimes it would just mean you brought

4    the person to the line-up to be lined up?

5                MS. EKL:  Objection, form.

6                THE WITNESS:  Correct.

7    BY MR. AINSWORTH:

8          Q.    And looking at this document, can you

9    tell -- well, strike that.

10               When you were a detective, you

11   would make these kind of reports line-up

12   reports, right?

13         A.    Correct.

14         Q.    And if there's an ASA present for a

15   line-up as when you were a detective, you would

16   note that fact in your report, correct?

17         A.    I think so, yes.

18         Q.    There was so --

19         A.    But they normally wouldn't go inside

20   on a line-up.

21         Q.    They would usually wait outside?

22         A.    Usually, yes.

23         Q.    Why was that?

24         A.    I don't know.  I don't know what their

1    reasoning was.

2         Q.   But if they did go inside, you would

3    note that in your report, fair?

4         A.   Oh, sure.

5              MS. ROSEN:  Objection, form.

6              THE WITNESS:  Yeah, you could, yeah.

7    BY MR. AINSWORTH:

8         Q.   And you would?

9         A.   Because it's unusual.

10        Q.   And there's a spot in the report to

11   note the persons present during the line-up; is

12   that right?

13             MS. EKL:  Objection, form, foundation.

14             THE WITNESS:  Yes.

15   BY MR. AINSWORTH:

16        Q.   And so looking at Exhibit No. 5, can

17   you tell whether or not a state's attorney was

18   present for the line-up that's documented here?

19             MS. ROSEN:  Objection, form,

20   foundation.

21             THE WITNESS:  No.

22   BY MR. AINSWORTH:

23        Q.   Why do you see that?

24        A.   I don't see a state's attorney's name

1    here.

2         Q.    So that indicates to you that a

3    state's attorney was not present?

4         A.    Correct.

5              MS. ROSEN:  Objection, form,

6    foundation.

7    BY MR. AINSWORTH:

8         Q.    Just so we're clear, the absence of

9    the state's attorney's name on this Exhibit 5

10   indicates to you that a state's attorney was

11   not present for the line-up; is that right?

12             MS. ROSEN:  Objection, form,

13   foundation.

14             MS. EKL:  Objection, form, foundation.

15             THE WITNESS:  I don't see a state's

16   attorney's name listed anywhere on the report

17   unless I'm missing it, so I would assume there

18   was no state's attorney there.

19   BY MR. AINSWORTH:

20        Q.    Do you recall the line-up room at Area

21   5 back in 1988?

22        A.    Yes.

23        Q.    How was it set up?

24        A.    It's on the second floor of Area 5.

```
 1      The line-up room and viewing room are on the

 2      south side of the building of the second floor.

 3                      It would be the west side were

 4      all the interview rooms and a couple offices,

 5      administrative offices; the south end, that

 6      room is separated, the viewing, the line-up

 7      rooms by one-way glass.

 8           Q.   So there are two separate rooms where

 9      the line-up room is, or does the line-up area

10      comprise two rooms?

11           A.   Yes.

12           Q.   Are there separate doors to each?

13           A.   Yes.

14           Q.   And in the portion of the room or the

15      area where the subjects of the line-up stand,

16      is there any furniture in that room?

17           A.   No.

18           Q.   Are there any markings in that room

19      either on the floor as to where people should

20      stand or anywhere either on the floor or the

21      walls?

22           A.   I don't remember any, no.

23           Q.   How would suspects know which spot to

24      choose from?
```

1          A.    Sometimes they would be -- they would

2     choose their own, chose their spot in a

3     line-up.

4          Q.    And would they just go stand in the --

5     well, strike that.

6                Do you recall there being any,

7     like, numbering on the floor as to which number

8     the people should stand as far as how far apart

9     they should be from other people?

10         A.    I don't remember that, no.

11         Q.    When you were at Area 5, did you

12    sometimes use fillers from the lock-up?

13         A.    Yes.

14         Q.    Did you sometimes use fillers from the

15    street?

16         A.    Yes.

17         Q.    Would you try and get fillers from the

18    same gang as the suspect?

19         A.    I don't remember doing that ever.

20         Q.    Would you try and have all of the

21    fillers be members of a different gang than the

22    suspect?

23         A.    Oh, no.

24         Q.    Why wouldn't you do that?

1      A.   It would cause a problem.

2      Q.   How would that cause a problem?

3      A.   Well, if they're rival gang members,

4  you don't want to start that.

5      Q.   And when you say start that, what are

6  you referring to?

7      A.   Oh, they would be fighting in there.

8      Q.   You don't want to have fighting inside

9  the police station?

10      A.   Of course not.

11      Q.   When you had a filler in the line-up

12  who is from the lock-up, would they have

13  shoelaces?

14          MS. EKL:  Objection, form, foundation.

15          THE WITNESS:  No, they wouldn't.

16  BY MR. AINSWORTH:

17      Q.   What about a suspect who was in a

18  line-up, would they have shoelaces?

19          MS. EKL:  Objection, form, foundation.

20          THE WITNESS:  They take them out.

21  BY MR. AINSWORTH:

22      Q.   What about fillers who were from the

23  street, would they have shoelaces?

24      A.   No.  They would have to take them out.

1       Q.   Any filler who is from the lock-up,

2   would they have a CB number written on their

3   hand?

4           MS. EKL:  Objection, form, foundation.

5   BY MR. AINSWORTH:

6       Q.   Back in 1988?

7       A.   I don't remember them having it on

8   their hand.  I don't know about it on their

9   hand.

10      Q.   Where would the police officer stand

11  while conducting the line-up, which room?

12      A.   Well, you would have -- well, one

13  officer would be in with the suspects just to

14  keep order.  And then on the other side of the

15  glass would be the other officers.

16      Q.   Where did the officer stand who was

17  with the suspect and the fillers?  Where in

18  the --

19      A.   Oh, in the corner.

20      Q.   Were there any chairs in that room?

21      A.   Sometimes.

22      Q.   How about in the viewing room, were

23  there chairs there?

24      A.   Where the witness and victims would

1    view?

2         Q.   Yes.

3         A.   Yeah, there would chairs and desks in

4    there.

5         Q.   Was there a curtain?

6         A.   I can't remember.  I don't think so.

7         Q.   Why don't you think so?

8         A.   I don't remember seeing -- remembering

9    one there.

10             MS. ROSEN:  A curtain in which -- just

11   to be clear, a curtain in the viewing room, or

12   are you talking about a curtain separating on

13   the glass?

14   BY MR. AINSWORTH:

15        Q.   A curtain that would go over the glass

16   in between the viewing room and the suspect

17   room.

18        A.   I'm not sure.

19        Q.   And when I'm asking about a curtain, I

20   mean on either side of the glass either in the

21   viewing room or in the suspect side?

22        A.   Yeah.  No, I'm not sure.

23        Q.   Was there a glass window between the

24   viewing room and where the line-up participants

1    would be?

2          A.   Yes.

3          Q.   Was that a one-way mirror?

4          A.   Yes, it was.

5          Q.   Would you photograph the line-up

6    participants as part of the line-up procedure?

7                MS. EKL:  Objection, form, foundation.

8                THE WITNESS:  Yes.

9    BY MR. AINSWORTH:

10         Q.   How would you go about doing that?

11         A.   Call an ET, Evidence Technician.

12   That's what it stands for.

13         Q.   And would they photograph the line-up

14   before the witness viewed it, during the

15   witness viewing it, or after the witness

16   viewing it?

17         A.   After.

18         Q.   How long would it take to get an

19   evidence technician to the station to

20   photograph the line-up?

21         A.   It varies.

22         Q.   Would you have to have -- would

23   sometimes the participants go sit down and have

24   a break before coming back out to be

1    photographed if it was taking a long time for

2    the evidence technician to come to photograph

3    it?

4        A.    Yes.

5        Q.    Looking at the second page of

6    Exhibit 5, do you see the persons participating

7    in line-up and the third person is Jacques

8    Rivera; do you see that?

9        A.    Yes.

10       Q.    And it has a blank after the CB number

11   there?

12       A.    Correct.

13       Q.    Is that because at the time of the

14   line-up Jacques Rivera hadn't been arrested for

15   this crime yet?

16            MS. EKL:  Objection, foundation.

17            THE WITNESS:  Yes.  He hadn't gone to

18   the lockup.

19   BY MR. AINSWORTH:

20       Q.    For this line-up, you weren't in the

21   viewing room; is that right?

22       A.    I can't remember if I was or was not.

23       Q.    Were you in the room with the

24   participants?

1        A.   I can't remember that either.

2        Q.   Do you have any recollection as to who

3  was in the viewing room for this line-up?

4        A.   No, I do not.

5        Q.   Do you know who was in the -- which

6  police officers, if any, were in the

7  participant room for this line-up?

8        A.   Don't know.

9        Q.   Can you describe what Detective

10  McLaughlin looked like back in 1988?

11       A.   I think she had blonde hair.

12       Q.   So it was light-colored hair?

13       A.   Like what?

14       Q.   Light-colored hair?

15       A.   Light-colored hair, yeah.

16       Q.   Anything else about her description?

17       A.   No.

18       Q.   Do you know a Assistant State's

19  Attorney Rosner, Julie Rosner?

20       A.   Do not, do not.

21       Q.   Was there a bulletin board in the

22  participant room?

23       A.   Where the suspects were?

24       Q.   Yes.  Sorry.  Where the participants

1    in the line-up were?

2        A.   Bulletin board, no, I don't think so.

3        Q.   When you were detective, did you have

4    it happen that a witness would pick out a

5    filler from a line-up, a physical line-up?

6        A.   I don't remember an instance, but I'm

7    sure it happened.  I couldn't tell you the

8    case.

9        Q.   How would you document that fact?

10       A.   Just in your reports.

11       Q.   What would you write?

12       A.   Same thing, like this report here,

13   Exhibit No. 5, list everybody, and picked the

14   wrong person.

15       Q.   And what would you write down about?

16   Would you say picked the wrong person or what

17   would you say?

18       A.   Well, if the suspect was in there,

19   yes, I mean, that's why you're having a

20   line-up.

21       Q.   Did you ever have line-ups where

22   there's no suspect in it?

23       A.   No.

24       Q.   Did you ever show photo arrays where

1      there's no suspect in the photo array?

2          A.   No.

3          Q.   If a witness picked a filler from a

4      physical line-up, would you call that a

5      negative identification?

6              MS. EKL:  Objection, form.

7              THE WITNESS:  Well, yes.

8              MS. EKL:  You're saying today would he

9      recall it meaning referred to it as a -- I

10     don't know what you mean -- vague as to call.

11     BY MR. AINSWORTH:

12         Q.   How about in the timeframe of when you

13     were a detective, okay, so from between 1990 to

14     1996, if a witness picked a filler from a

15     line-up, would you call it a negative

16     identification?

17             MS. EKL:  Objection, form as to call.

18     What do you mean by that?

19     BY MR. AINSWORTH:

20         Q.   Would you document it as a negative

21     identification?

22         A.   Yes.

23         Q.   And for photo arrays that you

24     conducted, when you were a gang crimes

1    specialist, between '85 and '90, if a witness

2    picked out a filler from a photo array, would

3    you also document that as a negative

4    identification?

5         A.    If a suspect was in the -- yes.

6         Q.    If a filler was picked out of a

7    photograph, would you have an evidence

8    technician photograph the line-up?

9         A.    No, I don't think so.

10        Q.    And in a line-up report like

11   Exhibit 5, if you had a filler identified in a

12   live line-up, next to the line where it says

13   persons identified in line-up, would you write

14   negative identification in that line if a

15   filler was picked out?

16        A.    No.

17        Q.    What would you write?

18        A.    I would write the number that he

19   picked or she, whatever, and explain it in the

20   narrative.

21             MS. EKL:  Are you doing okay?  Do you

22   want to take a break?

23             MR. AINSWORTH:  Would you like a

24   break?

1          THE WITNESS:  Yes.  Let's take a

2     break.

3          THE VIDEOGRAPHER:  This marks the end

4     of tape No. 2.  We're going off the record at

5     1:50.

6               (WHEREUPON, a short break was

7                taken.)

8          THE VIDEOGRAPHER:  Here begins tape

9     No. 3.  We're going back on the record at 2:40.

10    BY MR. AINSWORTH:

11         Q.   Why did you leave the Training

12    Division?

13         A.   I had a job offer to go to internal

14    affairs.

15         Q.   How did you get that offer?

16         A.   Through the deputy, head of the unit.

17         Q.   Who is the deputy?

18         A.   Debra Kirby.

19         Q.   How did you know Debra Kirby?

20         A.   I knew her -- I met her through --

21    when I was at the Training Division doing a

22    domestic violence course.

23               I think she was an advocate for

24    the city, for the police department, and she

1   needed -- she wanted to have a lesson plan put

2   together, so she came to us and we put it

3   together.

4        Q.   How long -- do you still talk to Deb

5   Kirby?

6        A.   No.

7        Q.   How long did you spend in internal

8   affairs?

9        A.   I think it was almost four years.

10       Q.   Did internal affairs -- did the

11  Internal Affairs Department have a file on your

12  partner, Rey Guevara?

13       A.   I have no idea.

14       Q.   Excuse me?

15       A.   I have no idea.

16       Q.   Did you have access to investigatory

17  files within the Internal Affairs Department

18  while you were a sergeant there?

19       A.   Yes.

20            MS. EKL:  Objection, form, to the

21  form -- or to the word access.  I don't know

22  what you mean by that.  Go ahead.

23            THE WITNESS:  Yes, some.

24

1   BY MR. AINSWORTH:

2        Q.   What were your duties in the internal

3   affairs?

4        A.   I was a supervisor for investigations.

5   I had a team of I think four investigators and

6   to supervise cases.

7        Q.   Did you investigate any allegations of

8   misconduct out of Area 5?

9        A.   No, I don't remember any.

10       Q.   Did you investigate any allegations of

11  misconduct by Rey Guevara?

12       A.   No.

13       Q.   Did you have to assert a conflict of

14  interest and say that you couldn't investigate

15  a case where there was an allegation of

16  misconduct against Rey Guevara?

17       A.   You're asking would I?

18       Q.   Did that happen where you had to

19  say --

20       A.   No.

21       Q.   -- I would investigate this except it

22  was my former partner, so I'm not allowed to

23  investigate this case?

24       A.   No.

1     Q.   What did -- during the time that you

2  were there, what did internal affairs

3  investigate?  What types of cases?

4     A.   We not only did police officers, but

5  we also did civilians that work for the police

6  department.  They fell under our jurisdiction.

7           A lot of it was some criminal --

8  a lot of it was policy and regulation

9  violations, medical abuse.  There's a whole

10  list, which I don't remember.

11     Q.   Why did you want to go to internal

12  affairs?

13     A.   The experience.

14     Q.   How do you think the experience would

15  help you?

16     A.   I just thought it would help me for

17  later on in life in my career, you know, after

18  the police department.

19     Q.   What did you want to do with that

20  experience?

21     A.   Oh, I don't know.  I just thought it

22  would help.

23     Q.   How did you think it would be helpful?

24     A.   Just to get another experience at

1    working in internal affairs.  It's a different

2    look from that side.

3        Q.   What was the distinction between

4    internal affairs and OPS when you were there?

5        A.   Well, OPS handled all the brutality

6    cases for police.  Shootings.  What else?  I

7    don't know.  As far as I can remember, those

8    are the main ones.

9        Q.   And so if there's an allegation of

10   false arrest with no physical abuse, that would

11   go to IAD; is that correct?

12       A.   Correct, I believe so.

13       Q.   Did you stay at internal affairs until

14   your retirement in 2008?

15       A.   Yes.

16       Q.   At the Christmas party where Rey

17   Guevara and Ed Mingey were, what did you three

18   talk about?

19            MS. ROSEN:  Objection, foundation.

20            THE WITNESS:  I don't even remember.

21   BY MR. AINSWORTH:

22       Q.   Did you ever talk to Rey Guevara and

23   Ed Mingey together during that Christmas party?

24       A.   I don't know.  May have.

```
 1          Q.    What did you say to Rey Guevara?
 2          A.    Nothing.  Just greetings, because he
 3    came a little later.  He was working and --
 4    nothing.  Holidays.  Just little talk.
 5    Chit-chat.
 6          Q.    Well, what was the chit-chat?
 7          A.    Well, nothing about this.  Just about
 8    the kids.  I became a grandfather.  I don't
 9    know.  I can't remember.
10          Q.    Was it before or after Christmas?
11          A.    It was just before.
12          Q.    Was it the week before Christmas?
13          A.    I don't remember.  Right around there.
14          Q.    Did Rey tell you he was going to go
15    for his deposition on the Monday before
16    Christmas?
17          A.    No.
18          Q.    What did you and Ed Mingey talk about?
19          A.    Nothing.  Just about jobs, families,
20    how his job was going.
21          Q.    At the time that you saw him at
22    Christmas or Christmastime, did you know that
23    he was being sued in this case as well?
24          A.    He was being what?
```

```
 1        Q.   He was being sued in this case as
 2   well?
 3        A.   No, I didn't think he was.  Is he?
 4   I'm not sure.
 5        Q.   Did you talk with Ed Mingey about this
 6   case at all?
 7        A.   No.
 8        Q.   Have you ever talked with Ed Mingey
 9   about this case?
10        A.   No.
11        Q.   Have you ever talked with either Noon
12   or Sparks about this case?
13        A.   No.
14        Q.   Have you talked with Guzman or Fallon
15   about this case?
16        A.   No.
17        Q.   Have you ever talked with Zacharias
18   about this case?
19        A.   No.
20        Q.   Have you ever talked with Russ
21   Weingart about this case?
22        A.   No.
23        Q.   Have you ever talked with Leonard or
24   McLaughlin about this case?
```

1     A.   No.

2     Q.   When was the last time you talked to

3  Bill Dorsch?

4     A.   Oh, my God, years ago.  Back when I

5  was in the unit.  I don't think I seen him

6  after that, after I left.

