**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 C 4428 |
| Plaintiff, | ) | |
| | ) | Hon. Joan B. Gottschall, |
| v. | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Hon. Mary M. Rowland, |
| | ) | Magistrate Judge |
| Defendants. | ) | |
| | ) | JURY TRIAL DEMANDED |

<u>**PLAINTIFF'S RESPONSE TO CITY OF CHICAGO'S LOCAL RULE 56.1(a)(3)**</u>
<u>**STATEMENT OF MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**</u>

Plaintiff, by and through her attorneys, Loevy & Loevy, submits the following Response

to Defendant City of Chicago's Local Rule 56.1(a)(3) Statement of Material Facts in Support of

Summary Judgment:

1.  Plaintiff, Jacques Rivera, is a resident of the City of Chicago, State of Illinois. (Tab 1:

Plaintiff's Complaint at ¶7).

**RESPONSE**: Undisputed.[1]

2.  In August 1988, Defendants Reynaldo Guevara, Steve Gawyrs, Daniel Noon, John

Guzman, Joesph Sparks, Paul Zacharias, Joseph Fallon, Gillian McLaughlin, John Leonard, Russell

Weingart, Edward Mingey and Rocco Rinaldi were members of the Chicago Police Department

(herein after referred to as "CPD"). (Tab 2: Defendant City's Answer to Plaintiff's Complaint, dkt.

32, at paragraphs 8-12; Tab 3: Defendant Officers' Answer to Plaintiff's Complaint, dkt. 33, at

paragraphs 8-12).

**RESPONSE**: Undisputed.

---

[1] Any statements or admissions contained herein are solely for purposes of adjudicating the motions for summary judgment.

## JURISDICTION

3.   Plaintiff's action is brought pursuant to 42 U.S.C §1983 and Illinois State Law. Jurisdiction and venue are proper based upon 28 U.S.C. §§ 1334, 1367, and 1391(b). (Tab 1: Plaintiff's Complaint at ¶¶5-7)

**RESPONSE**: Undisputed.

## DISCOVERY IN PURSUIT OF EVIDENCE TO SUPPORT MONELL CLAIMS

4.   During discovery, Plaintiff, through his counsel conducted a manual review of certain files located at the CPD warehouse.  The Parties agreed to review closed Investigative Files located at the warehouse for the years 1985-1991, which encompassed the years before and after Plaintiff's 1988 arrest.  The stated and agreed to purpose of this review was to identify homicide Investigative Files[1] which contained reports documenting the use of a lineup procedures. This was ultimately dubbed the "lineup project."  (Tab 4: Stipulation related to Warehouse Review)

**RESPONSE**: Undisputed that the Parties agreed to review closed Investigative Files located  at the warehouse for the years 1985-1991, which encompassed the years before and after Plaintiff's  1988 arrest, to identify homicide files which contained reports documenting the use of lineup procedures. The rest of the statements contained in this paragraph are not supported by the citation. In addition, disputed that Plaintiff's counsel conducted a manual review of certain files located at the warehouse; as stated in the Stipulation cited herein, both Parties reviewed the files located at the warehouse. (Exhibit 73, Stipulation at ¶ 3.)

5.   Upon completion of the warehouse review, Defendant City produced all of the 138 Investigative Files reviewed in conjunction with the "line up project." (Tab 5: Dkt. 71 – September 24, 2013 Minute Entry).

**RESPONSE**: Undisputed.

6. Also, during discovery, Plaintiff issued a Rule 34(a)(2) Request for Inspection requesting access to the file room located at CPD's Area North in order to discover evidence relating to Plaintiff's theory that the City had engaged in a practice of "secreting potentially exculpatory notes, memos, and other materials in [unofficial street files]." Plaintiff claimed the "street file" practice was "used to conceal evidence from Plaintiff during his criminal case" and all the files located at Area North were in fact "street files." (Tab 6: Plaintiff's Request for Inspection; Tab 7: Dkt. 77 at 1-2, 4-5; 7).

**RESPONSE**: Undisputed.

7. Plaintiff, through his counsel, inspected and was provided copies of the 52 closed homicide files from 1985-1991 that were being stored at the Area North Detective Division file room. (Tab 8: Dkt. 161 – Order regarding Area North File Room).

**RESPONSE**: Undisputed.

8. Plaintiff requested and Defendant City produced 138 Records Division Files ("R.D. Files")[2] that corresponded to the Investigative Files reviewed and produced in conjunction with the line-up project discussed in paragraphs 4 and 5, above, so that Plaintiff could compare the Investigative Files and the R.D. files to support his "street files" claim. (Tab 9: Dkt. 202 – June 11, 2015 Minute Entry).

**RESPONSE**: Undisputed.

9. Pursuant to the court's order, Plaintiff filed a Supplemental Rule 26(a) Disclosure ("Disclosure") which identified eleven sets of Investigative and R.D. Files, and affirmatively alleged that certain documents or information was withheld from the criminal defendants in each investigation and underlying criminal prosecution in support of Plaintiff's "street files" claim. (Tab 10: Plaintiff's October 23, 2015 Supplemental 26(a) Disclosures).

**RESPONSE**: Disputed in part. Pursuant to the Court's order, Plaintiff was instructed to supplement his Rule 26(a) Disclosures to identify any additional *witnesses* upon whom he might rely in proving his claims, which he did. (Exhibit 138, Plaintiff's October 23, 2015 Supplemental 26(a) Disclosures, at 1 ("The following *individuals* are likely to have discoverable information that Plaintiff may use to support his claims.")

10. After filing his Disclosure, Plaintiff issued his first subpoena to the Cook County Public Defender's Office ("CCPD") requesting the corresponding criminal defense files related to the eleven files he had identified in his Disclosure in which he alleged documents and information was withheld from criminal defendants. (Tab 11: December 11, 2015 Subpoena).

**RESPONSE**: Undisputed.

11. With respect to each of the eleven files Plaintiff identified in his Disclosure, Defendant City propounded contention interrogatories asking Plaintiff to:

"a) state with particularity each document and/or piece of information that Plaintiff alleges was not provided to the criminal defendants or the criminal defense attorneys; b) for each such document identify the specific bates number of the purportedly undisclosed document; c) for each piece of information referenced in Plaintiff's disclosure detail with specificity what information was not provided to the defendants and/or their criminal defense attorneys; d) for each such piece of information and/or documents identified above, please state with specificity all witnesses and/or evidence (including documents) that support Plaintiff's contention that said documents and/or information was not provided." (Tab 12: Dkt. 219 – December 14, 2015 Minute Entry; Tab 13: Defendant City's Fourth Set of Interrogatories to Plaintiff).

**RESPONSE**: Undisputed.

4

12. Plaintiff then issued four subpoenas to private criminal defense attorneys for their criminal defense files related to his Supplemental Rule 26(a) disclosure. (Tab 14: Subpoenas to Criminal Defense Attorneys).

**RESPONSE**: Undisputed.

13. Plaintiff's response to Defendant City's Fourth Set of Interrogatories identified specific documents and information that he claimed were not provided to the criminal defendant or his attorney in connection with each of the eleven files he identified in his Supplemental Rule 26(a) disclosure. (Tab 15: Plaintiff's Response to Defendant City's Fourth Set of Interrogatories to Plaintiff). Undisputed, but clarify that Plaintiff's Response to Defendant City's Fourth Set of Interrogatories lays out, over 27 pages, Plaintiff's Monell theory related to street files, discussing the theory and its application to specific homicide files. (Ex. 153, Plaintiff's Response to Defendant City's Fourth Set of Interrogatories.)

**RESPONSE**: Undisputed.

14. After responding to the City's Fourth Set of Interrogatories, Plaintiff issued a second subpoena to the CCPD, this time requesting corresponding criminal defense files for each of the 138 files produced by the City in connection with the line-up project discussed in paragraphs 4 and 5, above. The parties conducted an onsite inspection at the CCPD warehouse, at which time 48 of the 138 subpoenaed criminal defense files were located. These 48 files were produced to the Parties. (Tab 16: January 21, 2016 Subpoena; Tab 17: Letter from Loevy Documenting Production).

**RESPONSE**: Undisputed.

15. With respect to each of the additional 40 files for which Plaintiff received a companion Public Defender File, the City propounded contention interrogatories asking Plaintiff to:

a) state with particularity each document and/or piece of information that Plaintiff alleges

was not provided to the criminal defendant(s) or the criminal defense attorney(s); b) for each such document identify the specific bates number of the purportedly undisclosed document; c) detail with specificity each piece of information Plaintiff alleges was not provided to the defendant(s) and/or their criminal defense attorney(s); d) for each such piece of information and/or documents identified above, please state with specificity all witnesses and/or evidence (including documents) that support Plaintiff's contention that said documents and/or information was not provided.

