**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 C 4428 |
| Plaintiff, | ) | |
| | ) | Hon. Joan B. Gottschall, |
| v. | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Hon. Mary M. Rowland, |
| | ) | Magistrate Judge |
| Defendants. | ) | |
| | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S COMBINED LOCAL RULE 56.1(b)(3)(B) STATEMENT OF ADDITIONAL
MATERIAL FACTS OPPOSING MOTIONS FOR SUMMARY JUDGMENTOF
INDIVIDUAL DEFENDANTS AND DEFENDANT CITY OF CHICAGO**

Plaintiff, by and through his attorneys, Loevy & Loevy, submits the following Local Rule

56.1(b)(3)(B) Statement of Additional Material Facts Opposing the Motions for Summary

Judgment of the Individual Defendants and Defendant City of Chicago:

**A.     JACQUES RIVERA**

1.     Jacques Rivera is a 52-year-old man who grew up in the Humboldt Park

neighborhood of Chicago. Starting in 1988, when he was just 23 years old, Rivera was wrongly

arrested, prosecuted, and convicted of the murder of Felix Valentin, a crime he did not commit.

At the time that his ordeal began, Rivera was steadily employed at the Humboldt Park Institute,

an organization next to the church his family attended that helped young people to get their

General Education Diplomas, and lived with his wife and three children. ((Ex. 1, Rivera Dep at

8:6-9, 50:3-53:9; Ex. 3, Criminal Trial Transcript,  Rivera Testimony at 66:9-24, 67:16-68:4;
Pastor Rivas Testimony, at 86:17-23.)[1]

## B.    THE SHOOTING OF FELIX VALENTIN

2.    On the 27th of August 1988, Israel Valentin and his 16-year old younger brother Felix Valentin drove to an apartment building located at 3320 West Cortland Street in the City of Chicago, Illinois. Israel exited their car and went inside the building to pick up his girlfriend, Marilyn Lopez, to attend a wedding. Felix waited in the driver's seat of the car, which was parked next to the apartment building at the mouth of an alley off of Cortland Street. (Ex. 4, Rivera Street File at Wron 12, 22, 33, 69; Ex. 3, Criminal Trial Transcript, Lopez Testimony, at 18:17, 20:4-10, 33:20-34:9, 51:12; Ex. 5, 2011 PC Hearing Transcript, Lopez Testimony at 46:9-21; Ex. 6A, Lopez Dep at 38:3-39:12, 41:6-43:5, 47:11-24.)

3.    While Israel was inside, a car with two men inside pulled up on the street, stopping close to where Felix was sitting. The passenger in the car got out, approached Felix's vehicle, and shot him eleven times in rapid succession, and then ran back to the passenger seat of the getaway car and drove away. Police communications received the call at around 3:45 pm. Israel returned to find his brother seriously wounded. He got in the car and drove Felix to Norwegian Hospital; Felix was eventually transferred to Cook County Hospital. (Ex. 4, Rivera Street File at Wron 12, 16, 22, 24, 33, 69; Ex. 6A, Lopez Dep at 48:2-6; Ex. 5, 2011 PC Hearing Transcript, Lopez testimony at 46:24-48:15.)

---

[1] Any statements or admissions contained herein are solely for purposes of adjudicating the motions for summary judgment.

## C.    FELIX VALENTIN'S HOSPITAL COURSE AND DEATH

4.    After being treated initially at Norwegian Hospital, at 7 p.m. the evening of August 27, 1988, Valentin was transferred to Cook County Hospital for surgery. Hospital records and the testimony of Dr. Sharkey, the resident who treated Valentin, reflect that Valentin was able to communicate with treaters and react to stimuli, and accept family visits for approximately a week after the shooting. Police records reflect an interview with Valentin at Cook County on the early morning hours of August 31. (Ex. 4, Rivera Street File at Wron 31-33, 34-36; Ex. 7, Medical Records at CPD 249-816, JR-L 8497-9160; Ex. 8A, Sharkey Dep at 92:21-95:24)

5.    Valentin developed pneumonia around September 4, and his condition began to worsen rapidly. A few days later, his health was dramatically worse. By the evening of September 9, Valentin was confined to a roto-bed, which moved him constantly; he could not breathe on his own and was fully intubated on a breathing machine; he was on a medication that paralyzed him so he would not kick the ventilator; he was completely unresponsive to deep pain stimuli and to verbal stimuli; and his pupils were not reacting to light. (Ex. 8A, Sharkey Dep at 28:9- 53:1; Medical Records at CPD 596, 611, 612, 732.)

6.    On September 10, all of these symptoms of Valentin's comatose condition continued unabated, his neurological functioning had been substantially suppressed by medication, and he was suffering from an Acinetobacter infection that was impossible to treat. (*Id.*; *see also* Ex. 8A, Sharkey Dep at 32:3-36:18, 51:15-53:1, 55:9-57:2; Ex. 7, Medical Records at CPD 729-31, 617-32.)

7.    On September 14, 1988, just before midnight, Valentin died. (Ex. 4, Rivera Street File at Wron 12.) There is no indication that Valentin regained consciousness or responsiveness between September 9, 1988, and his death. (Ex. 8A, Sharkey Dep at 34:18-23.)

D.      **POLICE INTERVIEWS WITH FELIX VALENTIN AND THE
        IDENTIFICATION OF JOSE RODRIGUEZ AND FILIPE NIEVES**

8.      On August 27, 1988, responding police units who arrived at Norwegian Hospital were furnished with descriptions of the suspect and his "getaway" driver. According to the police report, Felix Valentin described both subjects as Hispanic males between the ages of 16 and 18, and reported that they were driving an older brown vehicle – possibly a Toyota hatchback. Felix also related that the suspect had been wearing a yellow baseball hat and was of light to medium complexion. (Ex. 4, Rivera Street File at Wron 44.)

9.      Defendants Gillian McLaughlin and John Leonard were the principal detectives working the case. Defendants Reynaldo Guevara and Stephen Gawrys were the lead gang crimes specialists working the case. (Ex. 9A, McLaughlin Dep at 201:6-8; Ex. 10, Noon Dep at 153:2-7.)

10.     Defendants McLaughlin and Leonard responded to the hospital at 5:15 p.m. on August 27 to interview Felix and Israel Valentin. They created a general progress report and police report reflecting their investigation at the hospital. The August 27 general progress report, signed by Defendants Leonard and McLaughlin, related Israel's description of the events surrounding the shooting, but does not contain a description of the suspect or getaway driver. It also contains information that Marilyn Lopez's 12-year old younger brother, Orlando "Macho" Lopez, may have observed some portion of the shooting, but had not yet been interviewed. (Ex. 4, Rivera Street File at Wron 69; Ex. 5, 2011 PC Hearing Transcript, Lopez Testimony, at 40:15-41:7, 70:13-71:11.) (Ex. 4 Wron 32-33, 68-69; Ex. 5, 2011 PC Hearing Transcript, McLaughlin Testimony, at 110:17-11:18)

11.     The August 27 police report contains a description of the suspect: Hispanic male between the ages of 18-22 with brown eyes, dark hair, a black jean jacket, dark pants, and gym

4

shoes. It also contains a description of the getaway driver: Hispanic male between the ages of 18-22. The description is not attributed to any person and the report does not describe the origin of the description. This description does not appear in the general progress report and is different than the description reported by responding police units. ((Ex. 4, Rivera Street File at Wron 31-Wron 33; *Compare* ¶¶ 8, 10, 11, *supra*.).

**E.    DEFENDANTS SUPPRESS THE INVESTIGATION OF JOSE RODRIGUEZ AND FILIPE NIEVES**

12.    Tactical officers Letrich and Moriarty interviewed Felix Valentin at the hospital on August 30, 1988. Felix stated that the two suspects were members of the Imperial Gangsters street gang. The officers then presented an Imperial Gangster photo album ("mug book") to Felix, who identified the shooter as Jose Antonio "Chequin" Rodriguez, and the driver of the getaway car as Filipe Nieves. (Ex. 4, Rivera Street File at Wron 39; Ex. 3, Criminal Trial Transcript, Letrich Testimony at 56:15-57:13.)

13.    Based on the identification provided by Felix, Rodriguez was arrested three blocks from the scene of the shooting at 1 a.m. on August 31, 1988 by Officers Moriarity, Vergara and Wojcik as the suspect in the shooting. A hold dated August 31, 1988 was placed on Rodriguez. The hold stated that a line-up was to be viewed by the witness in the case, Orlando Lopez, and that officers expected to charge Rodriguez with aggravated assault on Felix Valentin by 1 a.m. on September 2, 1988. (Ex. 4, Rivera Street File at Wron 58 (arrested at 0100 hours, at 2040 N. Spaulding, three blocks from Cortland and Kimball), 59; Ex. 5, 2011 PC Hearing Transcript, McLaughlin Testimony at 121:10-17; Ex. 3, Criminal Trial Transcript, Letrich Testimony at 57:18-58:16.)

14.    A lineup photograph of Rodriguez was taken on August 31, 1988. The photograph is one of a group of six lineup photographs of six different individuals. The six individuals

depicted in the photographs are the six individuals listed on Defendant Leonard's August 31, 1988 general progress report. The photographs also correspond to the photograph evidence form dated August 31, 1988, at 11:45 p.m. Rodriguez was then released later on August 31, 1988. (Ex. 11, RFC 1415-1420; Ex. 4, Rivera Street File at Wron 62-64; Ex. 3, Criminal Trial Transcript, Letrich Testimony at 58:6-59:3.)

15.     There is no reference in the entire police file to any interview of Rodriguez or Nieves. There is also no record of efforts to determine whether Rodriguez or Nieves had an alibi for the date and time of the shooting of Felix Valentin. These are typical investigative steps, and the evidence related to those investigative steps was, and remains, suppressed. (Ex. 12, Brasfield Report at 21; Ex.16, Ex. Wadas File (not contained therein);Ex. 19A, Wadas Dep at 64:8-16, 75:8-17, 140:11-16; Ex. 9A, McLaughlin Dep at 195:8-200:21, 205:3-08:23.)

16.     The only other reference to Rodriguez or Nieves in the entire police file is in a September 16, 1988 police report prepared by Defendants Guevara and Gawrys. That police report, which states that they showed photographs of Rodriguez and Nieves to Orlando Lopez, presumably around the time of the live lineup on September 15 (since that is the next time Lopez was with the police), is full of fabrications. (*See* ¶¶65-66, 25-28, 45-48, ,48-49, *infra*; Ex. 4, Rivera Street File at Wron 09-10.)

F.     **THE EYEWITNESS ACCOUNT ORLANDO LOPEZ**

17.     Other than Felix Valentin himself, there was a single known eyewitness to the shooting named Orlando Lopez. He was the younger brother of Marilyn Lopez, whom Israel Valentin had come to see. At the time, Lopez was 12 years old. (Ex. 4, Rivera Street File at Wron 53; Ex. 17, JR 964; Ex. 18, JR 978; Ex. 6A, Lopez Dep at 26:24-27; Ex. 5, 2011 PC Hearing Transcript, Lopez Testimony, at 46:20-47:17.)

1. **Lopez's Different Accounts Given to Police**

18.     Lopez was interviewed for the first time on August 29, 1988 by Defendants McLaughlin and Leonard. (Ex. 4, Rivera Street File at Wron 29-30; 32-33 (Aug 27 police report, submitted at 11:55 p.m. on that date, does not contain any reference to questioning 12 year-old Orlando Lopez); *see* ¶¶ 23-24, *infra*.) Their report states that Lopez communicated the following:

> LOPEZ was coming from the store at corner of Kimball and Cortland. LOPEZ observed a copper colored GM-type car coming out of the alley, traveling northbound at approximately 3319 W. Cortland. LOPEZ indicated that said vehicle contained 2 M/WH's one of whom exited from the passenger's side of the vehicle and began to walk toward 3320 W. Cortland where the victim was seated behind the wheel of his vehicle. Suddenly, the M/WH began to run toward vehicle and LOPEZ noticed a gun in M/WH's hand. LOPEZ believed he heard three (3) shots but indicated that they were not very loud. LOPEZ indicated that LOPEZ saw the victim lean forward and to the right in the vehicle which victim had been seated.

> LOPEZ informed R/D's that LOPEZ could identify the shooter because LOPEZ recognized the shooter as a M/WH who played baseball at Humboldt Park and LOPEZ had observed him there on a few occasions. LOPEZ did not know shooters name but was aware that shooter was affiliated with the Latin Kings. LOPEZ then viewed books and made an identification of one RIOS, Jose (16-D LATIN KING Page 40D) as the M/WH who exited the copper car and shot the victim. At this time there is no identification of the driver.

(Ex. 4, Rivera Street File at Wron 29-30.)

2. **Changes in Lopez's Accounts in Later Testimony**

   a. **1990 Trial Testimony**

19.     At trial, Lopez gave a very different account of what happened than was documented in Defendants McLaughlin and Leonard's August 29, 1988 police report. (*Compare* ¶ 23, *infra* and Wron 29-30 *with* ¶¶19a-h, *infra*.) Lopez's trial testimony about how he came to be able to see the shooter and make an identification defies common sense and reason:

   a. Lopez testified that when the shooting occurred, he was going outside to go the store on the corner, which was approximately half a block away, at the corner of Cortland and Kimball. (Ex. 3, Criminal Trial Transcript, Lopez testimony at 18:8-19:16.)

b. Lopez testified that just as he came out of the house, there were a series of approximately four shots being fired by the shooter at Felix's car, which was in the alley right next to Lopez's apartment building. The shooter's back was facing Lopez, and so he could not see who the shooter was. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 19:12- 21:12, 34:7-11; 35:19-24, 43:16-23.)

c. Lopez testified that when he heard the shots, he ran the approximately half a block to the corner store, went inside and told the owner of the store to call the police. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 19:14-16, 23:11-13, 36:1-10, 43:16-23.)

d. Lopez testified that the store owner did not want to call the police, so Lopez ran the half block back toward the shooting and hid in a "dent" next to his building. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 23:11-24:21, 36:1-18, 44:17-23.)

e. Lopez testified that the process of running to the store, talking to the store owner, and running back took approximately 25 seconds – ten seconds to get to the store, five seconds in the store, and another ten seconds to run back toward the shooting and hide. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 44:12-45:5.)

f. Lopez testified that after this approximately 25 seconds, the shooter was still there, and Lopez saw him shoot one final shot and then run back to the passenger door of the car and got in. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 24:22-25:4, 45:6-8.)

g. Lopez testified that it was at this point, right before shooter got back in the car, that the shooter stopped and looked around, and that Lopez saw the shooter's face for the first time. He only saw the shooter's face "for a very brief moment," from approximately 25-30 feet away. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 25:23-26:8, 38:8-21, 42:10-21, 49.)

h. Nevertheless, Lopez testified that he got a clear view of the shooter and recognized the shooter as someone he had seen two or three times before playing basketball at Humboldt Park. Lopez also testified that the shooter had a ponytail dyed gold. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 22:15-19, 26:15-27:2; RFC 971:15-972:2, 986:22-987:5.)