7     Q.   When was the last time you talked to

8  Boyle, Detective Boyle?

9     A.   Way back then, too.

10    Q.   Do you know an Officer Letrich?

11    A.   I know the name.

12    Q.   Do you know him by face?

13    A.   I don't think I could pick him out.  I

14  heard the name.

15    Q.   When you were at Gang Crimes North,

16  how would you get access to documents in a file

17  that was being run out of Area 5?

18    A.   I would go -- it would go to the unit

19  and talk to the sergeant there or whoever the

20  supervisor is and what we were looking for.

21    Q.   And would they give you copies of

22  police reports?

23    A.   Sure.

24    Q.   Would sometimes they send you copies

1    of police reports over to Gang Crimes North on

2    a case that you were assisting?

3        A.   May have, I don't remember them doing

4    it.  Usually we just drove over there.

5        Q.   And would they just give you copies of

6    the police reports and hand them to you, or

7    would they put it in an envelope, or how would

8    it be transmitted?

9        A.   Oh, I don't know.  I don't remember.

10        Q.   Did you have a clipboard or something

11    to carry police reports in?

12        A.   Yes.  I had a bag and a car.  I mean,

13    a duffle bag.

14        Q.   Would you just put the police reports

15    loose into the duffle bag?

16        A.   No.  Usually I used a manila envelope.

17        Q.   So, you would have a manila folder,

18    file folder?

19        A.   No.  I would just grab one from the

20    office and stick it in there.

21        Q.   Oh, sorry.  A manila envelope like one

22    of those big envelopes?

23        A.   No.  Just like you have right there, a

24    manila one.

1       Q.   Like a file folder?

2       A.   Yes, there you go.

3       Q.   Would you have one for each of the

4  cases that you're working on so you can keep

5  them separated?

6       A.   Yes.  It was usually one at a time.

7       Q.   And then when you drive back to Gang

8  Crimes North, do you put the file in your

9  duffle bag?

10      A.   Yes.

11      Q.   And then what would you keep in that

12  file?

13      A.   What would I keep in it?

14      Q.   Yes.

15      A.   Just the police reports.

16      Q.   Would you -- where would you keep your

17  notes while you were going through the

18  investigation before you shredded them?

19          MS. ROSEN:  Objection, foundation.

20  BY MR. AINSWORTH:

21      Q.   This is while you were a gang crimes

22  specialist.

23      A.   Just in the file.

24      Q.   So you would keep the police reports

1     that you had and your notes in that file, what

2     did you call that file?

3          A.   Just the file.

4          Q.   Just your file?

5          A.   Just my file.  That's it.

6          Q.   And then was there a place at the Gang

7     Crimes North while you were a specialist there

8     where you would store those files?

9          A.   In my locker, or I brought it home,

10    carried it with me.

11         Q.   So you could have access to it in case

12    something came up in your investigation?

13         A.   I just carried my bag with me.

14         Q.   And then what would you do with your

15    old files when you finished an investigation?

16    Would that go in your locker?  Would that go to

17    your home?  Or is there a place for it at Gang

18    Crimes North?

19         A.   It gets shredded.

20         Q.   And where would -- was there a

21    shredder at Gang Crimes North that you could

22    use?

23         A.   Yes.

24         Q.   Where was that shredder kept?

1        A.   I don't remember.

2        Q.   Would you have to shred it yourself,

3  or would you give it to somebody else to shred?

4        A.   I would do it myself.

5        Q.   Was that what you learned to do from

6  the other officers who were there?

7        A.   I don't know if I learned it.  I just

8  did it.  There was no need for it.

9        Q.   Were there some file cabinets that

10  were accessible to you where you could keep

11  your files while you were at Gang Crimes North?

12          MS. EKL:  Objection, form.

13          THE WITNESS:  Yes, there was.

14  BY MR. AINSWORTH:

15        Q.   Did you sometimes -- well, what was

16  kept in those file cabinets?

17        A.   Flashlight, you know, batteries, stuff

18  like that.  Sometimes a file.  I don't know.

19        Q.   Other specialists might have kept

20  files there?

21        A.   Specialists?  Where are you talking?

22  Gang Crimes North or --

23        Q.   Yes.  Gang Crimes North.

24        A.   Gang Crimes North.  No, we didn't have

1    a file there.

2         Q.   So, let me just be clear.

3             Was there a file cabinet at Gang

4    Crimes North that was available for you to use?

5         A.   No.

6         Q.   Officer Zacharias testified that there

7    was a file cabinet where specialists would put

8    files into during that timeframe at Gang Crimes

9    North; do you remember anything like that?

10        A.   No.

11         MS. EKL:  Objection, form.

12    BY MR. AINSWORTH:

13        Q.   Did any sergeants have a problem with

14    you shredding your file at the conclusion of an

15    investigation?

16         MS. EKL:  Objection, foundation, calls

17    for speculation.

18         THE WITNESS:  No.

19    BY MR. AINSWORTH:

20        Q.   How do you know that?

21        A.   No one ever said anything to me.

22        Q.   Did you shred files in secret or your

23    files in secret?

24         MS. EKL:  Objection, form.

```
 1               THE WITNESS:  Secret?
 2  BY MR. AINSWORTH:
 3       Q.   Would you come in the dead of the
 4  night and sneak in and shred the file?
 5       A.   No.
 6       Q.   While you were a gang crimes
 7  specialist, did you have access to GPR forms?
 8       A.   Sure.
 9       Q.   And how did you have access to those?
10  Do you know what I mean by GPRs?
11       A.   Yes, general progress report.
12       Q.   Yes.
13       A.   Ones made out or blank ones?
14       Q.   Blank ones.  Sorry.
15       A.   Yes, blank ones.  There's a whole --
16  they came in packages.
17       Q.   And so where were those stored?
18       A.   They were all over the place, on the
19  desks and in the drawers.
20       Q.   And I'm talking about Gang Crimes
21  North as opposed to Area 5; do you understand
22  that?
23       A.   Yes.
24       Q.   So while you were at Gang Crimes
```

1    North, you would have access to GPRs?

2           A.    No.   They were no GPRs there.

3           Q.    Okay.   I just want to be clear.

4                 MS. ROSEN:   You tend to jump back and

5    forth a lot between areas, so.

6                 MR. AINSWORTH:   Do I?

7                 MS. ROSEN:   Yes, you've been doing it.

8                 MS. EKL:   Yes.   Detective, specialist,

9    Detective, specialist, Detective, specialist.

10                THE WITNESS:   It's all right.   I'm

11   following you.   I lose you once in a while.

12   BY MR. AINSWORTH:

13          Q.    At Gang Crimes North, did you have

14   access to general progress reports?

15          A.    I don't remember them being there, no.

16          Q.    Would you take notes just on blank

17   paper?

18          A.    Yes.   That's how I usually did it.

19          Q.    Did you have a clipboard or something

20   that you would take notes on?

21          A.    Not a clipboard.   I had maybe some

22   kind of folding thing with a zipper.

23          Q.    Why would you take notes while you

24   were a gang crimes specialist?

```
 1              MS. EKL:  Objection, foundation.
 2              THE WITNESS:  It's what I did.
 3    BY MR. AINSWORTH:
 4         Q.   I understand it's what you did, but my
 5    question is why would you?
 6              MS. EKL:  Just in general?
 7              MR. AINSWORTH:  Yes.
 8              MS. ROSEN:  Like, under what
 9    circumstances?
10              THE WITNESS:  Can you be more
11    specific?
12    BY MR. AINSWORTH:
13         Q.   Sure.  For example, it might be that
14    25 years later you're being asked about
15    something by a lawyer and your notes might help
16    you remember it, right?
17              MS. EKL:  Objection, mischaracterizes
18    his prior testimony.
19    BY MR. AINSWORTH:
20         Q.   Well, it does happen, sir.
21              Would you agree with me that your
22    notes might refresh your memory?
23         A.   It happens, but you don't keep your
24    notes.
```

1       Q.   And why don't you keep your notes?

2       A.   Because I used them to put into

3   reports.  I don't need them anymore.

4       Q.   How do you know that all of the

5   information from your notes has been put into

6   the reports?

7       A.   Check it.

8       Q.   What if there's information in your

9   notes that's irrelevant to the investigation,

10  would you include that in your reports?

11      A.   Irrelevant?

12      Q.   Irrelevant.  Not relevant to your

13  investigation.

14      A.   Depends on what it is.  I mean, I

15  don't know what --

16      Q.   It's something that you determine to

17  be not relevant to your investigation.

18           MS. ROSEN:  Objection, form.

19           MS. EKL:  Objection,

20  mischaracterization, because your question

21  assumes that everything is related to a

22  particular case.

23           MR. AINSWORTH:  No speaking

24  objections.

1          MS. EKL:  I'm going to object the way

2     I want to object.

3          MR. AINSWORTH:  Just say form.

4          MS. EKL:  Objection, form.  I've

5     already said that.

6          MR. AINSWORTH:  Thank you.

7     BY MR. AINSWORTH:

8        Q.  So let me give you -- are you saying

9     that every single thing that you ever wrote in

10    any of your notes made its way into a report?

11         MS. EKL:  Objection, form, vague.

12         THE WITNESS:  It depends what the note

13    is.  I mean, it could be just anything.

14    License plate number that turned out to

15    be nothing.  Who knows?  I don't know, you

16    know.

17    BY MR. AINSWORTH:

18       Q.  And that's a good example like

19    somebody gives you a license plate number that

20    turned out to be the license plate to the

21    Chicago Tribune delivery guy as opposed to the

22    suspect's vehicle.

23       A.  It might not even --

24       Q.  Has something like that happened to

1    you before?

2              MS. EKL:  Objection, form, incomplete

3    hypothetical, calls for speculation.

4    BY MR. AINSWORTH:

5         Q.   Has something like that happened to

6    you before?

7         A.   Someone give me wrong information?

8         Q.   Yes, or unhelpful information.

9         A.   Sure.

10             MS. ROSEN:  Objection, form.

11   BY MR. AINSWORTH:

12        Q.   And would you then have to write the

13   unhelpful information into your report, or

14   would you just ignore the unhelpful information

15   and focus on what was the information that was

16   advancing your case?

17             MS. ROSEN:  Objection, form, vague.

18             MS. EKL:  Objection, form, vague,

19   incomplete hypothetical.

20             THE WITNESS:  I can't answer that.

21   BY MR. AINSWORTH:

22        Q.   Why not?

23        A.   Because it's too -- I mean, what are

24   we talking about?  I don't understand, you

1  know.

2      Q.   I'm talking about --

3      A.   I mean, if you're talking about if

4  somebody says something or observes something,

5  well, then that's different.

6            I don't know what it is that

7  they're talking about or what you're trying to

8  ask, you know.

9            I mean, if it's relevant to the

10 case, it goes in the report.  It's that simple.

11 You know, because it could sway either way.

12           It doesn't mean that now, but

13 four days from now or two hours from now it's

14 going to mean something.

15     Q.   How do you know what's relevant to a

16 case while the investigation is going on?

17     A.   You don't.  You have an idea, but you

18 don't know positively.

19     Q.   If a witness made an identification,

20 and let's use the timeframe back when you were

21 a gang crimes specialist, if a witness made an

22 identification from a gang book, how long after

23 that identification were you supposed to

24 document that fact in a report?

1    MS. EKL:  Objection, form, assumes

2    facts not in evidence.

3    THE WITNESS:  You just make the report

4    out after you get finished with that witness.

5    BY MR. AINSWORTH:

6    Q.    Would you do it the same day?

7    A.    Oh, yes.

8    Q.    Why is that?

9    A.    It's just because it's a matter of

10   record and then you want to notify detectives.

11   Listen, we got this case, hey, we got an ID.  I

12   mean, that's big stuff.  So you would just

13   logically tell them.

14   Q.    And you document it to let the other

15   people in the investigation know what's going

16   on; is that right?

17   A.    Oh, sure.

18   Q.    When you were a gang crimes

19   specialist, how would you let the next shift

20   know what had been going on in the shift

21   before?

22   A.    Well, I wouldn't really do it

23   personally.  I think maybe the sergeant would

24   do it sometimes.  He would let the next shift,

1    hey, you know, so and so, they got an ID on

2    that case.  So that was it.  So you know that

3    someone is working that case or whatever.

4        Q.   So sometimes the sergeant would come

5    up to you when you were working the afternoon

6    shift and tell you about an ID that happened in

7    the morning shift?

8        A.   Yes, or they're working on the case,

9    they're close, so.

10        Q.   How would the sergeant -- or strike

11    that.

12                You usually worked -- well, no.

13                When you're a specialist, you

14    work both days and afternoons; is that right?

15        A.   Yes, usually evenings.

16        Q.   So, when you left at 2:00 a.m. in the

17    morning, how would you communicate to the

18    morning shift what needed to be done in an

19    investigation or what had been done in an

20    investigation?

21        A.   Well, I think it was the sergeant, you

22    tell the sergeant, hey, we got an ID on this

23    case.  So then he would leave a note or

24    something maybe.  I don't know.  Notify the day

1   shift that something is happening.

2        Q.   Make some kind of memo for the next

3   shift?

4             MS. ROSEN:  Objection, form,

5   foundation.

6   BY MR. AINSWORTH:

7        Q.   I'm sorry.  What's that?

8        A.   Yeah, just make a piece of paper out

9   of it or whatever.

10       Q.   I know that in Area 5, you had the

11  Serafini reports?  Do you know what I'm talking

12  about?

13            MS. ROSEN:  Objection.

14            THE WITNESS:  No.

15            MS. ROSEN:  Form, foundation.

16  BY MR. AINSWORTH:

17       Q.   The Serafini reports are something

18  that Sergeant Rinaldi referred to as an

19  informal memo that a detective would write-up

20  at the end of his shift to leave for the next

21  shift.

22            MS. ROSEN:  So now you're switching to

23  detective, because I thought you were talking

24  about Gang Crimes?

 1                    MR. AINSWORTH:  I said at Area 5.

 2                    MS. ROSEN:  Okay.  I'm just making

 3      sure.

 4      BY MR. AINSWORTH:

 5          Q.   While you were at Area 5 -- well, that

 6      was the prior question.

 7                    So, Sergeant Rinaldi referred to

 8      a report that detectives would make at the end

 9      of their shift that would apprise the next

10      shift of what had happened in the

11      investigation, and what yet needed to be

12      happening.  It was named after an old Detective

13      Serafini.

14                    Are you familiar with that kind

15      of memo being done and it would go up on the

16      bulletin board?

17                    MS. EKL:  Objection, form,

18      mischaracterizes Mr. Rinaldi's testimony.  Also

19      object to the form.

20                    THE WITNESS:  I never heard of the

21      form, so I don't know.  But notes were left for

22      the next watch.

23      BY MR. AINSWORTH:

24          Q.   And you would put them on the bulletin

1       board?

2               A.      No.  We left -- I left them in a file.

3               Q.      And so when you were at Area 5, which

4       file would you put them?

5               A.      Which file?

6               Q.      Yes.  When you said you left them in

7       the file, which file?

8               A.      Whatever I was working on.

9               Q.      And at Area 5 would that be the file

10      in the filing cabinets or would that the form

11      file that you had?

12                      MS. EKL:  Objection, form, foundation.

13                      THE WITNESS:  I didn't hear --

14                      MS. EKL:  Now, you're talking about

15      when -- he testified to a file when he was a

16      gang specialist.  You keep going back and

17      forth.  It's an unfair question.

18                      MR. ART:  And to be fair, he's not

19      going back and forth.  He's being very clear

20      about Area 5 versus Gang Crime Specialist since

21      you made that last objection.

22                      MS. EKL:  He said the file you had, so

23      he asked a bunch of questions about a file that

24      he had.

1        MR. ART:  He just asked that question

2  by saying back to Area 5.  That's how he just

3  began.

4        MS. EKL:  Assumes a fact that's not in

5  question.  There's been no testimony about him

6  having a file while he was a detective.

7        MR. ART:  You should stop interrupting

8  questions that are being asked to try to break

9  the flow of questions so that he can be clear

10  about what he's asking.

11        MS. EKL:  It's confusing, because you

12  asked him about a file.  He told you about a

13  file.  He would go from Gang Crimes to the area

14  to get reports.

15           Now, you're switching to him

16  being a detective and talking about a file.  I

17  mean, it's unclear -- you got to make sure that

18  it's clear to him that now you're talking about

19  something completely different.

20        MR. AINSWORTH:  Let the witness answer

21  the question.

22        MS. EKL:  He answered.

23        MR. ART:  They're all about Area 5.

24        MR. AINSWORTH:  We'll let the witness

1    answer.

2    BY MR. AINSWORTH:

3         Q.   Do you recall the question, sir?

4         A.   No.  Something about the Serafini

5    notes.

6         Q.   You said that when you're a detective,

7    when you made memos for the next shift, you

8    would put them in the file, correct?

9         A.   Correct.

10        Q.   And when you put those in the file,

11   I'm just trying to understand whether the file

12   that you're talking about was a file that was

13   kept in the file cabinets, or was it like a

14   file that you would keep in your duffle bag

15   that you testified about before?

16             MS. ROSEN:  Objection, foundation,

17   mischaracterizes his testimony.

18             THE WITNESS:  Let me say this.  In the

19   Detective Division I didn't take any files.  I

20   had none.  Everything was done in the office.

21                  When they call -- I think they

22   call that a working file, street file, work

23   file, whatever you want to call it, that was

24   the one that you used to work the case.  That

1    stayed there.  I didn't take anything with me.