For each such document and/or piece of information identified in response to Interrogatory Number [NUMBER] relating to the investigation and criminal prosecution involved in [RELATIVE RD NUMBER] state with specificity how the document and/or piece of information was exculpatory, impeachment or *Brady* material.

(Tab 18: Defendant City of Chicago's Fifth Set of Interrogatories to Plaintiff).

**RESPONSE**: Undisputed. but clarify that Plaintiff's Response to Defendant City's Fifth Set of Interrogatories lays out, over 428 pages, Plaintiff's *Monell* theory related to street files, discussing the theory and its application to dozens of specific homicide files. (Ex. 154, Plaintiff's Response to Defendant City's Fifth Set of Interrogatories.).

16. Without any comparison to the CCSAO file or the Circuit Court file, Plaintiff responded to the City's Fifth Set of Interrogatories contending in sworn interrogatories that in each of the remaining 40 files "investigatory materials" were "withheld" by CPD that contained "exculpatory" and "impeachment" evidence., (Tab 19: Plaintiff's Response to Defendant City of Chicago's Fifth Set of Interrogatories to Plaintiff, *see e.g.* Response to Interrogatory No. 1 at p.10).

**RESPONSE**: Undisputed.

17. Plaintiff included physical evidence, such as vials of blood, a bullet, a weapon and a

6

vehicle, among the "investigative materials" he determined were missing from the criminal defense file leading to Plaintiff's conclusion that the physical evidence was "exculpatory" or "impeachment" evidence that was "withheld." (Tab 20: Plaintiff's Response to Defendant City of Chicago's Fifth Set of Interrogatories to Plaintiff, *see e.g.* Response to Interrogatory No. 4, 5 at pp 25-34).

      **RESPONSE**: Disputed. Defendant City's request demanded that Plaintiff identify "each document and/or piece of information that Plaintiff alleges was not provided to the criminal defendant(s) or the criminal defense attorney(s)," and for each such document or piece of information to "state with specificity all witnesses *and/or evidence* (including documents) that support Plaintiff's contention." (*Id.* at 27.) Plaintiff's response indicates that Defendant City of Chicago was demanding that Plaintiff identify all investigative material withheld from criminal defendants and their counsel in a given case, despite that the City had only produced one police file containing investigative material related to the case, and despite that there was evidence that the City had more than that one police file containing investigative material related to the case. To that end, Plaintiff's response states that "the file produced in this case explicitly references several pieces of evidence," such as photographs, vials of blood, a weapon and a vehicle, yet the file "contains no General Progress Reports, no property inventory sheets, no evidence reports, no vehicle tow-reports, and no lab reports." In other words, "the 52-page investigative file produced for RD number K575912 is incomplete," and "Plaintiff is therefore unable to specify what additional documents were created, and stored elsewhere, but not disclosed to the criminal defendant." (*Id.* at 33-34.)

      18. After Plaintiff answered the City's Fifth set of Interrogatories, Defendant City issued a subpoena to the Cook County State's Attorney's Office ("CCSAO") for its files related to the criminal prosecution of the arrestees in each of the 138 files produced by the City in connection with

the line-up project. The CCSAO located and produced 33 corresponding files. (Tab 21: Subpoena to CCSAO; Tab 22: Expert Report of Murray at pg. 1).

**RESPONSE**: Undisputed.

19. Of these 190 Investigative Files (138 Investigative Files produced from the warehouse and 52 Investigative Files produced from Area North) , 48 criminal defense attorney files related to 44 Investigative Files were located.[3] There are 33 corresponding CCSAO files.[4] (Tab 22: Expert Report of Bernie Murray at pg. 1).

**RESPONSE**: Undisputed.

**THE EVOLUTION OF CPD'S POLICES FOR FILE CREATION AND MAINTENANCE**

20. The "R.D." number is the Records Division number, which is assigned to each case that has been referred to the detective area for investigation. The number is assigned in a numerical sequence. (Tab 23: Deposition of James Hickey, *Kluppelberg v. Burge,* N.D. Ill. 13-CV-03963, at 113:16-24).

**RESPONSE**: Undisputed.

21. The Records Division File ("RD" File") contains the Incident Case Report, which is  the original report that begins any investigation and all supplemental reports that are created. This  file is physically maintained in the Records Division. This file is sometimes referred to as the "Permanent Retention File" as that stamp is affixed to each page of the file by Records Division personnel for records maintained by the Records Division that are required to be kept permanently, such as homicide files or other files that do not have a statute of limitations. (Tab 24: Expert Report of Jeff Noble at pg. 14, ¶26(a); Tab 25: Deposition of Hickey 189:21-190:2; 192:2-20).

**RESPONSE**: Undisputed, to the extent this is a reference to the policy and practice in general, and not a statement about any given case.

22. The RD File was never intended to include miscellaneous police reports, such as notes (or subsequent to 1982, GPRS). (Tab 25: Deposition of Hickey 192:2-20).

**RESPONSE**: Disputed. Undisputed that it was often the case that RD Files, or permanent retention files, did not contain general progress reports, notes or any other investigative material from an investigation other than the supplementary reports; however, it is not possible to make a statement asserting or implying uniformity or consistency of practice, because the filekeeping and disclosure process was *ad hoc* and lacked clear procedures. So, for example, there are a number of permanent retention files that contain handwritten notes, both on GPRs and not on GPRs. (Exhibit 39A, Hickey Dep at 161:10-162:12; Exhibit 12, Brasfield Report at 38-40; *see also, e.g.*, *id.* at Attachment G, Rows M184949, M258570, M579697 (for the permanent retention file for each of these cases, the column listing documents contained in Permanent Retention Files includes General Progress Reports and handwritten notes).)

23. Prior to 1982, CPD maintained what were commonly referred to as "working files" but also known as "running files" or "street files" which were folders that contained photocopies of reports, criminal history statements, photographs, mugshots and memorandums requesting assistance on investigations. (Tab 23: Deposition of James Hickey, July 29, 2014 Deposition in *Kluppelberg v. Burge,* N.D. Ill. 13-CV-03963, at 106:3-22).

**RESPONSE**: Disputed. The use of the terminology street files, working files, and running files continued after 1982. In addition, the street/working/running files contained more than the items identified in this purported statement of fact; they also included anything an officer might use to record information related to an investigation, including officers' notes in their personal notebooks, or pads, or scraps of paper; to-from memoranda among investigators; Serafini Reports and humper reports; and anything else they created. (Exhibit 12, Brasfield

9

Report at 18 (identifying, by precise Bates page, numerous subpoenas in the homicide files in the

1985-1991 homicide files in this case in which criminal defense attorneys were requesting all

police records including street files and/or running files and/or working files); Exhibit 39A,

Hickey Dep at 216:6-15, 109:10-110:10; id. at 134:10-137:17; Fallon Deposition at 50, 73-74;

*see also* ASOF ¶¶ 113-114.)

24. Detective Division Notice 82-2 ("DDN 82-2"), was issued on April 20, 1982, and

formally identified the "working files, street files, running files" as "Investigative Files" and

mandated their preservation. "Investigative Files" were defined as "any document or group of

documents the subject of which relates to criminal incidents and which are maintained and stored

under Detective Division control within a unit." DDN 82-2 did not cover documents that were not

maintained or stored under the control of the Detective Division. (Tab 24: Expert Report of Jeff

Noble at. pp. 10, ¶21(a); Tab 26: Detective Division Notice 82-2; Ex: 25: Hickey Dep. 80:19-81:10).

**RESPONSE**: Undisputed, to the extent this statement makes no claim beyond reciting

the language used in DDN 82-2.

25. Detective Division Special Order 83-1 ("SO 83-1"), issued on January 13, 1983, was

designed to institutionalize the control of all Detective Division violent crime field investigation

documents and files, which previously may have been referred to as working files, running files, or

detective's personal files and notes." S.O. 83-1 defined the Investigative File as a "criminal case

file pertaining to a violent crime field investigation which contains official Department reports,

notes, memoranda and miscellaneous documents generated or received by any detective during the

course of such investigation." S.O. 83-1 instructed that the Investigative File "is designed to

provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense

Attorney, and the assigned Department members with a comprehensive account of the subject

criminal case." (Tab 24: Expert Report of Jeff Noble at pp. 11, ¶21(b); Tab 27: SO 83-1; (Tab 23: Deposition of James Hickey, *Kluppelberg v. Burge,* N.D. Ill. 13-CV-03963, at 169:20-170:1).