### b. 2010 Affidavit

20. In 2010, Lopez was visited by lawyers from the Northwestern University Center for Wrongful Convictions. He spoke with the investigators and signed a sworn statement regarding his knowledge of the shooting. (Ex. 20, Lopez Affidavit at 44736-39.) He stated as follows:

a. For years and years, Lopez had avoided telling anyone that he had lied at Rivera's criminal trial when he identified Rivera as the shooter, not even Israel Valentine. When investigators came to see him in 2010, however, the burden of the lie had grown to be too much, and Lopez wanted to set the record straight. (*Id.* at ¶ 17, 18.)

b. Lopez admitted that Rivera was not the person he had seen shoot Felix Valentin, and that the shooter was not someone he knew or had seen before. (*Id.* at ¶¶ 9, 13.)

c. He also admitted that he had seen two separate in-person, live lineups, the first one just a few days after the shooting. (*Id.* at ¶¶ 12, 14.)

d. About a week after the shooting, after the first lineup, he saw the actual shooter near Funston Elementary School, wearing the same black jacket as the shooter, and that he observed this person give the Imperial Gangsters handshake to another man. (*Id.* at ¶ 13.)

### c. 2011 Post-Conviction Hearing Testimony

21. In 2011, Lopez testified at a post-conviction hearing regarding Mr. Rivera's innocence. At that hearing, Lopez affirmed the statements above from his 2010 affidavit and stated that had not been pressured or threatened by the investigators who came to see him in 2010. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony, at 66; *see* ¶¶20a-d, *infra*.) He stated as follows:

a. Up to that point, he had never told his sister or any of the Valentins, and he did not come forward at the time of the trial because he was worried about being liked and how it would be perceived. But by the time the investigators came in 2010, he was feeling regret and wanted to correct the wrong and be able to "look at himself in the mirror." (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony at 67:23-68:18, 90:5-91, 94.)

b. This time, Lopez testified that he had seen the shooter's face not just once but twice: once when the shooter looked around after firing the last shot, and then again after he ran to the car. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony at 48.)

c. Lopez testified that his testimony that Rivera was the person who shot Felix Valentin was a lie. He did not recognize the shooter at the time, and had never seen him before. His trial testimony that the shooter was someone who played ball at Humboldt Park was false. The story was fed to him by the police. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony at 43-44, 49, 93.)

d. He viewed two live lineups. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony at 54.)

e. After the first lineup, Lopez saw the actual shooter near Funston School. He has no doubt the person he saw was the actual shooter. The person had the same black jacket and hair style, and his face is imprinted in Lopez's head. He saw the actual shooter perform the Imperial Gangsters handshake. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony at 56-58.)

## G. DEFENDANTS FRAME RIVERA BY FABRICATING AND SUPPRESSING EVIDENCE

### 1. Defendants Make Rivera the Suspect Before Any Witness Implicates Him In the Crime

22. The record demonstrates that Defendants considered Rivera a suspect on August 27, 1988, the day of the crime, before any eyewitness ever implicated him in the crime. On that day, the Defendants requested Rivera's arrest history report, or rap sheet, from the Chicago Police Department's central records division, which was produced to the Defendants with a stamp that reads, "Issued on Inquiry, Aug 27 1988." That stamp means that an officer requested that person's rap sheet on or before that date. (Ex. 4, Rivera Street File at Wron 55; Ex. 22, Machain Dep at 50; Ex. 10, Noon Dep at 144; Ex. 23A Mingey Dep at 166:20-167:1; Ex. 24A, Guevara Dep at 16:15-20, 17:4-9, 18:6-9136:6-139:4, 143:8-21; *see also, e.g.,* ¶¶ 73-86, *infra*.)

23. However, Lopez first identified Rivera in a mug book on August 29, 1988, two days later. Indeed, multiple police reports state that Lopez selected Rivera from a mug book on August 29, 1988. The police file lacks any investigative basis for Rivera to have been on the Defendants' radar prior to Lopez's August 29, 1988 mug book identification. (Ex. 4, Rivera Street File at Wron 09 (Sept. 16 supplemental report stating that Defendants "located a witness on 29 Aug 88 [who] was brought into Gang Crimes North to view mug book photos."), *id.* at Wron 29-30; Ex. 25A, Gawrys Dep at 236:3-4.)

24. Defendants McLaughlin and Leonard's police reports and investigative notes indicate that they had not interviewed Orlando Lopez on August 27 or August 28, 1988, let alone

10

shown him mug books on those dates. For example, Defendants McLaughlin and Leonard created a police report dated August 27, 1988, at 11:55pm, documenting their investigative efforts that day. That police report omits any reference to Orlando Lopez, Lopez's supposed identification of Rivera from a gang book, or any reference to Rivera whatsoever. Likewise, their August 27, 1988 general progress report explicitly states that Orlando Lopez had not yet been interviewed. (Ex. 4, Rivera Street File at Wron 31-33, 69.)

**2. Defendants Told Lopez Who To Pick From the Mug Books And Fabricated the Claim That The Shooter Played Ball at Humboldt Park**

25.    Defendants Noon, Guzman, Sparks, Zacharias, Leonard and McLaughlin were involved in initial conversations with Lopez, and along with Defendants Noon, Guzman, Sparks, and Zacharias – all gang crimes officers – showed him mug books of Latin Kings, from which he made a purported identification of Rivera. Defendants Guevara and Gawrys were also there when Lopez went through the mug books. (Ex. 4, Rivera Street File at Wron 09-10 (Noon, Guzman, Sparks, Zacharias involved in mug book identification), *id* at 29-30 (Leonard and McLaughlin police report stating that Lopez looked at mug books, listing photo he  identified and stating that Lopez told them the shooter played ball at Humboldt Park); Ex. 26, Leonard Dep at 73:21-74:20, 80 (acknowledging spoke to Lopez and directed mug book procedure); Ex. 9A, McLaughlin Dep at 185:4-188:23-90; Ex. 25A, Gawrys Dep at 236:3-37:11; Ex. 27, Sparks Dep at 79:6-14, 90:17-91:1795:14 (admitting he and Zacharias were there when Lopez went through books), 94:4-20 (Guevara and Gawrys present); Ex. 24A, Guevara Dep at 18:17-19:11, 21:8-13.)

26.    Consistent with the fact that the Defendants had requested Rivera's arrest history report two days earlier, (*see* ¶¶ 22, *supra*), Defendants Noon, Guzman, Sparks, Zacharias, Guevara and Gawrys manipulated Lopez into identifying Rivera from the gang book by showing him Latin King mug books and telling Lopez who to pick from the mug book. (Ex. 5, Transcript

of 2011 PC Hearing in *People v. Rivera*, case no. 88CR15436, Lopez Testimony at 49:10-50:12, 93:13-18 ("Because, you know, what happened was the cops were like, *when they pointed him out*, they were asking me have you seen him playing baseball or have you see him anywhere else; and I said, yes, that was the reason why I said that I seen him playing baseball in the park." (emphasis added); Ex. 24A, Guevara Dep at 18:17-19:11, 21:8-13, 158:15-23, 181:6-15, 182:10-19, 184:15-24, 189:6-12, 203:14-204:1.)

27.     In addition, Defendants Noon, Guzman, Sparks, Zacharias, Guevara and Gawrys fed him the story that the shooter was someone who played baseball at Humboldt Park. Lopez had never seen the shooter before, and he did not recognize the shooter as someone he had seen playing ball at Humboldt Park. His testimony to that effect was a lie. (Ex. 5, 2011 Rivera Post-Conviction Hearing Transcript, Lopez Testimony, at 49:6-12, 93:3-18 ("Because, you know, what happened was the cops were like, when they pointed him out, *they were asking me have you seen him playing baseball or have you see him anywhere else; and I said, yes, that was the reason why I said that I seen him playing baseball in the park.*" (emphasis added); Ex. 6A, Lopez Dep at 18:3-13, 58:21-59:3; Ex. 24A, Guevara Dep at 170:1-23.)

28.     There is also a complete lack of reliable evidence supporting the purported mug book identification made by Orlando Lopez of Rivera. (Ex. 25A, Gawrys Dep at 33:22-35:24 (stating that when a mug book identification is made, the gang crimes officers conducting the photo lineup should prepare a supplementary report documenting the identification; no such documentation exists here); Ex. 4, Rivera Street File at Wron 53 (general progress report referencing Lopez and has the date August 27 on it, as well as the dates August 28 and August 29, but no reference to a mug book or mug book identification); *compare* Ex. 4, Rivera Street File at Wron 09 (mug book ID conducted by Defendants Noon, Guzman, Sparks, Zacharias, at

Gang Crimes North) *with* Wron 29-30 (conducted by Defendants Leonard and McLaughlin, without reference to location); Ex.4 Rivera Street File at Wron 1-69 (mug book photo purportedly selected not contained therein); Ex. 25A, Gawrys Dep at 42:10-20 (doesn't preserve mug book photos after identification).)

### 3. Defendants Hold A First Live Lineup in Which A Filler Is Selected (and Cover Up Its Results and Its Connection to the Valentin Investigation)

#### a. First Lineup on August 31, 1988

29.     An undisclosed first, live lineup in which Rivera was a suspect was viewed by Orlando Lopez on or about August 31, 1988. Although the police reports indicate that Lopez viewed a single lineup on September 15, 1988, Lopez actually viewed two lineups containing Rivera. (Ex. 6A, Lopez Dep at 18:3-19:5, Lopez Dep at 80:11-82:8 (describing a first lineup to a tee: taken to police station by a detective, put in a separate room from the lineup participants, and looked through a glass window and made an identification); Ex. 3, Criminal Trial Transcript, Lopez testimony at 42:22-43:2 (it was "few days" after shooting); Ex. 20, Lopez Affidavit at ¶¶ 12 (first lineup was "[w]ithin a few days of the shooting"), 14; Ex. 5, 2011 PC Hearing Transcript, Lopez testimony at 54:1-3; Ex. 1, Rivera Dep at 166:2-68:15, Ex. 24A, Guevara Dep at 26:2-8.)

30.     Consistent with the occurrence of the first, live lineup on or about August 31, 1988, the two suspects in the case at that time – Jacques Rivera and Jose Rodriguez – were both in police custody on August 31, 1988. They had been arrested on August 30 at 11pm and August 31 at 1am, respectively. (Ex. 4, Rivera Street File at Wron File 35, 52, 56, 58.)

31.      The Defendants wanted Lopez to view a lineup on the night of August 30, around 11pm, but Lopez's mother said he was already asleep and she wanted the lineup to wait until the daytime. Accordingly, Defendants planned to conduct the lineup the next day, August 31,

instead, and gathered fillers on that date. (Ex. 26, Leonard Dep at 90:1-92:17, 278:17-80:5; Ex. 9A, McLaughlin Dep at 213:10-14:9, 228:3-30:24.)

32.     Police reports from August 30 all indicate that a live lineup would take place on August 31, 1988. Plaintiff was arrested on August 30 by Defendants McLaughlin, Leonard, Guevara, Zacharias, Sparks, and Fallon; the arrest report stated that Lopez was not available on August 30, and so hold papers had been submitted so Lopez could view "a physical lineup which will be held on 31 Aug. 88." The August 30 hold request for Rivera prepared by Defendant Leonard stated that Lopez "will not be available until tomorrow's date," and that Rivera, "is expected to be charged with Aggravated Battery upon completion of the investigation at 1900 hours on 31 Aug 88." The August 31 hold request for Jose Rodriguez stated that "a lineup must be viewed by the witness," and that "it is expected that the prisoner will be charged with Aggravated Battery when the investigation is completed at 0100 hours on 2 Sep88."  (Ex. 4, Rivera Street File at Wron File 56, 57, 59.)

33.     Rivera and Rodriguez were then abruptly released on August 31, 1988. Rivera was released after being in the first of two lineups. The release reports for Rivera and Rodriguez were signed by Defendant Leonard. For the reasons set forth herein, the release report for Rivera falsely stated that they "were unable to locate the witness for a lineup." (Ex. 1, Rivera Dep at 166-68; Ex. 4, Rivera Street File at Wron File 52, 63.)

34.     Testimony from Villafane, Olivero, and Ruiz also indicates that there was a first, live lineup on August 31, 1988. Ruiz testified that he had been in a lineup *for the shooting of Felix Valentin*, who was a friend of Ruiz. Villafane testified that he was in a live lineup in the summer of 1988, and that it is the only time he participated in a lineup in his life. Olivero also testified that he participated in a live lineup for a gang shooting in the summer of 1988, the only

lineup he had ever been in. (Ex. 28A, Ruiz Dep, at 26:14-27:24; Ex. 29A, Villafane Dep at 13:19-15:22; Ex. 30A, Olivero Dep at 13:20-14:14, 20:13-23, 59:9-19.)

35.     These fillers believed that they were participating in a live lineup viewed by a witness. (Ex. 30A, Olivero Dep at 42:12-24 (saying they lined up and faced the mirror), 52:3-23 (he could hear people on the other side of the mirror); Ex. 28A, Ruiz Dep at 30:1-31:11 (officers pulled up and asked if he wanted to be in a lineup), 57:11-58:3 (they were told to look forward, turn to the right, turn to the glass, then go back to their spot in line); Ex. 29A, Villafane Dep at 20:7-13 (they said to look at the mirror, someone would be on the other side watching).

36.     The police file includes a fabricated September 1 police report prepared by Defendants McLaughlin and Leonard stating that the six lineup participants did not participate in a live lineup but instead were participants in a photo array, whereby the Defendants organized a lineup, rounded up fillers, took photographs of the six participants, and then took the photos to the victim at the hospital for identification. (Ex. 4, Rivera Street File at Wron File 34-36.)

37.     In reality, no photos were taken to the victim for identification. There was no reason to bring a bunch of fillers into the station just to create a photograph array to show the victim. Area 5 detectives and gang crimes officers already had numerous photos to use for photo arrays – in a drawer in the detective division, and in boxes and mug books in the gang crimes offices – all of which could be used for a photo array. This was the process by which photo arrays were conducted, not the procedure Defendants claim they used in the Valentin investigation. (Ex. 9A, McLaughlin Dep at 226:3-27:16; Ex. 25A, Gawrys Dep at 48:9-49:21; Ex. 10, Deposition of Edward Noon at 84:10-88:24; Ex. 23A, Mingey Dep at 114:12-116:17.)