2                    Notes, if I left a note for the

3    next watch coming on, either I met these

4    people, that they were coming on and talked to

5    them, say, hey, you know what, we couldn't find

6    this person and blah, blah, whatever the case

7    may be, or leave a note on it, in case he was

8    busy and then somebody would pick it up.

9                    If not, well then the next watch

10   would pick it up or whatever.

11                   Does that answer your question?

12   BY MR. AINSWORTH:

13       Q.   So just to be clear, when you talk

14   about the file that you would leave the notes

15   in, where would that file be kept at Area 5?

16       A.   In the office.

17       Q.   All right.  And what would be in that

18   file?

19       A.   It's the working file, case reports,

20   witness notes, GPRs.

21       Q.   Was there another file in the office

22   where duplicate reports would go into?

23       A.   Yes.  I think on homicides it was a --

24   just reports, finished reports.  I think they

1    kept that in there.

2          Q.    Do they call that the RD file, or do

3    they have a name for that?

4          A.    I don't remember the name.

5          Q.    So you had a file that you're working

6    with and there was another file at the office

7    for homicides at Area 5?

8          A.    I don't know if they had it for other

9    ones.  I'm not sure.

10         Q.    When you were at Area 5, were you

11   still typing reports on typewriters?

12              MS. ROSEN:  Objection, foundation as

13   to time.

14              THE WITNESS:  Started to.

15   BY MR. AINSWORTH:

16         Q.    When you first started, you were

17   typing reports and then it switched?

18         A.    On a typewriter.

19         Q.    So you had to deal with the carbons

20   when you were first there?

21         A.    Yeah.

22         Q.    And so one of the carbons would go

23   into the completed reports file and one of the

24   carbons would go into you're working file?

1          MS. ROSEN:  You mean, one of the

2     copies?

3          MR. AINSWORTH:  Carbons.

4          MS. ROSEN:  Like the carbon paper?

5          MR. AINSWORTH:  Yes.

6          MS. EKL:  Objection, assumes facts not

7     in evidence.

8          THE WITNESS:  The carbon paper

9     wouldn't go in there.

10          MR. AINSWORTH:  Sorry.  I meant,

11     carbon copy.  My apologies.

12          THE WITNESS:  Right, the copy.

13     BY MR. AINSWORTH:

14          Q.    So let me ask it again.

15               At Area 5, when you were first

16     starting there, did you type out reports and

17     then put one of the carbon copies of the

18     reports into the completed reports file and one

19     went into the working file?

20          A.    No.

21          Q.    How did it work?

22          A.    I think how it worked was that once we

23     finished a case, I mean a report, we would

24     submit it to the administrative office for that

1    section and it would get processed in there

2    somehow.

3         Q.   And then would you eventually see a

4    carbon copy of your report in the working file?

5         A.   Yeah, we put a copy in there.

6         Q.   So you would do that?

7         A.   Yeah, sometimes we just add it in

8    there.

9         Q.   So how would you go about doing that?

10        A.   Because the report you had had to be

11   signed off on, had to be approved by a

12   supervisor.  It's a signature.

13             So that had to go into

14   administrative for that unit because it was

15   divided.  You had Violent Crimes and you had

16   Property Crimes.

17             Not the main office, just the

18   violent crimes section where you worked, one of

19   the sergeants in there, somebody would have to

20   sign off on that report.

21        Q.   And so the report that needed to be

22   signed off on went up the chain but you might

23   keep a copy just for your working file?

24        A.   Right.  You had to put one in the

1     working folder.

2          Q.   And then do you know what happened to

3     the working file at the end of the

4     investigation when you were at Area 5?

5          A.   End of the investigation?

6          Q.   Yes.

7          A.   It got handed in.  What happened then,

8     I don't know.

9          Q.   What do you mean by handed in?

10         A.   Well, when you're finished with the

11    whole file and the person is charged and it's

12    complete, then you hand it in to that section,

13    administrative office.

14         Q.   Do you know what would happen to the

15    completed reports file at the conclusion of an

16    investigation?

17         A.   No.  We just got whatever.  I don't

18    know what they did with it.

19         Q.   Would you personally be in charge of

20    handing in the file, the working files for

21    cases that you were investigating?

22         A.   Yeah.  It was your responsibility if

23    you finished it.  I mean, you put the last

24    closing supp in there and hand it in.

1      Q.   When you handed it in, would it still

2  have the notes that you took on the case and

3  any notes that you left for the next shift?

4      A.   Yeah, most of them.  What are you

5  talking, GPRs?

6      Q.   GPRs and also any memos or notes that

7  you wrote out about what was going on in the

8  investigation for the next shift or for anybody

9  else to see.

10     A.   Yes, just shred them and get rid of

11  them.

12     Q.   So you would take those notes out?

13     A.   Yes.

14     Q.   And so why would you shred those

15  notes, notes that you made for --

16     A.   Because you didn't want to just throw

17  them in the garbage.

18     Q.   Let me just finish the question.

19     A.   Sorry.

20     Q.   Why would you shred the notes that you

21  would make for the next shift?

22        MS. EKL:  Object as to form and

23  foundation as to what specifically you're

24  talking about.

1          THE WITNESS:  Why would I make the

2    notes or destroy them?

3    BY MR. AINSWORTH:

4          Q.   Yes.

5          A.   They're just notes like a to-do list.

6    So once they're completed, you don't need that

7    anymore.

8          Q.   So what files would go into the

9    working file?

10          MS. ROSEN:  What files would go into

11    the working file?

12    BY MR. AINSWORTH:

13          Q.   What documents would go into the

14    working file?

15          A.   Any documents relevant to the case.

16          Q.   So that might be evidence reports?

17          A.   Right.

18          Q.   Photographs?

19          A.   Correct.

20          Q.   Copies of your reports?

21          A.   Correct.

22          Q.   Notes that you made?

23          A.   Right.

24          Q.   Memos that you made?

1       A.    Correct.

2       Q.    Rap sheets?

3       A.    Correct.

4       Q.    Witness statements?

5       A.    Of course.

6       Q.    Anything else that you can recall?

7       A.    Inventory slips.

8       Q.    Property slips?

9       A.    Right.

10      Q.    Anything else?

11      A.    Crime lab reports, whatever was made

12 out for the case.

13      Q.    So were those just copies of reports

14 that were going in there, into the working

15 file?

16          MS. EKL:  Objection, form, foundation.

17          THE WITNESS:  For the mostpart.

18 BY MR. AINSWORTH:

19      Q.    You wouldn't interest like the

20 originals of your official police reports into

21 that working file; is that fair?

22      A.    No.  Originals were handed in.

23      Q.    So from that working file that you

24 had, would you just leave the police reports in

213

1      it and take out the other stuff that was in it?

2                  MS. EKL:  Objection, form foundation.

3                  THE WITNESS:  I don't understand take

4      out.  What am I taking out?

5      BY MR. AINSWORTH:

6          Q.   You mentioned that you would take out

7      the notes that you would leave for the next

8      shift.

9          A.   Oh, yes.

10         Q.   So my question is whether you would go

11     through that working file at the conclusion of

12     an investigation and leave in the police

13     reports but remove anything that wasn't a

14     police report?

15                 MS. ROSEN:  Objection, form.

16                 THE WITNESS:  No.

17     BY MR. AINSWORTH:

18         Q.   Well, what would you remove from the

19     working file at the conclusion of an

20     investigation?

21         A.   You know like the to-do list, you

22     know, go find this person, needs to be

23     interviewed.  Maybe they were working, and we

24     couldn't do it, maybe next shift will pick it

1    up, take it over, go interview them and leave a

2    report.

3         Q.   What else would you remove from the

4    file at the conclusion of an investigation,

5    from the working file?

6         A.   I don't know because most everything

7    else is kept in a GPR.

8         Q.   Would you hand in your GPR?

9         A.   Yes.

10        Q.   So would you keep the GPRs in a

11   working file as well?

12        A.   Yes.

13        Q.   Would that be a copy of the GPR that

14   you handed in?

15        A.   No, that would be originals.

16        Q.   So when would you hand in the GPR?

17        A.   When you completed with the file --

18   the case.

19        Q.   When the whole case is completed?

20        A.   Everything goes in.

21        Q.   So no supervisor would see your GPRs

22   until the end of the investigation?

23        A.   No, not necessarily.

24        Q.   How would they investigate --

1      A.    Probably reviewing the case.

2      Q.    How would a supervisor see your GPRs

3  before the conclusion of an investigation?

4      A.    If you did a report and you made it

5  part of your file and you hand the file back in

6  at the end of your shift, or whatever, it's his

7  or her responsibility to go through it.  Well,

8  they should they read it.

9      Q.    What is a street file?

10      MS. EKL:  Objection, form.

11      THE WITNESS:  It's just your working

12  file.

13  BY MR. AINSWORTH:

14      Q.    It's the same -- that term is the same

15  thing as what you're referring to as a working

16  file?

17      A.    Yes.

18      Q.    So there was a difference in how you

19  maintained your working file between when you

20  were an Area 5 detective and when you were a

21  Gang Crimes Specialist; is that fair to say?

22      A.    Yes.

23      Q.    When you were a detective, you would

24  make sure the file would stay at the office,

```
 1    right?

 2         A.   Detective, yes.

 3         Q.   But when you're a specialist, you

 4    could -- you would bring that file home

 5    sometimes?

 6         A.   If it was in my bag, yeah, or in my

 7    locker.

 8         Q.   Would you have the same kind of files

 9    in your working file as a specialist as you did

10    in your working file as a detective?

11              MS. ROSEN:  Same kinds of documents?

12              MR. AINSWORTH:  Yes.  I keep doing

13    that.  Let me ask it again.

14    BY MR. AINSWORTH:

15         Q.   When you were a specialist, would you

16    have the same types of documents in your

17    working file as you did in your working file

18    when you were a detective?

19         A.   Some.

20         Q.   And which ones would be the same and

21    which ones would be different?

22         A.   Regular case reports might be the

23    same.

24         Q.   What would be different?
```

1        A.   GPRs, notes left for the next watch, I

2   never saw that as a gang specialist.

3        Q.   So you wouldn't have access to the

4   detectives notes?

5        A.   No, not as a gang specialist.

6        Q.   Would you have access --

7        A.   I mean, I could.  I wouldn't say I

8   didn't have it, but I would have to ask why.  I

9   wouldn't know there is a note in there.

10  BY MR. AINSWORTH:

11       Q.   It would be an odd request for you to

12  make?

13       A.   Yeah.  Unless a detective called and

14  said, hey, would you go find somebody for me.

15  I left a note in the file in the office, and

16  would you go in there, get it, look at it, read

17  it, and do what you got to do.

18       Q.   What sort of documents did you have in

19  your gang crimes specialist file, working file

20  that you didn't have in your file as a

21  detective at Area 5?

22       A.   GPRs, like I said, notes, inventory

23  slips.

24       Q.   So I'm reversing the question this

1   time around.

2          A.   As a gang specialist?

3          Q.   Yes, as a gang specialist, what

4   documents would you have in your file at Gang

5   Crimes North, your working file at Gang Crimes

6   North that you didn't have in your working file

7   at Area 5?

8               MS. EKL:   Objection, assumes facts not

9   in evidence.

10              THE WITNESS:   I can't think of

11  anything.

12  BY MR. AINSWORTH:

13         Q.   You would have your notes, but I guess

14  you would have your notes --

15         A.   Where?

16         Q.   In both places.

17         A.   Well, of course, you have notes, yeah.

18         Q.   Let me switchgears for a second.

19              I would like to direct your

20  attention back to Exhibit No. 5.

21         A.   Okay.

22         Q.   If you look on the second page of that

23  document, I'm not trying to trick you.  I know

24  we covered this before the break.  I just have

1    a couple follow-up questions.

2              You don't recall whether or not

3    you were in the line-up room, correct?

4         A.   Correct.

5         Q.   You can't tell me whether or not gang

6    crimes specialist Guevara was in the line-up

7    room or not?

8         A.   No.

9         Q.   You can't tell me whether or not

10   Detective McLaughlin was in the line-up room or

11   not?

12        A.   No.

13        Q.   And you can't tell me whether Bill

14   Dorsch was in the line-up room or not?

15        A.   Could not.

16        Q.   And you can't tell me whether or not

17   Detective Boyle was in the line-up room or not?

18        A.   Could not, don't remember.

19        Q.   Were you are questioned by internal

20   affairs about this lawsuit?

21        A.   No.

22        Q.   Is it fair to say that the only person

23   that you've talked to about this lawsuit from

24   the Chicago Police Department is Detective

1    Guevara?

2         A.    Yes.

3         Q.    And just so we're clear, tell me

4    everything that you and Detective Guevara have

5    talked about in this lawsuit outside the

6    presence of your counsel.

7              MS. EKL:  Objection, asked and

8    answered, and foundation.

9    BY MR. AINSWORTH:

10        Q.    In all of your conversations that you

11   and Detective Guevara have had about this

12   lawsuit, tell me everything that you've said to

13   him and everything that he said to you outside

14   the presence of your counsel?

15             MS. EKL:  Objection, asked and

16   answered and foundation.

17             THE WITNESS:  Answer?

18             MS. EKL:  Yes.

19             THE WITNESS:  Not much.  I mean,

20   really.  I don't remember much of the case.  I

21   don't remember at all.  Asked him, he said, I

22   don't remember the case.  So I mean there isn't

23   much to talk about.  Kind of weird.  But I

24   didn't remember it.  I still don't remember it,

1    you know.

2    BY MR. AINSWORTH:

3        Q.   So how many times have you had that

4    conversation with Detective Guevara where you

5    say I don't remember what happened and he says,

6    I don't remember either?

7        A.   Once.

8        Q.   When was that?

9        A.   Oh, I don't know.  It was way back.

10       Q.   Are you talking about the conversation

11   when you first got notice of the lawsuit?

12       A.   Right probably around that time.

13       Q.   And then you had that conversation

14   again last week?

15       A.   Yeah, same thing.  Just -- but it was

16   mainly like I said, about your parking

17   situation, and he didn't understand, didn't

18   know anything so.

19       Q.   He didn't understand that he didn't

20   know anything?

21       A.   No.  He said, there's just nothing to

22   talk about because he couldn't remember

23   anything about it.

24       Q.   And then have you talked about this

1    lawsuit with Detective Guevara in between that

2    first discussion when you first got served with

3    the lawsuit and last week?

4         A.   I don't think so, no.

5         Q.   It just never came up?

6         A.   No.  We haven't -- we didn't talk a

7    lot either.

8         Q.   How many times have you been sued?

9         A.   Just once.

10        Q.   In this case?

11        A.   No.  With John Rivera, I think I was a

12   witness on that or something.  I'm not sure.

13        Q.   Did you give a deposition in that

14   case?

15        A.   Yeah, I did.

16        Q.   I thought when we started this

17   deposition, you said you had given a deposition

18   one time.  Oh, Juan Johnson?

19        A.   Yeah, that's the one.

20        Q.   All right.  And you were not a

21   defendant in that case, right?

22        A.   I don't think so.

23        Q.   So this is the only time you been sued

24   in your entire life?

```
 1        A.    Correct.

 2        Q.    And you were sued alongside your

 3   partner for seven, eight years?

 4        A.    Correct.

 5        Q.    And you and he have had two

 6   conversations about this lawsuit outside the

 7   presence -- outside the one conversation that

 8   you and your partner had with the Sotos Law

 9   Firm?

10        A.    Correct, that I can recall.

11        Q.    And the only thing that you and Rey

12   Guevara have said to each other is, I don't

13   recall and I don't recall either?

14        A.    That's about it, yeah.

15                    (WHEREUPON, Deposition Exhibit No.

16                     6 was marked for identification.)

17   BY MR. AINSWORTH:

18        Q.    Showing you what has been marked as

19   Exhibit No. 6.  It's a one-page document Bates

20   numbered CPD 0013.

21               Is this one of the documents you

22   reviewed in preparation for this deposition?

23        A.    Yes, I looked at it.

24        Q.    Having reviewed this document, did you
```

```
1      play any part in arresting Jacques Rivera on

2      August 30th, 1988?

3              MS. EKL:  I'm going to object to the

4      form of the question.  It's vague.  But you can

5      answer.

6              THE WITNESS:  I would say no.

7      BY MR. AINSWORTH:

8          Q.  Why would you say no?

9          A.  My name is not anywhere on this.

10         Q.  Do you have any recollection of --

11         A.  No, I don't.

12         Q.  -- playing any part in the arrest of

13     Jacques Rivera?

14              MS. EKL:  Objection, asked and

15     answered.

16     BY MR. AINSWORTH:

17         Q.  Do you have any recollection of

18     playing a role in arresting Jacques Rivera on

19     August 30th, 1988?

20         A.  No, I don't.

21         Q.  Having reviewed this document, does

22     that -- do you also not recall having anything

23     to do with bringing Jacques Rivera to the

24     police station for a line-up which will be held
```

225

1    on August 31st, 1988 as written at the bottom

2    in the narrative portion of Exhibit No. 6?

3        A.   I don't remember it.

4        Q.   Do you see those last two lines in the

5    narrative portion of this document?

6        A.   Yes.

7        Q.   Does that refresh your recollection at

8    all as to whether or not there was a line-up

9    held on August 31st, 1988?

10        A.   No.

11        Q.   Can you say one way or the other

12    whether such a line-up occurred on August 31st,

13    1988?

14        A.   Unless there's a report, otherwise I

15    don't remember.

16        Q.   So you can't say one way or the

17    other --

18        A.   No.

19        Q.   -- whether there was a line-up on that

20    day; is that right?