> **RESPONSE**: Undisputed, to the extent this statement makes no claim beyond reciting the language used in SO 83-1. So, for example, it is not disputed that SO 83-1 states that the Investigative File "is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney, and the assigned Department members with a comprehensive account of the subject criminal case." Disputed, to the extent it is intended to make any claim beyond that; SO 83-1 was not adequate to address the problem, and beyond that there was a near total lack of training or monitoring, and so it was not implemented or enforced. For example, SO 83-1 provides specific instructions and guidance to specific personnel, but completely absent is any instruction to any personnel to disclose the so-called Investigative File to prosecutors and criminal defendants. (Exhibit 60, SO 83-1; Exhibit 12, Brasfield Report, at 51-52, 56-59, 62-63, *see also id.* at 38-40.)

26. SO 83-1 mandated that the Investigative File be maintained in the "Investigative File Case Folder," specifically described as an 8 ½" x 11" inch case folder with two (2) two-hole punch fasteners designed to secure all documents relating to the subject criminal case." The Investigative File is also required to contain an Investigative File Inventory Sheet that lists each document contained within the file. To standardize note taking, CPD created General Progress Reports (GPRs), which are preprinted forms that detectives use to take notes. Detectives use GPRs to document "handwritten notes and memoranda including: inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigating detectives during the course of a violent crime field investigation." (Tab 24: Expert Report of Jeff Noble at pp. 11, ¶21(b); Tab

27: SO 83-1; (Tab 23: Deposition of James Hickey, *Kluppelberg v. Burge*, N.D. Ill. 13-CV-03963, at 170:7-9).

**RESPONSE**: Undisputed, to the extent this statement makes no claim beyond reciting the language used in SO 83-1. So, for example, it is not disputed that SO 83-1 states that the Investigative File should be maintained in the "Investigative File Case Folder," or that the Investigative File is also required to contain an Investigative File Inventory Sheet that lists each document contained within the file, or that CPD created General Progress Reports (GPRs), which are preprinted forms that detectives use to take notes. Disputed, to the extent it is intended to make any claim beyond that; SO 83-1 was not adequate to address the problem, and beyond that there was a near total lack of training or monitoring, and so it was not implemented or enforced. For example, SO 83-1 provides specific instructions and guidance to specific personnel, but completely absent is any instruction to any personnel to disclose the so-called Investigative File to prosecutors and criminal defendants. It also does not cover regular participants in homicide investigations, like gang crimes officers, and provides no information about what type of information is deemed relevant and should be documented and disclosed. Finally, the claim that "Detectives use GPRs to document handwritten notes and memoranda" is disputed; they were *supposed to* use GPRs , but routinely did not: in 61% of files, handwritten notes were recorded not on GPRs, and 20% of the files contain to-from memos not on GPRs. (Exhibit 60, SO 83-2; Exhibit 12, Brasfield Report, at 51-52, 56-66, *see also id.* at 38-40.)

27. On March 31, 1983, as a result of litigation brought challenging CPD's record- keeping system, the Honorable Milton Shadur issued an order to the CCSAO relating to SO 83-1, which required Cook County State's Attorney Richard M. Daley to "promptly issue such directives and take such other action as may be required to assure that all Assistant State's Attorneys" be familiar

with the CPD's systems for filing and maintaining police writings in criminal cases. The Court order outlined five bullet point requirements to ensure this familiarity. *See Palmer v. City of Chicago*, 562 F. Supp. 1067, 1082 (N.D. Ill. 1983).

**RESPONSE**: Undisputed that Judge Shadur's March 31, 1983 order contained a portion in which he directed the Cook County State's Attorney to issue certain directives, but disputed that this is the only guidance provided in Judge Shadur's March 31 order. His order identified a number of deficiencies with SO 83-1, including the following:

- Unless the crime being investigated fit one of the specified of violent crimes, there was no obligation to create an Investigative Case File Folder unless and until the offender was arrested and felony charges were approved. According to Judge Shadur, and in line with standard police practices, this continued to pose the same type of risk that information would not be retained and disclosed because there was nothing to prevent against selective retention while the case is investigated;

- It only required detectives to include "relevant" information in the official reports and offered no guidance about what information a detective should deem "relevant," leaving discretion for detectives to withhold information based on their assessment that it was not relevant.

- It did not include information to ensure that any detective who has or receives information relating to a violent crime field investigation not assigned to him will forward the information to the assigned detective for investigation and inclusion in the Investigative File Case Folder;

- It omits any provision defining how the CPD responds to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding

(*See Palmer v. City of Chicago,* 562 F. Supp. 1067, 1082 (N.D. Ill. 1983); Exhibit 139, NF-L 005620-21; Exhibit 60, Special Order 83-1 V(B) (NF-L 005620); Exhibit 140, Hickey Dep in *Kluppelberg v. City of Chicago* at 20, 238 (NF-L 001178); Exhibit 12, Brasfield Report at 51-52.)

28. In the 1980s, in addition to interoffice request forms and phone calls, prosecutors with the CCSAO routinely issued subpoenas for police reports, including Investigative Files (which

were informally referred to as "street files" by the prosecutors and defense attorneys). On June 13, 1983, Deputy State's Attorney, Lawrence O'Gara, Chief in the Criminal Prosecutions Bureau, issued a memorandum pertaining to discovery compliance that recited verbatim the requirements set forth in Judge Shadur's Order. (Tab 28: Expert Report of Judge John A. Wasilewski at pp. 12-13, Addendum B; Tab 22: Bernie Murray Expert Report at pg. 5, ¶c; Tab 29: Deposition of The Honorable Judge Wasilewski (Retired) at 66:19-67:9)

**RESPONSE**: Undisputed.

29. Detective Division Special Order 83-2 ("SO 83-2"), issued May 2, 1983, was issued to improve on the procedures set forth in SO 83-1 where possible, and was specifically designed to institutionalize the control of all violent crimes field investigation documents and files, which previously may have been referred to as Street files, working files, running files, or detectives personal files and notes." The language of SO 83-2 reinforced CPD's long standing, though unwritten, policy that everyone has an obligation to pass on information. (Tab 24: Expert Report of Jeff Noble at pp. 11, ¶21(e); Tab 30: SO 83-2; (Tab 23: Deposition of James Hickey, Kluppelberg v. Burge, N.D. Ill. 13-CV-03963, at 233:21-234:3).

**RESPONSE**: Disputed. SO 83-2 was not adequate to address the street files problem revealed as a result of *Jones* and *Palmer*, and beyond that there was a near total lack of training or monitoring, and so it was not implemented or enforced. The policy was on its face inadequate because, among other things, the policy did not "institutionalize the control of all violent crimes field investigation documents and files"; instead, it continued to tolerate a decentralized system of parallel files, in which investigators continued to keep personal files, and different investigative documents were stored in different places; it did not cover regular participants in homicide investigations, like gang crimes officers; it provided no guidance about what information a

14

detective was required to include in a supplementary report beyond information deemed "relevant"; and it lacked any instruction to any personnel to disclose the so-called Investigative File to prosecutors and criminal defendants. Finally, the policy also was not implemented: for example, although detectives were *supposed to* use an official police form, GPRs, for notes and memoranda, they routinely did not: in 61% of files, handwritten notes were recorded not on GPRs, and 20% of the files contain to-from memos not on GPRs. (Exhibit 60, SO 83-2; Exhibit 12, Brasfield Report, at 52-55, 56-66, *see also id.* at 38-40.)

30. Detective Division Special Order 86-3 ("SO 86-3"), issued May 19, 1986, was issued to further clarify the directions to the Detective Division regarding the creation and maintenance of Investigative Files, mandating that periodic, unscheduled inspections of the subject files be completed to ensure compliance. (Tab 24: Expert Report of Jeff Noble at pp. 13, ¶21(f); Tab 31: SO 86-3).

**RESPONSE**: Undisputed that 86-3 added a requirement mandating inspections of the subject files be completed to ensure compliance, the only substantive change in 86-3. However, the additional requirement was a dead letter: no such auditing ever occurred. (Exhibit 59, Hickey Testimony from 2016 Fields Trial at 2036:13-23; Exhibit 39A, Hickey Dep at 244, 246-249, 174; *see also* ASOF ¶ 111.)

### DISCOVERY RELATED TO THE VALENTIN INVESTIGATIVE FILE

31. Plaintiff's criminal defense attorney, Kenneth Wadas, was familiar with the kinds of documents that were created by CPD in the course of a felony investigation, knew how to request and receive documents and other evidence from CPD, and knew that he could go to court and compel production of documents from CPD if he felt he was missing something. (Tab 32: Deposition of Wadas at 18:6-19:16)

15

**RESPONSE**: Undisputed, except to clarify that in this case Wadas used his familiarity

with how the process worked to file a Request for Discovery, and upon reviewing the documents

he received to make further inquiries for additional photographs and police records, only to be

told no such information existed and that he had received everything the prosecutors had

received. In addition, Wadas knew from experience that it was not uncommon at the time of

Rivera's criminal trial to receive a homicide file with no general progress reports, because for a

investigators had stopped taking notes once general progress reports became required, or

destroyed any notes that they did take. (*See* ASOF ¶¶ 88; Exhibit 19A, Wadas Dep at 86:22--

88:9, 245:8-246:2, 254:16-256:7, 265:22-266:11; Exhibit 49, Victorson Dep at 30:6-9, 32:22-

33:24..)