38.     Finally, Defendant Leonard admitted that he only spoke to the victim once, on the night of the shooting, meaning he could not have shown a photo array to the victim on August 31. (Ex. 26, Leonard Dep at 53:4-15, 54:13-15, 55:2-21.)

b.   *Lopez Selects Filler in August 31, 1988 First Lineup*

39.     In the first lineup on August 31, 1988, Lopez made an identification. However, Lopez is mistaken when he says that he selected Rivera in that lineup; he did not select Rivera or Rodriguez, and instead selected one of the "fillers," since after the lineup, Rivera and Rodriguez were both promptly released. (Ex. 5 2011 PC Hearing Transcript, Lopez Testimony at 56-58; Ex. 4, Rivera Street File at Wron File 52, 63; Ex. BBBB, Criminal Trial Transcript, Letrich Trial Testimony, at 58-59; Ex. 1, Rivera Dep at 166:1-68:15; Ex. 9A, McLaughlin Dep at 264:7-16; Ex. 12, Brasfield Report at 71-72.)

40.     The existence of this first August 31 lineup and the selection of a filler were concealed from Rivera by Defendants McLaughlin, Leonard, Guevara, Fallon, Sparks, and Zacharias. They were all involved in the investigation during August 30 and 31 when the suppressed first lineup and fabricated photo array at the hospital occurred, including Plaintiff's arrest and the preparation of a live lineup. (Ex. 4, Rivera Street File at Wron File 34-36 (listing arresting officers), Wron 56 (same); Ex. 9A, McLaughlin Dep at 285:2-86:8; Ex. 31, Fallon Dep at 105:15-06:2; Ex. 24A, Guevara Dep at 33:8-23-34:17.)

41.     In addition, Defendant Guevara in particular was heavily involved in handling Lopez through the rest of the investigation, including picking him up and taking him to the first lineup. (Ex. 6A, Lopez Dep at 75:19-77:24; Ex. DDDD, 2011 PC Hearing Transcript, McLaughlin Testimony at 123:9-24:2; Ex. 24A, Guevara Dep. At 130:14-19, 282:7-14.)

16

      *c.   Rivera and His Counsel Are Unaware That August 31, 1988 Lineup Related to Valentin Investigation and Filler Was Selected*

42.    Rivera knew that he had been in two live lineups in late August and September 1988, but he and his counsel had no way of knowing or proving that the first lineup was related to the Valentin investigation, that the person viewing the lineup was the eyewitness Lopez, and that he was a suspect and not a filler. Before the first lineup, no one asked Rivera any questions about a crime or told him what crime he was standing in the lineup for, or who was viewing the lineup. In addition, before the first lineup, Guevara had asked Rivera to be a filler in a lineup. (Ex. 1, Rivera Dep at 136:11-37:14, 166:-68:18, 186:16-23, 248:7-11; Ex. 19A, Wadas Dep at 106:19-107:7, 109:8-10, 114:4-23, 244:14-247:21, 109:8-10, 114:10-23, 244:14- 247:21; Ex. 32, Matarazzo Dep at 61:1-16; Ex. 24A, Guevara Dep at 41:20-24:2, 209:23-210:4.)

43.    The police file contains no reference to a first lineup, and the documents that would have allowed Rivera or his attorney to confirm that Rivera was in a first lineup related to the Valentin investigation were all suppressed from Rivera and his defense attorney: the Rivera and Rodriguez arrest reports, hold reports, and release reports; the photos of the six lineup participants; and the general progress report listing the six lineup participants. (Ex. 4, Rivera Street File at Wron File 01-69 (no reference to Aug 31 lineup); Ex. 16, Wadas File (no reference to Aug 31 lineup and none of these suppressed documents); Ex. 19A, Wadas Dep at 94:10-18, 114:4-23, 244:14-247:21; Ex. 12, Brasfield Report at 70-72 (listing withheld documents).)

44.    In addition, neither Rivera nor his defense attorney was ever told that a filler was selected in the first lineup. (Ex. 1, Rivera Dep at 166-68; Wron 01-69 (no such statement); Ex. 20, Bluhm 044729-31 (Nov. 8, 2010 Verified Petition for Post-Conviction Relief Based on

Actual Innocence (stating that 20 years later evidence has first emerged that Lopez viewed an earlier lineup and did not select Rivera); Ex. 19A, Wadas Dep at 247:1-21.)

### 4. Defendants Fabricate An Eyewitness Identification of Rivera from Felix Valentin

45.     A police report dated September 16, 1988 (after Valentin's death), prepared by Defendants Guevara and Gawyrs, stated that on September 10, 1988 they went to Cook County Hospital and showed Felix Valentin a mug book, from which Felix made an identification of Rivera. This is the first and only instance in which there is a reference in the police file to an identification of Rivera by the victim (Ex. 4, Rivera Street File at Wron File 09-10; Ex. 25A, Gawrys Dep at 242:2-26; Brasfield Report at 17.)

46.     Felix's purported identification of Rivera never happened. As set forth above, between September 9 and his death on September 14, Valentin was in effect in a comatose condition – among other things, he could not breathe on his own and was fully intubated on a breathing machine; he was on a medication that paralyzed him, and he was completely unresponsive to deep pain stimuli and to verbal stimuli; and his pupils were not reacting to light. Consistent with the medical records, Dr. Sharkey testified without any contradiction that Valentin could not have spoken to another person, he could not have looked through a photo album, and he could not even have communicated with eyes on September 10, 1988. (*See* ¶¶ 4-7, *supra*; Ex. 8A, Sharkey Dep at 55:9-57:2; Ex. 24A, Guevara Dep at 307:6-12, 357:6-13; Ex. 76, Guevara Answer to Fourth Interrogatories, No. 3 (asserting Fifth Amendment right in response to question about claim in Sept 16 report regarding Valentin's purported Sept 10 identification).)

47.     A witness identification is an important investigative breakthrough, and it would be documented the same day and shared with detectives; that the victim identified the suspect on September 10, but this is not documented anywhere for another six days, is highly suspect and

contrary to practice. (Ex. 25A, Gawrys Dep at 197:19-98:17 (a witness identification is "big

stuff" and so you would want to notify detectives), 245 (should have submitted report the same

day, no explanation for why he did not); s*ee also* ¶¶ 65-66, *infra*.).

###### 5.   Defendants Fabricate That Lopez Viewed Photos of Alternate Suspects Rodriguez and Nieves and Ruled Them Out

48.     The September 16, 1988 police report prepared by Defendants Guevara and

Gawyrs also stated that Lopez was shown photos of alternate suspects Jose Rodriguez and Felipe

Nieves, and confirmed that they were not the perpetrators. The police report does not state when

or where this occurred. (Ex. 4, Rivera Street File at Wron File 10.)

49.     This portion of the September 16, 1988 police report is also fabricated. Lopez was

not shown photographs at the time of the September 15 lineup or after it, and was never shown a

photograph of Jose Rodriguez or any other members of the Imperial Gangsters. (Ex. 6A, Lopez

Dep at 177:1-21; Ex. 3, Criminal Trial Transcript, Lopez Testimony, at 48:9-49:8 (stating that he

was never shown photograph of Rodriguez, and has no recollection of being shown photographs

at or after September 15 lineup); Ex. 6A, Lopez Dep at 177:1-21 (stating he was not shown any

photographs other than the mug book he viewed early in the investigation); Ex. 20, Lopez

Affidavit, at ¶¶ 16; Ex. 25A, Gawrys Dep at 118:21-24, 251:2-4 ("Q: When did you show

photographs to Lopez, A: I don't remember doing it."); Ex. 24A, Guevara Dep at 356:5-11,

375:12-19.)

###### 6.   Defendants Suppress Orlando Lopez's Statements That Rivera Was Not the Perpetrator

50.     As set forth above, about a week after the shooting, Lopez saw the actual shooter

near Funston Elementary School. The person was wearing the same black jacket as the shooter,

and he observed this person give the Imperial Gangsters handshake to another man. It was not

Jacques Rivera. (*See* ¶¶ 20d, 21e, *supra*; Ex. 20, Lopez Affidavit at ¶ 13; Ex. 6A, Lopez Dep at

17:14-16, 87:24-90:16.)

51.     On September 15, Lopez was taken to the police station to view a live lineup

containing Rivera. That lineup was conducted by two detectives, along with Defendants Guevara

and Gawrys. Defendant McLaughlin was present throughout the entire second lineup as well.

(Ex. 4, Rivera Street File at Wron File 49-50; Ex. 33, Boyle Dep at 159:7-12; Ex. 34, Dorsch

Dep at 250:21-251:6; Ex. 24A, Guevara Dep at 325:7-13.)

52.     Right before Lopez viewed the live lineup on September 15, 1988, he told at least

two people at the police station that Rivera "was the wrong guy" and had not committed the

crime. He also told them about what he had learned, that is, that the shooter was an Imperial

Gangster and a "neighborhood guy." Lopez repeated himself twice. (Ex. 20, 2010 Affidavit of

Orlando Lopez, Ex. 20, Lopez Affidavit at ¶ 14; Ex. 5, Transcript of 2011 PC Hearing in *People*

*v. Rivera,* case no. 88CR15436, Lopez Testimony, at 60:5-9, 62:1-11; Ex. 24A, Guevara Dep at

22:7-11, 23:3-11.)

53.     Lopez told this information to at least two people at the station: an older woman

with white or blonde hair, and a Latino man with mustache, glasses, and an afro. (Ex. 5,

Transcript of 2011 PC Hearing in *People v. Rivera* , case no. 88CR15436, Lopez Testimony, at

59:23-60:9; 62:1-13; Ex. 5, Transcript of 2011 PC Hearing in *People v. Rivera* , case no.

88CR15436, Estes Testimony at 172: 2-21; Lopez Dep at 95:5-96:9.)

54.     The white haired lady was Defendant McLaughlin. She was the principal

investigator on the case, and had light blonde hair matching the description. In addition, she was

the only female police officer involved with the case. (Ex. 25A, Gawrys Dep at 174:9-15; Ex. 4,

Rivera Street File at Wron File 49-50; Ex. 9A, McLaughlin Dep at 201:6-8; Ex. 4, Rivera Street

File at Wron File 01-69 (McLaughlin only female officer referenced in police file); Ex. 24A,

Guevara Dep. at 23:3-11, 325:7-13.)

55.     The only other woman involved in the investigation or prosecution of the case

was an Assistant State's Attorney, Julie Rosner, but she was not involved in the lineup, was 31 at

the time, and had brown hair. (Ex. 25A, Gawrys Dep at 165:16-66:4; Ex. 35A, Rosner Dep at

16:17-17:4-; Ex. 4, Rivera Street File at Wron File 01-69 (McLaughlin and Rosner only female

law enforcement officials referenced in police file).)

56.     The Latino man with mustache, glasses and an afro was Defendant Guevara, who

matched the description at the time. Guevara is also listed, along with his partner Defendant

Gawrys as present for the September 15 lineup. (Ex. 5, 2011 PC Hearing Transcript, McLaughlin

Testimony at 123:13-24:2; Ex. 4, Rivera Street File at Wron 49-50; Ex. 24A, Guevara Dep. at

23:3-11, 104:12-105:17; Ex. 36A, Melendez Dep at 30:6-19; Ex. 37, Photo of Reynaldo

Guevara at JR-L 63213.)

57.     None of the Defendants that heard Lopez's statement, including Defendants

McLaughlin and Guevara, took steps to call off the lineup. Instead, Defendants suppressed

Lopez's exculpatory statements and withheld that information from Rivera and his defense

attorney, who, if provided with this information could have impeached the sole eyewitness's

identification and prevented the State from arguing (as it did) that Lopez was unwavering in his

identification. (Ex. 4, Rivera Street File at Wron File 01-69 (no reference to Lopez exculpatory

statement); Ex. 16, Wadas File (no reference to Lopez exculpatory statement); Ex. 38, Affidavit

of Kenneth Wadas, at JR2379 ¶ 9;Ex. 19A, Wadas Dep at 246:11-249:24.)

**7.     Defendants Secure An Identification of Rivera from Orlando Lopez That They Know to Be False**

58.     Despite what Lopez had told them, Defendants, including Guevara and McLaughlin, "did not "want[] to hear what [Lopez] had to say." They did not ask Lopez what happened, or why he thought he had the wrong guy, or what was motivating him. They told Lopez that he should not be afraid to identify Rivera and that they would "protect him" if he went ahead and identified Rivera. (Ex. 20, 2010 Affidavit of Orlando Lopez, Bluhm 44738 at ¶ 14; Ex. 5, 2011 PC Hearing Transcript, Lopez Testimony, at 60:10-15.)

59.     Lopez's protestations that Rivera was innocent fell on "deaf ears." Rather than listen to Lopez and take his statements seriously, Defendants Guevara and McLaughlin manipulated and coerced Lopez into going forward with the identification and picking Rivera. (Ex. 5, 2011 PC Hearing Transcript, Lopez Testimony, at 60:6-62:6; Ex. 20, Lopez, Affidavit at ¶ 15; Ex. 6A, Lopez Dep at 100:1-01:12; Ex. 24A, Guevara Dep at 18:17-23, 21:20-24, 22:7-11, 23:3-11, 23:19-24:2, 204:3-8.)

60.     The lineup report of the September 15 lineup made no reference to Lopez's exculpatory statement regarding Rivera and his inculpatory statement regarding the perpetrator being an Imperial Gangster, consistent with Valentin's identification of Jose Rodriguez. (Ex. 4, Rivera Street File at Wron File 49-50.)

## 8.  Before Trial, Defendants Fabricate A Description By Lopez That The Shooter Had a Ponytail Dyed Gold

61.     At trial, Lopez testified that the shooter had brown hair, with a ponytail dyed blonde or gold. That testimony was fabricated by Defendants, who fed this description to Lopez and told him to provide this description at trial. (Ex. 3, Criminal Trial Transcript, Lopez Testimony at 22:13-19, 41:22-25, Guevara Testimony at 82:11-16; Ex. 24A, Guevara Dep at 204:19-205:1, 381:22-382:5.).)

22

62.     Lopez had never previously made this claim. In the August 29, 1988 police report in which Defendants Leonard and McLaughlin documented their interview with Lopez, there is no such description of the shooter. And nowhere else in the police file is there a description of the shooter as someone with a distinctive dyed hairstyle. (Ex. 4, Rivera Street File at Wron File 29-30; see also Ex. 4, Rivera Street File at Wron File 01-69.)

63.     In fact, Rivera did not have this hairstyle or have any part of his hair dyed. (Ex. 1, Rivera Dep at 301:8-12; Ex. 3, Criminal Trial Transcript, Rivera Testimony at 68:10-13; *id.* at Pastor Rivas Testimony, at 87; *id.* at  Osorio Trial Testimony at 91:2-12; Ex. 4, Ex. 4, Rivera Street File at Wron File 37.)

64.     In order to make Lopez's fabricated description into powerful evidence against Rivera at trial, Defendant Guevara then falsely testified at trial that when he arrested Rivera for the murder, he noticed that Rivera had "a little pigtail died in gold" in the back. (Ex. 3, Criminal Trial Transcript Guevara Testimony, at 82:11-16; Ex. 24A, Guevara Dep at 26:15-22, 28:1-11.)