21        A.   Correct.

22        MR. AINSWORTH:  Let's mark this as

23    Exhibit No. 7.

24

```
 1                    (WHEREUPON, Deposition Exhibit No.

 2                    7 was marked for identification.)

 3   BY MR. AINSWORTH:

 4        Q.   I show you what has been marked as

 5   Exhibit No. 7.  It's a one-page document Bates

 6   No. CPD 0032.

 7                    Is this another document that you

 8   reviewed in preparation for this deposition?

 9        A.   Yes.

10        Q.   In reviewing this document -- having

11   reviewed this document, do you have any

12   recollection of actually arresting Jacques

13   Rivera on September 15, 1988?

14        A.   No, I do not.

15        Q.   Do you know why Jacques Rivera was

16   arrested on September 15, 1988?

17        A.   Based on the reports, he was picked

18   out of a line-up.

19        Q.   Where did that occur?

20        A.   What's that?  Occurred what?

21        Q.   Where was he arrested?  Let's put it

22   that way.

23        A.   Let's see.  Grand Avenue, 5555 West

24   Grand.
```

1      Q.   What's there?

2      A.   Police station.

3      Q.   Which one?

4      A.   Grand and Central, Area 5.

5      Q.   So Jacques Rivera was arrested at Area

6   5; is that right?

7      A.   As charged.

8      Q.   And he was arrested there as well,

9   correct?

10      A.   Technically you could say he was

11   arrested when he was brought in.

12      Q.   This is your partner's signature here,

13   correct?

14      A.   Correct.

15      Q.   On Exhibit No. 7?

16      A.   Correct.

17      Q.   And at the upper left-hand corner, it

18   says address of arrest, 5555 West Grand, right?

19      A.   Right.

20      Q.   Does that indicate to you -- and your

21   partner signed this under oath, right?

22      A.   Correct.

23      Q.   Does that indicate to you that the

24   arrest took place at Area 5?

1        A.   Well, he was brought in to Area 5.

2        Q.   Well, that's the Box 47 where it says

3  arrestee transported to Area 5?

4        A.   Correct.

5        Q.   And so I'm asking you, the place of

6  the arrest was Area 5, correct?

7        A.   That's what's listed.

8        Q.   Do you have any reason to dispute

9  that?

10       A.   Technically you could say when he was

11  picked up.

12       Q.   If he was arrested at the time that he

13  was picked up, would the address of his -- of

14  the place where he was picked up appear in the

15  box that says address of arrest?

16        MS. EKL:  Objection, form, foundation.

17        THE WITNESS:  Well, obviously, it

18  would be the wrong address.

19  BY MR. AINSWORTH:

20       Q.   Did you read Jacques his Miranda

21  rights when he was picked up on September 15,

22  1988?

23       A.   I don't remember.

24       Q.   Did your partner read Jacques Rivera

1      his Miranda rights in your presence on

2      September 15, 1988 when he was picked up?

3           A.   I don't remember.

4           Q.   Do you know the name of the witness

5      who picked out Jacques Rivera out of a line-up?

6           A.   Orlando Lopez.

7           Q.   How do you know that name?

8           A.   It's listed in the reports.

9           Q.   That's the only way you knew it?

10          A.   Yes.

11          Q.   Do you see in the narrative portion of

12     Exhibit No. 7 where it says above subject

13     arrested for murder after being placed in a

14     line-up and picked out by the witness as the

15     shooter in this homicide?

16          A.   Correct.

17          Q.   So that indicates to you that Jacques

18     Rivera was arrested after he was in a line-up?

19          A.   That's what it says.

20          Q.   Do you have any reason to dispute

21     that?

22          A.   If it's written.

23          Q.   Do you know your partner Rey Guevara

24     to create false police reports?

1        A.   No.

2        Q.   Do you have any reason to doubt that

3 what he's saying here is true?

4        A.   Is what true?

5        Q.   Where it says above subject arrested

6 for murder after being placed in a line-up and

7 picked out by the witness as a shooter in this

8 homicide.

9        A.   What's the question?

10       Q.   Do you have any reason to doubt that

11 what your partner has written there is true?

12       A.   It's true.

13       MR. AINSWORTH:  Let's mark this as

14 Exhibit No. 8.

15                  (WHEREUPON, Deposition Exhibit No.

16                  8 was marked for identification.)

17 BY MR. AINSWORTH:

18       Q.   Showing you what has been marked as

19 Exhibit No. 8, this is a two-page document

20 Bates numbered CPD 0030 and 0031.

21           Is that your signature at the

22 bottom of left-hand corner of Page 1 of Exhibit

23 No. 8?

24       A.   Yes, it is.

1      Q.    And who signed underneath your

2    partner's name on the first page of this

3    exhibit?

4      A.    It might be that I signed his name.

5      Q.    Did you have your partner review the

6    report --

7      A.    Yes.

8      Q.    -- prior to having him sign it?

9      A.    Yes.

10     Q.    Did your partner Rey Guevara review

11   this report before you signed his name on his

12   behalf?

13     A.    I'm guessing he did, yes.

14     Q.    Why are you guessing that he did?

15     A.    He told me to sign his name.  I don't

16   remember specifically, but --

17     Q.    Was it your practice to have your

18   partner review a report that you created before

19   signing his name on his behalf?

20     A.    Yeah.  He would have to read it.

21     Q.    So you would bring --

22     A.    Or peruse it and go through it.

23     Q.    So you would bring it to him and show

24   it to him and allow him to read it before you

1      would sign his name on his behalf?

2           A.    Correct.

3           Q.    In here you wrote that Jacques Rivera

4      was arrested on 15 September 1988 at 7:30 in

5      the evening; is that right?

6           A.    Right.

7           Q.    And you wrote that he was arrested at

8      Area 5, correct?

9           A.    Correct.

10          Q.    Why did you write that he was arrested

11     at Area 5?

12          A.    It's just the title of that topic is

13     actually charged in Area 5.

14          Q.    Well, you typed this report correct?

15          A.    Correct.

16          Q.    So to the left of that fourth line

17     down in the narrative section, it says date,

18     time, location of arrest, right?

19          A.    Right.

20          Q.    It doesn't say date, time, location of

21     charging?

22          A.    No.

23          Q.    So why would you put the location of

24     charging in the spot where it says location of

1    arrest?

2         A.   Oversight.

3         Q.   So you meant to write the location of

4    Jacques's -- where he was picked up as the

5    location of his arrest?

6         A.   Correct.

7         Q.   Is there a reason why you and your

8    partner made the same error on two different

9    forms?

10             MS. EKL:  Objection, form.

11             THE WITNESS:  Probably took it right

12   off the arrest report.

13   BY MR. AINSWORTH:

14        Q.   And did you know what 5555 West Grand

15   was back in 1988?

16        A.   Yes.

17        Q.   Let's look back at Exhibit No. 6, if

18   you compare Exhibit No. 6 and 7.

19             On Exhibit No. 6, in the upper

20   left-hand corner, you have address of arresting

21   3300 Beach, correct?

22             THE WITNESS:  Correct.

23             MS. EKL:  Objection to the form

24   specifically saying you have.  If you're saying

1    that generally, it should be clarified as

2    opposed to him personally.

3              THE WITNESS:  Yes, I see the address.

4    BY MR. AINSWORTH:

5         Q.   And so on Exhibit No. 6, it's written

6    3300 Beach as the address of arrest, and we can

7    assume that Jacques Rivera was arrested at that

8    location, right?

9         A.   Correct.

10        Q.   But you're saying that on Exhibit

11   No. 7 where it says 5555 West Grand as the

12   address of arrest, we cannot safely assume that

13   that's the address of arrest and it's actually

14   wrong; is that right?

15        A.   You could say that.

16        Q.   I'm asking you would you say that?

17        A.   Yeah, because he wasn't picked up

18   there.

19        Q.   How do you know?

20        A.   Unless he came in on his own, but I

21   think there's another report here that says we

22   went to get him, pick him up.

23        Q.   So is the only thing that you

24   independently recall about this case is that

1      you erroneously reported that he was arrested

2      at Area 5 on Exhibit No. 8?

3          A.    Correct.

4          Q.    Do you recall whether Jacques Rivera

5      came voluntarily to Area 5 on September 15,

6      1988?

7          A.    No, I do not.

8          Q.    You don't recall?

9          A.    No.

10         Q.    All right.  When did you submit this

11     report, Exhibit No. 8?

12         A.    On the 16th of September.

13         Q.    Under investigation, the first

14     sentence there says reporting officers along

15     with other gang crime specialists were

16     investigating an aggravated battery in which

17     the victim was shot ten times; do you see that?

18         A.    Yes.

19         Q.    When you say reporting officers, who

20     are you referring to?

21         A.    Ourselves.

22         Q.    Who is ourselves?

23         A.    Guevara and myself.

24         Q.    So does that indicate that you were

1   investigating an aggravated battery?

2        A.   Yes.

3        Q.   The next sentence says gang crimes

4   specialists Noon, Guzman, Sparks, and Zacharias

5   located a witness on August 29, 1988; do you

6   see that?

7        A.   Yes.

8        Q.   Does that mean the witness was located

9   on August 29, 1988?

10       A.   Yes.

11       Q.   Some of these are easy ones?

12       A.   Okay.  Yeah.

13       Q.   Next sentence says this witness was

14  brought into Gang Crimes North to view photo

15  books; do you see that?

16       A.   Correct.

17       Q.   Was that witness brought into Gang

18  Crimes North to view gang photo books?

19       A.   I don't remember it.

20       Q.   So he may have, he may not have?

21            MS. ROSEN:  Objection, form.

22            THE WITNESS:  No.  If I put it on the

23  report, then he must have been brought in into

24  Gang Crimes North.

```
 1    BY MR. AINSWORTH:

 2         Q.   Which witness was it who was brought

 3    to Gang Crimes North?

 4         A.   I think we only have one witness.

 5         Q.   Who is that?

 6         A.   Orlando Lopez.

 7         Q.   It states on that date, witness

 8    positively identified the photo of Jose Rios

 9    from book 16D, Page 40, Photo D, Latin King

10    gang book; do you see that?

11         A.   Yes.

12         Q.   Where you say on that date, are you

13    referring to August 29, 1988?

14         A.   Yes.

15         Q.   So you're writing this report on

16    September 16, 1988 close to three weeks after

17    August 29th, right?

18         A.   Right.

19         Q.   How did you know what position Jose

20    Rios' photo was in the gang book?

21         A.   How did I know?

22         Q.   Yes.

23         A.   Wrote it down.

24         Q.   Where did you write it down?
```

1         A.    Or somebody wrote it down.

2         Q.    Where did they write it down?

3         A.    I have no idea.

4         Q.    Have you seen any note or document

5    that shows where it was written down?

6         A.    No.

7         Q.    How do you know it was written down?

8         A.    Well, I wouldn't remember it.  I'd

9    write it down.

10        Q.    You wouldn't be expected to remember

11   that three weeks later?

12        A.    No.  I wouldn't trust myself.

13        Q.    Do you know that there's only one

14   witness in a case?

15        A.    From the reports.

16        Q.    There's only one witness written --

17   noted in the reports apart from the victim; is

18   that right?

19        A.    Correct.

20        Q.    Do you know if there were other

21   witnesses?

22        A.    No.

23        Q.    Who is Jose Rios?

24        A.    Who is he?

1  Q. Yes.

2  A. That's his other name of Jacques

3 Rivera.  His alias or his real name.

4  Q. How do you know that Jose Rios is

5 referring to Jacques Rivera?

6  A. I think it's on his IR sheet.

7  Q. Yes, but are there more than one Jose

8 Rios in Chicago?

9  A. Oh, I'm sure.

10   MS. EKL:  Objection, foundation.

11 BY MR. AINSWORTH:

12  Q. What is your answer?

13  A. I'm sure there are.

14  Q. How do you know that the Jose Rios

15 that is picked out from the gang book is

16 Jacques Rivera?

17  A. By the cards.

18  Q. Where are the cards?

19  A. Gang cards.

20  Q. Where are they?

21  A. Well, they would be in the gang

22 office.

23  Q. Where in the gang office?

24  A. In the office, administrative office.

1    Q.    So there's a card saying that the Jose

2    Rios that was picked out in that photo book is

3    actually Jacques Rivera?

4    A.    I don't know.

5    Q.    Then tell me why do you think that a

6    gang card has anything to do with Jose Rios

7    being Jacques Rivera?

8    A.    Because it could have been information

9    on the card.  I don't know.  I haven't seen the

10   card.  It comes off his IR sheet, both names

11   are on there.

12   Q.    Yes.  But if there's a Jose Rios who's

13   identified, why couldn't that be a different

14   Jose Rios than the alias that Jacques had used?

15   A.    Because you're going by the picture.

16   Q.    Where is the picture?

17   A.    I don't know.

18   Q.    If you flip to the second page of

19   Exhibit No. 8, the next sentence says numerous

20   attempts were made to interview the victim at

21   Cook County Hospital, or that's the first

22   phrase of that sentence; do you see that?

23   A.    Yes.

24   Q.    How do you know that numerous attempts

1    were made to interview the victim?

2         A.   I don't remember, but I couldn't

3    speculate.

4         Q.   Who made those attempts?

5         A.   I don't know.  Don't remember it.

6         Q.   Why were those attempts unsuccessful?

7         A.   Why?

8         Q.   Yes.

9         A.   I have no idea.

10        Q.   Was somebody preventing police

11   officers from interviewing the victim?

12        A.   I don't know.

13        Q.   Is it possible that you made numerous

14   attempts to visit the victim at Cook County

15   Hospital?

16        A.   Possible.

17        Q.   Let's look at the next part of this

18   sentence.  It says on 10 September 1988,

19   reporting investigators were able to have

20   victim view gang photo book where then an

21   identification was made of Jose Rios as the

22   person that shot victim; do you see that?

23        A.   Correct.  I see it.

24        Q.   So isn't it true, sir, that you didn't

```
 1      show the gang books to Orlando -- strike that.
 2                     Isn't it true, sir, you didn't
 3      show Felix Valentin the gang books on
 4      September 10th?
 5           A.   I don't remember if we were there or
 6      not.
 7           Q.   Isn't it true, sir, it was on a
 8      different day and you just made up the
 9      September 10 day?
10           A.   No.
11           Q.   Why do you say no?
12           A.   I wouldn't make it up.
13           Q.   So it was on September 10th, 1988 that
14      you showed Felix Valentin the gang books; is
15      that what you're saying?
16           A.   Yes.
17           Q.   Who are the reporting investigators
18      who showed the victim or had the victim view
19      the gang photo book?
20           A.   Reporting investigators?
21           Q.   Yes.
22           A.   I'm speaking about us, Guevara and
23      myself.
24           Q.   Tell me, how did Felix Valentin appear
```

1      on September 10th, 1988?

2              A.    I don't remember.

3              Q.    Was he conscious?

4              A.    Don't remember.

5              Q.    Did you get an identification from an

6      unconscious person?

7              A.    Probably not.

8              Q.    Why do you say probably not?

9              A.    If he's unconscious?

10             Q.    Yes.

11             A.    How would you get an ID?

12             Q.    You couldn't, right?

13             A.    No.

14             Q.    You agree?

15             A.    I agree.

16             Q.    So was he alert?

17             A.    I have no idea; don't remember.

18             Q.    Are you saying it's possible that he

19     was not alert when you got an identification

20     from him?

21                  MS. EKL:   Objection to form,

22     specifically the word alert.

23                  THE WITNESS:   Am I what?

24

244

1    BY MR. AINSWORTH:

2         Q.   Are you saying that you might have

3    gotten an identification from him when he was

4    not alert?

5              MS. EKL:  Same objection.

6              THE WITNESS:  I don't think so.

7    BY MR. AINSWORTH:

8         Q.   How did you have Felix Valentin view

9    the gang book?

10        A.   I don't remember.

11        Q.   How did you know when to turn the

12   page?

13        A.   I don't remember doing it.

14        Q.   What photograph did Felix Valentin

15   pick out on September 10th, 1988?

16        A.   I don't remember doing the process.

17        Q.   Why didn't you note which photograph

18   he picked out?

19        A.   Well, I mentioned that he picked out

20   the photo of Jose Rios.

21        Q.   Where was that photograph located

22   inside the book?

23        A.   Book 16D, Page 40, Photo D of the

24   Latin Kings book.

1      Q.    How do we know it was the same

2   photograph that was referred to previously in

3   the report?

4      A.    I don't know.

5      Q.    Why did you wait until September 16th

6   to submit a report about an identification that

7   was supposedly made on September 10th?

8      A.    I don't know.  I can't explain it.

9      Q.    You're supposed to submit a report on

10   the same day that an identification is made,

11   right?

12      A.    You should, yes.

13      Q.    You waited until after Felix Valentin

14   died before submitting this report, right?

15      A.    It looks that way.

16      Q.    Is it that way or isn't it?

17      A.    That's the way it turned out.

18      Q.    Why did you wait until September 16th

19   to document what happened on August 29th, 1988?

20      A.    What was the date?

21      Q.    August 29th, 1988?

22      A.    I don't understand what you're asking,

23   August 29.

24      Q.    Look on the first page of the report

1    in the bottom part of the narrative, it talks

2    about activities that occurred on August 29,

3    1988.

4         A.   Oh, okay.  I don't have an explanation

5    for that.  I don't know why.

6         Q.   Why did you wait until after Felix

7    Valentin died before submitting this report

8    discussing his supposed identification on

9    September 10th?

10             MS. EKL:  Objection, form,

11   mischaracterizes his testimony.