32. During Plaintiff's criminal prosecution, Wadas did not serve CPD with a general or

specific subpoena for any police records, including but not limited to the Investigative File in this

case. (Tab 32: Deposition of Wadas at 86:3-13)

**RESPONSE**: Undisputed that Wadas did not serve CPD with a subpoena for police

records, but disputed as to whether a subpoena was served on CPD before Rivera's criminal trial.

In November 1988, well before Rivera's criminal trial, attorney John DeLeon sent a subpoena to

the Chicago Police Department for "any and all police reports relating to . . . RD# K371955

[Valentin homicide investigation]," which was stamped as received by the Chicago Police

Department's Records Division on November 10, 1988. In addition, Wadas did issue a Request

for Discovery, to which the prosecutors responded with all of the police records they had

received. (Exhibit 42, Hickey 31; Exhibit 4, Street File at Wron 1-69 (Valentin-related

documents all labeled with RD# K371955; *see* ASOF ¶¶ 86-89).

33. Wadas issued trial subpoenas to Officer J. Moriarty and C. Letrich, commanding them

16

to appear on April 5, 1990 in Room 8 of the Circuit Court of Cook County, located at 5600 Old Orchard Road, in Skokie, Illinois. The subpoenas included a request for the "Imperial Gangster Photo Album Containing Photos of Jose Rodriguez and Felipe Nieves." (Tab 33: Trial Subpoenas at RFC 00538-00539)

**RESPONSE**: Undisputed.

34. The trial prosecutor, Lawrence Victorson, testified that, at the time of Plaintiff's criminal prosecution, he was aware of the process to obtain CPD documents, the types of documents maintained by CPD, and how to follow up if he did not receive documents that he expected CPD to produce, and ensure that he had all the documents pertaining to the investigation. This includes the Investigative File and GPRs. (Tab 34: Deposition of Victorson at 26:9-29:18, 65:5-66:19).

**RESPONSE**: Undisputed, except to clarify that when Wadas asked Victorson if there was anything else, including anything relate to a first lineup in particular, Victorson ultimately communicated that there were not any additional documents and Wadas had been given everything the prosecutors had. (Exhibit 19A, Wadas Dep at 94:10-18, 114:4-23, 172:22-173:5, 245:8-246:21,265:22- 266:11; Exhibit 49, Victorson Depat 39:1-6, 43:4-12; *see also* ASOF ¶¶ 86-89.)

35. The CCSAO file for Plaintiff's criminal prosecution was lost by the time of Plaintiff's post-conviction proceedings. (Tab 35: Deposition of Darren O'Brien at 24:9-25:22, 126:6-22).

**RESPONSE**: Undisputed.

36. Officer Letrich appeared pursuant to the subpoena, testified at trial and brought with him the Imperial Gangster photo album. (Tab 32: Deposition of Kenneth Wadas at 133:21-134:22; Tab 36: April 25, 1990 Correspondence to CPD Subpoena Department from Kenneth J. Wadas).

**RESPONSE**: Disputed, in that the citations do not support the statement. Wadas's cited testimony supports only that he thought Letrich brought the Imperial Gangsters mug book, but he did not remember.

37. In the early months of 2002, Cathryn Crawford, an attorney at the Bluhm Legal Criminal Law Clinic ("Bluhm"), spoke with Plaintiff and began looking into the facts of his case. During this time period, she contacted Wadas and provided him an authorization signed by Plaintiff allowing Bluhm access to Wadas' file. (Tab 37: Deposition of Crawford 28:17-24; 38:11-24; Tab 38: February 6, 2002 Correspondence from Crawford to Wadas).

**RESPONSE**: Undisputed.

38. In 2002, an attorney from Bluhm obtained a copy of Wadas's file and created an index of documents contained therein. (Tab 39: RFC 0808; Tab 32: Deposition of Wadas at 54:1-6; Tab 37: Deposition of Crawford at 54:12-20).

**RESPONSE**: Undisputed.

39. On January 17, 2013, Wadas responded to a Subpoena from Defendant City of Chicago and produced what he identified as the documents contained in his trial file ("the Wadas File"). (Tab 40: January 17, 2013 Correspondence from Wadas to RFC).

**RESPONSE**: Undisputed.

40. While the copy of the entire file made by Bluhm is lost, a copy of the index was produced with Wadas' file. The contents of the Wadas File, as it exists today, does not match the index that was created in 2002. (Tab 37: Deposition of Crawford at 41:16-17; Tab 32: Deposition of Wadas at 65:23-66:8; 187:11-189:11).

**RESPONSE**: Disputed. The index is merely a list describing documents contained in the Wadas file (without any citation that it was intended to list every page or item, including wholly

18

irrelevant documents), whereas the Wadas file is a collection of all police reports, notes, filings, transcripts, and other documents contained in Wadas' file. Nevertheless, the index identifies 29 pages of police records, and Wadas' file contains exactly the same number of police records. (Exhibit 16, Wadas File, RFC 468-810; compare RFC 808 (index listing 29 pages of "Police Reports) with RFC 507-535; Exhibit 19A, Wadas Dep at 242:9-244:22.)

41. At the outset of the civil litigation, Defendant City produced a copy of all of the police reports, including the Investigative File and the R.D. file in their Initial Rule 26(a) disclosures. (Tab 41: Defendants' Initial 26(a) Disclosures)

**RESPONSE**: Disputed. The City produced a "Chicago Police Department Permanent Retention File for RD K371955," *i.e.*, the R.D. File, consisting of 27 pages. However, in its Initial Disclosures, the City did not produce any document it characterized as an "Investigative File"; to the contrary, it produced what it called a "Chicago Police Department Area File for RD No. K371955," *consisting of 53 pages*; a "Chicago Police Department Supplementary Report for RD No. K 404356," consisting of two pages; "Arrest Reports," consisting of two pages; "Photographs for ME #300 Sep 88, RD No. K371955," consisting of 30 pages; and "Cook County Circuit Court Clerk File for Case No. 88 CR 15436," consisting of 468 pages. None of these compilation of documents, or any combination thereof, adds up to the 69 page file produced as Wron 1-69, that the City characterizes as the "Investigative File." (Exhibit 142, Defendants' Joint Initial Rule 26(a) Disclosures, at 5; Exhibit 4, Street File 1-69.)

42. During the discovery in the civil case, Defendant City produced a color copy of the Investigative File. (Tab 42: Wronkowski Deposition at 66:21-67:4; Tab 43: Investigative File at Wron 1- Wron 69).

**RESPONSE**: Undisputed, but to clarify *see* Response to ¶ 41.

43. Plaintiff's proposed expert, Michael D. Brasfield, reviewed the color copy of the Investigative File (produced as Wron 00001 – Wron 00069) and opined that the Investigative File was not produced to Wadas before the criminal trial and that the Investigative File contains approximately 30 pages of documents that he described as "investigative material." He identified the investigative material as WRON 0001-00008, 0011-0014, 0018-0021, 0037-0038, 0042, 0045-0048, 0052-0069. (Tab 44: Expert Report of Brasfield at pg. 70).

**RESPONSE**: Disputed in part. The so-called Investigative File contains approximately 40 pages (not 30) of documents that were not contained in Wadas' file. They include, for example, arrest reports, hold forms, and release reports from August 30 and August 31 for Rivera and alternate suspect Jose Rodriguez, indicating that in fact there had been a lineup in the Valentin investigation at that time; a general progress report and evidence report from August 31, also indicating that in fact there had been a lineup in the Valentin investigation at that time; a rap sheet for Rivera stamped "issued on inquiry" on August 27, indicating that Rivera had been a suspect before he was ever identified by any witness; and all other general progress reports in the case. (Exhibit 12, Brasfield Report at 70-71.)

44. Specifically, Brasfield concluded that the following "investigative materials" were "not produced" to Wadas: copies of memos from 2011 requesting that certain records and evidence relating to the Valentin homicide be preserved (Wron 07-08); a Fax Cover Sheet Dated June 7, 2012 (Wron 020); Copy of a Request for the Investigative File from the Office of Legal Affairs dated June 7, 2012 (Wron 021);. (Tab 28: Expert Report of Judge Wasilewski at pg. 19, at Appendix Ex. 1D, 1J, 1K)

**RESPONSE**: Disputed. *See* Response to ¶ 42.

45. Defendant's expert, retired Cook County Circuit Court Judge John A. Wasilewski,

reviewed the documents from the Investigative File that Brasfield described as "investigative material" and determined that the information contained therein either had no evidentiary value (and was not "investigative material") or was also contained in the reports and documents that are contained in the Wadas File produced in this case. (Tab 28: Expert Report of Judge Wasilewski at pg. 19, 22).