   **9.  Defendants Prepare False Police Reports, Include Them In Their Files, and Present Them to Prosecutors**

      (a) *Guevara and Gawrys False Closing Report*.

65.     On September 16, 1988, after the victim had died, Defendants Guevara and Gawrys created a police report about investigative steps that occurred earlier in the investigation. They both reviewed it before it was signed. As set forth above, the report is knowingly false. It contains the following statements: (a) that Lopez independently identified Rivera from the Latin Kings mug book; (b) that Felix Valentin identified Rivera out of a mug book at the hospital on September 10, 1988; (c) that Lopez was shown photos of Jose Rodriguez and Felipe Nieves, the members of the Imperial Gangsters that were alternate suspects, and excluded them as being involved in the shooting; and (d) that there was a September 15, 1988 lineup in which Lopez

identified Rivera, which by omitting reference to the August 31 lineup implied that Lopez viewed Rivera in a lineup only once, on September 15. (Ex. 4, Rivera Street File at Wron File 09-10; Ex. 25A, Gawrys Dep at 230:18-32:1; Ex. 24A, Guevara Dep at 350:17-24, 352:16-20, 354:20-24; Ex. 76, Guevara Answer to Fourth Interrogatories, No. 3 (asserting Fifth Amendment right in response to question about claim in Sept 16 report regarding Valentin's purported Sept 10 identification) *see* ¶¶ 25-28, 45-60, *supra*.)

66.     The September 16 report was also problematic for facially obvious reasons. For example, it is the only report in the police file in which the date and time of the sergeant's approval is typed in by the reporting officers, Defendants Guevara and Gawrys. On other reports, the date of the sergeant's approval is entered by way of a stamp by the sergeant. Preemptively typing in the date and time of the Sergeant's approval is extremely unusual. (*Compare* Ex. 4, Rivera Street File at Wron File 09 *with, e.g.,* Wron 49, 15, 26, 29; Ex. 25A, Gawrys Dep at 248:1-8.)

(b) *McLaughlin and Leonard False First Lineup Report*.

67.     On September 1, 1988, Defendants McLaughlin and Leonard created a police report stating that on August 30 at 11pm they, along with Defendants Guevara, Fallon, Sparks and Zacharias, had arrested Jacques Rivera. Other officers had arrested an alternate suspect, Jose Rodriguez. A hold was placed on both Rivera and Rodriguez so that they could participate in a lineup to be viewed by the witness, Orlando Lopez. The report then stated that extensive efforts were made to locate Lopez, but were unsuccessful, and so Lopez did not view a lineup at that time. The report indicates that they instead shifted their focus to conducting a photo lineup with the victim, but that their attempt to show the photos to the victim at the hospital were ultimately unsuccessful given the victim's condition. (Ex. 4, Rivera Street File at Wron File 34-36.)

24

68.     The report is false. Defendant McLaughlin had spoken to Lopez's mother around 11pm on August 30 but he was sleeping at the time, and so Defendants decided to conduct the lineup the next day, August 31. He was then brought to the police station on August 31, 1988, where he viewed a lineup containing Rivera and Rodriguez and selected a filler, after which Rivera and Rodriguez were released. (*See* ¶¶ 29-41, *supra*.) In addition, twelve-year old Orlando Lopez was not hard to find. The police knew that he attended Mozart Elementary School; the shooting occurred on August 27, so Aug 31 was Wednesday; and the police were well aware that a good place to find a juvenile witness is at school. And finally, the statement that the suspects and fillers identified in the report were photographed and then used for a photo lineup that was viewed by the victim at the hospital was also false. Each of the suspects and fillers identified in the report stood in a live lineup at Area 5 on August 31, 1988. (*See* ¶¶ 50-60, *supra*; Ex. 6A, Lopez Dep at 27:2-25 (shooting occurred on August 27, so Aug 31 was Wednesday, and he attended Mozart Elementary School); Ex. 4, Rivera Street File at Wron File 27, 53 (police notes listing "Mozart" under Lopez's name); Ex. 23A, Mingey Dep. at 124:2 (good place to find juvenile witness is at school); Ex. 24A, Guevara Dep at 132:3-10.)

*(c) McLaughlin and Leonard False Report of Lopez Interview*

69.     On August 29, 1988, Defendants Leonard and McLaughlin drafted a police report stating that Lopez had made an identification of Rivera from Latin Kings mug books, and was able to do so because he recognized the shooter as someone who played ball at Humboldt Park. (Ex. 4, Rivera Street File at Wron File 29-30.) This report is false; Defendants fed Lopez the story that the shooter played ball at Humboldt Park and told him who to pick from the lineup. (*See* ¶¶ 25-28, *supra*.)

25

**10. The Police Withhold Substantial Portions of the Police File From Rivera and the Prosecutors, Which is Not Produced In Its Entirety Until This Civil Case**

(a) *The Complete Homicide File Is Suppressed.*

70.     By way of background, there are at least two key sets of police files maintained by the Chicago Police Department relevant to the discussion in this section:

a.  The file containing the complete set of police records related to the Valentin investigation, including official reports, notes and other documents, was maintained at Area 5, and is what Plaintiff refers to as the street file, and what the City refers to as an Investigative File. That file is Bates-stamped Wron 01-69. (Ex. 4, Rivera Street File at Wron File 01-69; Ex. 12, Brasfield Report at 41, 68-69; Ex. 39A, Hickey Dep at 168:2-22; Ex. 40, Defendant City's Response to Plaintiff's 5th Interrogatories at 1-2.)

b.  The file containing the complete set of official reports was maintained at the Records Division, and is commonly referred to as the Records Division file or permanent retention file. That file is Bates-stamped Hickey 01-33. (Ex. 42, Hickey 01-33; Ex. 12, Brasfield Report at 68-69.) Ex. 39A, Hickey Dep at 283:22-284:7, Ex. 41, Detective Division Internal Memo In Re Street Files; Ex. 40, Defendant City's Response to Plaintiff's 5th Interrogatories at 1-2.)

71.     In November 1988, well before Rivera's criminal trial, attorney John DeLeon sent a subpoena to the Chicago Police Department for "any and all police reports relating to . . . RD# K371955  [Valentin homicide investigation]," which was stamped as received by the Chicago Police Department's Records Division on November 10, 1988. (Ex. 42, Hickey 31; Ex. 4, Rivera Street File at Wron 1-69 (Valentin-related documents all labeled with RD# K371955); Ex. 50, Subpoena for Documents, *People v. Rivera*.)

26

72.    Rivera's defense attorney for trial was Judge Kenneth Wadas (retired). Wadas believed Rivera was innocent, and as a result Wadas kept his entire file related to the case, and produced it in response to a subpoena from the Defendants in this case as documents Bates-stamped RFC 469-810. The file he kept contains all documents Wadas received in discovery from the prosecutors and the police. (Ex. 19A, Wadas Dep at 47:15-48:6; 49:11-51:16; Ex. 16, Wadas File at RFC 469 (Wadas stating producing entire trial file in response to subpoena); Ex. 16, Wadas File at  RFC 469-810.).)

73.    Before Rivera's criminal trial, his attorney, Kenneth Wadas, received 29 pages of police reports of any kind, including notes, in response to his Request for Discovery. They are Bates-stamped RFC 507-535. Those are the only 29 pages of police reports he received in response to his formal discovery motion and his additional requests to the prosecutors. (Ex. , Wadas File, RFC 507-535; Wadas Dep at 242:9-244:22; Ex. 47, Motion for Discovery at RFC 282-286.)

74.    These 29 pages are the same 29 pages of police reports that the Chicago Police Department produced to prosecutors as well. Before trial, Wadas took steps to confirm that he had received a complete police file. He made inquiries to the trial prosecutors, Larry Victorson and Mike Kress, about whether everything had been turned over; they showed him their file and told him that he had received everything they had received. The prosecutors turned over whatever police records they received; they did not hold anything back. (Ex. 19A, Wadas Dep at 86:22-87:10, 94:1-13, , 113:12-114:23, 244:14-22-246:21; Victorson Dep at 30:6-9 ("[Wadas] had everything I had, that I know, I can tell you that."), 32:22-33:24, 34:10-21, 38:13-15("He got everything we had, period.").)

27

75.     What Wadas and the prosecutors actually received is a copy of the Records Division file, or permanent retention file. The permanent retention file – containing only official reports and not general progress reports or other documents in a police file – consists of nearly an identical number of pages as Wadas's file, contains the exact same set of police reports, and like Wadas's file contains no general progress reports. Importantly, every police report in Wadas's file has been stamped – usually near the bottom of the page – with a date; the exact same stamp, in the exact same place, is on the permanent retention file copy of the police reports, but is *not* on the version of the police reports contained in the so-called investigative file kept at area. (Ex. 39A, Hickey Dep at 174:2-6 ("Q: So it appears that somebody has copied and provided to Mr. Wadas documents from the permanent retention file, right? A. Yes, sir."; *compare, e.g.*, Ex. 42, Permanent Retention File at Hickey 15 (permanent retention file version of Page 2 of Sept 1 police report, with datestamp highlighted) *with* Ex. 16, RFC 511 (Wadas version) *with* Ex. 4, Rivera Street File at Wron 35 (street file version) (permanent retention file and Wadas file have upside down datestamp "-3 SEP 1988 11 26" at the bottom; street file version does not); *see also* Ex. 12, Brasfield Report at 69.)

76.     The following documents contained in the street file were not produced to Rivera or his counsel before his criminal trial: WRON 0001-0008, 0011-0014, 0018-0021, 0037-0038, 0042, 0045-0048, 0052-0069.)

77.     This includes Rivera's rap sheet stamped "issued on inquiry," on August 27. It also includes the arrest reports, hold reports and release reports from August 30 and August 31 for Rivera and Jose Rodriguez, as well as the August 31 general progress report listing the participants in the first lineup and the evidence form documenting the placement into evidence of the photographs from that lineup. (Ex. 4, Rivera Street File at Wron File 55; *id.* at 52, 56-59, 62-

64; Ex. 12, Brasfield Report at 86-87; *compare* Ex. Ex. 16, Wadas File, RFC 507-535 *with* Ex. Ex. 4, Rivera Street File at Wron, Wron 01-69.)

78.     After Rivera's trial, in December 1996 he sent Freedom of Information Act requests to the Chicago Police Department for police records – including arrest reports, police reports and photographs - related to the Valentin investigation, and in particular the first lineup. When that was rejected, in February 1997 he filed a subsequent writ of mandamus for the same records. (Ex. 43, Jacques Rivera FOIA Requests for Police Reports at JR-L 10492-10503.)

79.     None of the requests above resulted in the production of the street file documents. The entire street file, Wron 1-69, was not produced until 2014, in response to civil discovery in this case. (Ex. 12, Brasfield Report at 41, 68-69; Ex. 39A, Hickey Dep at 165:22-169:7; Ex. 40, City's Response to Plaintiff's 5th Interrogatory at 1-2; Ex. Z006, Plaintiff's 3rd Response to City's Interrogatories at 4; Ex. 44, Wronkowski Dep at 66:15-67:8, 70:7-71:5; Ex. 55, Defendant Guevara's Amended Answers to First Interrogatories, No. 5.)

## H.     RIVERA'S WRONGFUL PROSECUTION AND IMPRISONMENT

### 1.     Defendants Cause Murder Charges to be Filed Against Rivera

80.     On September 15, 1988, after the live lineup on that date, Rivera was placed under arrest and charged for the murder of Felix Valentin. The arrest report was signed by Defendant Guevara, with additional arresting officers including Defendant Gawrys. The arrest report stated the arrest was after a lineup in which the witnesses picked Rivera as the shooter. (Ex. 4, Rivera Street File at Wron File 51.)

81.     The same day, charges were approved by Assistant State's Attorney ("ASA") Julie Rosner. The prosecuting witnesses were listed as Defendants Guevara and Gawrys. The felony minute sheet identified the following facts supporting the charges: Rivera "was identified

by photos by the witness Orlando Lopez," and was "positively identified" in a September 15 lineup. (Ex. 4, Rivera Street File at Wron File 48.)

82.     Before approving charges, ASA Rosner would have spoken with the investigators – detectives or gang crimes specialists – to learn what transpired over the course of the investigation, but she does not recall which ones spoke to her in this case. (Ex. 35A, Rosner Dep. at 24:9-20.)

83.     ASA Rosner was not told that Lopez had said before the September 15 lineup that Rivera was the wrong guy, or that there had been an earlier lineup in which Lopez had not selected Rivera. If she had been told either of these things, she would not have approved charges. (Ex. 35A, Rosner Dep. at 18:21-19:14, 19:15-20:2; 20:21-21:10.)

**2.  Guevara Repeats His False Story to the Grand Jury**

84.     On September 27, 1988, Defendant Guevara falsely testified before a grand jury that Rivera was identified by an "eyewitness" – he doesn't say if he is referring to Lopez or Valentin – as the person who shot Felix Valentin. (Ex. 45, JR 1389-93.)

**3.  Police Investigation Before Criminal Trial**

85.     In the period before trial, Defendants Guevara and McLaughlin coerced Lopez to testify falsely at trial against Rivera. Lopez felt that he was coached, and in particular that he was coached to identify the person on trial, Rivera. He said the people who were preparing him for his testimony were the "white haired lady and the cop." As above, (*see* ¶¶ 53-56, *supra*), this is likely a reference to Defendants McLaughlin and Guevara. (Ex. 46, Linzer Dep at 112:13-113:11; Ex. 24A, Guevara Dep at 45:22-26:7, 204:19-205:1.)

**4.  Wadas's Attempts to Investigate**

86.     Wadas did everything reasonably possible to defend Rivera. He visited the scene, filed a motion for discovery and answered discovery, viewed the prosecution's file, obtained answers to his discovery, made oral requests for discovery, developed a theory of the case, pursued a potential alibi defense, and spoke to the officer that obtained the identification of Imperial Gangster alternate suspects and subpoenaed him for trial. He also considered whether to file a motion to suppress, but based on the limited information he had about the second lineup, he determined that there was no viable motion to be filed. He did not know that Lopez had given exculpatory statements before the lineup or that there had been an earlier lineup in which Lopez did not select Rivera. He also took steps to confirm that he had received a complete police file. (Ex. 19A, Wadas Dep at 69:15-70:23, 73:23-75:18, 77:1-19, 86:22-87:10, 93, 230:9-11, 260:5-261:20; Ex. 47, RFC 282-286 (Request for Discovery); Z011, RFC 287 (Answer to Discovery); Ex. 49, Victorson Dep at 77:6-77:12 ("fair and reasonable" for defense attorney to rely on State's answer to discovery); *see* ¶¶ 50-60, 67-68, 73-75, *supra*.)