12             MS. ROSEN:  Objection, form.

13             THE WITNESS:  I don't know.

14   BY MR. AINSWORTH:

15        Q.   Why did you type in Sergeant Mingey's

16   name in the Box 92 and type in the date and

17   time that he was to approve the report in

18   Box 95?

19        A.   That's when I was going to hand it in.

20   It's just for him to sign though.

21        Q.   So that he could -- why didn't you

22   allow him to write in the date and time that it

23   was approved?

24        A.   No reason.

```
 1          Q.   How did you know he was going to
 2     approve it at that date and time?
 3          A.   Because we weren't off shift yet.
 4          Q.   But how did you know he was going to
 5     approve it?
 6          A.   I don't know.  He was probably
 7     working.  We don't get off until 2:00 o'clock.
 8          Q.   When you're a sergeant in patrol, did
 9     you allow your subordinates to prewrite the
10     date and time that you were going to approve a
11     document?
12          A.   No.  Usually they didn't fill that out
13     at all.
14          Q.   Was it your practice to always fill in
15     the date and time that a supervisor was going
16     to sign the report?
17          A.   Not always.
18          Q.   Is this the only time that you recall
19     doing it?
20          A.   Probably not.
21          Q.   Why do you say probably not?
22          A.   Well, because I would type the
23     sergeant's name in there, so he wouldn't have
24     to print his name.
```

1       Q.   I'm not asking about putting the

2   sergeant's name.  I'm talking about the date

3   and time.

4              Is this the only time that you

5   can recall putting the date and time in there

6   for a supervisor as to when they're going to

7   approve the report?

8       A.   Yes.

9       Q.   Let's go back to Page 2 of this

10   report.

11              There's the first full paragraph

12   of the report that says on 15 September '88,

13   reporting officers located Jose Rios a/k/a

14   Jacques Rivera on the street and he was asked

15   to accompany reporting officers to Area 5

16   violent crimes to stand in a line-up for

17   murder, subject agreed, and he was read his

18   Miranda warnings; do you see that?

19       A.   Yes.

20       Q.   Does that refresh your recollection

21   that Jacques Rivera was asked to accompany you

22   and your partner to Area 5 and that he came

23   voluntarily?

24       A.   No, I still don't remember.

1     Q.   All right.  So before you said that

2    you remembered or you said that it was wrong

3    that he was arrested at Area 5 and he was

4    actually arrested on the street?

5     A.   Technically, yes.

6     Q.   So does reviewing this document

7    refresh your -- indicate to you that Jacques

8    Rivera actually came voluntarily to Area 5

9    where he was then arrested?

10     A.   Yes.

11     Q.   The next paragraph says once in Area 5

12    violent crimes, Jose Rios was placed in a

13    line-up, and he was positively identified as

14    the person that shot the victim, Felix

15    Valentin, on 27 August 1988, reviewed by ASA

16    Rosner with witness; charges of first degree

17    murder were approved.

18         Do you see that, sir?

19     A.   Yes.

20     Q.   And then it states Orlando Lopez,

21    witness, was shown photographs of Jose

22    Rodriguez and Felipe Nieves and he stated to

23    reporting investigators that these two

24    individuals were not involved in this incident;

1    do you see that?

2           A.   Yes.

3           Q.   Let me go back to the second paragraph

4    of this report where it says on 15

5    September '88, reporting officers located Jose

6    Rios a/k/a Jacques Rivera.  You located Jacques

7    Rivera, correct?

8           A.   Yes.

9           Q.   Did you try to locate Jose Rodriguez?

10          A.   I don't remember that.

11          Q.   Why wouldn't you try to locate Jose

12   Rodriguez?

13               MS. EKL:  Objection, form.

14               THE WITNESS:  I don't remember the

15   whole process.

16   BY MR. AINSWORTH:

17          Q.   Excuse me?

18          A.   I don't remember it.

19          Q.   Is there any reason why you wouldn't

20   try to locate Jose Rodriguez if you're bringing

21   Orlando Lopez in to view a line-up?

22          A.   I don't know.

23               MS. EKL:  Objection, form.

24               THE WITNESS:  I don't know.

1    BY MR. AINSWORTH:

2        Q.   When did you show photographs to

3    Orlando Lopez?

4        A.   I don't remember doing it.

5        Q.   Was it before or after he viewed the

6    line-up?

7        A.   Say that again.

8        Q.   Was it before or after he viewed the

9    line-up on September 15, 1988?

10       A.   Showed pictures to who?

11       Q.   Orlando Lopez.

12       A.   After the line-up?

13       Q.   Did you show him pictures before or

14   after?

15       A.   It would have to be before.

16       Q.   Why would it have to be before?

17       A.   Well, after is not going to --

18           MS. EKL:   I'm to object and just ask

19   you clarify your question.   I think there's a

20   confusion.   You've talked about different

21   things.

22           THE WITNESS:   Which pictures are we

23   talking about?

24

1    BY MR. AINSWORTH:

2         Q.   The last paragraph of your report,

3    sir, it says that Orlando Lopez, witness, was

4    shown photos of Jose Rodriguez and Felipe

5    Nieves.

6                   I'm asking you, sir, when was

7    Orlando Lopez shown those photographs?

8         A.   I don't remember.

9         Q.   Was he shown these photographs before

10   or after he viewed the line-up on September 15,

11   1988?

12        A.   I don't know.  I don't remember it.

13        Q.   Did you show the same two photographs

14   to Orlando Lopez on August 29, 1988?

15        A.   I don't remember that.

16        Q.   Which photographs of Jose Rodriguez

17   and Felipe Nieves did you show to Orlando

18   Lopez?

19        A.   I don't remember.

20        Q.   Did you inventory those photographs?

21        A.   Not me, no.

22        Q.   Did anyone inventory those

23   photographs?

24        A.   I don't know.

1   Q. Did you indicate in your report that

2 the photographs were inventoried?

3   A. No.

4   Q. If you or your partner inventoried

5 those photographs, would you have noted that in

6 your report?

7   A. Yes, probably.

8   Q. Is there a reason why those

9 photographs were not inventoried?

10   A. Don't know of any reason.

11   Q. Did you show those photographs without

12 any fillers to Orlando Lopez?

13   A. I have no idea.

14   Q. Did you show both of those photographs

15 at the same time?

16   A. Don't know.

17   Q. Who was present when you showed

18 Orlando Lopez those photographs?

19   A. I don't remember.

20   Q. Did you show those photographs to

21 Felipe -- to Felix Valentin on September 10th,

22 1988 when you were at the hospital?

23   A. I don't remember.

24   Q. Why wouldn't you show those

1    photographs to Felix Valentin if --

2         A.   Why wouldn't I?

3         Q.   Why wouldn't you if you're showing him

4    photographs at the hospital?

5              MS. EKL:  Objection, form.

6              THE WITNESS:  Couldn't answer that.

7    BY MR. AINSWORTH:

8         Q.   How did you obtain photographs of Jose

9    Rodriguez and Felipe Nieves?

10        A.   I have no idea.

11        Q.   Were they in your working file for

12   this case?

13        A.   I don't remember.

14             MS. ROSEN:  If we could take a break

15   at a convenient time, that would be great.

16   BY MR. AINSWORTH:

17        Q.   If those photographs were from a gang

18   book, would you have noted the location of

19   those photographs in a gang book?

20             MS. EKL:  Objection, form.

21             THE WITNESS:  Yes, probably.

22   BY MR. AINSWORTH:

23        Q.   Why do you say probably?

24        A.   Well, if they're in a gang book, I

```
1     would think you would make some kind of note.
2          Q.    Because that's the only way you would
3     know where those photographs would be found?
4          A.    Correct.
5          Q.    What if those photographs weren't in a
6     gang book, would you make some kind of note so
7     that you can determine where those photographs
8     could be found?
9          A.    What do you mean found?
10         Q.    Located.
11         A.    It says here they were shown.  So --
12         Q.    But if you wanted to see which
13    photographs were shown to the witness, if the
14    photographs were not in a gang book, would you
15    make some notation so that you could determine
16    which photographs were shown to the witness?
17         A.    I would think so, yes.
18         Q.    Why would you think so?
19         A.    That they were used.
20         Q.    Did you make any such notation?
21         A.    Not here, no.
22         Q.    Did you make it anywhere?
23         A.    I don't know.  I don't think so.
24         Q.    It might have been one of your notes
```

1    that was in the working file?

2         A.    No, because this is all done on that

3    night.

4         Q.    So, did you make any notation anywhere

5    of which photographs you showed to Orlando

6    Lopez of Jose Rodriguez and Felipe Nieves?

7         A.    I don't remember any notes.

8              MR. AINSWORTH:  Let's go off the

9    record.

10             THE VIDEOGRAPHER:  We're going off the

11   record at 4:06.

12                      (WHEREUPON, a short break was

13                       taken.)

14             THE VIDEOGRAPHER:  Here begins Tape

15   No. 4.  We're going back on the record at 4:18.

16             MR. AINSWORTH:  Let's mark this as

17   Exhibit No. 9, please.

18                      (WHEREUPON, Deposition Exhibit No.

19                       9 was marked for identification.)

20   BY MR. AINSWORTH:

21        Q.    Showing you what's been marked as

22   Exhibit No. 9, this is a document from Felix

23   Valentin's medical records dated September 10,

24   1988 and Bates numbered CPD 0489.

```
 1                    I'm going to direct your

 2     attention to the top of this page, sir, where

 3     it says patient is unresponsive nor alert, has

 4     no spontaneous breathing.  And it's repeated on

 5     the page about the fifth line down, it says

 6     patient unresponsive and again --

 7                    MS. ROSEN:  Where are you reading

 8     further down?

 9                    MR. ART:  Just do that part.

10     BY MR. AINSWORTH:

11          Q.   So, focusing on the first two lines

12     where it says patient is unresponsive nor

13     alert, has no spontaneous breathing.

14                    Sir, did you -- when you

15     encountered Felix Valentin on September 10th,

16     1988, did you find him to be responsive?

17          A.   I don't remember.

18          Q.   Do you find him to be alert?

19          A.   I don't remember.

20          Q.   Do you know why the notes would

21     indicate that he was unresponsive and not alert

22     on the date that you supposedly got an

23     identification from him of Jacques Rivera?

24                    MS. ROSEN:  Objection.
```

1             MS. EKL:  Objection, foundation.

2             THE WITNESS:  No, I don't.

3  BY MR. AINSWORTH:

4     Q.   Was Felix Valentin responsive to

5  stimuli when you visited him at Cook County

6  Hospital?

7             MS. ROSEN:  Objection, form.

8             THE WITNESS:  When I visited him?

9  BY MR. AINSWORTH:

10     Q.   Yes.

11     A.   I don't remember.

12     Q.   I'm specifically asking about

13  September 10th, 1988.

14     A.   Yeah, I don't remember.

15     Q.   Did you try to shake him awake on

16  September 10th, 1988?

17             MS. ROSEN:  Objection, form.

18             THE WITNESS:  I don't remember.

19  BY MR. AINSWORTH:

20     Q.   Did you try to give him a sternal rub

21  to get him to respond to you on September 10th,

22  1988?

23             MS. ROSEN:  Objection, form.

24             THE WITNESS:  I'm sure I wouldn't do

1    that, but I still don't remember.

2    BY MR. AINSWORTH:

3        Q.   Do you have any explanation for how

4    you were able to obtain an identification from

5    Felix Valentin on September 10, 1988 when he

6    was unresponsive and not alert and not

7    spontaneously breathing?

8            MS. EKL:   Objection, assumes facts not

9    in evidence, that this report relates to the

10   same time period that the officer was

11   present --

12           MR. AINSWORTH:   No, no.  Ms. Ekl, no

13   speaking objections.

14           MS. EKL:   I can make whatever

15   objection I want.  You're making misleading

16   questions.

17           MR. AINSWORTH:   The only reason that

18   you would make a speaking objection is to cue

19   the witness.  I'm going to direct you not to

20   cue the witness.

21           MS. EKL:   I'm not cuing the witness.

22   I'm doing my job.  So you do your job, I'll do

23   my job.  Don't instruct me how to make

24   objections, Russell.

260

1           MR. AINSWORTH:  Your job is not to cue

2    the witness.  You will not cue the witness in

3    this deposition.

4           MS. EKL:  You will not tell me what to

5    do.  I will make the objections that I see

6    appropriate.

7           MR. AINSWORTH:  You can make

8    objections, and I have no problems with the

9    objections that you're making all day.

10    Objection, form.  That's all you need to do.

11           MS. EKL:  I will make the objections

12    that I see necessary and proper, and if you

13    want to call the judge you think I'm being

14    improper, go ahead.

15    BY MR. AINSWORTH:

16       Q.   Can you answer the question, sir?

17       A.   No.

18               (WHEREUPON, Deposition Exhibit

19                 No. 10 was marked for

20                 identification.)

21           MS. ROSEN:  This is 10.

22           MR. AINSWORTH:  Correct.  This is 11.

23

24

```
 1                    (WHEREUPON, Deposition

 2                     Exhibit No. 11 was marked

 3                     for identification.)

 4     BY MR. AINSWORTH:

 5          Q.    Showing you Exhibit 10, it's a

 6     one-page document Bates number CPD 0046.

 7                     Do you know whose photograph that

 8     is in this document?

 9          A.    Not sure, no.

10          Q.    Do you know why this document is in

11     the file?

12          A.    No.

13               MS. ROSEN:   Objection, form.

14     BY MR. AINSWORTH:

15          Q.    Do you know who took this photograph?

16          A.    No, I do not.

17          Q.    Showing you Exhibit No. 11, there are

18     three pages to this exhibit, pages CPD 0048,

19     0049, and 0051.

20                     Do you know who appears in the

21     first two paragraphs or pages of this exhibit?

22          A.    No, I do not.

23          Q.    Do you know why these photographs are

24     in the police file?
```

1          MS. ROSEN:  Objection, form.

2          THE WITNESS:  No, I do not.

3    BY MR. AINSWORTH:

4      Q.   Did you have anything to do with

5    adding these two photographs that appear on the

6    first two pages of Exhibit 11 with putting

7    these photographs in the area file?

8          MS. ROSEN:  Objection, form,

9    foundation.

10         THE WITNESS:  No, I don't remember

11   doing anything like that.

12         MR. AINSWORTH:  Let's mark this as

13   Exhibit No. 12.

14                    (WHEREUPON, Deposition Exhibit

15                     No. 12 was marked for

16                     identification.)

17   BY MR. AINSWORTH:

18     Q.   Showing you what has been marked as

19   Exhibit No. 12, this is a batch of photographs

20   Bates numbered CPD 0103 through 0112.  I'll ask

21   you, sir, reviewing these photographs, have you

22   seen these before?

23     A.   No, I have not.

24     Q.   Can you tell from looking at the first

1      page in Exhibit 12 where that photograph was

2      taken?

3              A.   Well, it looks like a police station.

4              Q.   Can you tell which police station it

5      is?

6              A.   No.

7              Q.   Can you tell whether or not it's

8      Area 5?

9              A.   No, I cannot.

10             Q.   Does reviewing the photographs in --

11     starting with Page No. 105 in the bottom

12     right-hand corner and going on through, does

13     reviewing those photographs indicate to you

14     where those photographs were taken?

15             A.   No, it does not.

16             Q.   Does that look like the line-up room

17     at Area 5 to you?

18             A.   No.

19             Q.   What about it makes you think that

20     it's not or that it doesn't look like the

21     line-up room at Area 5?

22             A.   Because there's pictures, if I

23     remember right, photos were on the back wall

24     there.  Behind that wall was the line-up room

1    and the viewing room.

2         Q.    So do you know what this room would

3    have been?

4         A.    This is not a room.  Well, it's a room

5    technically, yeah.  It's the floor, the rest of

6    the floor.

7         Q.    The open floor of Area 5?

8         A.    Yes.

9         Q.    And so on the other side of this wall

10   is where the line-up room would have been?

11        A.    I believe so, yeah.

12        Q.    Do you remember being present for a

13   line-up that was held in the open floor of

14   Area 5?

15        A.    No.

16        Q.    What are these photographs that are on

17   the back wall of the photograph?

18        A.    I have no idea.

19        Q.    Do you recognize anyone in these

20   photographs that are of the line-up?

21        A.    Well, now I do, yes.

22        Q.    What do you recognize?

23        A.    Well, the No. 3, Rivera.

24        Q.    Does the picture look at all familiar

1    to you?

2         A.    Which one?

3         Q.    The pictures of the line-up.

4         A.    No, I haven't seen them.

5              MR. AINSWORTH:  Let's mark this as

6    Exhibit No. 13, please.

7                        (WHEREUPON, Deposition Exhibit

8                         No. 13 was marked for

9                         identification.)

10   BY MR. AINSWORTH:

11        Q.    Showing you what's been marked as

12   Exhibit No. 13, have you seen these photographs

13   before, or should I say take a look through

14   them.  They are Bates numbered RFC 01415

15   through RFC 01420, and let me know if these are

16   the photographs that you reviewed in

17   preparation for today's deposition.

18        A.    Yes.

19        Q.    These are the photographs that you

20   reviewed?

21        A.    I saw them differently, but I think

22   these are the same pictures.

23        Q.    In what format did you see them?

24        A.    It was in a row.

1      Q.   Excuse me?

2      A.   A row, on a piece of paper.

3      Q.   All of them?

4      A.   Yeah.  I don't remember the line-up of

5  the order.

6      Q.   Do you recognize any of the

7  photographs in Exhibit No. 13?

8      A.   Now I recognize No. 3.

9      Q.   How do you recognize No. 3?

10      A.   From seeing him in all the

11  preparation, this picture. (Indicating.)

12      Q.   When you saw the photographs all in a

13  row together, did you understand that to be

14  from a line-up?

15          MS. EKL:  Objection, form.

16          THE WITNESS:  No, I didn't know what

17  they were from.