 **RESPONSE**: Undisputed only that this is what Wasilewski opined. Disputed as to whether these opinions are true; in fact, the investigative material withheld from Rivera was exculpatory, investigative material that should have been disclosed, and specifically relevant to demonstrating that Defendants had settled on Rivera before any witness had identified him, and to demonstrating that there was a first lineup viewed by Lopez. Given that Plaintiff's expert opines to the contrary, this statement cannot possibly be an undisputed statement of fact. (Exhibit 12, Brasfield Report at 68-72; ASOF ¶¶ 22-24, 29-44.)

 46. Judge Wasilewski concluded the following "investigative material" identified by Brasfield had no evidentiary value: copies of a file folder (Wron 01, 4-6); a copy of a sheet of paper with A5/VC written on it (Wron 014, 42, 66); the back side of inventory slips with no content or writing (Wron 019); the back side of a polaroid photograph with no writing or information (Wron 38); and the back side of an evidence report with no content or writing (Wron 46). (Tab 28: Expert Report of Judge Wasilewski at pg. 19-22, at Appendix Ex. 1A, 1C, 1G, 1I, 1M, 1N, 1P, 1FF).

 **RESPONSE**: Undisputed only that this is what Wasilewski opined. *See* Response to ¶ 45.

 47. Other "investigative material" Brasfield concluded were "not produced", such as the Investigative File Inventory Form (Wron 02-03) are contained in the RD File. (Tab 28: Expert

Report of Judge Wasilewski at pg. 19, at Appendix Ex. 1B)

  **RESPONSE**: Undisputed, but clarify that the inventory form is not contained in the file produced to Rivera's criminal defense attorney, Wadas. (Exhibit 16, Wadas File, RFC 507-535.)

  48. The remaining "investigative material" Brasfield alleged were not produced to Wadas include a supplementary report pertaining to the death investigation and hospitalization case report (Wron 11-12); five GPRs (Wron 53, 54, 64, 68, 69); seven inventory slips and evidence reports (Wron 13, 18, 45, 60, 61, 62, 65); two CB (Chicago Police Arrest Reports) (Wron 56, 58); a hold over slip and release from custody report for Jacques Rivera (Wron 52, 57); a polaroid photograph of Jacques Rivera (Wron 37); two copies of an I.R. report for Jacques Rivera (Wron 55, 67); and a hold over slip and release from custody report for Jose Rodriguez (Wron 58, 63). Judge Wasilewski compared the information in these documents to the information in the Wadas File and found that all of the information contained in those documents is included in the documents in the Wadas File. (Tab 28: Expert Report of Judge Wasilewski at pg. 19-22).

  **RESPONSE**: Undisputed only that this is what Wasileski opined. His opinion is wrong, and vigorously disputed by Plaintiff's expert Brasfield. Again, given that Plaintiff's expert opines to the contrary, this statement cannot possibly be an undisputed statement of fact. (Exhibit 12, Brasfield Report at 69-72; *see* also response to ¶ 42.)

  49. Finally, Brasfield concluded that the ERPS file, that contained the six photographs of the individuals who participated in the identification procedures on August 31, 1988, was not produced to Plaintiff until this underlying litigation. The Inventory number for the photographs was on the Supplementary Report, dated submitted September 1, 1988, contained in the Wadas File. Further, Wadas testified that while he has no independent recollection of requesting the six photographs in the inventory, he believed he would have, because it was "part of the evidence in

the case." It was "routine." (Tab 44: Brasfield Report at 71; Tab 28: Expert Report of Judge

Wasilewski at pg. 22; Tab 32: Wadas Depositions at 103:1-23).

      **RESPONSE**: Disputed. Wadas requested photographs from a first lineup on or about

August 31, and nothing was produced to him. (Exhibit 19A, Wadas Dep at 245:8-246:21; *see*

*also* 94:10-18.)


## BRASFIELD'S OPINIONS REGARDING CPD'S RECORD-KEEPING PRACTICES

      50. Plaintiff's proposed expert, Michael Brasfield, was hired to provide opinions related to

the creation, maintenance, storage, preservation and disclosure of investigative material by CPD.

He reviewed 190 "police investigative files" from the time period of 1985-1991. (Tab 44: Brasfield

Report at 41).

      **RESPONSE**: Undisputed, except to clarify that in addition to the 190 police

investigative files that he reviewed, in many instances Brasfield also reviewed corresponding

permanent retention files and/or defense attorney files and/or State's Attorney's Office files.

(Exhibit 12, Brasfield Report at 41-42, 49.)

      51. Contained within his report is a spreadsheet, titled "Chart of Missing Material" wherein

he identifies by bates number 1) items he alleged were in an Investigative File but missing from the

Criminal Defense file and 2) items in an Investigative File that were not contained in the R.D. File,

(herein referred to as "Attachment G"). (Tab 44: Brasfield Report at Attachment G).

      **RESPONSE**: Undisputed, except to clarify that the spreadsheet also identifies instances

in which the investigative files and permanent retention files, standing alone, demonstrate

violations of the applicable Special Orders. (*Id.*)

      52. Brasfield testified that he did not prepare Attachment G, but that it was prepared for

23

him by Plaintiff's counsel and he did not amend, edit or in any way add or subtract to the information that was contained in Attachment G. His only input for the creation of the spreadsheet pertained to the coloring. (Tab 45: Deposition of Brasfield at 116:13-117:8)

**RESPONSE**: Disputed in part. In the cited testimony itself, Brasfield explains that he did not amend the information contained in Attachment G, because he has done previous street files cases with Plaintiff's counsel and had given input into the structure of Attachment G. Brasfield also "reviewed and double-checked the spreadsheet extensively." (*Id.*; Exhibit 12, Brasfield Report at 41.)

53. Brasfield testified that he did create Attachment F, which is titled "List of Files Reviewed" and contains a comparison of 48 criminal defense files to 44 "corresponding Investigative Files." Attachment F includes a disclaimer that states that Brasfield did not "make any inferences about what documents were turned over to criminal defendants." (Tab 44: Brasfield Report at Attachment F).

**RESPONSE**: Undisputed.

54. Bernard Murray, former Chief of the Criminal Prosecutions Bureau of the Cook County State's Attorney's Office, was hired by Defendant City to review Brasfield's report and render opinions relating to Brasfield's conclusions regarding documents allegedly missing from criminal defense files. (Tab 22: Expert Report of Bernard Murray at pg. 1, 22)

**RESPONSE**: Undisputed.

55. Murray determined that some of the documents Brasfield claimed were withheld were "clearly administrative in nature," including front and back sides of folders with no investigatory information. He also found that certain documents, such as the medical examiner's report and toxicology reports were not created by CPD. Finally, Murray observed that documents such as the

property inventory forms, a defendant's arrest report and arrest warrants were documents that were generally maintained in the circuit court file. (Tab 22: Murray Report at pg. 10-11).

**RESPONSE**: Undisputed only that this is what Murray opined. Disputed as to the opinion itself, as Defendant City is well aware. Indeed, Brasfield's report states as follows: "Of course, not all of the material withheld is of equal importance. Some of the documents not turned over to criminal defendants were administrative in nature and not crucial evidence (*although I note that administrative records like inventories can be important evidence to disclose*); while other records were highly relevant investigative material. *But any withheld pages, regardless of their importance, are evidence that there was not a policy of copying all police files in their entirety*. Moreover, the inconsistent nature of what was withheld or disclosed is concerning, (i.e. the same category of document is sometimes disclosed and sometimes withheld). *That variation suggests that individual officers are making ad hoc decisions about what to disclose from each file. Picking and choosing what materials to produce, or failing to have a procedure to ensure complete production of all material in all police investigation files, are both egregious departures from generally accepted police practices*." In other words, not all of the documents Brasfield identified as being withheld are administrative in nature, to the extent some are they can still be important evidence to disclose, and in any event administrative material is still important for what it says about *ad hoc* practices for disclosing files that indicate the opportunity to pick and choose what to produce. (Exhibit 12, Brasfield Report at 42.)

56. To the extent that corresponding CCSAO files were located, it was determined that every file contained many of the investigative materials Brasfield claimed to be withheld. In fact, a review of the corresponding CCSAO files revealed only two files where documents were missing from both the CCSAO file and CCPD files as they exist today. A review of those two files showed

that in one file, the information was known to the criminal defense attorneys (i.e.: line-ups where the criminal defendants were present or cause of death reports). In the second file, the document at issue was an anonymous tip where a concerned citizen implicated a possible third defendant. Whether or not this information was known to the criminal defense attorney cannot be concluded as this file concerned a juvenile suspect/arrestee and therefore was redacted. (Tab 22: Murray Report at pg. 12).