87.     The 29 pages of police records Wadas received contained no evidence of a first lineup. Wadas also made specific inquiries about whether there were documents related to a first lineup, and also made requests for any photos of a first lineup. He was told that had received everything, that there were no documents related to a first lineup because one did not exist. He accepted their answer because of the high regard he had for the prosecutors on the other side of the case. Without any photographs or any other documentation related to a first lineup, he had no way to investigate within the police department for a lineup he was told did not exist, and he would not have been able to get information about every lineup that was conducted at Area 5 in that time period. (Ex. 19A, Wadas Dep at 94:10-18, 114:4-23, 172:22-173:5, 245:8-246:21,265:22- 266:11; Ex. 49, Victorson Dep at 39:1-6, 43:4-12.)

88.     Although no general progress reports were included in the file, in Wadas' experience it was not unusual to receive no general progress reports in a case because it seemed that police officers stopped taking notes once that requirement came into place, and at that time they were still destroying their notes. He nevertheless asked the prosecutors to confirm that no such documents existed, and they confirmed that he had received everything. (Ex. 19A, Wadas Dep at 86:22--88:9, 245:8-246:2, 254:16-256:7, 265:22-266:11; Ex. 49, Victorson Dep at 30:6-9, 32:22-33:24.)

89.     Lopez was not available to be interviewed by Wadas because he knew, based on his experience, that Lopez would be controlled and that he was never going to be able to talk to Lopez, especially because he was a minor. (Ex. 19A, Wadas Dep at 71:2-16; Ex. Z064, Wasilewski Dep at 249-50.)

**5.  Rivera's Criminal Trial**

90.     Rivera's criminal trial began on April 5, 1990. Testifying witnesses at the trial were Israel Valentin, the brother of the victim, Orlando Lopez, Defendant Guevara, Detective Letrich, Rivera, and by stipulation Defendant Leonard and the medical examiner. In his surrebuttal case, Plaintiff presented two witnesses, Pastor Fernando Rivas and a friend named Guillermo Osorio. He was convicted on July 9, 1990, to 80 years incarceration in the Illinois Department of Corrections for the murder of Valentin, the maximum sentence. Throughout his sentencing, Rivera maintained his innocence.  (Ex. 3, Criminal Trial Transcript 009:1-010:6, 052:23-053:19, 064:14-065:24, 080:15-16, 085:8-13, 089:6-12., Sentencing Transcript at 107:11-14, 114:21-115:1).)

91.     During Lopez's trial testimony, his mug book photo identification of Rivera and his identification of Rivera in a September 15 live lineup were both introduced. A photograph

from the September 15 lineup was also introduced as People's Ex. 81, and Lopez placed an "X" over Rivera's head on the September 15 lineup photograph. He also made an in-court identification of Rivera. Lopez was also questioned about whether he actually viewed photos of Imperial Gangsters (to rule out Jose Rodriguez and Felipe Nieves, the Imperial Gangster alternate suspects). And he testified that the shooter had brown hair, with a ponytail dyed blonde or gold. (Ex. 3, Criminal Trial Transcript, Lopez Testimony, at 22:13-19. 29:14-32:19, 41:22-42:5, 42: 22-43:2, 48:9-49:2, 50:19-51:5; Ex. 52, Photos of Sept 15 Lineup.)

92. Defendant Guevara testified at Rivera's trial about the September 15 lineup and lineup photo (without any reference to Lopez's exculpatory statements immediately prior), and testified that when he arrested Rivera for the murder, he noticed that Rivera had "a little pigtail dyed in gold" in the back. (Ex. 3, Criminal Trial Transcript, Guevara Testimony, at 82:11-16.)

93. Defendant Leonard testified, by stipulation, about his August 29 police report detailing the interview of Lopez by him and Defendant McLaughlin. Leonard testified that Lopez recognized the shooter as someone who played ball at Humboldt Park, and was therefore able to make an identification from a Latin King mug book. (Ex. 3, Criminal Trial Transcript, Leonard Testimony, at 65:19-22.)

## I.   RIVERA'S POST-CONVICTION PROCEEDINGS, EXONERATION, AND CERTIFICATE OF INNOCENCE

94. In 2010, the Center on Wrongful Convictions at Northwestern University School of Law had agreed to represent Rivera in his post-conviction proceedings, and set about investigating his case. Among other things, they spoke to Orlando Lopez and developed evidence that during the investigation, and before Felix Valentin even passed away, Lopez had determined that Rivera was the perpetrator, and that he had told this to the police. They also developed evidence that Lopez was fed the story about the shooter playing ball at Humboldt

33

Park, and that Lopez had actually viewed two lineups. (*See* ¶¶ 25-38, 50-60, *supra*; Ex. 5, 2011 PC Hearing Transcript, Raley Testimony at 140:17-141:23; *id.* at Lopez Testimony at 49:6-12, 53:14-54:3, 54:19-55:3, 56:19-57:18, 58:8, 58:17-19, 58:24-59:5, 60:6-15, 61:19-24; 62:7-11, 77:11-13, 83:18-85:21, 93:3-94:3.)

95.    On June 23, 2011 Rivera's evidentiary hearing began before Judge Neera Walsh in Cook County. The Court heard testimony from Orlando Lopez, Defendant McLaughlin, and Cythia Estes. In a written opinion on September 13, 2011, Judge Walsh granted Rivera relief, vacating his conviction and ordering a new trial. Judge Walsh relied primarily on the hearing testimony of Orlando Lopez, stating as follows: "Orlando Lopez testified in an evidentiary hearing on this matter on June 23, 2011. At the hearing, this court had an opportunity to assess his demeanor and tone in determining his credibility, and since then has read and re-read the transcript of his testimony. This court finds that Lopez was credible in his recantation." (Ex. 50, RFC 1063; Ex. 5, 2011 PC Hearing Transcript, McLaughlin Testimony, at RFC 1100, 1170, 1200; Ex. 18, Post-conviction Decision, JR977-984; *id.* at JR983.)

96.    Jacques Rivera has always been completely innocent, and had nothing to do with the tragic death of Felix Valentin. On October 4, 2011, state prosecutors dropped all charges against Rivera. He walked out of prison a free man. (Ex. 51, RFC 1378, 1381; Ex. 1, Rivera Dep at 9; Ex. 2, Rivera COI Opinion.)

97.    In November 2011, Rivera filed a petition for a certificate of innocence pursuant to 735 ILCS 5/2-702. Cook County Judge Michael McHale granted Rivera a certificate of innocence on September 5, 2012. With regard to Lopez's recantation, Judge McHale stated as follows: "After reviewing the trial and post -conviction hearing testimony of Orlando Lopez, the deposition testimony of Investigator Cynthia Estes and the ruling by Judge Walsh, this court

34

finds the recantation of Orlando Lopez to be credible." (Ex. 17, Certificate of Innocence Opinion at JR 972, 964-976.)

## THE CITY'S POLICIES AND PRACTICES

### A.     THE STREET FILES PRACTICE

#### *Chicago Police Department on Notice of Street Files Problem*

98.     In April 1982, Chicago officials, including Chicago Police Department Superintendent Richard Brzeczek, became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional street files practice that caused his wrongful prosecution. (*Palmer v. City of Chicago*, 562 F. Supp. 1067, 1073 (N.D. Ill. 1983) (Brzeczek testified at hearing); Ex. 39A, Hickey Dep at 207:15-209:8, *see also* 83:21-24:4 (Brzeczek testified at injunction hearing); Ex. 59, Hickey Testimony from 2016 Fields Trial , at 2012 ("It is true that the City got put on notice that there was a problem with the way it was handling the topics I mentioned a minute ago, correct? A. Correct."), 2019.)

99.     A detective named Frank Laverty developed strong evidence that Jones could not have committed the murder. But, as stated by the Seventh Circuit, this information was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files." In the spring of 1982, Detective Laverty learned that Jones was on trial for the murder; he went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action; and Laverty then informed Jones' criminal defense attorney about the information in the street file. The court declared a mistrial, and the State's Attorney dropped all charges against Jones. He then filed a civil lawsuit stemming from the withholding of

important investigative information in a street file, resulting in his wrongful prosecution. His case resulted in a jury verdict finding a custom of maintaining "street files" that were withheld from the State's Attorney's Office and criminal defendants. *Jones v. City of Chicago*, 856 F.2d 985, 995-96 (7th Cir. 1988); Ex. 39A, Hickey Dep at 61:3-23, 63:6-9, 67:9-68:3; Ex. 59, Hickey Testimony from 2016 Fields Trial , at 2012-14; Ex.12, Brasfield Report at 33.)

100.    In April 1982, shortly after the Laverty revelations about street files, a class action lawsuit called *Palmer v. City of Chicago* was filed to challenge the use of street files to suppress investigative materials, and days later federal judge Milton Shadur issued a temporary restraining order requiring the CPD to preserve all street files. *Palmer v. City of Chicago*, 562 F. Supp. 1067, 1069 (N.D. Ill. 1983); Ex. 39A, Hickey Dep at  69:22-72:2, 83:21-84:10; Ex. 12, Brasfield Report at 34.)

101.    The City became aware immediately that there was substantial resistance within Chicago Police Department to changing the street practice. Judge Shadur's April 1982 Order was amended in September 1982 when it was learned that detectives were circumventing the court's order, and Detective Division Notice 82-2 was issued by the Superintendent to preserve all notes. In addition, on March 31, 1983, Judge Shadur issued an order in which he found (a) CPD personnel were applying Detective Division Notice 82-2 "in an improperly restrictive and grudging manner under which detectives could consider their investigative writings as their personal property (and thus not under Detective Division control)"; (b) two Area Commanders interpreted the new directive so that detectives were still free to destroy their own investigative writings under the guise of "personal property"; (c) official reports were sometimes "prepared from the perspective of what fits the preparer's concept of the crime," thereby omitting  "highly relevant and sometimes exculpatory" information that "the preparer does not deem 'pertinent.'"

*Palmer v. City of Chicago*, 562 F. Supp. 1067, 1069-1073 (N.D. Ill. 1983); Ex. 39A, Hickey Dep at 72:9-73:4, 76:9-24, 203:19-204:21, 214:18-24; Ex. 12, Brasfield Report at 50-51.)

### City Investigation Resulting From Jones and Palmer

102.    As a result of the developments in *Jones* and *Palmer*, James Hickey of the Chicago Police Department conducted an  internal review of Chicago Police Department practices related to street files, the results of which he shared with senior Department officials including Chief of Detectives Hardhardt. (Ex. 39A, Hickey Dep at 59: 1-24; 208:17-209:8, 220:11-222:22, 225:19-116:1, 227:3-6; Exs. 12-15 of Ex. 39A, Hickey Dep; Ex. 59, Hickey Testimony from 2016 Fields Trial  at 2012:19-2014:7, 2017:12)

103.    Hickey's finding was that there was a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files. The information in the memos and notes was not making it into official reports. In addition, official reports often were not written right away, and instead were written only once they had settled on a suspect, at which point investigators might consider alternate suspects and other evidence to be non-pertinent. As a result, entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed once an investigation was complete. (Ex. 39A, Hickey Dep at 58:10-13, 72:3-15, 95:14-96:20, 204:3-21, , 215:10-16:15, 219:9-221:6 ; Ex. 56, April 10, 2014 Hickey Testimony, Fields v. City of Chicago at 2043:22-25; 2044, 2050, 2051:2-5;  Ex. 59, Hickey Testimony from 2016 Fields Trial  at 2014:9-19, 2016:15-21.)

104.    City official were well aware at the time that the street files practice documented above resulted in wrongful prosecutions and convictions. (Ex. 39A, Hickey Dep at 102:2-23, 205:18-206:12; Ex. 59, Hickey Testimony from 2016 Fields Trial  at 2019:6-9; *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) (finding that the failure to retain street file documents "creates a serious potential of deprivation of defendants' constitutional rights," and that "[s]uch deprivations have in fact occurred in the past.").)

### *Special Orders 83-1, 83-2 and 86-3*

105.    Based on Hickey's investigation, in 1983 the Chicago Police Department promulgated Detective Division Special Order 83-1, which was quickly replaced by Special Order 83-2. (Ex. 60, Special Orders 83-1, 83-2; Ex. 39A, Hickey Dep at 225, 227:7-229:6; Ex. 59, Hickey Testimony from 2016 Fields Trial  2024:9-2025:13)

106.    The new Special Order 83-2 created a police document called a General Progress Report, or GPR, on which all notes and memoranda were to be documented. The Special Order required those GPRs to be placed in a so-called Investigative File kept at the Area, rather than in personal files kept on the street by investigators. Special Order 86-3 replace 83-2, but the only substantive change was the addition of an auditing provision. (Ex. 60, Special Order 83-2; Ex. 54, Special Order 86-3; Ex. 39A, Hickey Dep at 100: 9-101:12, 227, 246-47, 249, 174; Ex. 59, Hickey Testimony from 2016 Fields Trial  at 2028)

107.    Gang crimes specialists and others participated in homicide investigations, but the new Special Order applied only to detectives. (Ex. 60, SO 83-2 (*Detective Division* Special Order); Ex. 39A, Hickey Dep at 229-31.)

108.    Even though the Special Orders were a response to the failure to disclose documents created during the police investigation to prosecutors and criminal defendants, absent

from the new Special Order was any instruction that the general progress reports and other documents in the newly-created Investigative File were to be disclosed to prosecutors and criminal defendants, or any mechanism to ensure that occurred. Indeed, the Special Order expressly stated, "A copy of the [inventory form] will be forwarded to the Records Division" to ensure production to prosecutors and defense attorneys, but contained no instruction to produce or disclose the investigative file or the police records contained therein. (Ex. 60, Special Order 83-2; *see also* Ex. 12, Brasfield Report at 54.)

109.    The clerks in the Subpoena Service Unit were responsible for responding to subpoenas and producing documents to prosecutors and criminal defendants. But, the subpoena clerks received no formal training on how to respond to subpoenas for homicide files. There were also no rules, policies, directives or any other form of written guidance to the subpoena clerks that instructed them to produce the Investigative Files from the Area, or to otherwise ensure that all exculpatory information was produced. As a result, the process of disclosing police records to prosecutors and criminal defendants was *ad hoc*, and described by the City's designee, James Hickey (the same person who created the Special Order), as an "art form." (Ex. 39A, Hickey Dep at 161:10-163:24, *see also* 35-37, 39, 146-48, 159-60, 125, 197-198; Ex. 12, Brasfield Report at 13-14; Ex. 53, City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3.)

### *Street Files Practice Continued Unabated*

110.    The Defendants in this case did not get training on the new Special Orders, or any obligation to preserve notes or disclose exculpatory information. (Ex. 26, Leonard Dep at 39-40, 71; Ex. 10, Noon Dep at 68-69; Ex. 137, Guzman Dep at 38, 70-71; Ex. 31, Fallon Dep at 66; *see also* Ex. 39A, Hickey Dep at 55:5-24.)