18  BY MR. AINSWORTH:

19      Q.   Is Jacques Rivera the only one you

20  recall?

21      A.   Yes, as far as what?  As seeing?

22      Q.   As recognizing.

23      A.   Well, I remember seeing this picture.

24          MS. ROSEN:  Are you asking him if he

1    recognizes the pictures or the people?

2    BY MR. AINSWORTH:

3        Q.   Do you recognize any of the people in

4    this photograph apart from Jacques Rivera?

5        A.   As far as what?

6        Q.   Recognizing them from before you

7    started preparing for this deposition, people

8    you've seen before, know who they are, have any

9    recognition of them?

10       A.   No, I don't think so.

11       Q.   Why do you hesitate?

12       A.   Why do I what?

13       Q.   Why do you hesitate?

14       A.   Because I'm thinking if I had seen

15   them before in the office.

16       Q.   Did the photograph of Jacques look

17   familiar to you the first time you saw it

18   during the dep prep?

19       A.   No.

20       Q.   Have you ever had any CRs filed

21   against you?

22       A.   Yes.

23       Q.   What have you had CRs filed against

24   you for?

```
1          A.    I don't even remember.

2          Q.    To your knowledge, has anyone alleged

3    that you falsely arrested them?

4          A.    That I what?

5          Q.    You falsely arrested them?

6          A.    Who?

7          Q.    You.

8          A.    Falsely arrested who?

9          Q.    I'm just asking, do you have any

10   recollection of responding to a CR that was

11   open because somebody was alleging that you had

12   falsely arrested him or her?

13         A.    No, I don't remember that.

14         Q.    Have you ever had a CR open against

15   you for using excessive force against a

16   civilian?

17         A.    No.

18         Q.    Have you had a --

19         A.    I don't believe so.

20         Q.    Have you ever reported to a supervisor

21   misconduct that you observed being committed by

22   a fellow police officer?

23         A.    No.

24         Q.    Have you ever observed any police
```

1    officer ever committing any act of misconduct

2    against a civilian?

3        A.   Against a civilian?

4        Q.   Yes.

5        A.   I don't know.  I would have to think.

6    I don't think so.

7        Q.   Well, think about it.

8        A.   Unless there was an arrest made, I am

9    not sure.

10       Q.   What do you mean unless there was an

11   arrest made?

12       A.   Well, sometimes prisoners -- people

13   that get arrested fight with you.

14       Q.   But I'm talking about an act of

15   misconduct, not an act to protect an officer or

16   an act to affect an arrest.

17             Have you ever observed an officer

18   commit an act of misconduct?

19             MS. ROSEN:  Objection, form, vague.

20             THE WITNESS:  No, not that I remember.

21   BY MR. AINSWORTH:

22       Q.   Do you know of any officer who has had

23   a sustained CR against them for misconduct

24   against a civilian?

270

1          A.    Can't think of any.

2          Q.    Were you ever spoken to by anyone at

3     the state's attorney's about this

4     investigation, the Felix Valentin

5     investigation?

6          A.    No, not that I recall.

7          Q.    Were you ever subpoenaed to come to

8     court?

9                MS. ROSEN:  Are you talking about back

10    in time at the criminal case?

11               MR. AINSWORTH:  At any point in time.

12               MS. ROSEN:  Because you already

13    covered that, that's why I'm asking.

14               THE WITNESS:  I don't believe I was at

15    the trial.

16    BY MR. AINSWORTH:

17         Q.    Why don't you believe that?

18         A.    I don't know.  I don't remember it.

19         Q.    While you were partners with Guevara,

20    did one of you testify more frequently than the

21    other?

22               MS. EKL:  Objection, foundation.

23               THE WITNESS:  Maybe Rey did more,

24    Guevara.

1    BY MR. AINSWORTH:

2         Q.   Do you know why that was?

3         A.   No.  I mean, it was overtime.  Rey was

4    looking for the hours or the money, whatever,

5    the overtime pay.  I did, too, but not as much.

6    I had kids at home, you know, to watch.  It's

7    just a family situation going on.

8         Q.   Let me switch gears.  Let's mark these

9    as Exhibit 14 and 15.

10                          (WHEREUPON, Deposition Exhibit

11                           No. 14 was marked for

12                           identification.)

13                          (WHEREUPON, Deposition Exhibit

14                           No. 15 was marked for

15                           identification.)

16              MR. AINSWORTH:  Sorry, Eileen.  This

17   is 44B.

18              MS. ROSEN:  Is it Bates stamped

19   somewhere?

20              MR. AINSWORTH:  It is.

21              MS. ROSEN:  Is the top one the

22   Anthony -- oh, the top one is 14.

23   BY MR. AINSWORTH:

24         Q.   I'm going to show you two documents.

1    Exhibit No. 14 would be Bates No. CPD 339 and

2    400.  And Exhibit 15 is Bates numbered CPD 400,

3    411 and 412.

4              MS. EKL:  I would just ask before you

5    ask a question that I get a chance to look at

6    that, please.

7              MR. AINSWORTH:  Yes.

8    BY MR. AINSWORTH:

9        Q.   So, sir, take an opportunity to

10   examine those documents.

11             MR. AINSWORTH:  Can we mark this as

12   Exhibit 16.

13                       (WHEREUPON, Deposition Exhibit

14                        No. 16 was marked for

15                        identification.)

16             MS. ROSEN:  You don't have another

17   copy of this?

18             MR. AINSWORTH:  It's my only copy.  I

19   have one additional.

20   BY MR. AINSWORTH:

21       Q.   This is Exhibit 16, Bates numbered --

22   may I see it just so I get it right, sir.  CPD

23   000398, a one-page document.

24                       I'm going to start you actually

1   with Exhibit 16.

2                   Well, I should ask you, have

3   you -- do you recall either Exhibits 14, 15 or

4   16, have seen them before?

5        A.   Well, this one I made out, 14,

6   Exhibit 14.

7        Q.   Do you recall seeing it since the time

8   you made it out?

9        A.   No.

10       Q.   Do you have any recollection of this

11   murder investigation?

12       A.   Somewhat, a little bit.

13       Q.   Taking a look --

14       A.   If I remember correctly.

15       Q.   Taking a look at Exhibit No. 16, do

16   you see that was a report submitted on

17   July 13th about a murder that occurred on

18   July 9th, the date of the original offense?

19       A.   Right.

20       Q.   It's in the upper right-hand corner?

21       A.   Okay.

22       Q.   Do you see that Exhibit No. 16 is a

23   report stating that the state's attorney's has

24   rejected a request by the Chicago Police

1    Department to issue a warrant for Adolfo

2    Rosario?

3        A.   Yes.

4        Q.   Now, let's take a look at Exhibit

5    No. 14.  That's a report that you filled out,

6    is that right?

7        A.   Yes.

8        Q.   And it's submitted on that same day,

9    July 13th, at 11:30 p.m.; is that right?

10        A.   Correct.

11        Q.   So after the state's attorney's

12    refused to issue a warrant for Adolfo Rosario,

13    you and your partner, Rey Guevara, somehow

14    found an additional witness by the name of

15    Denise Seay; is that right?

16        A.   I don't think we found -- if I written

17    here -- oh, yeah, along with others, additional

18    witness.  Okay.

19        Q.   Where did you find this additional

20    witness to this murder that nobody had talked

21    to before?

22        A.   You know, I don't know.  I don't

23    remember.

24              MS. EKL:  I'm sorry.  This is belated,

1    but I didn't get a chance.  I just want to

2    object that it assumes facts not in evidence.

3    BY MR. AINSWORTH:

4        Q.    How did you go about finding a witness

5    to the murder?

6            MS. EKL:  Objection, form.

7            THE WITNESS:  I can't answer it.  I

8    don't know.

9    BY MR. AINSWORTH:

10       Q.    Is your report supposed to document

11   things such as how you're able to locate a

12   particular witness?

13       A.    I would say not necessarily.

14       Q.    So you don't find it at all abnormal

15   that you did not note in this report how you

16   came to find an additional witness four days

17   after the murder?

18       A.    I can't tell you.

19       Q.    Did Denise Seay approach you and your

20   partner and say she was a witness?

21       A.    I don't remember.

22       Q.    Did you canvas the area and find this

23   witness?

24       A.    No, I don't remember doing that.

1       Q.   Did somebody tell you that Denise was

2   somebody that you should talk to about this

3   murder?

4       A.   I don't remember that.

5       Q.   And so hours after the Cook County

6   State's Attorney's office refused to issue a

7   warrant for Adolfo Rosario, you found a witness

8   Denise Seay, who then according to your report

9   positively identified Adolfo Rosario from a

10   gang book?

11       MS. EKL:  Objection, form, assumes

12   facts not in evidence.

13   BY MR. AINSWORTH:

14       Q.   Is that right, sir?

15       A.   It appears, yes.

16       Q.   And you created this report about

17   Denise Seay's identification of Adolfo Rosario

18   in a gang book the same day that that

19   identification took place, right?

20       A.   Say that again.  Did we what?

21       Q.   You documented Denise Seay's

22   identification of Adolfo Rosario in a gang book

23   the same day that it occurred, right?

24       A.   Yes.

1      Q.   And you documented it and you did not

2   wait six days to document that fact, right?

3      A.   Six days.

4      Q.   Yes, sir.

5      A.   I don't understand what you mean.

6      Q.   Well, in the Valentin homicide

7   investigation you said that Felix Valentin

8   identified the victim on September 10th, but

9   you did not submit the report until

10   September 16th, right?

11          MS. EKL:  Objection, form.

12          THE WITNESS:  Right.

13   BY MR. AINSWORTH:

14      Q.   But in the case involving Mr. Rosario,

15   you submitted that report the same day the

16   identification was made, correct?

17      A.   Yes.

18      Q.   And after you were able to find Denise

19   Seay who identified Adolfo Rosario from the

20   gang book, then a warrant was issued by the

21   state's attorney's office; do you see on the

22   last line of your report, Exhibit No. 14?

23      A.   Yes.

24      Q.   Do you recall that Detectives

1    McLaughlin and Leonard were both involved in

2    investigating the case against Adolfo Rosario?

3              MS. EKL:  Objection, form.

4              THE WITNESS:  No, I do not know that.

5    BY MR. AINSWORTH:

6         Q.   Do you recall that when you found the

7    witness Denise Seay, you brought her to Area 5

8    to talk to Detectives McLaughlin and Leonard?

9         A.   I don't remember it.

10        Q.   And that was on July 13th, 1988, one

11   month before the shooting of Felix Valentin?

12             MS. EKL:  Observation, form, assumes,

13   facts not in evidence.

14   BY MR. AINSWORTH:

15        Q.   Do you recall that happening?

16        A.   Yes.

17        Q.   Did you review any documents related

18   to Adolfo Rosario in preparation for today's

19   deposition?

20        A.   No, I don't believe so.

21             MR. AINSWORTH:  Let's mark this as

22   Exhibit No. 17.  Let me get a copy that has the

23   Bates number legible.

24

```
 1                    (WHEREUPON, Deposition Exhibit

 2                     No. 17 was marked for

 3                     identification.)

 4    BY MR. AINSWORTH:

 5         Q.   Let's mark this as Exhibit No. 17.

 6    It's Bates No. JRJJ 044616 and 615.

 7                    I think I have a copy for you,

 8    Eileen.

 9              MS. EKL:  Sorry.  You have a copy for

10    her or no?

11              MR. AINSWORTH:  I'll find a copy.

12              MS. ROSEN:  Is it Bates stamped?

13              MR. AINSWORTH:  The back side has -- I

14    think it got cutoff in that marker on the front

15    page.

16              MS. ROSEN:  So what do you think it

17    is?

18              MR. AINSWORTH:  I think it's the

19    number immediately right before.

20              MS. EKL:  You indicated before JRJJ

21    44616 through 615.

22              MR. AINSWORTH:  I think on my

23    computer --

24              MS. ROSEN:  Oh, I see.  What do you
```

1    think it is?  616 and 615.

2              MR. AINSWORTH:  616 and then 615.

3    BY MR. AINSWORTH:

4         Q.   Showing you what has been marked as

5    Exhibit No. 17.  I would ask that you take a

6    look at that document.

7                   Did you review this document

8    Exhibit No. 17 in preparation for this

9    deposition?

10        A.   I just did.

11        Q.   Did you review it in preparation for

12   your deposition?

13        A.   No.

14        Q.   Earlier today?

15        A.   No.

16        Q.   Okay.  You did review your partner,

17   Rey Guevara, testimony from the Juan Johnson

18   trial, right?

19        A.   I believe so.

20        Q.   Do you recall the portion of his

21   examination at trial about how he was able to

22   find three witnesses who were then off the

23   street?

24        A.   I don't remember that, no.

1      Q.   Well, sir, you authored this report

2    that's marked as Exhibit No. 17, correct?

3      A.   Correct.

4      Q.   Can you tell us how you and your

5    partner were able to find the witnesses who

6    were listed in that report?

7      A.   I don't remember.

8      Q.   Is it listed in the report?

9      A.   How we found them?  No, not how we

10   found them.

11     Q.   Do you know why it is that your report

12   doesn't say how you were able to find the

13   witnesses?

14     A.   Do I know why?

15     Q.   Yes.

16     A.   No.

17     Q.   Can you tell me why you think that

18   your report doesn't need to include that

19   information?

20          MS. EKL:  Object, form, assumes facts

21   not in evidence.

22          THE WITNESS:  I don't know.  I have no

23   idea.

24

1    BY MR. AINSWORTH:

2       Q.   Well, let me ask it this way then.

3           Do you think your report should

4    somewhat document how you were able to find

5    witnesses after the initial scene has been

6    canvassed?

7       MS. EKL:  Objection, form.

8       MS. ROSEN:  Objection, form,

9    foundation.

10       THE WITNESS:  I don't understand the

11    point of it.

12    BY MR. AINSWORTH:

13       Q.   What do you mean the point of it?

14       A.   Well, listing how we found them, I

15    don't think it has a bearing on the case, how

16    we found them.

17       Q.   Why doesn't it have a bearing on the

18    case?

19       A.   Why would it?  I don't understand.

20       Q.   Well, isn't there a difference between

21    if a witness calls 911 and said I witnessed a

22    case, as opposed to a gang member coming

23    forward and saying, oh, I've got information

24    about a crime that occurred some time ago?  Do

1      you see there's a distinguish between these two

2      cases?

3            A.    Yeah, I see that.

4            Q.    And there's also a distinction if the

5      witnesses never reported seeing the crime until

6      they were spoken to by you and your partner

7      some time after the crime occurred.

8            A.    Okay.

9                  MS. EKL:  Objection.  Is there a

10     question?

11     BY MR. AINSWORTH:

12           Q.    Do you understand that distinction?

13           A.    Yes.

14           Q.    So, would you agree with me that then

15     that it's important to document in some way how

16     you're able to first make contact with these

17     witnesses, so as to demonstrate they were

18     either free of bias, or that they may have some

19     bias to want to falsely implicate the suspect

20     in the case?

21                 MS. ROSEN:  Objection, form,

22     foundation.

23                 MS. EKL:  Objection, form.

24                 THE WITNESS:  What is the question?

284

```
 1    BY MR. AINSWORTH:
 2         Q.   The question is -- well, the question
 3    was, would you agree with me that it's
 4    important to document how you came in contact
 5    with the witnesses?
 6              MS. EKL:  Objection, form.
 7              MS. ROSEN:  Objection, form,
 8    foundation.
 9              THE WITNESS:  Maybe sometimes.
10    BY MR. AINSWORTH:
11         Q.   Under what circumstances?
12         A.   I don't know.  I would have to think
13    about it.
14         Q.   Well, how about in the circumstances
15    of that case involving Juan and Henry Johnson?
16              MS. EKL:  Objection, form, vague.
17    BY MR. AINSWORTH:
18         Q.   Do you think it's important to
19    document how you came in contact with the
20    witnesses in that case?
21              MS. EKL:  Objection, form, foundation,
22    vague.
23              THE WITNESS:  Not sure.  Right now,
24    yeah.
```

1    BY MR. AINSWORTH:

2          Q.    Did you see any reference to -- does

3    that refresh your recollection as to any

4    questions to Rey Guevara at trial, at civil

5    trial about where these witnesses came from?

6                MS. EKL:  Objection, form.

7                THE WITNESS:  No, I still don't know

8    how we found them.

9    BY MR. AINSWORTH:

10         Q.    Did that happen to you a lot that you

11   would go out in the neighborhood and find

12   witnesses to murders that nobody else had

13   talked to before, you and your partner?

14               MS. EKL:  Objection, form, assumes

15   facts not in evidence.