**RESPONSE**: Disputed. The cited reference does not support the statement. With regard to the "second file," the citation to Murray's report does not support the claim that "[w]hether or not this information was known to the criminal defense attorney cannot be concluded as this file concerned a juvenile suspect/arrestee and therefore was redacted." To the contrary, Murray admits that the information is potentially *Brady* or *Giglio* material (he couches it as, "not *necessarily* Brady or Giglio material") and should be tendered (again, he couches it as, "would have been tendered in discovery"). In addition, the claim that there are only two cases in which documents were missing from both the CCSAO files and the defense attorney files is disputed; Brasfield details six specific example cases in which investigative material of potential exculpatory value was missing from both the defense attorney file and the CCSAO file. (Exhibit 143, Murray Report at 11-12; Exhibit 12, Brasfield Report at 45-49.)

57. Among the allegedly withheld documents found in the CCSAO files were supplementary reports, requests for fingerprints, criminal histories, witness statements, felony 101 forms, lineup photos, defendants' statements, case reports, handwritten notes, and GPRs. (Tab 22: Murray Report at pg. 12, ¶f(ii)).

**RESPONSE**: Undisputed that in some cases information missing from criminal defense attorney files was found in the current version of the CCSAO files. *But see* Response to ¶ 56.

58. Of the 190 police files Brasfield reviewed, Brasfield stated that he reviewed seven files wherein the review included an examination of the Investigative File, the R.D. File, the CCPD File and the CCSAO file. (Tab 44: Brasfield Report at 45-49; Tab 45: Brasfield Deposition at 138:17-140:1).

**RESPONSE**: Undisputed, except to clarify that Brasfield reviewed hundreds of files; there are six (not seven) cases in which he reviewed all of the files correspondence to the case, including the investigative file, RD file, CCSAO file and defense attorney file.

59. There is no evidence that the CCSAO files or the CCPD files were maintained and stored in the same condition that they were in when the cases went to trial. There are several examples where the files obtained from both the CCSAO and CCPD were incomplete. The review of RD #P272087 – Criminal Defendant Demetrius Johnson, involved what appeared to be an incomplete criminal defense file. A review of the CCSAO file indicates that the file likely was transferred to a private counsel at some point during the criminal proceedings. The CCPDs office issued several subpoenas to CPD, and filed a motion for discovery. The CCSAO file indicates that he tendered "26 pages RD (GPR Supb) to defense counsel. The file lacks any documents with the trial attorney's name. (Tab 22: Expert Report of Bernard Murray at pp. 22, ¶i, iii, v)

**RESPONSE**: Disputed in part. The files, as they are preserved, are the best evidence of what was in those files at the time of trial. With regard to the Demetrius Johnson case, the investigative material withheld is potentially explosive exculpatory evidence: the investigative file contains documentation of an in-person lineup, in which a witness positively identified an alternative suspect named Bryan Johns; but *the report of this lineup and all references to this lineup occurring are not in the permanent retention file or the criminal defense attorney file or the CCSAO file*; and instead typed police reports included in the permanent retention file state

that Bryan Johns appeared in a lineup *that resulted in no positive identification.* So, unless after

trial the CCSAO and defense attorney each independently lost the same explosive document –

one for which the permanent retention file contains a different lineup report with different results

– it is highly unlikely that the discrepancy can be explained by a lack of completeness in any one

of the files. Notably, this is a case in which Defendant Guevara was actively involved. (Exhibit

12, Brasfield Report at 40, 48-49.)

60. Further, J080925 – Criminal Defendant Samuel Slack, had no corresponding CCSAO

file, yet Brasfield claims to have reviewed one to conclude that documents were withheld. (Tab 22:

Expert Report of Bernard Murray; Tab 44: Brasfield Report, Att. B, List of Materials Reviewed by

Brasfield)

**RESPONSE**: Undisputed that Brasfield erroneously references seven cases in which he

reviewed CCSAO file; it was actually six. Brasfield's opinions about the materials in the police

investigative file not contained in Slack's defense attorney file remain intact.

61. Brasfield testified that he made no inference regarding what documents were actually

turned over to criminal defense attorneys during the criminal prosecution. (Tab 45: Deposition of

Brasfield at 193:7-19).

**RESPONSE**: This statement is disputed as incomplete, and therefore misleading.

Brasfield explained as follows in his report: "I also gave the City the benefit of the doubt in my

comparison to criminal defense files by assuming that all material in the criminal defense file

had been there at the time of the original criminal trial (even if it might have been added

subsequently, for example, as part of appeals or post-conviction proceedings)." In this way, his

"comparison exercise was objective in nature rather than subjective," that is, he "did not make

any inferences about what documents were turned over to criminal defendants" at particular

points in time, and instead assumed it was all turned over before trial. (Exhibit 12, Brasfield Report at 42.)

62. Brasfield did no analysis of criminal trial transcripts or the circuit court files to determine if information which he claimed was missing from the criminal defense file was present in some other form or fashion, and testified that he is not familiar with the Illinois Rules of Criminal Procedure as they relate to discovery in criminal cases. (Tab 45: Deposition of Brasfield at 121:2-6; 215:12-17).

**RESPONSE**: Disputed in part. *See* Response to ¶ 61. Moreover, the cited reference does not support the claim that Brasfield "is not familiar" with the Illinois Rules of Criminal Procedure, only that Brasfield does not claim to be an expert on those rules such that he would opine on them.

63. Brasfield did not make any inference regarding whether or not the documents he identified as not produced to criminal defendants were exculpatory in nature and did no analysis to be in a position to make such a determination. (Tab 45: Deposition of Brasfield at 209:5-211:3). Brasfield testified that based upon his review, a parallel file was "any file[s] that are not produced during the discovery process, and that could be a single piece of paper. It could be a number of pieces of paper on one specific report, such as a medical examiner's report or a crime lab report, as opposed to this specific manila folder hidden away in a drawer someplace that is a "street file." (Tab 45: Brasfield Dep. at 167:16-168:3).

**RESPONSE**: Disputed. Brasfield's Expert Report is clear that he did assess the potential exculpatory value of documents in the police investigative files that were missing from defense attorney files: "I conducted a case-by-case analysis of what documents are included in the police investigative files but are missing from criminal defense files. . . . I then analyzed the types of

documents withheld across the files, focusing in particular on whether there were the types of documents withheld that could and would be important to disclose to prosecutors and criminal defendants." (Exhibit 12, Brasfield Report at 42.)

Next, he wrote that "in the majority of cases I reviewed there were significant amounts of relevant information that would have aided the defendant and therefore should have been disclosed under standard police procedures. In my experience, given the volume of investigative material that was not disclosed, it was inevitable that relevant information helpful to a criminal defendant would be withheld. That is exactly what I found." He then went on to discuss in detail seven specific cases in which investigative material was withheld, and explained the circumstances of the investigation and the potential significance of the withheld information. (Exhibit 12, Brasfield Report at 49,)

## CPD'S DOCUMENTATION OF LINEUPS

64. On March 16, 1983, CPD issued General Order 83-5 ("G.O. 83-5") regarding lineup procedures. G.O. 83-5 was effective March 17, 1983. G.O. 83-5 mandated that when a lineup is held, a supplementary report will be completed. It stated that "in no case will a lineup be conducted without a Supplementary Report being completed." Detectives were trained to document the results of all lineups. (Tab 46: G.O. 83-5; Tab 47: Deposition of Lt. Karen Sullivan at 34:14-35:16).

**RESPONSE**: Disputed, except that GO 83-5 was the operative policy on lineup procedures and that it stated "in no case will a lineup be  conducted without a Supplementary Report being completed." That policy did not provide guidance on what had to be reported in the event of a lineup procedure in which a filler was selected, nor were police investigators trained on it. Likewise, neither that policy nor any other policies in effect in 1988 governed the conduct

of photographic lineups. (Exhibit 70, General Order 83-5 (no instructions for filler

identifications, no instructions for photo lineups); Exhibit 12, Brasfield Report at 19; Exhibit

39A, Deposition of James Hickey at 84:20-24, 254:23-256:2; 264:19-265:19; Exhibit 25A,

Deposition of Stephen Gawrys at 48:14-16 (learned by watching others); Exhibit 71A,

Deposition of James Spratte at 229:21-230:5.)