111.    No auditing or other steps were ever taken to ensure that the "major change" in practices required by the new Special Order were actually being implemented and followed. (Ex. 39A, Hickey Dep at 244, 247, 249; Ex. 56, April 10, 2014 Hickey Testimony, *Fields v. City of Chicago*, at 2053:24-2054:1; Ex. 59, Hickey Testimony from 2016 Fields Trial at 2036:13-23.)

112.    As a result, the street files practice continued unabated. Rather than checking out the investigative file, where all memos and notes were supposed to be stored and preserved (on general progress reports), detectives reverted back to keeping personal files with their own copies of investigative material. (Ex. 140, Hickey Kluppelberg Dep at 327-29.)

113.    The Defendants in this case admit that they continued the practice of keeping street files containing personal notes and memoranda exchanged between investigators that were not preserved in any official file or disclosed, and instead were destroyed. For example, Defendant Leonard took notes on a pad (not GPRs), and then destroyed his notes. Defendant Gawrys took notes as a gang crimes officer, keeping them in his own personal street file, and then shredding his street file at the end of each investigation. He also wrote notes to the next shift related to ongoing investigations, and at the end of an investigation would take those out of his files and destroy them. Defendant Guzman kept his own notes, would not transfer everything from his notes into his reports, and then would shred his notes. Defendant Fallon took notes in how own personal spiral notebook, and then threw away the notes. Defendant Zacharias would take notes on a piece of paper that was not an official police form of any kind, and then discard his notes. Defendant Mingey, a sergeant overseeing the gang crimes officers that investigated the Valentin homicide, testified that there was no centralized file for an investigation and the specialists instead kept files in their own lockers or elsewhere, and destroyed their notes. (Ex. 26, Leonard Dep at 69-70; Ex. 25A, Gawrys Dep at 35-37, 188-89, 210-11, 213-14; Ex. 79,

40

Guzman Dep at 68-69; Ex. 31, Fallon Dep at 60-62, 65-66; Ex. 79, Zacharias Dep at 179-81; Ex. 23A, Mingey Dep at 134-37, 148, 149.)

114.    In addition, Defendant Rinaldi, a sergeant overseeing the Valentin investigation, and Defendant Zacharias, a gang crimes specialist, testified about the use of Serafini reports, which were memoranda homicide investigators prepared for the Sergeant containing information about an investigation, such as updates to be communicated to investigators working the next shift. These Serafini reports were posted on a board in the sergeant's office. They were not part of any official file, and were purged. (Ex. 77, Rinaldi Dep at 28:1-30:10, 34:4-36:25, 34:13-16, 102:12-103:2; Ex. 79, Zacharias Dep at 210-213.)

### *Continuation of Street Files Practice Results in Other Wrongful Convictions*

115.    The continuation of the street files practice has resulted in other wrongful prosecutions and convictions in which exculpatory information was withheld from criminal defendants, including for example Nathson Fields and James Kluppelberg. (Ex. 39A, Hickey Dep at 55:5-24; Ex. 62, Kluppelberg Street File; Ex. 63 Fields Street File; Ex. 64, Opinion on Kluppelberg Certificate of Innocence Opinion; Ex. 65 Fields Opinion on Post-Trial Motion; Ex. 12, Brasfield Report, Attachment I at 11, Attachment H at 40-45.)

116.    James Kluppelberg was convicted for a 1984 fire that killed six people, and later exonerated for that crime. In 2014, during Kluppelberg's subsequent civil case, anew file was discovered that had never been disclosed in the criminal proceedings. That file contained investigative materials from the 1984 Area Three investigation, and included critical exculpatory information such as handwritten notes that a neighbor had reported there was loose and dangerous wiring in the basement that got wet sometimes (undermining the arson determination and supporting the evidence that the fire was accidental); numerous references to individuals

who had had arguments or fights with the victims; and a memo between detectives that recounted a statement from an alternate suspect named Isabel Ramos who had started another porch fire in a building nearby just hours before the fire for which Kluppelberg was convicted. Ramos also reported that she had been intoxicated at the time, could not remember what she had done, but thought she perhaps set other fires. (Ex. 62, Kluppelberg Street File; Ex. 63, Opinion on Kluppelberg Certificate of Innocence Opinion; Ex. 12, Brasfield Report, Attachment I, at 11)

117. Nathson Fields was convicted of the 1984 double murder of Jerome Smith and Talman Hickman. Fields' conviction was thrown out after a court granted his petition for post-conviction relief; he was re-tried in 2009 and acquitted. During discovery in his subsequent civil lawsuit, a street file of over a hundred pages of police reports and notes concerning the Smith/Hickman murders was located in a file cabinet at Area Central, along with files relating to other murders. The City admitted that the file had not been previously disclosed to Mr. Fields or to prosecutors. The documents newly produced in the street file, which were not contained in any of the earlier files, include handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Nathson Fields was not involved in the Hickman and Smith homicides. It also included a previously undisclosed rap sheet for an alternate suspect with an issued on inquiry date stamp that undermined the prosecution's theory of the case. Nathson Fields name, meanwhile, was never mentioned as a possible suspect in any of the street file documents. (Ex. 63, Fields Street File; *see also* Ex. 12, Brasfield Report at 67-68.); Ex. 65, Fields Opinion on Post-Trial Motion; Ex. 12, Brasfield Report, Attachment H at 40-45.)

118. In December 2016, a jury found that the failure to disclose the street file to Mr. Fields was the result of a pattern and practice of the Chicago Police Department, and awarded

Mr. Fields compensatory damages of $22 million. Discovery in *Fields* revealed dozens of other street files in the Area Central basement. (Ex. 67, Brasfield Summary of Voluminous Records -- Comparing Basement, Criminal Defense and Permanent Retention Files) At the trial in Mr. Fields' case, additional evidence in support of the conclusion that the City had a street file practice was presented, including the following:

    a.   Defendants and other CPD employees testified that there were frequently widespread departures from written policies; that they did not even know new written policies had been put in place in the 1980s; that they considered investigative materials their personal property, and would not transcribe all investigative leads into official reports; and that there was no mechanism for reporting missing investigative materials. (See *Fields v. City of Chicago,* Case No. 10 C 1168, Dock. No 1185-10 at 122:5-21, 127:11-128:3, 131:25-132:16; 1185-22 at 124:25-125:23; 1185-7 at 103:5-8, 112:3-9; 1185-16 at 31:2-9, 31:23-25, 32:14-24, 52:5-112; 1185-29 at 85:8-86:7, 95:22-96:5, 97:2-19; 1185- 27 at 137:5-22.)

    b.   Street files were kept and suppressed in violation of *Brady* in the cases of Jon Fulton, Timothy Malone, and James Crockett, *Fields v. City of Chicago,* Case No. 10 C 1168, Dock. No 1185- 15 at 12:3-14:15, 17:1-21:12, 18:10-17; 1185- 18 at 111:2-115:18; 1185-32 at 111:6-18; 1185-30 at 69:8-21; 1185- 20 at 58:1-61:1; 1185-32 at 29:13-31:8, 31:9-34:5]

### Report of Plaintiff's Retained Expert Michael Brasfield

119.   Plaintiff retained Michael Brasfield, a police practices expert, to review the Chicago Police Department's policies and practices related to the creation, maintenance, storage,

43

preservation, and disclosure of investigative materials in homicide cases. In addition to reviewing the relevant Special Orders, deposition testimony, and many other documents, In order to assess the Chicago Police Department's practices and adherence to its policies, Brasfield also reviewed and analyzed the 138 homicide files disclosed in this case, and compared them to available permanent retention files, criminal defense files and prosecutor files. (Ex. 12, Brasfield Report at 1-2, 40-42, Ex. B to Brasfield Report (materials reviewed).)

     120.    Brasfield spent 41 years as a law enforcement officer. In 1969, he joined the Seattle Police Department and served Seattle as a police officer, detective, sergeant, lieutenant, captain, major, and assistant chief of police. As a sergeant, he served in patrol, the tactical squad, and internal investigations.  As a lieutenant, he served as a watch commander in charge of 50 patrol officers, and later as the commander of the Washington State Criminal Justice Training Commission's Basic Law Enforcement Academy for 2 years.  As a captain, he had responsibility for over 250 officers and served as the commander of the Internal Investigations section of the Seattle Police Department.  He was the major in command of the inspectional services division responsible for developing, implementing, and monitoring departmental policies and procedures. And his last 5 years with the Seattle Police Department were served as assistant chief in command of the support services bureau, where he was responsible for, and oversaw the activity of, nine uniquely different divisions including: internal investigations; training; personnel; intelligence; crime prevention; communications; records & evidence, which included the maintenance and control of homicide files; data processing; and fiscal, property & fleet management. He went on serve as the Chief of Police of the City of Fort Lauderdale, Florida for six years, retiring in 2001, and then spent another six years serving as the elected Sheriff of Jefferson County, Washington. (Ex. 12, Brasfield Report at 6-8; Ex. 68, Brasfield CV.)

121.     Brasfield reviewed the Special Orders promulgated in the wake of *Jones* and *Palmer*, discussed above. He concluded that the policies were deficient on their face to solve the street files problem of which the City was on notice. Among other things, he concluded that the policies (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) failed to cover gang crimes officers, despite their significant role as investigators in homicide cases, like this one; (c) left too much discretion to detectives about what to record in the official files; and (d) did nothing ensure that the subpoena service unit, detective division, or anyone else produced all of the parallel files created for an investigation. (Ex. 12, Brasfield Report at 56-58; *see also id.* at 36-40.)

122.     Brasfield also reviewed the Chicago Police Department's efforts to implement the new Special Orders and found that the City failed to provide proper training and oversight to ensure compliance with the Special Orders. He summarized his opinion as follows: "[I]t appears that there was no oversight to ensure that the special orders were being enforced and that the street files practice was eliminated. This is particularly troubling given the importance and scope of the problem and is certainly deficient. You cannot expect a department- wide, decades-long practice to be eliminated by simply issuing an order that was read at roll call a few times. Based on my experience, this requires extensive and ongoing training (not a one-time session of a couple of hours), careful auditing and monitoring, and meaningful discipline when the new special orders were not followed. Based on my review of the record, almost none of this occurred." (Ex. 12, Brasfield Report at 58-59.)

123.     Brasfield also reviewed 190 homicide files from Area 5 for the period 1985-1991, the three-year period surrounding the Valentin homicide. Of those 190 files, 138 came from the

45

CPD records warehouse, where old homicide files are kept for storage. The other 52 homicide files came from file cabinets at Area North in which Area 5 homicide files from 1985-1991 were stored, including the Valentin homicide file produced as Wron 01-69.

124.    In addition to the 190 homicide files, Plaintiff's counsel obtained by subpoena criminal defense files corresponding to 44 of the homicide files, and provided them to Brasfield for his review. 132 Chicago Police Department permanent retention files corresponding to the homicide files were also obtained in discovery in this case, and those were also provided to Brasfield for his review. He then analyzed these files independently and comparatively, and reached a number of conclusions. The file-by-file, document-by-document comparison of all of these file types is contained in Attachment G to Brasfield's Report. (Ex. 12, Brasfield Report at 40-42, 49, Attachment G to Brasfield Report.)

125.    First, Brasfield analyzed the 190 homicide files themselves to see whether they demonstrated compliance to the new Special Orders. So, for example, the Special Orders require notes and memoranda to be maintained on general progress reports, not notebooks or other documents that police investigators might construe as being "personal property" outside the Department's retention and disclosure requirements; Brasfield analyzed whether this requirement was being followed. Brasfield found that 61% of homicide files contained notes not taken on general progress reports; and 20% of files contained to-from memos not on official police forms. (Ex. 12, Brasfield Report at 59-60.) When considering these and other requirements of the new Special Orders, Brasfield found that 100% of the homicide files he reviewed contained evidence that the special orders were not being followed – that is, they were either lacking inventories, had incomplete inventories, had handwritten notes not on GPRs, or had to-from memos not on GPRs; and most often, some combination of these things. (Ex. 12, Brasfield Report at 62-63.)

46

126.     Second, Brasfield reviewed the permanent retention files, which contain only official reports, standing alone. Based on his review of those permanent retention files, Brasfield opined as follows: the files are "different in kind from those I've seen in other police departments around the country. Usually, an official file reads like a novel: it tells a story, with twists and turns in the plot and characters whose importance waxes and wanes. CPD's permanent retention files routinely lack this texture; they read like a single (often final) chapter of the novel – the one that explains the information that led to charges against the person ultimately charged."(Ex. 12, Brasfield Report at 60.)

127.     Third, Brasfield compared the permanent retention files to the homicide files in the 43 cases where he had corresponding files. He found that the files were replete with examples in which information contained in handwritten notes (regardless of whether on general progress reports or scraps of paper) was not transferred into official reports, including information with potential exculpatory value. In addition, more than 50% of the permanent retention files did not contain a copy of the inventory that is supposed to serve as an index of every document placed in the homicide file, a violation of an express requirement in the Special Orders. (Ex. 12, Brasfield Report at 60-61.)

128.     Finally, Brasfield compared the contents of the homicide files to the contents of the criminal defense files to determine if the information contained in the homicide files was being produced to criminal defendants. His file-by-file, document-by-document comparison is contained in Attachment F to his report. Brasfield's finding was that over 90% of the criminal defense files were missing documents contained in the corresponding homicide files. Among other things, he also found that (a) the majority of files contained handwritten notes taken in "unofficial forms" – that is, not on general progress reports – and that 74% of the criminal

47

defense files were missing such handwritten notes; and (b) that approximately 17% of the criminal defense files were missing to-from memos – a classic type of street file document, *see* ¶ 6, *supra* – that were not present in the investigative files. (Ex. 12, Brasfield Report at 42-44, Attachment F to Brasfield Report.)

129.     Brasfield also identified specific examples of files where documents contained in the homicide files and missing from the criminal defense files was potentially exculpatory information of significant investigative value and should have been disclosed. The six examples for which he discussed at length the withheld investigative material that would have aided the defendant and therefore should have been disclosed under standard police procedures, are the following: (1) Records Division # J209456 (Defendants David Quinones, Bruce Andras, Marc Johnson); (2) RD # P526822 (Defendant Miguel Borrotto); (3) RD# J080925 (Defendant Samuel Slack); (4) N028256 (Defendant Jesse Swanigan); (5) RD# M258570 (Defendant Curtis Kirkland); and (6) N162782 (Defendant Tomas Nieves). For each of those six cases, Brasfield reviewed corresponding State's Attorney's Office files. In each of the six cases, the police documents were withheld from the criminal defendant, and were of potential exculpatory value, and were withheld from the prosecutors. (Ex. 12, Brasfield Report at 45-48, 49.)