16               THE WITNESS:  Not a lot.

17   BY MR. AINSWORTH:

18         Q.    But it did happen?

19         A.    Yes.

20         Q.    How often did it happen?

21               MS. ROSEN:  Objection, relevance.

22               THE WITNESS:  I have no idea.

23               MR. AINSWORTH:  Let's mark this as

24   Exhibit No. 18.

```
 1                        (WHEREUPON, Deposition Exhibit
 2                        No. 18 was marked for
 3                        identification.)
 4                        (WHEREUPON, Deposition Exhibit
 5                        No. 19 was marked for
 6                        identification.)
 7                        (WHEREUPON, Deposition Exhibit
 8                        No. 20 was marked for
 9                        identification.)
10   BY MR. AINSWORTH:
11        Q.   This is three-page document Bates No.
12   JRJJ 010825 through 010827; Exhibit No. 19 is a
13   two-page document JRJJ 010821 and 22.
14                   Have you reviewed those two?
15        A.   Yes, I have.
16        Q.   I have one last one, Exhibit 20 Bates
17   numbered JRJJ 035939 and 40.
18                   Showing you what has been marked
19   as Exhibit 20, please take a moment to review
20   that.
21                   All right.  If I may, let's
22   starts backwards with Exhibit 20, and I'm going
23   to direct your attention to the second page of
24   Exhibit 20, if I may.
```

```
 1                    Do you see that this is the notes
 2      of a conversation with Ivar Velasco in the
 3      middle of the page there?
 4           A.   Yes.
 5           Q.   And then do you see towards the bottom
 6      of that paragraph it says, he next heard three
 7      gunshots but did not see who fired the shots?
 8           A.   Correct.
 9           Q.   Now, then let's turn to Exhibit 19.
10                    Do you see on the second page it
11      says an interview with Michael Ybarra?
12           A.   Correct.
13           Q.   And towards the end of that interview,
14      it's tough to read because the photocopying,
15      but it says he heard gunshots but did not see
16      who was firing the gun; do you see that, sir?
17           A.   Yes.
18           Q.   Exhibit 19 was authored by Halvorsen,
19      correct, Detective Halvorsen?
20           A.   Yes.
21           Q.   Exhibit 20 was also authored by
22      Detective Halvorsen?
23           A.   Correct.
24           Q.   Do you know Detective Halvorsen to be
```

1   untruthful in how he documents things?

2          A.   No, I do not.

3          Q.   So then Exhibit 18 is your report,

4   correct?

5          A.   Yeah, William Johnston.

6          Q.   All right.  And in this report, you

7   were able to have Michael Ybarra and Ivar

8   Velasco both identify Edwin Davila as the

9   person who shot at them, correct?

10              MS. ROSEN:  Objection to form.

11              MS. EKL:  Objection to form.

12              THE WITNESS:  I don't see that.  Where

13  is that at?

14  BY MR. AINSWORTH:

15         Q.   So on Page 2 of Exhibit 18, it says

16  the two victims is Michael Ybarra and Ivar

17  Velasco?

18         A.   Okay.

19         Q.   They're listed victims?

20         A.   Correct.

21         Q.   The other victim is deceased, right?

22         A.   Correct.

23         Q.   So then on the third page, it says

24  that a suitable line-up was formed and viewed

1  by both of the surviving victims.  Both

2  positively identified Davila as the shooter in

3  this case; do you see that, sir?

4      A.  Yes.

5      Q.  Can you please explain how you were

6  able to get two people who did not see who the

7  shooter to identify Edwin Davila as the

8  shooter?

9          MS. EKL:  Objection, form, assumes

10  facts not in evidence, argumentative.

11          THE WITNESS:  I can't explain it.

12  BY MR. AINSWORTH:

13      Q.  Do you have any idea how that came to

14  be?

15      A.  No.

16      Q.  All right.  Let's mark Exhibit No. 21,

17  please.

18                          (WHEREUPON, Deposition Exhibit

19                          No. 21 was marked for

20                          identification.)

21  BY MR. AINSWORTH:

22      Q.  Exhibit 21 is a group exhibit Bates

23  numbered JRJJ 047777, four 7s at the end. It

24  goes all the way to 810.

1        I'm going to ask you, sir, of

2   this exhibit to take a look at pages Bates

3   numbered the bottom left-hand corner will be

4   779 through 785, and tell me if this crime, the

5   murder that occurs in this case, is describing

6   a gang crime committed by a group of Latin

7   Lovers?

8        MS. EKL:  For clarification, you're

9   asking him to answer the question of whether or

10   not the document reflects that or whether he

11   has a recollection of that.

12        MR. AINSWORTH:  Whether the document

13   reflects that.

14   BY MR. AINSWORTH:

15   Q.   Can I amend my question?  I said Latin

16   Lovers.  I meant Latin Eagles.

17        Can you tell from your review of

18   these documents whether the witnesses to the

19   murder were initially describing a crime

20   committed by a group of Latin Eagles?

21   A.   How far did you want me to read?

22   Q.   Well, I just wanted you to see if that

23   confirmed that the victims were -- the

24   witnesses were describing a crime committed by

```
1      a group of Latin Eagles?

2             A.   Yes, it sounds like it.

3             Q.   That's what the witnesses were saying?

4                  MS. EKL:  According to the report.

5                  THE WITNESS:  According to the report,

6      right.

7      BY MR. AINSWORTH:

8             Q.   Do you recall this investigation at

9      all?

10            A.   No, I don't.

11            Q.   What's the difference between a photo

12     array and a photo showup?

13            A.   I don't think much.

14            Q.   Well --

15            A.   An array of photos or a photo showup?

16     I think it's the same thing.

17            Q.   Is a showup where you just show one --

18     like a live showup is when you bring just the

19     suspect to the scene of a crime and have a

20     witness tell you whether or not that's the

21     person they saw just running away; would you

22     agree with that?

23            A.   What is that called?

24            Q.   A showup?  Have you heard that before?
```

```
1              A.   No, not that I can recall.

2              Q.   Have you ever done that before where

3    you have an --

4              A.   An on-scene identification.

5              Q.   An on-scene identification.   What

6    would you call that?

7              A.   An on-scene ID.

8              Q.   Did you call it a showup?

9              A.   No.

10             Q.   Have you ever anyone referred to that

11   as a showup?

12             A.   I don't remember that.

13             Q.   You never heard that before?

14             A.   A showup?

15             Q.   Yes.

16             A.   I heard of showup, yeah.   There's

17   different --

18             Q.   Have you ever heard of a showup

19   referred to in a situation where you're just

20   having one person being shown to a witness?

21             A.   No, not that I remember.

22             Q.   How have you heard the term "showup"

23   used?

24             A.   Showup can be used as a physical
```

```
1    line-up, a showup.  I think it's just a matter
2    of semantics, as far as I know.
3         Q.   Well, is there any difference between
4    a photo showup and a photo array in your mind?
5         A.   No, not in my mind.  I don't think so,
6    uh-uh.  Nope.
7         Q.   Have you ever heard of other police
8    officers referring to a photo showup where
9    you're just showing one photograph to a
10   witness?
11             MS. EKL:  Objection, foundation.
12             THE WITNESS:  No.
13   BY MR. AINSWORTH:
14        Q.   I'm going to ask you to turn to the
15   page Bates numbered 802.  It's the number on
16   the left, the last three digits are 802.
17             Is that a report that you
18   authored?
19        A.   Yes.
20        Q.   Is it true according to this report
21   that you authored that you and your partner,
22   Rey Guevara, learned from an informant that the
23   nickname of Gigolo belonged to a subject of
24   Manuel Rivera from the Spanish Cobras?  Do you
```

1     see that?

2           A.    Yes.

3           Q.    And then it says that reporting

4     officers referring to yourself and Detective --

5     or Officer Guevara obtained a photo of the

6     subject and conducted a photo showup with

7     Victim No. 2.  This victim positively

8     identified the photo of Manuel Rivera as the

9     person that shot victims one, two and three.

10                    Do you see that, sir?

11          A.    Yes.

12          Q.    Do you know how it is that all the

13    witnesses were initially saying it was a group

14    of Latin Eagles who had shot them and it was a

15    Spanish Cobra who your witness identified as

16    the shooter?

17                MS. ROSEN:  Objection, form.

18                THE WITNESS:  Why is that?

19    BY MR. AINSWORTH:

20          Q.    Yes.

21          A.    That's the way it turned out.

22          Q.    Do you have any recollection as to why

23    Manuel Rivera a Spanish Cobra would be

24    pretending to be a Latin Eagle?

1          MS. ROSEN:  Objection, form,

2    foundation.

3          MS. EKL:  Foundation.

4          THE WITNESS:  Why he was what?

5    BY MR. AINSWORTH:

6        Q.    Pretending to be a Latin Eagle?

7        A.    No, I have no idea.

8        Q.    Do you know who the informant was who

9    provided the fact that the nickname of Gigolo

10   belonged to Manuel Rivera?

11       A.    No, I don't remember that.

12       Q.    Do you remember a man named Wilfredo

13   Rosario?

14       A.    No, I do not.

15       Q.    Do you remember a man named Wilfredo

16   Rosario claiming that you and your partner

17   Detective Guevara fed him information about a

18   murder?

19          MS. EKL:  Objection, form, foundation.

20          THE WITNESS:  That we what?

21   BY MR. AINSWORTH:

22       Q.    Fed him information about a murder?

23       A.    No.

24       Q.    And that you fed him information about

```
 1     a murder so that you could falsely implicate a

 2     man named Xavier Arcos?

 3              MS. EKL:  Objection, form, foundation.

 4              THE WITNESS:  No.

 5     BY MR. AINSWORTH:

 6         Q.   Isn't it true that you threatened

 7     Wilfredo Rosario that if he didn't cooperate

 8     with you that you would charge him falsely with

 9     a crime?

10         A.   No, I don't remember that at all.

11         Q.   Isn't it true that your partner told

12     Wilfredo Rosario that if he didn't cooperate

13     with the murder investigation involving Xavier

14     Arcos that you would falsely charge him with a

15     crime?

16         A.   Don't remember that.

17         Q.   That doesn't jog your memory at all?

18         A.   No.

19         Q.   The cases that you reviewed in

20     preparation for this deposition that did not

21     involve Felix Valentin, did either of them

22     involve a man being run over by a van?

23         A.   No, don't remember that.

24         Q.   Have you looked at any of the reports
```

1    from the cases that -- the other cases that you

2    reviewed in preparation for today's deposition?

3            MS. EKL:  Objection, form.

4    BY MR. AINSWORTH:

5       Q.   Sorry.  During this deposition, have

6    you reviewed any of the police reports --

7       A.   Today?

8       Q.   -- today that were the same as the

9    police reports you reviewed in preparation for

10    this deposition on matters not concerning the

11    Felix Valentin shooting investigation?

12       A.   Sorry.  I don't understand what you're

13    asking me.

14       Q.   I'm just trying to find out what those

15    two other cases are.

16       A.   Oh, one was Wilfredo.

17       Q.   Wilfredo Rosario?

18       A.   Yeah.  Right.  Wilfredo Rosario.  I

19    saw I think two of them and one involved

20    Casper.  I don't know what -- I don't

21    remember -- Casper Malo, M-a-l-o, I think it

22    was.  Nicknames.

23       Q.   Yes, yes.  That's the Davila case,

24    right?

1       A.   Is it?  I don't remember now.

2       Q.   I know the case I just don't know the

3  name?

4       A.   Sorry.  I mean we can look it up.

5       Q.   When you became a detective in 1990

6  and you went to detective school, were you

7  provided with training on how to conduct photo

8  arrays?

9       A.   I don't remember it.

10       Q.   Were you ever provided with training

11  from the Chicago Police Department on how to

12  conduct photo arrays?

13       A.   Not that I remember.  I believe it's

14  listed in our policy.

15       Q.   And is that the sum total of the

16  training that you received from the Chicago

17  Police Department, was it being listed in --

18  the photo arrays were listed in the policy

19  book?

20       A.   For what?  For detective?

21       Q.   For detective or any position.

22       A.   Detective, no.  We went to school for,

23  I'm not sure, two weeks, maybe a month.  I'm

24  not sure.

1      Q.   So that's what I was asking.

2           When you went to detective

3    school, did they give you any training on how

4    to conduct photo arrays?

5      A.   I don't remember if they did or not.

6      Q.   Right.  So I guess what I'm saying is,

7    as you sit here today, is this the only

8    training that you recall being provided by the

9    Chicago Police Department on the subject of

10   photo arrays consist of the subject of photo

11   arrays being in a policy manual?

12     A.   As far as I remember.

13     Q.   How about on how to conduct

14   interrogations, were you provided with training

15   from the Chicago Police Department on how to

16   conduct interrogations at detective school?

17     A.   I believe so, interviews.

18     Q.   Prior to that point, had you been

19   provided with any training on how to conduct

20   interrogations?

21     A.   I believe so, yes.

22     Q.   Where?

23     A.   I don't remember it.

24     Q.   At what point in your career were you?

1          A.    Detective school.

2          Q.    Prior to detective school?

3          A.    Oh, prior.

4          Q.    Were you provided with any training on

5     how to conduct interrogations?

6          A.    No, not that I remember -- no.

7          Q.    Prior to detective school, were you

8     provided with any training on how to conduct

9     live line-ups?

10         A.    I don't remember.

11         Q.    During detective school, were you

12    provided with any training on how to conduct

13    live line-ups?

14         A.    I don't remember the training that we

15    had.

16         Q.    How about when you went to sergeant

17    school, were you provided with any training on

18    how conduct either live line-ups or photo

19    arrays?

20         A.    I don't think so.

21         Q.    Do you ever recall being provided with

22    any training by the Chicago Police Department

23    on how to conduct live line-ups?

24         A.    Not that I can remember.

```
 1              MS. EKL:  Are you getting close?

 2              MR. AINSWORTH:  It's a little ways.

 3              MS. EKL:  What's that?

 4              MR. AINSWORTH:  Some more to go.

 5      BY MR. AINSWORTH:

 6          Q.  Did you recreate summary reports of

 7      things you observed when you were a gang crimes

 8      specialist?

 9              MS. EKL:  Objection, form,

10      specifically the word summary reports.

11              MS. ROSEN:  Foundation.

12              THE WITNESS:  What kind of summary

13      reports?

14      BY MR. AINSWORTH:

15          Q.  Well, when a detective initiated an

16      investigation and a gang crimes specialist went

17      to the scene of the crime and made

18      observations, would the gang crimes specialist

19      create a report, not in a supplemental report

20      form, but in a summary report form which would

21      be just writing a memo on a blank piece of

22      paper?

23              MS. EKL:  Objection, foundation, to

24      the extent you're asking him about the practice
```

1    of other gang crime officers.

2              THE WITNESS:  It depends.  I mean, I

3    don't think so.  I don't know.

4    BY MR. AINSWORTH:

5         Q.   Did you ever do that?

6         A.   I don't remember ever doing that, no.

7         Q.   Did you ever remember creating a memo

8    of your observations in summary format on a

9    blank piece of paper for other gang crime

10   specialists?

11        A.   No, I don't remember doing that.

12        Q.   Do you understand that you have to

13   provide information that's good for the defense

14   in your police reports?

15             MS. ROSEN:  Can you read back the

16   question?

17                  (WHEREUPON, said Record was read

18                   as requested.)

19             MS. EKL:  Objection, form.

20             MS. ROSEN:  Objection, form.

21             THE WITNESS:  I said yes.

22   BY MR. AINSWORTH:

23        Q.   Why is that?

24        A.   Well, it makes it fair, you know, this

1     is what you're investigation is taking you.

2     So --

3          Q.   And you have to make that available to

4     be subpoenaed, isn't that right?

5               MS. ROSEN:  Objection, form.

6               THE WITNESS:  I would think so.

7     BY MR. AINSWORTH:

8          Q.   So that you can't hide it from the

9     criminal defendant, right?

10              MS. ROSEN:  Objection, form.

11              THE WITNESS:  Hide it from who?

12    BY MR. AINSWORTH:

13         Q.   The criminal defendant.

14         A.   Right.

15         Q.   Do you remember interviewing any

16    witnesses in the Felix Valentin shooting case?

17         A.   Interviewing?

18         Q.   Yes.

19         A.   No.

20         Q.   Do you remember interviewing any

21    suspects in the Felix Valentin shooting case?

22         A.   No, I do not.

23         Q.   Did Felix Valentin ever give you a

24    statement in this case, in the Felix Valentin

304

```
1        shooting case?
2             A.   Don't remember it.
3             Q.   Did you ever talk with any of -- any
4        member of the Valentin family?
5             A.   Don't remember if I did.
6             Q.   Did you talk with Felix Valentin's
7        brother, Israel?
8             A.   Don't remember.
9             Q.   Did you talk with Felix Valentin's
10       brother, Israel, who had been in the car with
11       him when Felix was -- or drove him away after
12       he was shot?
13            A.   I don't remember it.
14            Q.   Did you talk to any neighborhood gang
15       members about who might have committed the
16       Felix Valentin shooting?
17            A.   No, I don't remember doing that.
18            Q.   Did you play any role in the arrest of
19       Jose Rodriguez for the shooting of Felix
20       Valentin?
21                 MS. EKL:  Objection, form.
22                 THE WITNESS:  Oh, I don't think so,
23       no.
24
```

1    BY MR. AINSWORTH:

2         Q.   Did you ever talk to Jose Rodriguez

3    about the shooting of Felix Valentin?

4         A.   I don't believe so.

5         Q.   Did you ever talk to Felipe Nieves

6    about the shooting of Felix Valentin?

7         A.   No, I don't think so.

8         Q.   Did you try to find Felipe Nieves?

9         A.   I don't remember doing that.

10        Q.   Did you ever try to find Jose

11   Rodriguez?

12        A.   Don't remember doing that.

13        Q.   Did you ever interview Jacques Rivera?

14        A.   No, I don't think so.

15        Q.   Did you ever learn Jacques Rivera's

16   alibi for August 27th, 1988?

17             MS. EKL:  Objection, form.

18             MR. ART:  Objection, form, foundation.

19             THE WITNESS:  Don't remember if I did.

20   BY MR. AINSWORTH:

21        Q.   Was Gang Crimes North actively

22   investigating the Felix Valentin shooting

23   between August 31st and September 14th?

24             MS. EKL:  Objection, foundation.

1                    THE WITNESS:  I don't remember.

2    BY MR. AINSWORTH:

3         Q.   What activities were gang crimes

4    officers or specialists taking as far as you

5    knew between August 31st and September 14th to

6    investigate the Felix Valentin shooting?

7         A.   I don't know.

8         Q.   Did any supervisor direct you to go

9    visit Felix Valentin on September 10th?