      In addition, the City designated James Hickey to provide binding testimony on behalf of

the Chicago Police Department regarding policies, procedures, and practices concerning the

conduct of lineups in the late 1980s, the period of the Valentin investigation. Hickey testified

that the policy and practice at the time was that a photographic record would not be made of a

lineup in which a filler was selected, and further, that if a filler was identified there would be no

documentation of the fact that the witness had identified someone. Several of the Defendants in

this case confirmed this was the practice. (Exhibit 39A, Deposition of James Hickey at 254:23-

255:8, 261:10-262:6, 264:11-265:19; *see also* Exhibit 72A, Deposition of Russell Weingart at

42:25-43:18 (filler documented as negative identification), 59:12-22 (negative identification

means no identification); Exhibit 25A, Deposition of Stephen Gawrys at 58:23-59:2; Exhibit 33,

Deposition of John Boyle at 34:4-13, 36:7-11.)

      65. According to CPD policy and detective training, if a witness viewed a lineup and

identified the suspect in the lineup, the lineup would be documented as "positive." Only 100%

positive identifications were considered a "positive ID" by CPD. If the suspect was not identified,

it was a considered a "negative lineup" and was documented as such in the supplementary report.

This included when no identification was made or when a witness picked a filler. (Tab 47:

Deposition of Sullivan at 60:17-19; 63:4-64:1; Tab 25: Deposition of Hickey 265: 2-11).

      **<u>RESPONSE</u>**: Disputed, to the extent this statement asserts that there was documentation

of the selection of a filler from photo lineups or live lineups. *See* Response to ¶ 63.

66. Plaintiff created and provided his eyewitness identification expert, Dr. Gary Wells, a spreadsheet that Wells understood to document data collected from the CPD Investigative Files that Plaintiff was provided during discovery. According to Plaintiff, the spreadsheet lists each lineup documented in the files, including live lineups and photographic lineups, and the outcomes of each of those lineups. The spreadsheet contained columns for the number of "positive IDs," "tentative positive IDs," "No ID's," "Filler IDs," and "no outcome reported." According to Wells, a "filler ID" is one in which the witness identifies someone other than the suspect and a "No ID" is when the witness could not make an identification of anyone. (Tab 48, Wells Report, p. 2, 4, Appendix A; Tab 49, Wells deposition at 87:17-88:17; 176:22-178:1; 181:17-182:8).

**RESPONSE**: Undisputed, except to clarify that although Defendants imply that the information compiled in the spreadsheet about lineup results is "according to Plaintiff," Defendants had the same data and did not offer their own compilation of the lineup results or challenge any of the data in Plaintiff's compilation. In addition, Dr. Wells had all of the underlying case files containing the lineup reports, and spot checked the accuracy of the spreadsheet compilation against the underlying police reports, in forming his opinions, which speak for themselves. (Exhibit 69, Wells Report and Attachments; *id.* at 2.)

67. Wells distinguished between lineups that were documented in what he called "official lineup reports" and lineups that were documented in "ancillary reports." According to Wells, the "official lineup reports" documented 54.6% "suspect" identifications 32% "no pick," 13.4% "no outcome reported," and 0% "filler." According to Wells, the "ancillary reports" in the files documented 60.5% "suspect" identifications, 31.8% "no pick," 24% "no outcome reported," and 0% "filler." Wells also concluded that in two files "official lineups had outcome information in the

32

ancillary materials that could be construed as filler selections." (Tab 48, Wells Report, p. 7-10).

**RESPONSE**: Disputed in part. The ancillary reports documented 7.6% "no outcome reported" (not 24%). In addition, Wells considered that "two of these *official* lineups had outcome information in the ancillary materials that could be construed as filler selections," which would result in four total filler identifications. He then concluded that if the City was given the benefit of the doubt of these 4 filler identifications (out of 666 identifications in live lineups, or 990 identifications in live and photo lineups combined), it remains the case that the rate of filler identifications in Chicago are (a) still more than 200-300 filler identifications less than would be expected based on peer-reviewed studies of other police departments around the country; and, (b) still less than one in ten thousand chance of being due to mere chance. (Exhibit 69, Wells Report at 7-11.)

68. Wells testified that a minimum requirement of a clean study is one in which the data collection is accurate and reliable. Wells agreed to the examine the CPD data "under the assumption that the data provided to [him] were reliable extractions from the case files and that it would be up to the plaintiffs in the case [not him] to establish that reliability." Wells testified that he did not know how plaintiff intended to establish the reliability of the data, and expected that the "defense can look at this and change it." Wells testified that he "spot checked" the data and reviewed approximately 30-35 files. (Tab 48, Wells Report, p. 2; Tab 49, Wells Deposition at 31:17-33:1; 61:6-19; 71:19-73:8).

**RESPONSE**: Undisputed that Wells spot-checked the data, but otherwise disputed. (*See* Response to ¶ 65.)

69. Wells compiled data from 11 peer-reviewed published field studies, which, according to Wells, demonstrate that witnesses identify fillers in lineups an average of 23.7% of the time. The field studies were conducted in the United States and the United Kingdom. In compiling this data,

Wells excluded data from the field studies where the witness identified a "familiar perpetrator." He did not do that with the CPD data. (Tab 48, Wells Report, p. 5-7; Tab 49, Wells Deposition, 183:8-23; 249:21-250:10; 254:11-19; 255:2-21).

**RESPONSE**: Disputed. Ten of the peer-reviewed field studies were from police departments in the United States, and one was from London, England. Wells did not exclude data from field studies in performing his analysis in this case; he relied on them, but not the data where witnesses identified a familiar perpetrator. Neither the City nor its retained expert on this topic presented an alternate data set excluding familiar perpetrators, or presented any evidence that there were a high number of identifications of familiar perpetrators in the Chicago data, or any other evidence to suggest that the exclusion of familiar perpetrators would in any way change the results. In other words, Dr. Wells' analysis remains the only one of the data available to both sides, and is unrebutted. (Exhibit 69, Wells Report and Attachments; Exhibit 144, Wixted Report (no counter-analysis or compilation of any kind).)

70. Wells compared the rates of filler identifications from the data from the CPD lineups to the rates of filler identifications in the published field studies using a chi square analysis and concluded that the difference between the two sets of data was profoundly improbable and could not be due to chance. According to Wells, the most likely cause for the low rate of filler identifications in the CPD lineups is as a result of "policy or practice of never reporting filler identifications;" according to Wells, the policy or practice would be to "treat filler identifications as 'non-events,' something that never happened and for which no report is ever written." (Tab 48, Wells Report, 7-12).

**RESPONSE**: Undisputed.

71. Defendant's eyewitness expert, Dr. John Wixted, concluded that Wells statistical

analysis does not support Wells's conclusion that CPD did not create a record of a lineup when a witness identified a filler because it does not account for the possibility that filler identifications were recorded as non-identifications. Assuming that filler identifications are recorded as non-identifications, the CPD data are consistent with the field studies Wells cites. (Tab 50, Wixted report, p. 5).

**RESPONSE**: Undisputed that this is what Wixted opines, but clarify that this merely highlights a dispute of fact between Drs. Wells and Wixted. The opinion itself is disputed; indeed, Dr. Wixted's opinion rests on the premise that in the Chicago Police Department, the practice when a filler was identified was not to document the identification of a filler, an instead falsely document it as a non-identification. (Exhibit 144, Wixted Report at 5; Exhibit 70, GO 83-5.)

72. Wixted determined that the average suspect identifications in the field studies is 42.1% with a standard deviation of plus or minus 18%, meaning the CPD data would not deviate from the field studies to a significant degree if the CPD suspect identifications fall within the range of 23.2% and 60.1%. Wells's observed value of positive identifications of 54.6% (in the "official reports") and 56.5%, which is the rate of the "official" reports combined with the "ancillary reports," the CPD data are within that range. Similarly, the CPD data are within the range expected from the field studies if the filler identifications and nonidentifications from the field studies are combined. (Tab 50, Wixted report, p. 5).

**RESPONSE**: Undisputed only that this is what Wixted opined. These opinions are in dispute with Dr. Wells's, and the veracity of his opinions on this point are disputed. Among other things, Dr. Wixted's opinion rests on the premise that in the Chicago Police Department, the practice when a filler was identified was not to document the identification of a filler, and

instead falsely document it as a non-identification. (Exhibit 144, Wixted Report at 5; Exhibit 70, GO 83-5.).

73. Wells determined that Hickey's testimony was "of no consequence" to him and he did not review the testimony of Lt. Sullivan. (Tab 48, Wells Report, p. 2; Tab 49, Wells Deposition at 193:13-23).

**RESPONSE**: Disputed in part. Wells did receive and review the deposition of James Hickey. (Exhibit 69, Wells Report at 2.)