130.     In further support of his conclusions, Brasfield also relied on and incorporated his review of hundreds of Chicago Police Department homicide files in the case of Nathson Fields. Attachment H to Brasfield's report is a copy of his opinions in the Fields case. In that case, Brasfield reviewed 429 homicide files produced by the Chicago Police Department, as well as 50 corresponding defense attorney files and an additional 27 corresponding permanent retention files. Among other things, his review found that more than 90% of defense attorney files were missing investigative material contained in the homicide file, including 80% of cases in which

handwritten notes (not on GPRs) were withheld, approximately 50% of cases in which GPRs were withheld, and approximately 20% of cases in which to-from memos were withheld. (Ex. 12, Attachment H to Brasfield Report; *id.* at 16-17.)

131.     In further support of his conclusions, Brasfield also relied on and incorporated his review of hundreds of Chicago Police Department homicide files in the case of James Kluppelberg. Attachment I to Brasfield's report is a copy of his opinions in the Kluppelberg case. In that case, Brasfield reviewed 164 homicide files produced by the Chicago Police Department. Among other things, his review found as follows: "The case files I reviewed (100%) are replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information. These handwritten notes contained critical investigative information, including: 1) Leads on different or additional avenues of investigation (Bates 120228; 120374); 2) Names or descriptions of possible alternative suspects (Bates 118848); 3) Names or descriptions of additional witnesses (Bates 120368; 120386); 4) Names or descriptions of possible alibi witnesses; 5) References to other CPD or outside law enforcement involvement in the investigation; and 6) Handwritten diagrams, scene and area maps, evidence locations. (Bates 128084; 120221)." (Ex. 12, Attachment I to Brasfield Report; *id.* at 45.)

## B.     FILLER LINEUPS

132.     When a witness identifies filler,that can be highly exculpatory information. It is a greater indicator that a witness is unreliable, and therefore more exculpatory, than when a witness fails to make any identification at all in a lineup; this is because when an eyewitness looks at a lineup and identifies a filler, the eyewitness is saying (in effect) that the filler looks more like the culprit than does the suspect (Ex. 39A, Hickey Dep at 262:12:24; Ex. 69, Wells Report at 15.)

133.    The City of Chicago's policy regarding lineup procedures, effective at the time of

the Valentin investigation, was General Order ("GO") 83-5. That policy did not provide

guidance on what had to be reported in the event of a lineup procedure in which a filler was

selected. Likewise, neither that policy nor any other policies in effect in 1988 governed the

conduct of photographic lineups. (Ex. 70, General Order 83-5 (no instructions for filler

identifications, no instructions for photo lineups); Ex. 12, Brasfield Report at 19; Ex. 39A,

Hickey Dep at 84:20-24, 254:23-256:2; 264:19-265:19; Ex. 25A, Gawrys Dep at 48:14-16

(learned by watching others); Ex. 71, Spratte Dep at 229:21-230:5.)

134.    The City designated James Hickey to provide binding testimony on behalf of the

Chicago Police Department regarding policies, procedures, and practices concerning the conduct

of lineups in the late 1980s, the period of the Valentin investigation. Hickey testified that the

policy and practice at the time was that a photographic record would not be made of a lineup in

which a filler was selected, and further, that if a filler was identified there would be no

documentation of the fact that the witness had identified someone. Several of the Defendants in

this case confirmed this was the practice. (Ex. 39A, Hickey Dep at  254:23-255:8, 261:10-262:6,

264:11-265:19; see also Ex. 72, Weingart Dep at 42:25-43:18 (filler documented as negative

identification), 59:12-22 (negative identification means no identification); Ex. 25A, Gawrys Dep

at 58:23-59:2; Ex. 33, Boyle Dep at 34:4-13, 36:7-11.)

135.    The parties reviewed 435 homicide investigative files stored in the records

division of the Chicago Police Department warehouse. The 435 files represent all of the

investigative files stored at the Records Division of the Chicago Police Department for

homicides committed between January 1, 1985, and December 31, 1991, within Area 5 of the

Chicago Police Department. The parties agreed that these 435 files were a representative sample

50

of the City's policies, practices, or customs for documenting live, in-person, and photographic lineups on a City-wide basis, including all of the Areas. Of the 435 homicide investigative files reviewed, 138 of them involved at least one live, in-person, or photographic lineup, and those 138 files were produced to all parties for analysis. (Ex. 73, Stipulation of Parties dated June 11, 2015.)

136.    The parties stipulated that these files were representative of the City's policies and practices citywide for the relevant time period. (Ex. 73, Stipulation of Parties dated June 11, 2015.)

137.    The City was asked to identify a single file—from anywhere at any time—in which a lineup report reflected the identification of a filler. (Ex. 74, Doc. No. 64, Plaintiff's Motion to Compel Regarding Filler Lineups (describing the history of this issue and Rivera's discovery requests].) The City responded that it would identify such a file if it found it, and it never updated that response.  (Ex. 75, City Supplemental Response to Plaintiff's First Interrogatories, Request No. 14, July 2013.)

138.    Plaintiff retained Gary L. Wells, Ph.D., Distinguished Professor of Psychology at Iowa State University and the Stavish Chair in the Social Sciences at Iowa State University. He is an expert in social influence, human memory, and judgment in general, and eyewitness identification evidence in particular, and has published over 125 peer-reviewed publications reporting on his studies of eyewitness identification since 1978 and has received several national awards for this work. (Ex. 69, Wells Report at 1 *id* at Wells CV.)

139.    Plaintiff's counsel reviewed the 138 homicide investigative files and compiled the lineup results into a spreadsheet. Dr. Wells received all of the underlying files, and spot checked the spreadsheet for accuracy. Dr. Wells then reviewed the data collected from Chicago Police

Department files for the 138 homicide cases that involved eyewitness identification evidence to determine whether the rates of the eyewitnesses making positive identifications of suspects, tentative positive identifications of suspects, no identification of anyone in the lineup, or identifications of a filler (based on what was reported in the case files) were within expected and reasonable numerical ranges. (*Id.* at 2.)

140.    Dr. Wells found that the Chicago files showed a total absence of any filler identifications reported on an official or ancillary lineup report. In all of the thousands of pages of police files reviewed, there were only two pages that contained vague references to possible filler identifications, and these were mentioned in documents that were not police reports and that did not actually report the results of lineups. Notably, in both of those cases the official lineup reports did not report the filler identifications. (Ex. 69,  Wells Report Exhibit C,  RD# G159909 at RFC 2775-76, 2914, 2866-67, RD #K466033 at RFC 8484-85, 8529-30)

141.    In total, Dr. Wells reviewed 980 eyewitness identification attempts in the police reports of lineups that were included in the files produced by Chicago. Based on peer-reviewed published field studies across many jurisdictions, there should have been anywhere between 232 and 321 filler identifications found in these police reports. The absence of filler identifications in these police reports cannot be due to chance, and instead is the result of the result of a policy or practice of the detectives in these cases not reporting filler identifications.  (Id. at 3.)

142.    Controlled studies in psychological science indicate that people commonly make mistakes in attempting to identify a person they encountered previously. There is no single rate of mistaken identification, but instead mistaken identification rates vary as a function of a large number of variables relating to the three stages of memory, namely acquisition, retention, and retrieval. The reliability of an identification depends critically on factors such as view and

attention (acquisition variables), events that occur between witnessing and attempting to identify (retention variables), and the manner in which the identification test is administered (retrieval variables). All three factors (acquisition, retention, and retrieval) are necessary for successful retrieval of an accurate memory. In other words, a problem at the level of any one of these factors is sufficient to make a memory fail. At acquisition, for instance, stress and fear reduce the amount of information that is processed, thereby severely restraining what can be retained and what can be retrieved. As a result, encountering a person under stressful or fearful conditions increases the chances that the witness will later make a mistaken identification. (Id. at 3-4.)

143. There are now also eleven major studies that are published in peer-reviewed scientific journals that have tracked the outcomes of lineups conducted by police in actual cases across a broad number of jurisdictions, including Northern California, San Diego, Houston, TX, Tucson, AZ, Austin, TX, Charlotte, NC, and London, England. Collectively, these eleven field studies include over 6,000 eyewitness attempts to identify a perpetrator from a lineup. (Id. at 4-5.)

144. One of the core elements of each of the peer-reviewed studies of outcomes in actual police lineups is obtaining data on the rates at which eyewitnesses identify the suspect in a lineup (who might or might not be the guilty person), identify fillers (known-innocents who are placed in the lineup for the purpose of making it fair to the suspect), or make no identification. (Id. at 5.)

145. Taken in the aggregate, in the eleven peer-reviewed studies there were 6,734 attempts by eyewitnesses to identify perpetrators from lineups. Among the 6,734 attempts by eyewitnesses to identify the perpetrator from a lineup, 2,746 (40.8%) identified the suspect, 1,599 (23.7%) identified a known-innocent filler, and 2,389 (35.5%) identified no one. In other

words, on average a lineup filler is selected 24% of the time; and for every one suspect identification that occurs, we would expect about .58 filler identifications (i.e., 1,599 filler IDs divided by 2,746 suspect IDs). (Id. at 6-7.)

146.     The 138 Chicago Police Department files that were reviewed consist primarily of two categories of reports documenting identifications: (1) 211 official lineup reports, 209 of which were live lineups; and (2) 175 ancillary reports, 257 of which were photo lineups. (Id. at 7.)

147.     Beginning with the official lineup reports, some lineup reports document lineups viewed by more than one witness, or involving more than one suspect. As a result, the 211 official lineup reports contained 666 possible identifications of suspects (total number of witnesses x total number of suspects). The outcomes of the 666 possible identifications of suspects in Chicago, and as compared to outcomes from published field studies, are reported by Dr. Wells as follows:

| Comparison: | Field | | Chicago | |
|---|---|---|---|---|
| Suspect | 2746 | (40.8%) | 364 | (54.6%) |
| Filler | 1599 | (23.7%) | 0 | ( 0.0%) |
| No pick | 2389 | (35.5%) | 213 | (32.0%) |
| No outcome rep'd | 0 | | 89 | (13.4%) |
| Total | 6734 | | 666 | |

(*Id.* at 7.)

148.     Using these data, Chi-Square tests were used to compare the published field studies to the Chicago results on filler identification rates to test the statistical significance of the findings by determining a probability (called a p-value) that the two samples would yield the difference being observed based on mere chance. The results of the Chi-Square test on the data above results in a p-value of less than .0001, meaning that there is less than one chance in 10,000

54

that obtaining zero filler identifications in 666 lineups could have been due to mere chance. (Id. at 8.)

149.    Turning to the ancillary reports, there were 314 total witness attempts.  The outcomes of the 314 possible identifications of suspects in Chicago, and as compared to outcomes from published field studies, are reported by Dr. Wells as follows:

| Comparison: | Field | | Chicago | |
|---|---|---|---|---|
| Suspect | 2746 | (40.8%) | 190 | (60.5%) |
| Filler | 1599 | (23.7%) | 0 | (0%) |
| No pick | 2389 | (35.5%) | 100 | (31.8%) |
| No outcome rep'd | 0 | (0%) | 24 | (7.6%) |
| Total | 6734 | | 314 | |

(*Id.* at 9-10.)

150.    Using these data, the results of the Chi-Square test on the data above results in a p-value of less than .0001, meaning that there is less than one chance in 10,000 that obtaining zero filler identifications in 314 lineups could have been due to mere chance. (Id. at 10.)

151.    Based on field studies, of the 980 total eyewitness attempts in the Chicago case files studied in this case, one would have expected to see filler identifications totaling in the range of 232 (23.7% of 980) and 321 (554 identifications of suspects x .58). (Id. at 12.)

152.    Dr. Wells concluded that the Chicago Police Department's total or near total absence of documented filler identifications indicated that there was a policy or practice of not reporting filler identifications.  (*Id.* at 12-13.)

## C.    Failure to Discipline

153.    Juan Johnson:  In 1989, Detective Guevara framed Juan Johnson for murder by coercing Samuel Perez into falsely implicating Johnson. To accomplish this feat, Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan

55

Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer. (See Ex. 80, Testimony of Samuel Perez, *People v. Johnson*, 89 CR 21806, at Bluhm 008131-48). Juan Johnson was later exonerated and Johnson sued Guevara in *Johnson v. Guevara*, 05-C-1042, eventually obtaining a verdict against him for $21 million. (See Ex. 81, Jury Verdict in *Johnson v. Guevara*, 05 C 1042). Guevara has taken the Fifth in regard to all allegations regarding Juan Johnson. (Ex. 24A, Guevara Dep, at 398-402).

154.    Bill Dorsch: In approximately 1990, former Chicago police detective Bill Dorsch was present when Detective Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license plate of the shooter's car. While the first juvenile was viewing a photo array, and before he identified any of the photographs, Guevara pointed to the suspect's photo and told the juvenile "that's him."  The juvenile then agreed with Guevara, saying that was the person who committed the shooting. (See Ex. 82, Testimony of William Dorsch, *People v. Serrano & Montanez*, 93 CR 1873 at JR-L 076819, JR-L 076824-48). Mr. Dorsch then directed Guevara to leave the room and had the other juvenile view the same photo array—that juvenile was unable to make any identification. (*Id.*)  Subsequently, Dorsch spoke to the two juveniles without Guevara present. The juveniles admitted that they had been paid to falsely claim that the suspect was shooter. (*Id.*) Dorsch's supervisors in the CPD knew about Guevara's misconduct in that case, but instead of disciplining Guevara, instead Guevara was promoted. (*Id.* at JR-L 076888-90, JR-L 076906-09, JR-L 076928-32).  Guevara has taken the Fifth in regard to all allegations regarding Bill Dorsch's accusations. (Ex. 24A, Guevara Dep, at 402-15).

155.    Serrano & Montanez: In 1993, Detective Guevara used physical violence and inducements to coerce Francisco Vicente into falsely testifying against Armando Serrano and

Jose Montanez. When Vicente initially refused to cooperate, Guevara hit him in the head and promised him money and a favorable disposition on unrelated pending charges. Guevara then provided Vicente with the details of the crime. (See Ex. 83, Affidavit of Francisco Vicente, at ¶¶4-14). In that same investigation, Detective Guevara beat Timothy Rankins with a flashlight, threw him out of his chair, and placed him in a chokehold to induce a statement implicating Serrano and Montanez. As a result, Rankins testified falsely against the men in the Grand Jury. (See Ex. 84, Testimony of Timothy Rankins in *People v. Serrano*, 93 CR 18173, at JR-L 02899-912). The City of Chicago has since determined that Montanez and Serrano were wrongfully convicted. (*See* Ex. 85, Lassar Report Dated 3/3/15, at CCSAO 0046156). In 2016, both men were exonerated and received certificates of innocence. (See Ex. 86 and Ex. 87, Certificates of Innocence for Jose Montanez and Armando Serrano). Guevara has taken the Fifth in regard to all allegations regarding Vicente, Rankins, Montanez, and Serrano. (Ex. 88, Testimony of Reynaldo Guevara in *People v. Serrano & Montanez*, 93 CR 18173, at JR-L 077138-43, JR-L 077148-62).