10        A.   I don't remember.

11        Q.   Was any supervisor giving you input in

12   terms of how you investigated the Felix

13   Valentin shooting?

14        A.   I don't remember that.

15        Q.   Do you recall showing anyone gang

16   books in the course of the Felix Valentin

17   shooting investigation?

18        A.   No, I don't remember.

19        Q.   Did you bring in any fillers for any

20   line-up relating to the Felix Valentin

21   shooting?

22        A.   I don't remember.

23        Q.   In the live line-up where a suspect

24   was identified, would you take individual

1    photos of each of the participants?

2              MS. EKL:  Objection, foundation.

3              THE WITNESS:  In the last line-up?  Is

4    that what you said?

5    BY MR. AINSWORTH:

6         Q.   In a live line-up.

7         A.   Oh, live line-up.  A physical line-up?

8         Q.   Yes.  In a physical line-up, where a

9    suspect was picked out, would you take

10   individual photos of each participant?

11        A.   Individuals?

12        Q.   Yes.

13        A.   No, I don't think so.

14        Q.   And that happened before that you had

15   taken individual photos of each participant of

16   a live line-up?

17        A.   No.

18              MS. EKL:  Objection, form, foundation.

19              THE WITNESS:  No, not that I recall.

20   BY MR. AINSWORTH:

21        Q.   Did Assistant State's Attorney Rosner

22   interview about the Felix Valentin shooting?

23              MS. EKL:  Interview what?

24

1    BY MR. AINSWORTH:

2         Q.   Interview Sergeant Garz.

3         A.   No, I don't remember that.

4         Q.   Do you know what time Assistant

5    State's Attorney Rosner arrived at Area 5 on

6    September 15, 1988?

7         A.   Don't remember.

8         Q.   Can you tell us whether it was before

9    or after the line-up that was held where

10   Orlando Lopez identified purportedly Jacques

11   Rivera?

12             MS. ROSEN:  Objection, form.

13             THE WITNESS:  Don't remember.

14   BY MR. AINSWORTH:

15        Q.   Did you visit the crime scene where

16   the Valentin homicide occurred?

17        A.   No, I don't remember doing that.

18        Q.   Were you ever furloughed during the

19   time of the Valentin investigation?

20        A.   Don't know, don't remember.

21        Q.   Back in '88, how long would your

22   furloughs last?

23        A.   Let's see.  I was on the job for

24   11 years.  I think 28 days.

1  Q. So --

2  A. Or you could split it.

3  Q. Do you recall being on furlough during

4 the Summer of 1988?

5  A. No, I don't remember.

6    MR. AINSWORTH: Ms. Ekl, will you

7 agree to the same arrangement regarding

8 punitive damages as to this defendant as we

9 have had with other defendants?

10    MS. EKL: Since I wasn't specifically

11 at the depositions, I will agree that we'll

12 present information regarding his finances if

13 he decides that he's going to argue inability

14 to pay at trial. We will provide you with that

15 information.

16    MR. AINSWORTH: And so just so we're

17 clear, should plaintiff prevail at the summary

18 judgment stage against this defendant, we would

19 then be seeking and preserving the right to

20 propound both written and oral discovery to

21 this witness regarding his financial condition.

22    MS. EKL: I'm not today agreeing that

23 we would be answering both, the format of it,

24 but I would agree that you would be entitled to

1   full knowledge regarding his net worth if he

2   decides to argue inability to pay.  As we've

3   certainly done in the past, we'll provide you

4   with that information.

5           MR. AINSWORTH:  Then I will ask him

6   the questions about punitive damage.

7           MS. EKL:  Well, I'm going to instruct

8   him not to answer that at that point.  So you

9   can ask it, but he's not going to be answering

10  those questions today.  He will provide that

11  information if he decides to argue inability to

12  pay in the future.

13  BY MR. AINSWORTH:

14      Q.   Sir, is there the possibility that you

15  will contend at trial that you are unable to

16  satisfy a punitive damages judgment against you

17  because of your finances?

18      A.   I'm not going to answer that question

19  at this time.

20      Q.   Why aren't you going to answer that

21  question?

22          MS. EKL:  I'm instructing my client

23  not to answer the question regarding punitive

24  damages.

1           MR. AINSWORTH:  I'm not asking you.

2           MS. EKL:  I don't care that you're not

3    asking me.  I'm telling you that I'm

4    instructing him not to answer.  I'm putting it

5    on the record.

6           MR. AINSWORTH:  I hear you.

7           MS. EKL:  I don't understand what the

8    problem is, Russell, because we've done this

9    before.  Is it because we won't allow you to

10   have both written and a deposition?

11          MR. AINSWORTH:  Yes.

12          MS. EKL:  Well, you're not entitled to

13   both.

14          MR. AINSWORTH:  I am.

15          MR. ART:  Beth, at Mr. Guevara's

16   deposition, you said you would reopen it for a

17   deposition --

18          MS. EKL:  I said I would provide you

19   with the information.  I didn't say you could

20   do interrogatories and a dep.  I'm not saying

21   that.  We won't.  I'm just saying that I'm not

22   going to make an agreement at this point in

23   time because --

24          MR. ART:  Can I finish for the record

1    what I was saying?

2              MS. EKL:  Certainly.

3              MR. ART:  At Mr. Guevara's deposition

4    on December 23rd, we said the exact same thing

5    that Mr. Ainsworth just said and you said you

6    would allow a deposition to be reopened into

7    questions of punitive damage.

8              MS. EKL:  I did not say at his

9    deposition that I would allow interrogatories

10   and a deposition, which is what Mr. Ainsworth

11   just said.  And I said I will not agree today

12   to both.

13              I'm not saying that I won't

14   eventually agree to it.  I'm just saying right

15   now I'm not going to agree to allow you to do

16   both.  I think that's harassing and you're

17   entitled to the information.  That's all I'm

18   saying.

19              MR. AINSWORTH:  I said written and

20   oral.  So written includes document production

21   and it also could include interrogatories.

22   Sometimes we get the information we need from

23   the interrogatories, but right now the default

24   is I get both.  I'm not willing to give up

1   both, so if you're not willing to do it, then

2   we'll just --

3           MS. EKL:  You can ask the questions.

4   I'm instructing him not to answer.

5           MR. AINSWORTH:  On what basis?

6           MS. EKL:  On the basis that right

7   now -- he has not -- it's personal information.

8   He has not made a determination that he is

9   going to be -- that he's going to be asserting

10  inability to pay.  If he does not assert

11  inability to pay, then you're not entitled to

12  the information.  It's completely personal

13  information.  It has nothing to do with the

14  case.

15          MR. AINSWORTH:  This is the time for

16  discovery.

17          MS. EKL:  You're entitled to learn his

18  net worth.  I fully agree with that, but I'm

19  just not agreeing to say you can have it in

20  every format that you want.  We've always been

21  able to come to an agreement, a reasonable

22  agreement, give you whatever information you're

23  entitled to if we get to that point.  Today,

24  he's not going to be answering that.

```
 1                    MR. AINSWORTH:  That's not a basis to

 2     direct a witness not to answer.

 3                    MS. EKL:  Then file whatever motion

 4     you need to file.

 5                    MR. AINSWORTH:  You need to file a

 6     protective order is what you need to do if you

 7     think that he's not supposed to answer these

 8     questions.

 9     BY MR. AINSWORTH:

10         Q.   Sir, what is your current -- do you

11     have any income from any source?

12                    MS. EKL:  I'm instructing you not to

13     answer that question.

14                    THE WITNESS:  I'm not going to answer

15     that at this time on the advice of my attorney.

16     BY MR. AINSWORTH:

17         Q.   Do you receive a pension at this time?

18         A.   I'm not going to answer that question.

19         Q.   Do you have any retirement accounts?

20         A.   I'm not going to answer at this time.

21         Q.   Do you have any bank accounts?

22         A.   I'm not going to answer that question

23     at the time.

24         Q.   How much money do you have in any
```

```
 1    stocks or bonds?

 2         A.   I'm not going to answer that question

 3    at this time.

 4         Q.   Do you own your own home?

 5         A.   I'm not going to answer that question

 6    at this time.

 7         Q.   What's the value of your home?

 8         A.   I'm not going to answer that question

 9    at this time.

10         Q.   How much equity do you have in your

11    home?

12         A.   I'm not going to answer that question.

13         Q.   Do you own any vehicles?

14         A.   I'm not going to answer that question

15    at this time.

16         Q.   How much did you purchase the vehicles

17    for?

18         A.   I'm not going to answer that question

19    at this time.

20         Q.   When did you purchase the vehicles?

21         A.   I'm not going to answer that question

22    at this time.

23         Q.   Do you own any vacation homes?

24         A.   I'm not going to answer that question
```

1    at this time.

2         Q.   Do you own any real estate property

3    that is not your home?

4         A.   I'm not going to answer that question

5    at this time.

6         Q.   Do you own any boats?

7         A.   I'm not going to answer that question

8    at this time.

9         Q.   Do you own any life insurance policies

10   with a cash value?

11        A.   I'm not going to answer that question

12   at this time.

13        Q.   Do you have any certificates of

14   deposit?

15        A.   I'm not going to answer that question

16   at this time.

17        Q.   How much do you have in retirement

18   savings?

19        A.   I'm not going to answer that question

20   at this time.

21        Q.   Have you transferred any assets since

22   the time that this lawsuit was filed?

23        A.   I'm not going to answer that question

24   at this time.

```
 1          Q.    Have you transferred more than $10,000

 2    in assets since the time this lawsuit was

 3    filed?

 4          A.    I'm not going to answer that question

 5    at this time.

 6          Q.    Have you sold any assets worth more

 7    than $10,000 since the time this lawsuit was

 8    filed?

 9          A.    I'm not going to answer that question

10    at this time.

11          Q.    Will you notify your attorneys and

12    plaintiff's counsel before transferring any

13    assets worth more than $10,000 between now and

14    the time of trial?

15          A.    I'm not going to answer that question

16    at this time.

17          Q.    I'm going -- this is a new set of

18    questions.  If you choose not to answer these

19    questions, it's up to you.  I suggest that you

20    take them on a question by question basis.

21                      If you do choose not to answer

22    the questions, then we'll move and attempt to

23    bar you from answering these questions at

24    trial, if your counsel should ask them of you.
```

1   BY MR. AINSWORTH:

2      Q.  Are you married?

3        MS. EKL:  You can answer that

4   question.

5        THE WITNESS:  Yes.

6   BY MR. AINSWORTH:

7      Q.  Do you have any children?

8      A.  Yes.

9      Q.  Do you have any grandchildren?

10      A.  Yes.

11      Q.  What are your children's occupations?

12        MS. EKL:  I'm going to instruct him --

13   well, let me ask you this.  What is the

14   relevance of that question?

15        MR. AINSWORTH:  None at all as long as

16   you don't ask it at trial.

17         So, if he wants to get up and say

18   he's got a lawyer as a child, I am entitled to

19   know.

20         If you say don't ask -- don't ask

21   that question, then you're precluded from

22   asking that question at trial.

23        MS. EKL:  You can answer the question

24   to the extent that you feel comfortable

1    answering those questions and intend to testify

2    to it at trial.  If you do not feel comfortable

3    at trial testifying to it, then you don't have

4    to answer those today.  We just won't be

5    allowed to ask you those questions at trial.

6            So, if you want to keep that

7    private because it is a very personal question,

8    that's fine.  We just won't ask you that at

9    trial.

10          THE WITNESS:  Who won't ask?

11          MS. EKL:  I won't ask that.  They're

12    basically saying if we're going to ask you at

13    trial, they have a right to know the answer to

14    it, which is correct.  And so I'm fine either

15    way.  You can answer the question if you want

16    to, and if not, then that's fine, too.

17          MS. ROSEN:  What was the question?

18          MS. EKL:  What the occupation is of

19    his children.  You don't need to answer it if

20    you don't want to.

21          THE WITNESS:  I don't see a point to

22    it.

23          MS. EKL:  That's fine.

24          THE WITNESS:  No, I don't see a point

1    in answering that question.

2    BY MR. AINSWORTH:

3         Q.   Okay.  Do you have any grandchildren?

4         A.   Yes.

5              MS. ROSEN:  Asked and answered.

6              THE WITNESS:  You asked me that.

7    BY MR. AINSWORTH:

8         Q.   How many grandchildren?

9         A.   One.

10        Q.   Is that the new one?

11        A.   That's the new one.

12        Q.   Congratulations.

13        A.   Thank you.

14        Q.   And what is your spouse's occupation,

15   or if your spouse is retired, what was her

16   occupation when she was working?

17             MS. EKL:  You don't have to answer

18   that.

19             THE WITNESS:  I won't answer that at

20   this time.

21             MR. AINSWORTH:  Let's go off the

22   record.

23             THE VIDEOGRAPHER:  We're going off the

24   record at 6:10.

```
 1                        (WHEREUPON, a short break was

 2                         taken.)

 3            THE VIDEOGRAPHER:  We're going back on

 4      the record at 6:16.

 5              MR. AINSWORTH:  I have no further

 6      questions.

 7              MS. ROSEN:  I don't have any

 8      questions.

 9              MS. EKL:  Thank you.  We'll reserve

10      signature.

11              THE VIDEOGRAPHER:  This marks the end

12      of tape No. 4 and concludes today's deposition.

13      We're going off the record at 6:16.

14                        (Whereupon, the deposition was

15                         concluded at 6:16 p.m.)

16          (FURTHER DEPONENT SAITH NAUGHT.)

17

18

19

20

21

22

23

24
```

322

1    STATE OF ILLINOIS   )

2                   ) SS:

3    COUNTY OF C O O K   )

4       I, Jamye Giamarusti, a certified shorthand

5    reporter, within and for the County of Cook

6    County and State of Illinois, do hereby certify

7    that heretofore, to-wit, on January 21, 2014,

8    personally appeared before me, at 311 North

9    Aberdeen Street, Suite 200B, Chicago, Illinois,

10   STEPHEN GAWRYS, in a cause now pending and

11   undetermined in the Circuit Court of Cook

12   County, Illinois, wherein JACQUES RIVERA is the

13   Plaintiff and REYNALDO GUEVARA, et al, are the

14   Defendants.

15      I further certify that the said witness

16   was first duly sworn to testify the truth, the

17   whole truth and nothing but the truth in the

18   cause aforesaid; that the testimony then given

19   by said witness was reported stenographically

20   by me in the presence of the said witness, and

21   afterwards reduced to typewriting by

22   Computer-Aided Transcription, and the foregoing

23   is a true and correct transcript of the

24   testimony so given by said witness as

1    aforesaid.

2         I further certify that the signature to

3    the foregoing deposition was reserved by

4    counsel for the respective parties.

5         I further certify that the taking of this

6    deposition was pursuant to Notice, and that

7    there were present at the deposition the

8    attorneys hereinbefore mentioned.

9         I further certify that I am not counsel

10   for nor in any way related to the parties to

11   this suit, nor am I in any way interested in

12   the outcome thereof.

13        IN TESTIMONY WHEREOF:  I have hereunto set

14   my hand this 26th day of March, 2014.

15

16

17

18

19

     _____
20             Jamye Giamarusti,
               CSR No. 084-004183
21

22

23

24

```
 1                 C O R R E C T I O N   P A G E

 2              I made the following changes for the

 3     following reasons:

 4     PAGE LINE  CHANGE:

 5     ____ ____  _____

 6                REASON: _____

 7     ____ ____  _____

 8                REASON: _____

 9     ____ ____  _____

10                REASON: _____

11     ____ ____  _____

12                REASON: _____

13     ____ ____  _____

14                REASON: _____

15     ____ ____  _____

16                REASON: _____

17     ____ ____  _____

18                REASON: _____

19     ____ ____  _____

20                REASON: _____

21     ____ ____  _____

22                REASON:

23

24     (Signed)_____
```

1

2                    WITNESS CERTIFICATION

3

4

5                          I hereby certify that I

6     have read the foregoing transcript of my

7     deposition consisting of Pages 1 through 321,

8     inclusive.  Subject to the changes set forth on

9     the preceding pages, the foregoing is a true

10    and correct transcript of my deposition taken

11    on January 21, 2014.

12

13

14              (Signed) _____

15

16

17

18    SUBSCRIBED AND SWORN TO

19    Before me this ___ day of

20    _____,2014.

21

22    _____

23    Notary Public

24

1    Siebert & Associates Court Reporters, Inc.

2    3768 North Oleander Avenue

3    Chicago, Illinois 60634

4    (773) 851-7779

5

6    DATE: March 26, 2014

7    Sotos Law Firm

8    Ms. Elizabeth Ekl

9    550 East Devon Street, Suite 150

10   Chicago, Illinois 60143

11

12   IN RE: Rivera vs. Guevara, et al.

13   COURT NUMBER: 12 C 4428

14   DATE TAKEN: January 21, 2014

15   DEPONENT: Stephen Gawrys

16

17   Dear Ms. Ekl:

18   Enclosed is the deposition transcript for the

19   aforementioned deponent in the above-entitled

20   cause. Also enclosed are additional signature

21   pages, if applicable, and errata sheets.

22

23

24   Per your agreement to secure signature, please

1    submit the transcript to the deponent for

2    review and signature.

3    All changes or corrections must be made on the

4    errata sheets, not on the transcript itself.

5    All errata sheets should be signed and all

6    signature pages need to be signed and

7    notarized.

8

9    After the deponent has completed the above,

10    please return all signature pages and errata

11    sheets to me at the above address, and I will

12    handle distribution to the respective parties.

13

14    If you have any questions, please call me at

15    the phone number above.

16

17

18    Sincerely,

19    Carol Siebert LaMonica   Jamye Giamarusti, CSR

20    Signature Department    Court Reporter

21

22    Cc: All attorneys of record.

23

24