74. Wells testified in Wilson v. O'Brien, with respect to filler identifications that "many jurisdictions have failed to document filler IDs. They simply complete reports saying, witness didn't ID the suspect." In a study published in 1980, Wells wrote "functionally, an identification of a foil is treated as a non-identification as is a witness's choice of making no identification from that lineup." In another 1980 article, Wells's coauthor wrote that "choices of foils might be more appropriately labeled failures to identify the suspect." (Tab 49, Wells Deposition at 208:209:24; 264:2-10; 265:16-266:13; Tab 51, RFC 164083).

**RESPONSE**: Disputed. These excerpted statements are taken out of context and misconstrue Dr. Wells' opinions. Indeed, the very purpose of the studies cited above, when read in context, was to make sure people do not treat filler identifications and no identifications the same. (Tab 49, Wells Dep at 265:3-15 (stating that "one of the main purposes of the article is to make sure that people don't just collapse these" categories).) Wells' expert report is clear that filler identifications are different in kind than non-identifications, and have unique meaning in terms of the reliability of a witness. (Exhibit 69, Wells Report at 14-15 ("When an eyewitness looks at a lineup and identifies a filler, the eyewitness is saying (in effect) that the filler looks more like the culprit than does the suspect. And, not surprisingly, this is most likely to occur

when the suspect is not the culprit.").)

## BRASFIELD'S OPINIONS REGARDING CPD'S DISCIPLINARY PRACTICES

75. The totality of Plaintiff's evidence to support his failure to discipline claim consists of seven pages of Brasfield's repot. Brasfield opined that "CPD's internal investigation and disciplinary processes allowed Defendant Reynaldo Guevara to engage in the sort of investigative misconduct" alleged in this case. Brasfield relied only on complaints where allegations were made against Guevara. He relied on five complaints made against Guevara before Plaintiff's arrest in 1988. (Tab 44, Brasfield Report, p. 23-30).

**RESPONSE**: Undisputed.

76. Of the five complaints made against Guevara before Plaintiff's arrest in 1988, four of the Complaint Register files ("CR files") documenting the investigation of those complaints are incomplete. In two of the files, the investigation reveals that allegations made against Guevara were sustained. Based on these records, the sustained rate against Guevara before 1988 is 40%. (Tab 44, Brasfield Report, p. 23-30; Tab 24, Noble Report, 28-33).

**RESPONSE**: Plaintiff denies that there were only five CR complaints lodged against Guevara before 1988. As the City notes, the pre-1988 files are incomplete. For example, Leshurn Hunt complained to OPS in 1986 about his mistreatment during his interrogation by Guevara, Defendant Noon, and others, including that they beat him into making an involuntary confession. *See* Ex. 67, Letter from Leshurn Hunt to Eugene Hudson, Dated 2/28/86. Mr. Hunt's confession was suppressed and he even went so far as to sue Guevara, Noon, and others for violating his constitutional rights. *See Hunt v. Jaglowski*, 665 F. Supp. 681 (N.D. Ill. 1987).

Plaintiff admits that of the five pre-1988 CR files for Guevara produced by Defendant City, records suggest that in two of those CR files some charges were sustained against Guevara.

37

But a closer examination reveals that in CR #150473, OPS initially sustained allegations that Guevara had punched and choked Melvin Warren and called him a "nigger," and recommended a shockingly short five-day suspension for criminal acts that warrant termination. See Exhibit 145, CR #150743 at JR-JJ 027978-80. Without explanation, however, OPS then overturned the findings that Guevara had punched and choked Mr. Warren, but left intact the sustained finding that Guevara had called Mr. Warren a "nigger." *Id*. at JR-JJ 027981. The discipline was reduced in turn from a suspension to a "reprimand," communicating to Guevara that he could refer to citizens as "niggers" and face nothing more than a written reprimand. Ultimately, only 1 of the 4 allegations against Guevara was sustained. *Id*. Indeed, of the pre-1988 OPS allegations that still exist, OPS only sustained four of the twenty-one allegations against Guevara. See Exhibit 146 (CR# 124631, fourteen allegations, including that Guevara beat two citizens and called them "nigger bitch" and "nigger bastard," all unsustained); Exhibit 147 (CR# 152612, two allegations, both unsustained); Exhibit (CR# 125360, one allegations, unsustained); Exhibit (CR# 026019, seven allegations, three sustained). That works out to a 14% sustained rate, not a 40% rate. Which, regardless, stands for little. Guevara was found to have lied to OPS in CR #026019 and called a citizen a "nigger," in CR #150473, but warranted only a two-day suspension and a reprimand. All of the other misconduct, although supported by witness accounts and medical records, and included a pattern of violence against citizens and racial slurs, went unpunished. As Brasfield points out, "[i]t almost goes without saying that when a police officer is caught committing misconduct but suffers no consequences, the effect on the officer is even worse than if the officer had not been apprehended in the first place – the officer learns that the internal affairs system has no teeth, and the system fails to serve as a deterrent regarding future misconduct." Exhibit 12 (Brasfield Report) at 25. The import of the pre-1988 CR files is that

Guevara was both accused of and found to have committed very serious misconduct, but suffered no meaningful discipline whatsoever.

77. Brasfield testified that he did not review, and was otherwise unaware of the policies and procedures of CPD as it pertained to disciplining officers. Further, he professed no understanding of the division with CPD that would have been tasked with investigating allegations of misconduct in the 1980s. (Tab 45: Deposition of Brasfield at 72:5-18; 74:9-20).

> **RESPONSE**: Undisputed as to the material Brasfield reviewed, but disputed to the extent this statement makes an assertion about Brasfield's qualifications to opine. Of course, Brasfield has the expertise to review the City's practices, regardless, based on patterns of discipline, or lack thereof, of individual officers. Brasfield spent two years heading the internal affairs division of the Seattle Police Department in the 1980s and spent 41 years in law enforcement. (*See* Exhibit 12, Brasfield Report at 6.)

78. The publicly available annual reports indicate that between 1984 and 1988, Internal Affairs completed 18,672 investigations and OPS completed 11,295 investigations. Between 1984 and 1988, The Chicago Police Department imposed disciplinary actions in sustained cases by issuing an average of 216 reprimands; 372 suspensions between 1-5 days; 44 suspensions between 6-15 days; 47 suspensions between 16-30 days; and 10 suspensions of more than 30 days. During this same period, there were an average of 29 terminations per year. (Tab 24, Noble Report, p. 23, 29).

> **RESPONSE**: Plaintiff admits the allegations in this paragraph, documenting that the City sustained roughly 2-3% of the allegations of misconduct against its officers during the relevant time period. (*See* Exhibit 12, Brasfield Report at 25 n.3.) This woefully abysmal rate of sustaining allegations of misconduct against police officers simply emboldens officers, like

Defendant Guevara, to commit additional misconduct. (*Id.* at 23-24.)

RESPECTFULLY SUBMITTED,


**JACQUES RIVERA**


By: /s/ Steven Art

Steven Art

*Counsel for Jacques Rivera*


| | |
|---|---|
| Arthur Loevy | Locke E. Bowman |
| Jon Loevy | Sheila Bedi |
| Michael Kanovitz | David Shapiro |
| Russell Ainsworth | Alexa Van Brunt |
| Elizabeth Mazur | RODERICK MACARTHUR JUSTICE CENTER |
| Anand Swaminathan | Northwestern University School of Law |
| Steven Art | 375 E. Chicago Avenue |
| LOEVY & LOEVY | Chicago, Illinois 60611 |
| 312 N. May St., Ste. 100 | (312) 503-0844 |
| Chicago, IL 60607 | |
| (312) 243-5900 | J. Samuel Tenenbaum |
| | BLUHM LEGAL CLINIC |
| | Northwestern University School of Law |
| | 375 E. Chicago Avenue |
| | Chicago, Illinois 60611 |
| | (312) 503-8576 |

## CERTIFICATE OF SERVICE

I, Steven Art, an attorney, certify that on September 19, 2017, I served Plaintiff'a Response to City of Chicago's Local Rule 56.1(a)(3) Statement of Material Facts in Support of Summary Judgement on counsel of record via the CM/ECF system.

/s/ Steven Art

Steven Art

*Counsel for Jacques Rivera*

*Attorneys for Defendants Guevara, Gawrys, Noon, Guzman, Fallon, Sparks, Zacharias, McLaughlin, Leonard, Mingey, Weingart, and the Estate of Rocco Rinaldi*

James G. Sotos

Elizabeth A. Ekl

Jeffrey N. Given

Caroline P. Golden

The Sotos Law Firm

550 E. Devon Ave., Suite 150

Itasca, Illinois 60143

*Attorneys for Defendant City of Chicago*

Eileen E. Rosen

John J. Rock

Silvia M. Masters

Stacy A. Benjamin

Erin N. Bybee

Rock Fusco & Connelly, LLC

321 N. Clark Street, Suite 2200

Chicago, Illinois 60654

(312) 494-1000