156. Robert Bouto: Also in 1993, Detective Guevara manipulated the results of the line-up in which Mr. Bouto was identified. Specifically, Detective Guevara allowed witnesses to see Mr. Bouto in the police station prior to the line-up, allowed them to view photographs Mr. Bouto and confer with one another before the line-up, and threatened a witness that Guevara would "put a case" on him if he did not cooperate. (*See* Ex. 89, Affidavit of Rey Lozada, at ¶¶ 3-5, 6-11; Ex. 90, Affidavit of Carl Richmond, at ¶¶ 5, 7-9). Ultimately, the City of Chicago investigated Mr. Bouto's claims and concluded that Mr. Bouto is more likely than not innocent. (*See* Exhibit 91, Lassar Report regarding Robert Bouto Dated 3/3/15, at JR-L 055738-39). Guevara has taken the Fifth in regard to all allegations regarding Bouto's case. (Ex. 24A, Guevara Dep, at 560).

57

157.    Almodovar & Negron: The City of Chicago has also determined that Roberto Almodovar was wrongfully convicted in another case investigated by Guevara in 1994. (*See* Ex. 92, Lassar Report regarding Roberto Almodovar, Dated 2/9/15, at JR-L 042869, JR-L 042882). In that case, Guevara was alleged to have framed Almodovar for a murder he did not commit by surreptitiously showing his photograph to witnesses before they viewed a lineup and then falsifying reports to make it seem as if the witnesses had picked Almodovar out of a line-up without any influence by Guevara. (*See* Ex. 93, Affidavit of Melinda Power; Ex. 94, Post-Trial Testimony of Kennelly Saez in People v. Negron, 94 CR 24318). Almodovar, and his co-defendant William Negron, have both since been exonerated. (*See* Ex. 95, Order Vacating Judgment and Sentence in *People v. Negron*, 94 CR 24318 ). Guevara has taken the Fifth in regard to all allegations regarding the case against Almodovar and Negron. (Ex. 24A, Guevara Dep, at 434-39).

158.    Solache & Reyes: In 1998, Detective Guevara repeatedly struck Gabriel Solache on the side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop.  Solache sustained permanent hearing loss to his left ear as a result of his abuse. (*See* Ex. 96, Suppression Hearing Testimony of Gabriel Solache, *People v. Solache & Reyes*, 98 CR 12440, at Bluhm 018579, 018586-97). In that same investigation, Detective Guevara repeatedly threatened and beat Arturo Reyes in an attempt to coerce Reyes into falsely implicating himself.  After two days of isolation and interrogation, Reyes finally gave in and falsely confessed.  (*See* Ex. 97, Suppression Hearing Testimony of Arturo Reyes, *People v. Solache & Reyes*, 98 CR 12440 ,at Bluhm 018478, 018482-502). The City of Chicago subsequently determined that Solache and Reyes were abused during their interrogations and that

their convictions should not stand. (*See* Ex. 98, Lassar Report Regarding Solache and Reyes, Dated 12/12/14, at CCSAO 0043666-67). Guevara has taken the Fifth in regard to all allegations regarding Solache and Reyes. (Ex. 99, Testimony of Reynaldo Guevara in People v. Arturo Reyes & Gabriel Solache, 98 CR 12440, at JR-L 049858-65).

159.     Guevara's Criminal Activity: The FBI authored a 302 report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Detective Guevara, in the 1980s and 1990s.  The report explains that Guevara would apprehend drug and gun dealers and then allow them to "buy their way out of trouble."  Guevara also took bribes to alter the results of lineups.  Guevara, using an attorney as a conduit, would also receive cash in exchange for the dismissal of murder cases he investigated.  (See Ex. 100, FBI Report Dated June 23, 2001 at JR-L 02444-45). Guevara has taken the Fifth in regard to all allegations regarding the topics covered in the 302. (Ex. 24A, Guevara Dep, at 418-26).

160.     Dozens of Other Instances of Guevara Misconduct:  In 1982, Guevara physically assaulted Annie Turner by hitting her across the face with a metal bracelet and called her a "nigger bitch;" although Ms. Turner complained to OPS, no discipline was imposed on Guevara; (*See* Ex. 101, Testimony, Medical Records, and OPS Complaint of Annie Turner); In 1982, Detective Guevara broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home; again, Ms. Lloyd complained to OPS, but no discipline was imposed; (See Ex. 102, OPS Complaint of Almarie Lloyd, Testimony of Almarie & Job Lloyd, *Hunt v. Jaglowski*, 85 C 1976); In 1983, Guevara and others beat Leshurn Hunt until he confessed to murder; that statement was suppressed and Mr. Hunt sued Guevara and complained to OPS about Guevara's misconduct;  (*See* Ex. 103, Affidavit of Leshurn Hunt; Ex. 104, Testimony of Leshurn Hunt in *Hunt v. Jaglowski*, 85 C 1976, at Bluhm 038527, 038539-89, 038609-12; Ex.

105, Letter from Leshurn Hunt to Eugene Hudson, Dated 2/28/86); In 1984, Guevara physically assaulted Graciela Flores; (*See* Ex. 106, Testimony of Graciela Flores & Anna Flores, *Hunt v. Jaglowski*, 85 C 1976); In 1985, Detective Guevara used threats and violence to attempt to coerce a false identification from Reynaldo Munoz; (*See* Ex. 107, Affidavit of Reynaldo Munoz); In 1986, Guevara beat Rafael Garcia, and the City's OPS found that Guevara had lied about the incident and recommended that Guevara be suspended; (*See* Ex. 108, OPS Complaint of Rafael Garcia); In 1986, Guevara coerced a confession from Daniel Pena by beating him; (*See* Ex. 109, Testimony of Daniel Pena, Armador Rivera, and Jamie Velez in *People v. Pena*, 86 CR 1458); In 1986, Guevara called Melvin Warren a "nigger dog" and beat him, and the City's OPS initially sustained Warren's allegations, recommending a five-day suspension, but OPS later downgraded the discipline to a reprimand for calling a citizen "nigger;" (*See* Ex. 110, OPS Complaint and Testimony of Melvin Warren, *Hunt v. Jaglowski*, 85 C 1976; Ex. 111, OPS Report and Findings regarding Warren Hunt); In 1989, Guevara coerced a false confession from Victor Vera; (See Ex. 112, Affidavit of Victor Vera); In 1989, Guevara coerced Virgilio Muniz to falsely implicate Manuel Rivera (See Ex. 113, Affidavit of Virgilio Muniz); in 1989, Guevara threatened Virgilio Calderon Muniz (unrelated to the Virgilio Muniz) into falsely identifying Victor Vera (See Ex. 114, Affidavit & Testimony of Virgilio Calderon Muniz); in 1991, Guevara coerced Wilfredo Rosario into falsely identifying Xavier Arcos; (*See* Ex. 115, Testimony of Wilfredo Rosario & Appellate Court Opinion, *People v. Arcos*, 91 CR 743)2; In 1991, Guevara coerced David Rivera falsely confessing to murder; (*See* Ex. 116, Affidavit of David Rivera); In 1991, Detective Guevara coerced a false confession from Daniel Rodriguez; (*See* Ex. 117, Affidavit of Daniel Rodriguez); In 1991, Guevara physically coerced sixteen year-old David

---

[2] Mr. Arcos was convicted based on the false evidence, but the appellate court overturned his conviction based on a lack of evidence. *See People v. Arcos*, 228 Ill App. 3d 870, 876 (1st Dist. 1996).

Velazquez into falsely identifying Daniel Rodriguez; (*See* Ex. 118, Testimony of David Velazquez in People v. Velazquez, 91 CR 13938); In 1991, Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup; (*See* Ex. 119, Affidavits of Efrain & Julio Sanchez, Police Reports from *People v. Colon*, 93 CR 23750); In 1992, Guevara obtained an involuntary confession from 15 year-old Jacqueline Montanez; *see People v. Montanez*, 273 Ill. App. 3d 844, 855 (1st Dist. 1995); In 1993, Guevara tried to coerce 15 year-old Eleizar Cruzado into implicating himself in a murder; (*See* Ex. 120, Suppression Hearing Testimony of Eleizar Cruzado, *People v. Cruzado*, 93 CR 24896); In 1993, Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz; (*See* Ex. 121, Affidavit of Adolfo Frias Munoz); In 1994, Guevara used violence to coerce a confession from Adrian Duta; (*See* Ex. 122, Affidavit of Adrian Duta); In 1995, Guevara and others coerced an involuntary confession from Santos Flores; *see People v. Flores*, 315 Ill. App. 3d 387, 393-94 (1st Dist. 2000); In 1995, Guevara coerced Evelyn Diaz into falsely identifying Luis Serrano; (*See* Ex. 123, Deposition of Evelyn Diaz, *Johnson v. Guevara*, 05 C 1042); In 1995, Guevara told Luis Figueroa to falsely identify Angel Diaz; (*See* Ex. 124, Testimony of Luis Figueroa, *People v. Diaz*, 95 CR 610901 & Supplemental Police Report); In 1995, Guevara coerced Gloria Ortiz Bordoy into falsely implicating Santos Flores; (*See* Ex. 125, Deposition of Gloria Ortiz Bordoy, *Johnson v. Guevara*, 05 C 1042); In 1995, Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez; (*See* Ex. 126, Affidavit of Rodolfo Zaragoza); In 1995, Guevara told Jose Melendez to falsely identify Thomas Sierra; (*See* Ex. 127, Testimony of Jose Melendez, *People v. Sierra*, 95 CR 18601); In 1996, Guevara coerced Maria Rivera into falsely identifying Angel Gaya and all charges were later dropped in the case (*See* Ex. 128, Suppression Hearing Testimony of Maria Rivera, *People v. Solache and Reyes*, 98 CR 12440); In 1997, Guevara coerced Robert Ruiz into

falsely identifying Freddy and Concepcion Santiago as the murderers of Guevara's nephew; (*See* Ex. 129, Testimony of Robert Ruiz, *People v. Santiago & Santiago*, 97 CR 20973); In 1997, Guevara falsely reported that witness Ruth Antonetty implicated Ariel Gomez in a murder, when she had not; (*See* Ex. 130, Post-Conviction Petition in *People v. Gomez*, 97 CR 18961); In 1997, Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room; (*See* Ex. 131, Affidavit of Jed Stone); In 1998, Guevara used violence against Rosauro Mejia in an attempt to coerce a confession from him; (*See* Ex. 132, Suppression Hearing Testimony of Rosauro Mejia, *People v. Solache & Reyes*, 98 CR 12440); In 1998, Guevara used violence against Adriana Mejia during her interrogation; (See Ex. 133, Suppression Hearing Testimony of Adriana Mejia, *People v. Solache & Reyes*, 98 CR 12440); In November 2001, Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and conferred with Guevara; (*See* Exhibit 91, Lassar Report regarding Robert Bouto Dated 3/3/15).

161.    Detective Guevara has refused to testify about his interactions with: Anna Flores (Ex. 88, Testimony of Reynaldo Guevara in *People v. Serrano & Montanez*, 93 CR 18173, at JR-L 077143, JR-L 077171-72; Ex. 99, Testimony of Reynaldo Guevara in P*eople v. Arturo Reyes & Gabriel Solache*, 98 CR 12440, at JR-L 049883-85), Graciela Flores (Ex. 88 at JR-L 077143, JR-L 077171-72; Ex. 99 at JR-L 049883-84), David Velazquez (Ex. 88 at JR-L 077143, JR-L 077168-71; Ex. 99 at JR-L 049873-75), Efrain Sanchez (Ex. 88 at JR-L 077144, JR-L 077172-73), Julio Sanchez (Ex. 88 at JR-L 077144, JR-L 077173-74), Adolfo Frias Munoz (Ex. 88 at JR-L 077144-45, JR-L 077174-75; Ex. 99 at JR-L 049869-70), Jose Melendez (Ex. 88 at JR-L 077145, JR-L 077177-79; Ex. 99 at JR-L 049886, JR-L 049888), Gabriel Solache (Ex. 88 at JR-L 077145-46; Ex. 99 at JR-L 049861-64), Arturo Reyes (Ex. 88 at JR-L 077146; Ex. 99 at JR-L

049858-61, JR-L 049893-94), Virgilio Muniz (Ex. 88 at JR-L 077147, JR-L 077180), Luis

Figueroa (Ex. 88 at JR-L 077176; Ex. 99 at JR-L 049890-92), Angel Diaz (Ex. 88 at JR-L

077176-77; Ex. 99 at JR-L 049891-92, JR-L 049894), Wilfredo Rosario (Ex. 88 at JR-L 077181-

82), Xavier Arcos (Ex. 88 at JR-L 077182; Ex. 99 at JR-L 049880-81), Gloria Ortiz Bordoy (Ex.

88 at JR-L 077182-83), Robert Ruiz (Ex. 88 at JR-L 077184; Ex. 99 at JR-L 049877-79),

Leshurn Hunt (Ex. 99 at JR-L 049867-68), Adrian Duta (Ex. 99 at JR-L 049868-69), Voytek

Dembski (Ex. 99 at JR-L 049871-72), Daniel Pena (Ex. 99 at JR-L 049875-77), Annie Turner

(Ex. 99 at JR-L 049881-82), and Thomas Sierra (Ex. 99 at JR-L 049887-88).


Respectfully Submitted,
PLAINTIFF JACQUES RIVERA

By   /s/ Steven Art
One of his attorneys


Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Elizabeth Mazur
Anand Swaminathan
Steven Art
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900

Locke E. Bowman
Sheila Bedi
David Shapiro
Alexa Van Brunt
RODERICK MACARTHUR JUSTICE CENTER
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844

J. Samuel Tenenbaum
BLUHM LEGAL CLINIC
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-8576

## CERTIFICATE OF SERVICE

I, Steven Art, an attorney, certify that on September 19, 2017, I served Plaintiff's

Combined Response Local Rule 56.1(b)(3)(B) Statement of Additional Material Facts Opposing Motions for Summary Judgment of Individual Defendants and Defendant City of Chicago on all counsel of record.

/s/ Steven Art
*Counsel for Jacques Rivera*

*Attorneys for Defendants Guevara, Gawrys, Noon, Guzman, Fallon, Sparks, Zacharias, McLaughlin, Leonard, Mingey, Weingart, and the Estate of Rocco Rinaldi*

James G. Sotos
Elizabeth A. Ekl
Jeffrey N. Given
Caroline P. Golden
The Sotos Law Firm
550 E. Devon Ave., Suite 150
Itasca, Illinois 60143

*Attorneys for Defendant City of Chicago*

Eileen E. Rosen
John J. Rock
Silvia M. Masters
Stacy A. Benjamin
Erin N. Bybee
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000