UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12-CV-04428 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| REYNALDO GUEVARA et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

On the afternoon of Saturday, August 27, 1988, someone shot Felix Valentin eleven times

as he sat in a car parked on Chicago's west side. ECF No. 332 ¶¶ 2–3.[1] Jacques Rivera, the

plaintiff here, was convicted of Valentin's murder in 1990 after a bench trial. *See* ECF No. 332

¶ 90; ECF No. 316 ¶ 1. It is undisputed that "Rivera has always been completely innocent, and

had nothing to do with the tragic death of Felix Valentin." ECF No. 332 ¶ 96.

As the Seventh Circuit stated when it reviewed Rivera's conviction in 2002, "Certainly,

the evidence against Rivera was not overwhelming. The state's case hinged entirely on the

testimony of a thirteen-year old witness who identified Rivera as the shooter." *Rivera v. Briley*,

52 F. App'x 270, 274 (7th Cir. 2002); *accord United States ex rel. Rivera v. DeTella*, No. 97 C

---

[1] The City and the officer defendants filed separate Local Rule 56.1(a)(3) statements with their respective motions. Rivera filed with his response a combined Local Rule 56.1(b)(3)(C) statement of additional material facts he contends require denial of summary judgment. The statements have long titles. For brevity's sake, the court refers to the defendants' statements as the "City's Statement of Material Facts" ("City SMF" in citations), ECF No. 307, and the "Officers Statement of Material Facts" ("Officers SMF"), ECF No. 305. Rivera's Local Rule 56.1(b)(3) statement is referred to as the "Plaintiff's Combined Statement of Additional Facts" ("Pl. SAF" in citations), ECF No. 317. Citations to the summary judgment exhibits are as follows: "Officer Defs. Tab xx" refers to the officer defendants' exhibits to their Local Rule 56.1 statement, ECF No. 305; "City Tab xx" refers to the City's exhibits to its Local Rule 56.1 Statement, ECF No. 307; and "Pl. Ex. xx" refers to plaintiff's exhibits to his Local Rule 56.1 statement, ECF No. 313. Where possible the court utilizes the original pagination of exhibits. The court indicates the use of a Bates page number by including the appropriate abbreviation in the citation. Two exceptions are the transcript of Rivera's criminal trial, Pl. Ex. 3, ECF No. 313-3, and the transcript of the 2011 post-conviction proceedings, Pl. Ex. 5, ECF No. 313-5, for which Bates numbers are used (but which have no accompanying abbreviation) as the transcripts' original page numbering begins anew with each new court date.

2993, 1998 WL 704308, at *1 (N.D. Ill. Sept. 29, 1998). Nonetheless, "the credible testimony of one eyewitness is sufficient to support a conviction." *Rivera*, 52 F. App'x at 274 (citing *United States ex rel. Wandick v. Chrans*, 869 F.2d 1084, 1089 (7th Cir. 1989)).

The support for Rivera's conviction effectively collapsed in 2011 when Orlando Lopez, the twelve-year-old eyewitness (he was thirteen when he testified at Rivera's trial), recanted his trial testimony at a hearing held in state court on June 23, 2011. ECF No. 332 ¶ 95. The state court found that Lopez's recantation was credible and ordered a new trial. *Id.*; Pl. Ex. 18 at 7–8. Prosecutors dropped the charges against Rivera in October 2011, and he walked out of prison a free man after spending more than twenty years in prison for a crime he did not commit. ECF No. 332 ¶ 96. The state court issued Rivera a certificate of innocence on September 5, 2012. *Id.* ¶ 97; *see* Pl. Ex. 17; 735 Ill. Comp. Stat. 5/2-702.

Rivera then filed this suit under 42 U.S.C. § 1983 and Illinois law against the City of Chicago ("the City") and several Chicago police officers, including Reynaldo Guevara (collectively "officer defendants"), allegedly involved in the investigation of the Valentin murder. The City and the officer defendants have filed separate motions for summary judgment; the City joins the officer defendants' motion.

## I. SUMMARY JUDGMENT STANDARD AND LOCAL RULE 56.1 STATEMENTS

Before reciting the factual background, the court sets forth the summary judgment standard–an understanding of which helps to frame a threshold issue. Defendants object to Rivera's Local Rule 56.1 submissions in opposition to the pending motions, contending that the statements should be stricken from the record.

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The underlying substantive law governs whether a factual dispute is material: 'irrelevant or unnecessary' factual disputes do not preclude summary judgment." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248). In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of, "the nonmoving party[–but] only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted). Summary judgment is warranted when the nonmoving party cannot establish an essential

element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## B.  Local Rule 56.1 Statements

Local Rule 56.1 sets out a procedure for presenting facts that are germane to a party's request for summary judgment pursuant to Fed. R. Civ. P. 56.  Specifically, Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting L.R. 56.1(a)(3)).  Each paragraph of the movant's facts must include "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a).  The "[f]ailure to submit such a statement constitutes grounds for denial of the motion." *Id.*  Local Rule 56.1(b)(3) requires the nonmoving party to submit a response to each statement of fact provided by the movant, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B).  The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(C).  "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.* Similarly, "[i]f additional material facts are submitted by the opposing party . . ., the moving party may submit a concise reply in the form prescribed in that section for a response."

L.R. 56.1(a).  If the movant fails to respond properly to the opposing party's statement of additional facts, those facts will be deemed admitted.  *Id.*

The parties sought and obtained leave to exceed the respective 80- and 40-statement limits on the number of paragraphs in a moving party and responding party's Local Rule 56.1 statements.  *See* N.D. Ill. L.R. 56.1(a), (b)(3)(C).  Defendants accuse Rivera of blatantly violating Local Rule 56.1 and the assigned judge's standing order on summary judgment motions.  They urge the court to strike Rivera's responses to their Local Rule 56.1 statements of material facts and his Combined Statement of Facts in their entirety or, failing that, disregard several paragraphs of those papers.  *See* Defs. Combined Reply 3–6, ECF No. 333.  Defendants identify six purported defects in Rivera's Local Rule 56.1 submissions.  As explained in the following paragraphs, the court disregards certain material in Rivera's Local Rule 56.1 submissions but leaves resolution of legal issues and arguments on materiality to the discussion on the merits.

"[T]he Seventh Circuit repeatedly has held that the district court is within its discretion to enforce strict compliance with the requirements of Local Rule 56.1."  *Hanover Ins. Co. v. House Call Physicians of Ill.*, No. 15 C 3684, 2016 WL 1588507, at *2 (N.D. Ill. Apr. 19, 2016) (collecting cases).  This is because "[c]ompliance with local rules like Rule 56.1 ensures the facts material to the issues in the case and the evidence supporting such facts are clearly organized and presented for the court's summary judgment determination."  *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015).  "The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination."  *Id.*  And parties should be cognizant of the rule that "district courts are not required to 'wade through improper denials and legal argument in search of a genuinely disputed

fact.'" *Id.* (quoting *Bordelon v. Chicago Sch. Reform Bd.*, 233 F.3d 524, 529 (7th Cir. 2000)). With these principles in mind, the court considers defendants' objections to Rivera's Local Rule 56.1 submissions.

First, some paragraphs of Rivera's Local Rule 56.1 submissions include legal argument and arguments about what inferences should be drawn from facts. Defendants sometimes respond argumentatively in their Local Rule 56.1 submissions. The court disregards the portions of the parties' Local Rule 56.1 submissions that make legal arguments and assert legal conclusions, which are not factual statements at all. *See Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 359–60 (7th Cir. 2009) (affirming decision to disregard "argumentative" Local Rule 56.1 statement); *Fetzer v. Wal-Mart Stores, Inc.*, No. 13 C 9312, 2016 WL 792296, at *8 (N.D. Ill. Mar. 1, 2016) (Gottschall, J.) ("[L]egal arguments in Rule 56.1 submissions are improper so the court will disregard legal arguments and conclusions in the plaintiffs' Rule 56.1 submissions." (citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008)); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). The noncompliant paragraphs will not be stricken, however, as doing so would in some cases throw out a properly supported assertion along with a legal argument or conclusion. Instead, the properly supported factual assertion stays in the Local Rule 56.1 statement; the court disregards the portion of any factual statement that contains legal arguments or conclusions. *Minn. Life Ins. Co. v. Kagan*, 847 F. Supp. 2d 1088, 1093 (N.D. Ill. 2012) (denying motion to strike portions of Local Rule 56.1 statements containing legal conclusions but disregarding conclusions); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771–72 (N.D. Ill. 2012) (same).

Defendants next object that some paragraphs of Rivera's combined Statement of Additional Facts make compound factual assertions. For instance, defendants claim

Paragraphs 1 and 40 of the Combined Statement of Additional Facts, e.g., ECF No. 317, consist of seven and eight "facts" respectively, each of which should apparently be in a separate paragraph. Paragraphs 1 and 40 are each two sentences long. The court does not count facts or sentences mechanically, however, though the number often increases complexity. "A statement of material facts that presents one fact at a time per paragraph would not be an efficient manner in which to present a statement of material facts and would not be consistent with Local Rule 56.1." *Nettles-Bey v. Burke*, No. 11 C 8022, 2015 WL 4638068, at *5 (N.D. Ill. Aug. 4, 2015) (Gottschall, J.) (quoting *Fishering v. City of Chicago*, No. 07 C 6650, 2009 WL 395462, at *2 (N.D. Ill. Feb. 18, 2009)) (alteration omitted). At some point, paragraphs become objectively too long, but deciding when requires an exercise of discretion with sensitivity to the needs and complexity of the case. *See Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 655–56 (7th Cir. 2011) ("[W]hat is 'short' to one judge may be long to another, and a single judge's definition might reasonably vary from case to case."). Generally, when the presentation becomes more confusing than efficient, as when the facts in a single paragraph are jumbled or disjointed, appear to be non sequiturs, or their connection must be explained by an improper argument, Local Rule 56.1 requires the paragraph to be split. *See Nettles-Bey*, 2015 WL 4638068, at *5 (concluding that plaintiff properly combined sentences because "the sentences [were] all clearly interrelated so that it would make no sense to split them into separate paragraphs"); *Cardoso v. Cellco P'ship*, No. 13 C 2696, 2014 WL 6705282, at *3 (N.D. Ill. Nov. 26, 2014) ("Local Rule 56.1 directs counsel to present facts in 'short numbered paragraphs' to prevent lengthy stream-of-consciousness submissions that are difficult for opposing counsel and the court to assess.").

Recognizing the practical issues involved, defendants say that they have sought only to strike the "most egregious" portions of Plaintiff's Combined Statement of Additional Facts "that are too lengthy and disjoined to allow a proper response." Defs. Combined Reply 5, ECF No. 333 (citing specific paragraphs). Yet defendants responded to each of the allegedly egregious paragraphs, albeit while reserving the instant objection. *See, e.g.*, Resp. to SAF ¶¶ 1, 3, 19, 68, ECF No. 332. Moreover, the sentences themselves, though there are sometimes as many as eleven of them, bear a logical relationship to one another so that keeping them together as a unit makes sense. Given the needs of this case, keeping the basic, mostly undisputed facts of the shooting and drive to the hospital together in paragraph 3 seems sensible, for instance. Paragraph 120's recitation of a purported expert witnesses' career history may be unnecessary and unhelpful because it regurgitates the record rather than streamlines the presentation of material issues. But even so, the sentences reciting the history have a logical connection. The court can see no benefit in requiring further disaggregation. *See Nettles-Bey*, 2015 WL 4638068, at *5.

Third, defendants contend that certain paragraphs of Plaintiff's Combined Statement of Additional Facts do not cite specific evidentiary material in the record.[2] Local Rule 56.1 makes it the "the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact." *Curtis*, *supra*, 807 F.3d at 219 (affirming district court's decision to disregard portions of Local Rule 56.1 statement because litigant did not cite supporting evidentiary material); *see also Patterson*, *supra*, 589 F.3d at 359–60 (affirming decision to disregard material for failure to cite portions of the record creating

---

[2] Defendants also say this problem plagues plaintiff's response to their statements of fact, but they cite no examples. Defs. Combined Reply 5, ECF No. 333.

factual dispute because the Seventh Circuit has "repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions" (quoting *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005)). An examination of the paragraphs to which defendants object reveals that Rivera generally cites evidentiary materials by page and line where appropriate. *E.g.*, ECF No. 317 ¶¶ 1, 9. Defendants assert instead that the cited evidence does not support the proposition for which it is cited, *e.g.*, Resp. to SAF ¶¶ 1, 9, or mischaracterizes the evidence, *e.g.*, *id.* ¶¶ 16, 24, 26, 27. Because these objections turn out to be issue-specific, fact-intensive, and sometimes immaterial, the court addresses them infra to the extent they bear on material issues.

The fourth issue defendants raise is plaintiff's use of cross references. *E.g.*, Pl. SAF ¶¶ 11, 16, 19, 21, 50, 128. Local Rule 56.1 requires citations to the record evidence rather than cross reference to a reference to a citation; using a cross reference saves counsel time but offloads on the court the burden of identifying what is factually disputed and whether the dispute is material. *Schlessinger v. Chicago Hous. Auth.*, 130 F. Supp. 3d 1226, 1228 (N.D. Ill. 2015) (Gottschall, J.) (finding response that cited statement of additional facts rather than record violated Local Rule 56.1). The court therefore disregards the portions of Plaintiff's Combined Statement of Additional Facts that cite other paragraphs of it. *See id.*

Fifth, defendants claim that several of plaintiff's additional facts are immaterial. A Local Rule "56.1(a) statement should be limited to material facts, that is, facts pertinent to the outcome of the issues identified in the summary judgment motion." *Malec, supra*, 191 F.R.D. at 583 (emphasis omitted). Rivera argues vociferously that his facts are material in the summary judgment sense, and the answer to that question, in the appropriate context, lies very much at the heart of the parties' dispute here. Rather than attempt to winnow the voluminous statements to

only material paragraphs in the abstract, the court again deems addressing materiality questions as they pertain to particular issues to be the better course because it may obviate the need to analyze each disputed paragraph. *Cf. Tarau v. Coltea*, No. 15-CV-03545, 2017 WL 3521410, at *1 (N.D. Ill. Aug. 16, 2017) ("Because neither party contends these facts are material, the court need not resolve [a] dispute" about whether the facts should stricken. (citation omitted)).

Finally, defendants point out that Rivera's response brief cites to an expert report not mentioned in his Combined Statement of Additional Facts. *See* Pl. Combined Resp. 34–36, ECF No. 321 (citing Report of Jennifer Dysart, Pl. Ex. 21). The court has searched Rivera's Combined Statement of Additional Facts but finds no reference to the expert by name or the cited exhibit. *See* ECF No. 317. Defendants therefore never had a procedurally proper opportunity, under L.R. 56.1, to test the report as a summary judgment exhibit, so the court disregards it, Pl. Ex. 21, at this stage. *See Greene v. CCDN, LLC*, 853 F. Supp. 2d 739, 744 (N.D. Ill. 2011) ("[T]he Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts." (citing *Malec*, 191 F.R.D. at 584)).

Having addressed the procedural issues pertinent to the parties' Local Rule 56.1 statements, the court is ready to delve into the facts and exhibits in earnest.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Summary of Complaint

Rivera's complaint has eight counts. In Count I, he alleges that defendants violated the due process clause by withholding and suppressing exculpatory evidence. Compl. ¶¶ 51, 53, ECF No. 1. He alleges in Count II that the officer defendants conspired to violate his constitutional rights. In Count III, Rivera brings failure to intervene claims; that is, he claims one or more of the officer defendants stood by while other officers violated his constitutional

rights.  Compl. ¶ 64.  Finally, in Count IV, Rivera seeks to hold the City liable under *Monell* for

his damages on the theory that a City policy was the moving force behind the officer defendants'

alleged violations.  Compl. ¶ 68.

Counts V–VIII arise under Illinois law.  In the order pleaded, they are: a malicious

prosecution claim (Count V), a civil conspiracy claim (Count VI), a claim for intentional

infliction of emotional distress (Count VII), and a respondeat superior claim (Count VIII).

**B. Parties**

In addition to the City, Rivera names twelve former Chicago police officers (all have

retired) (actually the estate of two) as defendants ("officer defendants").  *See* Compl. ¶¶ 9–13,

ECF No. 1; Resp. to Officers SMF ¶ 2.  John Leonard and Gillian McLaughlin were the Chicago

Police Department ("CPD") detectives initially assigned to the Valentin shooting.  Resp. to

Officers SMF ¶ 2 (noting substitution of Leonard's personal representative).  McLaughlin is the

only female defendant.  *Id.* ¶ 32.

Guevara was a Gang Crimes Specialist (sometimes "GCS") as were defendants Daniel

Noon, John Guzman, Joseph Sparks, Paul Zacharias, Steve Gawrys, and Joseph Fallon.  Resp. to

Officers SMF ¶ 2.  They were assigned to the Gang Crimes Unit (not to be confused with Violent

Crimes), sometimes referred to as "Gang Crimes North."  *Id.*

Defendants Rocco Rinaldi (sued through his estate) and Russell Weingart were sergeants

in Gang Crimes North; defendant Edward Mingey was a sergeant assigned to Gang Crimes

North.  Resp. to Officers SMF ¶ 2.  Each approved one or more reports in the Valentin

investigative file.  *Id.* at ¶¶ 2, 65, 66, 72.  For simplicity, the court refers to the officer defendants

by their last names and elides the distinction between the estate of the two defendants who have

died and the former CPD officer.

**C. The Valentin Investigation and Trial**

Rivera's bench trial began on April 5, 1990, and was continued to April 16, 1988, on which date rebuttal and surrebuttal witnesses testified and the court found Rivera guilty. *See* Resp. to SAF ¶ 90; Trial Tr. at 77:10–14, 80:4–9, Pl. Ex. 3, ECF No. 313-3. The state trial court imposed an 80-year sentence (the maximum allowed) on July 9, 1990. Trial Tr. at 114:21–115:1. Kenneth J. Wadas ("Wadas") represented Rivera through the trial and sentencing. The following individuals testified: the victim's father, Israel Valentin; Lopez; Guevara; Detective Craig Letrich ("Letrich"); Leonard by stipulation; the medical examiner, also by stipulation; Rivera's pastor, Fernando Rivas; and a friend of Rivera's named Guillermo Osorio. Resp. to SAF ¶ 90.

Israel Valentin identified the victim. Trial Tr. at 6:16–7:24. The medical examiner testified that Valentin died of a total of 11 gunshot-related wounds. *See id.* at 53:13–18.

1. Lopez's Trial Testimony

Lopez testified that at around 3:40 p.m., he left his home at 3320 W. Cortland Street to go to a store to buy candy. Trial Tr. at 18:5–19:11. He said he saw Valentin sitting in a red car parked in an alley on Cortland. *See id.* at 19:20–20:12. He saw someone standing about five feet away from the car and firing at Valentin (whom he knew as a friend of his sister's). *See id.* at 21:15–23. He testified that the man wore "all black" and that "his hair" was dyed "brown or gold," a color he associated with the Latin Kings gang. *See id.* at 21:24–23:10. The shooter had his back turned to Lopez. *See id.* at 21:10–12. Lopez ran to the store, asked the store's owner to call the police, but the store's owner did not want to do so, so Lopez returned to the alley and hid in an indentation. *See id.* at 23:11–20. The shooter looked around and then ran to a brown Chevy parked nearby. *See id.* at 26:7–14. Lopez told the court that he could see the shooter's face as he ran, and although he did not know the shooter's name, he recognized him as someone

he had seen playing basketball "two or three times" in nearby Humboldt Park.  *Id.* at 25:21–26:6, 26:15–27:18.  The brown car drove away toward Spaulding.  *Id.* at 28:6–12.

Lopez further testified that he told his sisters he knew who had committed the crime.  *See id.* at 28:15–21.  At some time later (his trial testimony is not entirely clear on this), he testified that he also told this story to police officers and reviewed two photo books of Latin Kings for "[a]n hour."  *Id.* at 29:5–30:4.  He did not pick out anyone from the first book but, according to his trial testimony, he recognized Rivera's photograph and he told "the police that was him."  *Id.* at 30:14–31:5.  He answered "like, three questions" more from the police, and "they left."  *Id.* at 31:6–9.

Lopez's testimony then jumps an uncertain number of days ahead to the lineup that occurred on September 15, 1988, at Area Five Violent Crimes.  *See id.* at 31:10–13.  Lopez testified that he viewed a lineup on that day and that he picked Rivera out of the lineup.  *Id.* at 31:16–32:7 (referring to People's Ex. 4).  When presented with a photograph of the lineup he saw that day, Lopez put an X over Rivera's head indicating that he was the person identified at the lineup.  *Id.* at 32:9–19; *see also* Lineup Photos, Pl. Ex. 52 at 1 (including "X" mark).

Lopez clarified on cross examination that he was interviewed "a few times" by police about the shooting.  *Id.* at 46:2–4.  It is unclear from the record when the alleged gang book identification occurred.  *See id.* at 42:18–24 (testifying that it may have happened as late as Sept. 12, 1988, "a few days" before the Sept. 15, 1988, lineup).

Also on cross examination Wadas brought out the fact that Lopez's narrative was inconsistent with statements recorded in a police report (discussed under the next heading of "Leonard's Report").  *See id.* at 46:5–48:8.  Lopez did not recall telling the police that the shooting started after, rather than before, he left the store.  *See id.* at 48:1–4.

2. Letrich's Testimony and Leonard's Report Submitted August 29, 1988

Letrich testified that he and his partner visited Valentin at Cook County Hospital on August 30, 1988.  Trial Tr. 56:2–5.  According to his testimony, he and his partner left the hospital, retrieved an album of photographs of members of the Imperial Gangsters street gang, showed that book to Valentin, and he arrested Jose A. Rodriguez ("Rodriguez") the next day.  *See id.* 56:13–58:2.  Letrich did not say how Valentin reacted to the photo book or that Valentin picked anyone.  *See id.* at 57:5–13.

Letrich further testified that Rodriguez was released either on August 31 or September 1, 1988.  *Id.* at 58:23–59:1.  Wadas questioned Letrich about whether he or any other Area Five police officers interviewed Valentin on August 29, 1988, but Letrich did not recall.  *Id.* at 60:10–13.  Earlier in the trial, Wadas asked Lopez about Rodriguez.  Lopez did not recall telling the police that Rodriguez did not shoot Valentin.  *See id.* at 49:3–5.

The parties stipulated that Leonard interviewed Lopez on an unspecified date and wrote a report about the interview.  *See id.* at 64:17–65:22 (spelling Leonard's name phonetically as "Lehner").  The report bears a submission date of August 29, 1988.  Pl. Ex. 4 at Wron 29–30, ECF No. 313-4.  At Lopez's trial, a portion of the report was read into the record.  A quote from the report follows.  Only the portion before the asterisks was read into the record at trial.

> The undersigned detectives, in continuation of the investigation of the above captioned incident; interviewed an eye-witness who stated in essence but not verbatim that on date and time of this incident; LOPEZ was coming from the store at corner of Kimball and Cortland.  LOPEZ observed a copper colored GM-type car coming out of the alley, traveling northbound at approximately 3319 W. Cortland.  The vehicle turned east-bound on Cortland and stopped at approximately 3311 W. Cortland.  LOPEZ indicated that said vehicle contained 2 M/WH's one of whom exited from the passenger's side of the vehicle and began to walk toward 3320 W. Cortland where the victim was seated behind the wheel of his vehicle.  Suddenly the M/WH began to run toward vehicle and

LOPEZ noticed a gun in M/WH's hand. LOPEZ believed he heard three (3) shots but indicated that they were not very loud. LOPEZ indicated that LOPEZ saw the victim lean forward and to the right in the vehicle which victim had been seated.

LOPEZ informed R/D's that LOPEZ could identify the shooter because LOPEZ recognized the shooter as a M/WH who played baseball at Humboldt Park and LOPEZ had observed him there on a few occasions.

[***]

LOPEZ did not know shooters [sic] name but was aware that shooter was affiliated with the Latin Kings. LOPEZ then viewed books and made an identification of one RIOS, Jose[3] (16-D Latin King Page 40-D) as the M/WH who exited the copper car and shot the victim. At this time there is no identification of the driver.

*Id.* at Wron 29–30.

### 3. Rivera's Testimony and Alibi

Rivera then took the stand. He testified that he was not a member of the Latin Kings in August 1988. *Id.* at 66:18-21. He stated that he lived with his common law wife and their five-month-old child when Valentin was shot. *Id.* at 66:22–24. He testified that his hair was not dyed at the time and that he last played basketball at Humboldt Park six or seven years prior to the shooting (making Lopez six years old at the oldest). *See id.* at 68:6–23. He stated that he spent Saturday, August 27, 1988, at home with his family. *Id.* at 70:12–16.

On cross examination, Rivera stated that he had been a member of the Latin Kings street gang six years prior to 1988 when he was in high school. *Id.* at 74:3–11. He recalled that he had been arrested at least once in or around 1982.[4] *See id.* at 74:12–18.

---

[3] It appears that Rivera sometimes used the name Jose Rios.
[4] The record includes no further details on this alleged arrest, which appears to have occurred while Rivera was a minor.

### 4. Guevara's Rebuttal Testimony

Guevara testified in rebuttal on April 16, 1988. He stated that he knew Rivera "for quite a while prior to the arrest." *Id.* at 81:2–7. Guevara testified that when he arrested Rivera, Rivera's hair was unusual in that "[i]n the back it was gold, like a little pigtail died [sic] in gold." *Id.* at 82:8–16. Guevara also testified that he "play[ed] ball in Humboldt Park" and worked primarily in the area in the summer of 1988. *Id.* at 82:21–83:1. He stated that he saw Rivera in the park "numerous times" that summer. *Id.* at 83:6–9.

Wadas cross examined Guevara. In response to questioning about baseball (basketball was not mentioned), Guevara said that he had never seen Rivera playing baseball. *Id.* at 83:23–84:2. Wadas also had Guevara confirm that a photo depicted an accurate side view of a lineup in which Rivera participated and that Rivera looked the same as he did in the lineup when he was arrested. *Id.* at 84:12–16; *see also* Pl. Ex. 52 at CPD-105 (indeterminate black-and-white sidelong photographs).

### 5. Surrebuttal Witnesses: Rivas and Osorio

The trial concluded with two surrebuttal witnesses called by Rivera. The first, Rivas, described Rivera's hair style in August 1988 as "brown, kind of curly" and testified that he did not recall him ever dyeing his hair. *See* Trial Tr. at 87:3–22 (admitting Def. Ex. 1). Rivas also testified that Rivera separated from the Latin Kings in 1986. *Id.* at 88:16–20. Osorio testified that he knew Rivera well in 1988, that his wife cut Rivera's hair, and that Rivera never dyed his hair that year. *See id.* at 90:15–19, 91:2–12.

### 6. Closing Arguments

Wadas began his closing arguments with the point that the State did not call any police officers to describe the investigation. *Id.* at 93:10–19. He focused on the differences between

Leonard's August 29 report and Lopez's trial testimony. *See id.* at 93:20–95:3. He also pointed out that if anything, Letrich's testimony implied that Valentin identified the shooter as a member of the Imperial Gangsters. *See id.* at 95:16–96:20. Wadas argued that a photo of Rivera introduced into evidence "shows long hair down his neck, and there's no dyed hair, which would be obvious in that photo." *Id.* at 97:13–21. The state disagreed with this characterization of the photograph. *See id.* at 99:5–13.

**D. Lopez's Recantation**

In 2010, Northwestern University's Center for Wrongful Convictions agreed to represent Rivera. Resp. to SAF ¶ 94. Two investigators interviewed Lopez at his Ohio home on February 28, 2010. Resp. to Officers SMF ¶ 54, ECF No. 316. That interview led to the production of an interview report, Lopez's affidavit, his eventual testimony in state court in 2011, and his deposition in this action.

1. The 2010 Interview

The notes of one of the interviewers, Cynthia Estes ("Estes"), Officer Defs. Tab 54, ECF No. 305-55, and her report, Officer Defs. Tab 55, ECF No. 305-56, prepared three or four days later, record Lopez's initial recantation. Lopez said he knew that Rivera was not the shooter in 1988 and in 1990, but because Lopez was then a "peewee" in another gang, he did not care about what happened to Rivera, whom he believed to be a member of the Latin Kings. Officer Defs. Tab 55 at 8. The report also states that Lopez "did try to tell [the police] it was not the real guy" in 1988, "but they kept saying to him, 'don't be afraid, we will protect you, we will keep you safe.'" *Id.*

According to notes Estes made during the interview and her report, *see* Resp. to Officers SMF ¶ 56, Lopez stated that the police took him to his home after the shooting and had him review Latin King photo books, Estes Report 9. The report further states that Lopez "just kind of

got sick of looking at them so he picked out someone who looked similar to the real shooter." Estes Report 9; Officer Defs. Tab 54, Estes Notes at MJC 12.11.13 00012. Lopez saw the real shooter about a week later. *See id.* When confronted with his trial testimony, Lopez acknowledged that his testimony that he had recognized Rivera from Humboldt Park was false. Estes Report 13–14.

The report records Lopez' statement that he thought "he may have picked [Rivera] from a line-up a few days later," i.e., after the initial identification on August 27, 1988. *Id.* at 11. The report further states:

> He thinks a few days after that they showed him more photos, and that is when he told them Rivera was not the guy, but the lady wouldn't listen. We asked which lady. He said she was not in a uniform, maybe she was a lawyer. She was older with blond hair and some white hair. Mr. Lopez pointed to my hair and said, "kind of like yours." Mr. Lopez said he thinks it was the third time he was brought back that he tried to tell them they had the wrong guy but by then no one wanted to hear it. He said they just kept saying to him he didn't need to be afraid. He said it seemed as if they really did not want to hear him.

*Id.* Finally, the following passage appears in Estes' report: "Mr. Lopez said he wants us to know that the cops did not coerce him into picking anybody out. They just didn't want to hear when he tried to make it right." Estes Report 12.

2. The Lopez Affidavit (2010)

After six rounds of draft affidavits and two more in person meetings, *see* Resp. to Officers SMF ¶ 58, Lopez signed an affidavit prepared by Rivera's counsel on June 12, 2010, ("the Lopez affidavit"), Pl. Ex 20, ECF No. 313-24. In it, Lopez averred that his testimony was false and that he "knew it at the time." Lopez Aff. ¶ 5. He described the shooter as having long hair "with a streak of light color running through it." *Id.* ¶ 9.

Explaining his identification on the night of the Valentin shooting, Lopez averred that he made the assumption that the shooters were members of the Latin Kings because the car in which they left turned right on Spalding into that gang's territory. *Id.* ¶ 10. He picked out a photo he later learned was Rivera's "[t]hat same evening," meaning August 27, 1988. *Id.* ¶ 11.

Lopez's affidavit then described a "first line-up of possible suspects." Lopez Aff. ¶ 12. The first lineup, states his affidavit, occurred "[w]ithin a few days of the shooting," and he "recall[ed] that [his] mother and sister . . . accompanied [him] to the police station but were not present in the room during the lineup procedure." *Id.* The first lineup was not mentioned at trial or in prior proceedings.

The second lineup, which a jury could reasonably decide was the September 12, 1988, lineup, occurred "[a]bout two weeks after the shooting." Lopez Aff. ¶ 14. Lopez's affidavit describes what occurred at the second lineup as follows:

> [T]he police asked me to come to the police station in order to view a second lineup. It was at this point that I told a non-uniformed police officer that Jacques Rivera was not the shooter, and that the real shooter was an Imperial Gangster and a neighborhood guy. I told the same thing to a woman who could have been a lawyer. No one wanted to hear what I had to say. The police officer and possible lawyer kept saying "don't be afraid, we will protect you, we will keep you safe." What the police officer and possible lawyer did not understand is that I was not afraid – I wanted to take back my identification of Jacques Rivera because I had made a mistake and Jacques Rivera was not the shooter.

> At some point I made the decision that it was just easier to stick with my original identification of Jacques Rivera as the shooter. I then proceeded to identify Jacques Rivera in the second lineup knowing that he was not the killer.

*Id.* ¶¶ 14-15 (paragraph numbering omitted).

### 3. Lopez's 2011 Testimony at Rivera's Post-Conviction Hearing

Lopez was the lead witness at Rivera's 2011 post-conviction hearing held June 23, 2011. Post-Conviction Hr'g Tr. 38–96, Pl. Ex. 5, ECF No. 313-5. At one point, Lopez stated that the police pointed Rivera out to him. *Id.* at 93:13–18. This drew a question from the court. *See id.* at 93:19–20. Lopez clarified that when he pointed out Rivera's photograph, police officers asked him, "have you seen him anywhere else, at a park, playing you know, baseball, stuff like that, and [Lopez] said yes." *Id.* at 93:23–94:3.

Lopez testified about the first lineup, stating that it occurred "[a]t some point." *Id.* at 53:14–16. He testified a detective conducted the lineup, and gave a description generally matching Guevara's appearance[5] at the time. *Compare id.* at 55:11–15, *with* Pl. Ex. 37 (photograph of Guevara). According to Lopez's testimony, he identified Rivera at the first lineup. Post-Conviction Hr'g Tr. at 55:22–56:2.

Lopez also testified that he saw the shooter on the street before the second lineup. *See id.* at 56:19–57:4. Lopez also described his efforts to recant at the second lineup. *Id.* at 58:24–62:6. He stated that the light-haired woman told him not to be afraid when he confessed as though she was "trying to . . . console" him. *Id.* at 60:11–15; *see also id.* at 83:18–88:14 (attempting to clarify on cross examination the sequence of events at the second lineup). On cross examination Lopez testified that Guevara was present at the second lineup and further described the woman with whom he spoke as not dressed like a police officer and carrying a folder that might have been a Redweld. *See id.* at 83:2–17. He testified that neither "the police" nor "anyone else in

---

[5] All three men in the photograph of Rivera submitted as plaintiff's Exhibit 46 wear glasses and could conceivably fit Lopez's description of the detective. The record does not make clear which man in the photograph is Guevara. Still, defendants do not dispute that one of the men in the photograph is Guevara, so based on it the jury could reasonably find that Guevara fit Lopez's description of the male detective. The photograph therefore provides the link needed to send to the jury the question of whether Guevara was the detective to whom Lopez tried to recant at the September 15, 1988, lineup.

authority at the station that night . . . force[d] [him] to identify Jacques Rivera as the shooter . . . during that second lineup." *Id.* 62:12–17; *see also id.* at 67:4–12, 89:9–19 (testifying that neither the police nor the prosecutor pressured him to testify falsely at trial). Lopez learned for the first time during his cross examination that Rivera was released after the first lineup. *See id.* at 79:1-6.

### 4. Lopez's 2013 Deposition

On May 29, 2013, Lopez sat for a deposition during discovery in this case. Pl. Ex. 6A, ECF No. 313-6. Lopez testified that he had not seen the shooter before August 27, 1988, and that he participated in two lineups during the Valentin investigation. *See* Lopez Dep. 18:3–19, 58:21–59:3, cited in Resp. to SAF ¶ 27. He again testified that he picked Rivera at the first lineup. Lopez Dep. 82:9–16.

Drawing inferences favorable to Rivera, Lopez recalled interacting with Guevara but no other officers after the night of the shooting. *See* Lopez Dep. 75:19–77:24, cited in Resp. to SAF ¶ 41. He recounted a materially similar version of seeing the real shooter about a week later. *See* Lopez Dep. 87:24–90:16. He also testified again that that he told Guevara and a woman with white, yellow, or blond hair carrying a "binder full of papers" that he had identified the wrong person, but they assured him that 'everything was going to be fine." Lopez Dep. 95:1–97:18 ("They assumed that I was afraid and that I wanted to change my story, because I was afraid, but that was not the case."); *see also* Resp. to Pl. SAF ¶ 53.

### E. Documentary Evidence

### 1. Recordkeeping in the CPD

Some background on recordkeeping helps to understand the evidence on what documents were produced before Rivera's trial. By 1988 each case referred to the CPD's detective area received a sequentially assigned Records Division ("RD") number. Resp. to City SMF ¶ 20.

Separately maintained in the records division, where applicable, each page of an RD for crimes like murder for which there is no statute of limitations was stamped "permanent retention file," but the documents were not always stamped immediately. *See* Resp. to City SMF ¶ 21; Hickey Dep. 189:12–190:9, City Tab 25, ECF No. 307-2. At a minimum, the permanent retention file maintained by the Chicago Police Department's Records Division (also called the "RD file"), included the initial case incident report opening the case and formal supplementary reports (sometimes "SR's"). Resp. to City SMF ¶ 21. But the City has evidence that the RD file was not intended to include every document created during an investigation. City SMF ¶ 22. It is undisputed that after 1982, "RD Files, or permanent retention files, did not contain general progress reports, notes or any other investigative material from an investigation other than the supplementary reports." Resp. to City SMF ¶ 22 (undisputed fact but disputing that practices were uniform). Other "miscellaneous police reports" including General Progress Reports ("GPRs") were generally kept, if at all, in the headquarters of the CPD area to which the case is assigned. Hickey Dep. 192:2–22 Pl. Ex. 39A.

Between 1982 and 1986, the CPD issued four directives and orders aimed at regularizing the practice of creating RD files, on the one hand, and separate, noncentralized investigative files on the other. *See* Resp. to City SMF ¶¶ 22–30. Effective February 3, 1983, Special Order 83-1, which applied to "Detective Division field units," for the first time mandated the use of GPRs "by all detectives assigned to violent crime field investigations. This document is designed to standardize the recording of handwritten notes and memoranda . . . . normally generated by investigating detectives during the course of a violent crime field investigation." Pl. Ex. 60 at 1, 3, ECF No. 313-73, rescinded by Special Order 83-2, City Tab 30 (eff. May 2, 1983). The order and it successors required all documents to be placed in the file and logged on a separate

inventory sheet. *Id.* at 3; *accord* CPD Detective Div. Special Order 86-3, Pl. Ex. 54, ECF No. 313-67 (May 19, 1986, eff. May 29, 1986). The orders further required the inventory sheet to be forwarded to the Records Division for inclusion in the permanent retention file and required all documents, even those not included in the RD file, to be maintained in what the order defined as the "investigative file," a folder kept by the investigating unit. Special Order 86-3 at RFC 019365; *see also id.* at RFC 019363 (defining "investigative file").

Special Order 83-2 added a requirement that two copies of the inventory sheet be forwarded either to the CPD's Office of Legal Affairs or the State's Attorney, as appropriate, "[w]henever a subpoena or discovery motion is received in any case." City Tab 30 at 4, ECF No. 307-3. Special Order 86-3, which superseded Special Order 83-2, contained no comparable language. *See* Brasfield Report 29, Pl. Ex 12, ECF No. 313-15. Investigative files for "Cleared/Closed Homicide Cases," as the Valentin shooting then was, had to be forwarded to the "Records Division for postconviction retention" after final court disposition. *Id.* at RFC 019365; *see also id.* (establishing periodic, unannounced inspections of files to ensure compliance); Resp. to City SMF ¶ 30.

Rivera points to evidence tending to show that these written policies were not always followed. *See* Pl. SAF ¶¶ 112–14.

2. Wadas File

In 2002, Wadas produced a copy of his file for the Rivera case to the Bluhm Legal Clinic at Northwestern University, but this copy was lost. Resp. to City SMF ¶ 40. An index of the papers in the 2002 version of Wadas file survived, however. Pl. Ex. 16 at RFC 808. Wadas produced his litigation file during discovery in this case in 2013. Pl. Ex. 16, ECF No. 313-19.

The 2013 version of Wadas' file contained 341 pages. Adding the page counts on the index of the 2002 version of the Wadas file yields a total of 328 pages. *See* Pl. Ex. 16 at RFC 808.

Early in this litigation defendants produced the RD file for the Valentin investigation. Resp. to City SMF ¶ 41. Rivera attached the RD file, which he labels the street file, produced by the City to his summary judgment response and marked it as Exhibit 4. The exhibit consists of 63 pages excluding copies of folder covers and inventory sheets.

The following table compares the 2013 Wadas file and plaintiff's Exhibit 4.[6]

| Document | Authors | Number of pages | Bates No. (Pl's Ex. 4 – 'street file') | Bates No. (Pl's Ex. 16 – 'Wadas file') |
|---|---|---|---|---|
| SR dated 9/16/88 | Gawrys, Guevara | 2 | Wron 9-10 | RFC 516-17 |
| SR dated 9/29/88 | Leonard | 1 | Wron 11 | |
| Hospitalization Case Report dated 9/15/88 | Lettrich, Elliott | 1 | Wron 12 | |
| Prelim. Fired Evidence Report dated 9/22/88 (day uncertain) | illegible | 1 | Wron 13 | |
| SR dated 9/16/88 | Lazar | 3 | Wron 15-17 | RC 523-25 |
| Property Inventory sheet dated 9/16/88 | Thomas | 1 | Wron 18-19 | |
| Facsimile dated 6/7/12 from M. Majka to C/O Area North | | 6 (which encompasses the report which follows)<br><br>cover sheet and request are 2 pages | Wron 20-25<br><br><br>Wron 20-21 | |
| Case Report dated 8/27/88 | Crawford, Machain | 4 | Wron 22-25 | RFC 532-35 |

[6] The blanks in the Wadas file column indicate documents that are not present.

| | | | | |
|---|---|---|---|---|
| SR dated 9/15/88 | Dorsch, Boyle | 3 | Wron 26-28 | RFC 518-20 |
| SR dated 8/29/88 | McLaughlin, Leonard | 2 | Wron 29-30 | RFC 513-14 |
| SR dated 8/27/88 | McLaughlin, Leonard | 3 | Wron 31-33 | RFC 507-09 |
| SR dated 9/1/88 | McLaughlin, Leonard | 3 | Wron 34-36 | RFC 510-12 |
| Polaroid Photo of Rivera – unlabeled, undated | n/a | 2 (photocopy of front and back, presumably same photo) | Wron 37-38 | |
| SR dated 8/31/88 | Letrich, Moriarty | 1 | Wron 39 | RFC 515 |
| SR dated 9/16/88 (duplicate version of SR at Wron 9-10, but this one does not bear the signature of the supervisor approving) | Gawrys, Guevara | 2 | Wron 40-41 | see RFC 516-17 |
| Piece of paper on which is written: "A/5 VC Det. Dorsch" – otherwise blank | unknown | 1 | Wron 42 | |
| Case Report dated 8/27/88 (appears to be prior draft of the case report attached to the fax listed above, in that it lacks signatures of approving officers and is not stamped permanent retention file) | Crawford, Machain | 2 | Wron 43-44 | |
| Evidence Report dated 9/15/88 | Boyle (investigating officer) | 2 | Wron 45-46 | |
| Criminal Complaint dated 9/16/88 | signed Dorsch | 1 | Wron 47 | RFC 476 |
| Felony Minute Sheet | Unsigned | 1 | Wron 48 | |
| SR dated 9/15/88 – | Boyle, Dorsch | 2 | Wron 49-50 | RFC 521-22 |

| | | | | |
|---|---|---|---|---|
| Lineup report | | | | |
| Arrest Report 9/16/88 | Guevara | 3 | Wron 51 | RFC 527 |
| Release of person in custody dated 8/31/88 | signed by Leonard | 1 | Wron 52 | |
| GPR dated 8/27/88 | McLaughlin, Leonard | 1 | Wron 53 | |
| GPR dated 8/27/88 | Leonard | 1 | Wron 54 | |
| Criminal history of Rivera stamped "Issued on Inquiry Aug 27 1988 By Name Check Only" | unknown | 1 | Wron 55 | |
| Arrest Report dated 8/30/88 | Guevara | 1 | Wron 56 | |
| Hold papers dated 8/30/18 (Rivera) | Leonard | 1 | Wron 57 | |
| Arrest Report dated 8/31/88 | Letrich | 1 | Wron 58 | |
| Hold papers dated 8/31/88 (Rodriguez) | Boyle, Tapkowski | 1 | Wron 59 | |
| Property Inventory dated 8/28/88 | Leonard, Keating | 1 | Wron 60 | |
| Evidence Report dated 8/28/88 | McDonald, Keating | 1 | Wrong 61 | |
| Property Inventory sheet dated 8/31/88 | unknown | 1 | Wron 62 | |
| Release of person in custody dated 8/31/18 | Leonard, illegible | 1 | Wron 63 | |
| GPR dated 8/31/88 | Leonard | 1 | Wron 64 | |
| Preliminary Fired Evidence Report | Firearms examiner (but also signed by McLaughlin) | 1 | Wron 65 | |
| Piece of paper on which is written: "A5VC" – otherwise blank | unknown | 1 | Wron 66 | |
| Criminal History of Rivera (unstamped version) | unknown | 1 | Wron 67 | RFC 526 |
| GPRs dated 8/27/88 | McLaughlin, | 2 | Wron 68-69 | |

| | Leonard | | | |
|---|---|---|---|---|

*Compare* Pl. Ex. 4 *with* Pl. Ex. 16.

A material fact dispute exists over whether the police reports and other investigative material not present in the 2013 Wadas file were disclosed before Rivera's trial. Although the cumulative page count from the index of the 2013 Wadas file exceeds the page count of the 2002 Wadas index by 13 pages, the index also shows that the 2002 file contained 29 pages of "police reports."[7] Pl. Ex. 16 at RFC 808. The 2013 Wadas file includes 29 pages of material that can arguably be characterized as police reports. *See* table *supra*. No party argues that additional pages of the 2013 Wadas could be fairly characterized as police reports, and the court's own review of the 2013 Wadas file has turned up none. Thus, based on the matching page counts, a reasonable jury could conclude that the 13 pages not accounted for were not police reports or other police material created or gathered during the Valentin investigation. Three of these pages may be accounted for by the index and the photocopies of the front and back of the file folder.

## F. Facts at Summary Judgment

While Rivera advances three distinct due process theories and related federal and state law claims, they all revolve around a closely related body of summary judgment evidence. Defendants challenge the sufficiency of the summary judgment record to support several of Rivera's key factual positions on what happened during the Valentin investigation through trial. The court considers many of those challenges in the following paragraphs to establish what the jury could reasonably find on this record viewed in the light most favorable to Rivera.

1. Rivera Was Pre-Selected as the Investigation's Target

First, a reasonable jury could find that Rivera was selected as the investigation's target before the police interviewed Lopez. Whether this dispute is genuine largely depends on exactly

---

[7] Four pages of the 29-page count include an Illinois State Police Report dated October 26, 1990, Pl. Ex. 16 at RFC 528–31, which plaintiff's Exhibit 4 does not include.

when Lopez was first interviewed and picked Rivera from a book of suspected gang members. The RD file, but not Wadas' file, includes a copy of Rivera's criminal history report stamped as "issued on inquiry" the day Valentin was shot ("August 27 criminal history report"). Pl. Ex. 4 at Wron 55. If Lopez initially identified Rivera on the day of the Valentin shooting, the criminal inquiry might be explainable as the product of Lopez's identification earlier that day, but if the police had no suspects yet, the jury could reasonably view the report as marking the first step in framing Rivera.

Though defendants point to evidence that Lopez was first interviewed on the night of the shooting, *e.g.*, Pl. Ex. 4 at Wron 53, a report submitted by Guevara and Gawrys summarizing the Valentin investigation ("the September 16 report") states that Lopez was interviewed and picked Rivera from a gang book two days later on August 29, 1988. *Id.* at Wron 9–10. With inferences favorable to Rivera, another report, this one prepared by Leonard and McLaughlin on August 29, 1988, corroborates the date of Lopez's first interview and gang book identification as two days after the Valentin shooting. *See* Pl. Ex. 4 at Wron 29–30 (recounting investigation conducted since August 27 and transitioning to description of Lopez's gang book identification by stating "in continuation of the investigation of the above captioned incident," which can be reasonably read as implying a break between August 27 and Lopez's interview and gang book identifications). To be sure, the timeline just described conflicts with other evidence in the record, including some of Lopez's post-recantation testimony, but defendants point to no evidence explaining the dates given in the two reports just discussed. *See* Resp. to SAF ¶ 23 and material cited therein. Because the jury could believe Rivera or the defendants' timeline, the dispute here must be deemed genuine, and Rivera's version receives credence at summary judgment.

## 2. Valentin Never Identified a Photo of Rivera, and the Police Report Stating that He Did is False

A reasonable jury could also find that, despite statements of police reports to the contrary, *e.g.*, Pl. Ex. 4 at Wron 10, Valentin, the victim, never identified Rivera as the shooter from a photograph. Defendants point to evidence that on the day of the shooting, Valentin, while in the hospital, told police officers that the person who shot him was a 16–18-year-old Hispanic male believed to be a member of the Latin Kings. Officers SMF ¶ 6; *see also* Resp. to Officers SMF ¶ 6 (citing McLaughlin Dep. 167:5–19, Pl. Ex. 9A) (testimony that by the 5 o'clock hour, when Leonard and McLaughlin responded to the hospital, Valentin was able only to respond to yes-or-no questions by nodding).

Three days later, on August 30, 1988, Valentin apparently changed this story, and Letrich and Moriarity visited Valentin in the hospital and showed him a book of photos of suspected members of another gang, the Imperial Gangsters. Resp. to Officers SMF ¶ 12 (responding by pointing to evidence that Valentin stated that a member of the Imperial Gangsters shot him). Valentin identified Jose Rodriguez ("Rodriguez") and Felipe Nieves[8] respectively as the shooter and driver. *Id.* As will be discussed shortly, the police arrested Rodriguez in the early morning of August 31, 1988. *Id.* ¶ 13. A reasonable jury could find that the next two Valentin identifications never happened.

Some police records and other evidence state that Leonard and McLaughlin attempted to show Valentin photos of Rodriguez and Rivera the next day (August 31, 1988). *See id.* ¶ 16; *see also* Officer Defs. Tab 29 (six photographs used). According to defendants' evidence, Valentin's eyes were tearing, he could not focus because was heavily medicated, and Leonard and McLaughlin left. *See* Resp. to Officers SOF ¶ 17. But Rivera also points to Leonard's

---

[8] The parties agree that Nieves was in jail in Nebraska when Valentin was shot. Resp. to Officers SMF ¶ 14. As Rivera observes, nothing in the RD file suggests that efforts were made to locate Nieves. *See id.*

deposition testimony that he recalled meeting only once with Valentin on August 27, 1988, and the testimony of three of the people who participated in the first lineup that, viewed favorably to Rivera, no photos were taken. *See id.* at ¶ 16 (citing Leonard Dep. 54:13–15, Pl. Ex. 26) (citations to other depositions omitted). For summary judgment purposes, drawing the most favorable inferences in Rivera's favor compels the finding that the documented August 31, 1988, photo array shown to Valentin never happened.

It is also undisputed that a portion of the September 16, 1988, report prepared by Gawrys and Guevara is false. *See* Resp. to SAF ¶ 46. The report states that Valentin identified Lopez in what could be a third photo review on September 10, 1988. Pl. Ex. 4 at Wron 10. Defendants do not dispute that by September 9, 1988, "Valentin was in effect in a comatose condition–among other things, he could not breathe on his own and was fully intubated . . . ." Resp. to Pl. SAF ¶ 46. Valentin could not have reviewed a photo album or spoken to another person, so the September 16 report's statement that Valentin identified Rivera is false. *Id.*

3. Lopez Picked a Filler at the First Lineup

The jury could also reasonably find that Lopez picked a filler at the first lineup on August 31, 1988. Three basic narratives of the first lineup emerge from the summary judgment record. The first derives from Lopez's testimony that he picked Rivera at the first lineup. *See* Officers SMF ¶ 24 (citing Lopez's post-conviction hearing and deposition testimony).

In the second, no lineup occurred. This version comes from police reports and forms in the RD file. They confirm that Rivera and Rodriguez were arrested on August 30, 1988, for a lineup, but they say the lineup ultimately never happened because Lopez could not be located and because Valentin was unable to view a photo array. *See* Resp. to Officers SMF ¶¶ 11, 13, 21. The documents state that Lopez could not be located or, more specifically, was asleep when

police officers went to his home in the early morning of August 31, 1988, and Lopez's family told the officers to return later. But later that day, the documents say, Lopez could not be located (family members told police officers that Lopez might be at his father's home), so Rivera and Rodriguez had to be released.

The third, the one of which Rivera is a proponent, derives from most of the same evidence and inferences from how the investigation later unfolded. Again, it is undisputed that Rivera was released after the first lineup. Resp. to Officers SMF ¶ 25. Rivera submits that Lopez's testimony that the first lineup occurred should be credited, but Lopez does not accurately remember who he picked. *See* Officers SMF ¶ 26 (citing Lopez's deposition testimony that he saw the real shooter about a week after the shooting and realized he identified the wrong person).

Defendants argue that Rivera cannot pick and choose from Lopez's testimony about the August 31, 1988, lineup; it is all or nothing. Officers Mem. Supp. Mot. Summ. J. 7–8 (no citation for proposition). But the jury will be free to believe all, some, or none of Lopez's and the other witnesses' testimony, so Rivera may select as much of Lopez's testimony as he wishes to be regarded as true at summary judgment. *See Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) (faulting fact finder for "the discredited doctrine of *falsus in uno*, *falsus in omnibus* (false in one thing, false in all things), which Wigmore called 'primitive psychology'" (citations and quotation omitted)); *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003) ("[T]here are cases, perhaps the majority, in which a witness's testimony is a compound of truth and falsity. Perjury is a circumstance to be weighed by the jury in determining a witness's credibility rather than a ground for removing the issue of credibility from the jury by treating the witness's entire testimony as unworthy of belief."); *Branion v. Gramly*, 855 F.2d 1256, 1263 (7th Cir. 1988) ("A

trier of fact may disbelieve or reject any evidence; . . . [s]elective disbelief, however, is an ordinary incident of trial . . . ."). The jury's prerogative partially to disbelieve Lopez's testimony that he picked Rivera at the first lineup does not by itself furnish a basis for the jury to find that Lopez picked a filler, however; it just leaves a hole in the proof. Rivera must still fill that hole at summary judgment by pointing to other evidence from which the jury could find that Lopez picked a filler. *See Branion*, 855 F.2d at 1263 ("Disbelief is not evidence of the opposite of the thing discredited, however." (citing *Anderson*, *supra*, 477 U.S. at 256–57, and *LHLC Corp. v. Cluett*, *Peabody & Co.*, 842 F.2d 928, 934–36 (7th Cir. 1988))).

Rivera has identified enough evidence other than Lopez's testimony to survive summary judgment. He points to the undisputed fact that Rivera was released after August 31, 1988, Resp. to Officers SMF ¶ 25, and not rearrested until the second lineup fifteen days later. *See* Pl. SAF ¶¶ 39–41. To reiterate, that the first lineup occurred must be accepted as true at summary judgment; the question is who Lopez picked. If Lopez picked Rivera, why not arrest him within twenty-four hours as happened on September 15, 1988? And if Lopez picked Rivera at the first lineup, falsifying a police report saying Valentin identified Rivera could reasonably be seen by the jury as taking an unnecessary risk. Seen favorably to Rivera, his release and the two-week delay in rearresting him for the second lineup can be reasonably explained by Lopez's selection of a filler. Indeed, once the fact that the first lineup occurred is deemed true, the second lineup seems unnecessary unless the first one resulted in something other than Rivera's selection. Defendants point to testimony that not every positive identification leads immediately to arrest. That may be so, but the jury could reasonably wonder why approving charges would take two weeks and why someone thought a second lineup was a good idea. Again, the jury could decide that the answer can be found in Lopez picking a filler on August 31, 1988.

4. Lopez Told Guevara and Leonard that Rivera Was the "Wrong Guy"

Rivera relies on Lopez's post-recantation testimony to establish that he tried, but failed, to recant to a man and woman conducting the September 15, 1988, lineup. *See* Pl. SAF ¶¶ 52–53. Nothing in the RD file or Wadas' file suggests that Lopez tried to recant on September 15, 1988. Defendants argue that, other than Guevara's Fifth Amendment invocation, which is insufficient on its own, the evidence Rivera cites piles speculative inferences too high to create a genuine issue for trial. Officers Mem. Supp. Mot. Summ. J. 9–10; *see also Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017) ("[S]peculation is not enough to create a genuine issue of fact for the purposes of summary judgment." (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012))); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995) (explaining that invoking Fifth Amendment privilege cannot by itself be a basis for imposing civil liability). Defendants do not dispute that Lopez told two people at the police station on September 15, 1988, that Rivera was the "wrong guy." *See* Resp. to SAF ¶¶ 52–53 (citing, *e.g.*, Lopez Aff. ¶ 14). Defendants say, however, that there is not enough evidence to conclude that the two people were Guevara and McLaughlin or that either understood that Lopez really meant what he said. *See* Officers Mem. Supp. Mot. Summ. J. 9–10. Both questions must be decided by a jury. *See Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (substantially same on speculation at summary judgment).

Lopez has testified to a physical description of the man and woman with whom he spoke, "an older woman with white or blonde hair, and a Latino man with mustache, glasses, and an afro." Resp. to SAF ¶ 53 (undisputed fact). The description of the man matches the photograph of Guevara in the record closely enough to allow the jury to find that they were the same person, *see* Pl. Ex. 37; *see also supra* note 5, and even if it did not, Lopez testified that at his deposition

in this case the man, he thought, was the same one with whom he had interacted previously, *see* Lopez Dep. at 95:23–96:7, Pl. Ex. 6A.  The woman in the photo of McLaughlin in the record, Officer Defs. Tab 38, ECF No. 305-39, has brown hair, but it was taken at a certain time in or around 1988 (the photo was taken indoors).  People sometimes change their hair color within the same year, and Gawrys testified at his deposition that he thought McLaughlin had blond hair in 1988, Gawrys Dep. 174:9–15, Pl. Ex. 25A.  Especially in view of the fact that no other investigator assigned to the case was a woman, Resp. to Pl. SAF ¶ 55, this evidence suffices to allow the jury to identify McLaughlin as the woman to whom Lopez said Rivera was the "wrong guy" on September 15, 1988.

Defendants also maintain that Lopez has been unwavering in his testimony that Guevara and McLaughlin believed that he was afraid of reprisal and so did not take his "wrong guy" protestations seriously.  Officers Mem. Supp. Mot. Summ. J. 10.  They correctly characterize the summary judgment record.  *See, e.g.*, Lopez Aff. ¶ 14; Lopez Dep. 95:23–97:18.  But Lopez can only speculate about what Guevara and McLaughlin thought his motives were, which is no more probative than a plaintiff submitting a conclusory affidavit speculating about what someone else knew, *see Consolino*, *supra*, 872 F.3d at 830; speculating about an employer's motives in firing the plaintiff, *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984–85 (7th Cir. 1999); or averring in conclusory fashion that another witness lied about something said to the plaintiff, *Parvati Corp. v. City of Oak Forest*, No 08 C 0702, 2012 WL 957479, at *11 n.3 (N.D. Ill. Mar. 20, 2012) (St. Eve, J.) (citing *Delapaz v. Richardson*, 634 F.3d 895, 901 (7th Cir. 2011)).  Weighed with Guevara's Fifth Amendment invocation on this subject, the jury can reasonably decide based on Lopez's testimony that Guevara and McLaughlin feigned incomprehension.  And even if Guevara and McLaughlin earnestly held a good faith belief at the time that Lopez was scared of

what might happen if he fingered Rivera (defendants claim he already had), they could not suppress Lopez's statements that Rivera was the "wrong guy" for that reason because, as discussed more fully below, those statements would have been objectively material. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that material evidence must be given to the defense "irrespective of the good faith or bad faith of the prosecution"). In short, Guevara and McLaughlin's good faith is immaterial in the summary judgment sense, *id.*, and a reasonable jury could conclude that they suppressed the conversation before the September 15, 1988, lineup in which Lopez told them that Rivera was the "wrong guy."

5. Rivera's Photo Was Pointed Out to Lopez, and Lopez Was Fed Identification Details

To understand the final strand of Rivera's factual position on the Valentin investigation and trial, rewind to Lopez's initial identification of Rivera from a gang book, which, for summary judgment purposes, occurred two days after the shooting on August 29, 1988. The evidence, Rivera argues, creates a genuine dispute over whether Guevara and several other officer defendants coaxed Lopez to pick Rivera. *See* Pl. SAF ¶¶ 25–26. Then, in an effort to make Lopez's identification stick at trial, Guevara and McLaughlin concocted the details that Lopez had seen Rivera playing baseball in Humboldt Park and that the shooter had a gold streak in his hair; those details were then fed to Lopez to be repeated in his trial testimony and corroborated in part by Guevara. *See id.* ¶¶ 85, 91, 92.

Defendants analogize this record to the summary judgment record in a Fourth Amendment false arrest case, *Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015). Officers Mem. Supp. Mot. Summ. J. 17, ECF No. 304. After expressing some initial reluctance, four eyewitnesses identified the plaintiff in *Hart* from a photo array. *See Hart*, 798 F.3d at 584. The plaintiff claimed that coaching occurred, but the Seventh Circuit upheld the entry of summary

judgment for the defendants because "[o]n this record, there is simply no evidence of coercion or manipulation . . . ." *Id.* at 588. The officer "denied that she coached any of the witnesses, and all four witnesses testified that they were neither coached nor otherwise led to identify" the plaintiff. *Id.* Although the investigating officer had the opportunity to coach in unrecorded portions of interviews and one-on-one meetings, that possibility was too speculative to deny summary judgment. *Id.*

Since he first recanted in 2010, Lopez has maintained that he was not coached. *See* Officers SOF ¶¶ 40, 41, 75 and material cited therein. To show that there is an issue for trial, Rivera cites one passage from Lopez's testimony at the 2011 post-conviction hearing. *See* Pl. SAF ¶¶ 25, 26. The quoted material seems to support his position directly, but in light of the back-and-forth that follows, it turns out to be a slip of the tongue:

> Q. Why did you testify at the time of trial that you had seen the shooter play baseball at Humboldt Park?
>
> A. Because, you know, what happened was the cops were like, when they pointed him out, they were asking me have you seen him playing baseball or have you seen him anywhere else; and I said, yes, that was the reason why I said that I seen him playing baseball at a park.
>
> The court: Just a minute, did you say when they pointed him out?
>
> The witness: Who me?
>
> The court: Yes.
>
> The witness: No, they didn't point it out to me. When I pointed him out, they were asking have you seen him anywhere else, at a park, playing, you know, baseball, stuff like that and I said yes.
>
> The court: Okay, go ahead.

Post-Conviction H'rg Tr. at 93:10–94:4, Pl. Ex. 5. Lopez's clarification, even viewed in the light most favorable to Rivera, does not create a genuine fact dispute. Lopez's immediate clarification

in response to the state court's inquiry cannot be ignored. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) (chastising party who "cherry-picked" from deposition and providing examples from deposition showing that "[w]hen the [cited] testimony is read in context, . . . it becomes clear that [the person testifying] made no such admissions"); *Maxtech Consumer Prods., Ltd. v. Robert Bosch Tool Corp.*, 255 F. Supp. 3d 833, 840 (N.D. Ill. 2017) (reading testimony at summary judgment "sensibly and in context" despite requirement that all reasonable inferences be drawn in nonmovant's favor); *De Marco v. Pals Express, Inc.*, No. 96 C 6817, 1997 WL 619829, at *2 (N.D. Ill. Sept. 30, 1997) ("Taken in isolation, De Marco's answer of 'No' to one question at his deposition seems inconsistent with [other evidence]. Reading De Marco's deposition testimony in context, however, no inconsistency is apparent." (internal citation omitted)).

Rivera also cites the deposition of Jennifer Linzer ("Linzer"), Pl. Ex. 46. Pl. SAF ¶ 85. In this testimony, Linzer stated that, based on her notes from a telephone call with Lopez on March 2, 2010, shortly after he first recanted, he may have said that he thought he was coached. *See* Linzer Dep. (Pl. Ex. 46, pg. 64:5–65:14, 113:4–7). Defendants object on double hearsay grounds. Resp. to Pl. SAF ¶ 85.

Examples of cases resolving hearsay objections raised in responses to Local Rule 56.1 statements can be readily found. *E.g.*, *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 893–94 (N.D. Ill. 2016); *De v. City of Chicago*, 912 F. Supp. 2d 709, 714 (N.D. Ill. 2012); *Gondeck v. A Clear Title & Escrow Exchange, LLC*, No. 11 C 6341, 2013 WL 4564994, at *3 (N.D. Ill. Aug. 28, 2013); *see also Rogers v. City of Chicago*, 320 F.3d 748, 751 (7th Cir. 2003), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013), (affirming exclusion of affidavit at summary judgment on hearsay, among other, grounds). The court has no quarrel with

this practice, which has been blessed by the Seventh Circuit. At least on nontrivial issues, a motion to strike may still be preferable. Because the nonmoving party has no opportunity to reply to objections in Local Rule 56.1 responses, the court can sometimes be left without input from the evidence's proponent on the party's theory of admissibility in the form it is presented at summary judgment and, failing that, how it might be presented in an admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2) (permitting objection at summary judgment that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) ("[T]he Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." (citing Fed. R. Civ. P. 56(c)(2)–(4))). Filing a separate motion to strike ensures an opportunity to develop both issues fully through adversary presentation.

Defendants' hearsay objection to the cited portions of Linzer's deposition is nevertheless well taken. Each level of hearsay must fall into an exception to the rule against hearsay. Fed. R. Evid. 805. Neither Lopez's statement on the phone nor Linzer's notes can be admitted for the truth of the matter asserted as prior inconsistent statements because Lopez's statement on the phone (the innermost kernel of hearsay), and Linzer's notes (the next layer), were not "given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition."[9] Fed. R. Evid. 801(d)(1)(A); *see also*, *e.g.*, *United States v. Dietrich*, 854 F.2d 1056, 1061–62 (7th Cir. 1988). There would be no barrier to using these statements to impeach Lopez at trial, Fed. R. Evid. 613(b), but it cannot be used as substantive evidence that Lopez was coached. *See Dietrich*, 854 F.2d at 1061. But "fodder for impeachment . . . is not alone enough to avoid

---

[9] The court expresses no view on whether Linzer's testimony could be admitted for its truth as a prior consistent statement. *See* Fed. R. Evid. 801(d)(1)(B).

summary judgment." *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998)

(citing *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997))

(holding inconsistent, unsworn statement which could be used only to impeach did not create

genuine factual dispute); *accord Outlaw v. Newkirk*, 259 F.3d 833, 841 (7th Cir. 2001) (citations

omitted).

Without any direct or hearsay testimony from Lopez admissible to prove that he was

coached, only inferential theories remain. Rivera correctly observes that the story of the

shooter's gold hair first surfaced at Rivera's trial; it does not appear in police reports. *See* Resp.

to Pl. SAF ¶¶ 61, 62. But just as using a flawed process for recording interviews is too

speculative to support an inference of coaching, *Hart*, *supra*, 798 F.3d at 588, so too is the

omission of the shooter's distinctive gold hairstyle from the investigative file. Were it otherwise,

every detail that surfaced at a criminal trial would require a trial in a § 1983 suit if it could not be

found in police records. *See id.*

Nonetheless, what sets this record apart is the presence of evidence from which the jury

could find that the officers selected Rivera before Lopez picked him from the gang book. *See*

*supra*, Part II. F. Viewed in the light most favorable to Rivera, that fact casts substantial doubt

on Lopez's testimony that he happened to select the very person the police were targeting more

or less at random from the photo book. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295

F.3d 651, 663 (7th Cir. 2002) (whether "pure coincidence" explained actions had to be decided

by jury); *Elder Care Providers of Ind., Inc. v. Home Instead, Inc.*, No. 1:14-cv-01894-SEB-MJD,

2017 WL 1106093, at *14 (S.D. Ind. Mar. 24, 2017) (efforts to explain evidence at summary

judgment as an "'unfortunate coincidence' raise red flags signaling a genuine issue of material

fact to be left to a jury's determination"). Add to that improbable coincidence the conspicuous

absence of the detail about the distinctive gold streak in the shooter's hair from the investigative record, Pl. SAF ¶ 62; Guevara's invocation of his Fifth Amendment privilege when asked whether he manipulated, coached, and coerced Lopez, *see* Guevara Dep. at 18:17–19:11, 21:8–13, 158:15–23, 181:6–15, 182:10–19, 184:15–24, Pl. Ex. 24A; and Linzer's impeachment fodder, and a genuine dispute for trial on Rivera's theories of manipulation, coercion, and coaching emerges. *See Finwall v. City of Chicago*, 490 F. Supp. 2d 918, 924 (N.D. Ill. 2007). Wrapping up, the core facts supporting Rivera's narrative of the Valentin investigation and trial must be treated as established at summary judgment. Against this factual backdrop, the court considers Rivera's claims in turn.

### III. THE EFFECT OF GUEVARA'S EXERCISE OF HIS FIFTH AMENDMENT RIGHT TO REMAIN SILENT

At his deposition in this case and in his answers to written discovery, Guevara invoked his Fifth Amendment right not to be compelled to be a witness against himself hundreds of times. Together, the questions Guevara exercised his right not to answer cover virtually every aspect of the Valentin investigation, prosecution, and trial, and if the adverse inference that they would be answered in a way admitting culpability were to be drawn, those answers implicate Guevara and many, if not all, of the other officer defendants in egregious violations of Rivera's constitutional rights at every stage of the Valentin investigation and prosecution. *See, e.g.*, Pl. SAF ¶¶ 22, 26–27, 40–41, 46, 52, 61, 65, 79. No matter how damning the adverse inferences are, liability in a civil case cannot be based exclusively on a party's privileged decision to remain silent, so the court cannot deny summary judgment exclusively on that basis.

Guevara's silence may be properly considered at summary judgment. In a criminal case, the jury cannot draw an adverse inference from the defendant's invocation of his Fifth Amendment right not to be compelled to be a witness against himself. *Griffin v. California*, 380

U.S. 609 (1965). The rule against adverse inferences does not hold in a civil case, however. The Supreme Court held in *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976), that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them . . . ." *See also Hillman v. City of Chicago*, 834 F.3d 787, 792 (7th Cir. 2016) (collecting Seventh Circuit authority to the same effect). The Seventh Circuit has "interpreted *Baxter* to mean that the negative inference against a witness who invokes the Fifth Amendment in a civil case is permissive, not required." *Evans v. City of Chicago*, 513 F.3d 735, 741 (7th Cir. 2008) (citing *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993)). Here permissive means that "[s]ilence is a relevant factor to be considered in light of the proffered evidence, but the direct inference of guilt from silence is forbidden." *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995); *accord id.* at 391–92; *National Acceptance Co. of Am. v. Bathalter*, 705 F.2d 924, 930–32 (7th Cir. 1983); *see also Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977).

Rivera "acknowledges that courts may not enter judgment based solely on an invocation of the Fifth Amendment," Pl. Combined Resp. 8, ECF No. 321, but he nevertheless argues that Guevara cannot win at summary judgment because Guevara has invoked his Fifth Amendment right to be silent, *id.* at 8–9. Rivera reasons that a defendant who invokes his right to remain silent in a civil case deprives the plaintiff of an important source of proof. Without a rule requiring denial of summary judgment, a defendant in Guevara's position would be able to use the Fifth Amendment to "shift the burden at summary judgment" to the plaintiff, *id.* at 6.

The Seventh Circuit balanced the tradeoffs in civil cases of requiring proof of liability other than a party's reliance on the Fifth Amendment privilege in its first case applying *Baxter*:

> Inevitably, in civil cases where related criminal charges are involved, tension will arise between plaintiffs' rights to a just and

> timely adjudication and defendants' rights to refuse to answer
> under the Fifth Amendment upon a reasonable fear of prosecution.
> At the least, defendants may not be free to defend the suit as they
> would like, while plaintiffs may be prevented from acquiring
> evidence helpful, or even necessary, to their case. That tension is
> not for us to resolve, for it has its sources in the Constitution itself.

*National Acceptance Co.*, 705 F.2d at 932 (internal citation omitted). In *National Acceptance*, the Seventh Circuit reversed a decision entering an $8.6 million judgment. The case was decided on the pleadings; the plaintiff filed a complaint; the defendant invoked his Fifth Amendment right to stay silent in his answer; and the trial court entered judgment based on nothing but the complaint and answer. *Id.* at 928–32. A plaintiff cannot offer a civil defendant immunity from criminal prosecution, so forcing the defendant to choose between relinquishing the Fifth Amendment privilege and becoming liable for a money judgment based on no other evidence, the Seventh Circuit reasoned, is constitutionally untenable because "the threat of adverse economic consequences cannot be used to compel a waiver of the Fifth Amendment privilege." *Id.* at 928 (discussing cases including *Lefkowitz v. Turley*, 414 U.S. 70 (1973)); *accord id.* at 931.

The Seventh Circuit applied *Baxter* and *National Acceptance Co.*'s reasoning at summary judgment in *LaSalle Bank*, *supra*, 54 F.3d at 391–93. Reversing an award of summary judgment to a plaintiff, the *LaSalle Bank* court reiterated that "although inferences based on the assertion of the privilege are permissible, the entry of judgment based only on the invocation of the privilege and 'without regard to the other evidence' exceeds constitutional bounds." *Id.* at 391 (quoting *Baxter*, 425 U.S. at 318) (other citation omitted).

The *LaSalle Bank* court quoted the following language in *United States v. White*, 589 F.2d 1283, 1287 (7th Cir. 1979): "a grant of summary judgment merely because of the invocation of the fifth amendment would unduly penalize the employment of the privilege." *Id.* at 391–92. Courts in the Seventh Circuit have accordingly held that to create a fact issue for trial, a party

resisting summary judgment cannot rely exclusively on the moving party's invocation of the Fifth Amendment privilege.[10] *E.g.*, *Logan v. City of Chicago*, 891 F. Supp. 2d 897, 901 (N.D. Ill. 2012); *McArdle v. Peoria Sch. Dist. No. 150*, 833 F. Supp. 2d 1020, 1030 (C.D. Ill. 2011) (citing *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999)) (other citation omitted); *Hawkins v. St. Clair Cty.*, No. 07-142-DRH, 2009 WL 559373, at *5 (S.D. Ill. Mar. 5, 2009); *Cho v. Holland*, No. 04 C 5227, 2006 WL 2859453, at *6 (N.D. Ill. Oct. 3, 2006); *Evans v. City of Chicago*, No. 04 C 3570, 2006 WL 463041, at *6 (N.D. Ill. Jan. 6, 2006); *FTC v. Consumer Alliance, Inc.*, No. 02 C 2429, 2003 WL 22287364, at *3–4 (N.D. Ill. Sept. 30, 2003); *see also City of Chicago v. Reliable Truck Parts Co.*, 822 F. Supp. 1288, 1293–94 (N.D. Ill. 1993) (holding individual defendants who invoked Fifth Amendment privilege did not lose the ability to contest other evidence supporting plaintiff's motion for summary judgment). This court agrees with the reasoning of those decisions.

Requiring other evidence does not shift Guevara's summary judgment burden to Rivera. If the plaintiff will bear the burden of persuasion at trial, Guevara's initial summary judgment obligation is satisfied "by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (quoting *Celotex*, *supra*, 477 U.S. at 325). Guevara did not need to "support [his] motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 1168 (quoting *Celotex*, 477 U.S. at 323). As already explained, Rivera must introduce evidence in addition to Guevara's silence at trial to hold him liable, *See id.* at 1168–69

---

[10] As the court understands them, the pending motions seek summary judgment on claims for which Rivera will bear the burden of proof at trial. The court therefore expresses no view on whether a party's Fifth Amendment silence can support summary judgment on a claim or defense for which that party bears the burden of proof. *Cf. Clancy v. Coyne*, 244 F. Supp. 894, 900 (N.D. Ill. 2002) (St. Eve, J) (commenting that "[r]equiring [the defendant] to offer some evidence in responding to summary judgment where he bears the burden of proof on an issue cannot be labeled as coercion" (citation omitted)).

(explaining that a party opposing a properly supported summary judgment motion must "demonstrate that there is evidence 'upon which a jury could properly proceed to find a verdict' in her favor" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986))).

Under *Baxter*, *LaSalle Bank*, and a host of district court cases in this circuit, defendants' motions for summary judgment cannot be denied solely because Guevara has exercised his Fifth Amendment right to remain silent any more than the question of liability for damages could be sent to the jury on that basis alone. Instead, Rivera must identify additional evidence that would permit the jury to impose liability. *See LaSalle Bank*, 54 F.3d at 392–93. While Guevara's silence is not dispositive at summary judgment, the jury will be able to weigh it with the evidence in its totality and draw adverse inferences if it wishes. *See Hillman*, 834 F.3d at 793 (district court erred when it excused witness from testifying based on blanket invocation of Fifth Amendment privilege; jury should have heard witnesses invoke privilege on the stand); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 835 (7th Cir. 2016) (jury properly given adverse inference instruction when witness invoked Fifth Amendment privilege); *Harris v. City of Chicago*, 266 F.3d 750, 754–55 (7th Cir. 2001); *but see Evans*, 513 F.3d at 745 (discussing factors to be considered when witness waives Fifth Amendment privilege before trial).

## IV. CONSTITUTIONAL CLAIMS

Like all criminal defendants, Rivera had "a Fourteenth Amendment due process right to a fundamentally fair trial" in state court. *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (other citations omitted). At the heart of Rivera's theory of the case lies his contention that the police officers involved decided to railroad him on the day of the shooting and set about building a case against him by feeding a story to Lopez to make his planted identification seem plausible, fabricating a paper trail

corroborating the identification, manipulating the lineup process, and burying inconsistent and exculpatory evidence. In his response to defendants' motions for summary judgment, Rivera maintains that his due process right to a fair trial was violated in three, distinct ways. ECF No. 321 at 9. First, Rivera claims that evidence fabricated by the police, including knowingly false testimony by Guevara, was used at his trial to convict him. *See, e.g.*, *Avery v. City of Milwaukee*, 847 F.3d 433, 439–40 (7th Cir. 2017); *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014); *Fields v. Wharrie* ("*Fields II*"), 740 F.3d 1107, 1114 (7th Cir. 2014). Second, he claims that material evidence was suppressed in violation of the rule of *Brady v. Maryland*, 373 U.S. 83 (1963). Third, Rivera contends that the use of impermissibly suggestive lineup techniques deprived him of a fair trial.

## A. Fabrication of Evidence

The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way." *Avery*, 847 F.3d at 439 (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)) (alteration in original, other citation omitted). The Seventh Circuit has also distinguished between manufacturing false evidence from a "claim that an officer coerced a witness to give incriminating evidence." *Id.* The latter type of claim "does not, at least standing alone, violate the wrongly convicted person's due-process rights," though it may give rise to a *Brady* claim that the evidence of the coercion to which the witness was subjected must be disclosed, so a jury may weigh the circumstances under which the evidence came to light when deciding how much of it to believe.[11] *Id.* (citing *Fields II*, 740 F.3d

---

[11] In *Fields II* the Seventh Circuit used the following terminology:

Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by

at 1123 (Sykes, J., concurring in part and dissenting in part)). Rivera claims that several types of fabricated evidence were introduced at his trial and led to his wrongful conviction.[12] *See* Pl. Combined Resp. 11–14, ECF No. 321.

Rivera first points to Guevara's testimony before the grand jury and at trial that, respectively, an eyewitness identified Rivera and that Rivera had gold hair when he was arrested. *See id.* at 14–15 (citing Pl. SAF ¶¶ 80–85, 90–93). Rivera identifies three sources of evidence supporting his fabrication claim. *See* Pl. Combined Resp. 10–14, ECF No. 321. The first and third go hand in hand—Lopez's trial narrative identifying Rivera as the person who shot Valentin and Guevara's rebuttal testimony that Rivera had gold hair when he was arrested. *See id.* at 11, 14 (citing Pl. SAF ¶¶ 91, 92 regarding hair color).

Part II. F, *supra*, explains that the jury could reasonably find that Lopez and Guevara's testimony fabricated the story about the shooter's distinctive streak of gold in his hair. Guevara claims that absolute immunity shields him from damages liability for his testimony before the grand jury and at trial. Officers Mem. Supp. Mot. Summ. J. 16. The court finds it useful to begin by separating whether Rivera experienced liberty deprivation from causation issues. Absolute immunity shields a police officer, like most other witnesses, from damages liability under § 1983 for testimony before a grand jury or at trial. *See Rehberg v. Paulk*, 566 U.S. 356, 368–69 (2012) (holding investigator was absolutely immune from § 1983 claims that he testified falsely before grand jury); *Briscoe v. LaHue*, 460 U.S. 325, 341–45 (1983) (refusing to carve out

---

whoever cajoled or coerced the witness to give it. Much testimony is inaccurate, but not deliberately so and therefore not false or fabricated as we are using these words.

*Fields II*, 740 F.3d at 1110 (majority opinion); *see also Avery*, 847 F.3d at 439 ("[C]oercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but unlike falsified evidence and perjured testimony, coerced testimony may turn out to be true." (quoting *Petty v. Chicago*, 754 F.3d 416, 422–23 (7th Cir. 2014)) (alterations omitted)).

[12] The officer defendants note in their opening memorandum some confusion about what Rivera claims was fabricated. ECF No. 304 at 14. They analyze whether a report of the lineup prepared August 31, 1988, was used at Rivera's trial, *id.*, but Rivera does not discuss whether that report was used at trail in his response, instead focusing on the material discussed in the text, *see* ECF No. 321 at 11–15.

exception to absolute immunity for a police officer's allegedly perjured trial testimony). But the Supreme Court has "accorded only qualified immunity to law enforcement officials who falsify affidavits and fabricate evidence concerning an unsolved crime." *Rehberg*, 566 U.S. at 370 n.1 (internal citations omitted). On this record, a reasonable jury could find that Guevara fabricated Lopez's identification and the false details of hair style and color during the investigation. Lopez, who had on the version of facts most favorable to plaintiff never seen Rivera before viewing the Latin King photo book, could not have known those things, and because that fabrication happened during the investigation, Guevara does not enjoy absolute immunity. *See Avery*, 847 F.3d at 441–43 (denying absolute immunity to officers who testified to fabricated confession because "[w]hen the detectives falsified their reports of a nonexistent confession, it was entirely foreseeable that this fabricated 'evidence' would be used to convict [the § 1983 plaintiff] at trial for [the] murder. That was, of course, the whole point of concocting the confession."); *Fields II*, 740 F.3d at 1110; *Whitlock*, 682 F.3d at 572, 584.

Rivera also points to portions of the September 16, 1988, supplementary report prepared after Rivera's arrest by Guevara and Gawrys (and approved by Mingey), Pl. Ex. 4 at Wron 9–10, that were fabricated. Pl. Combined Resp. 13–14. Because this evidence was not introduced at Rivera's trial, defendants say Rivera cannot show that the fabrication caused a deprivation of his liberty, regardless of whether the evidence was in fact fabricated. Officers Mem. Supp. Mot. Summ. J. 14–15; Reply 22–23. Having to go to court and stand trial does not work a liberty deprivation in the relevant sense, so where the defendant is released on bond before trial, introducing fabricated evidence at the criminal trial does not violate due process if the defendant is acquitted, *Bianchi v. McQueen*, 818 F.3d 309, 320 (7th Cir. 2016); *Saunders–El v. Rohde*, 778 F.3d 556, 561 (7th Cir. 2015); *Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012), or

never tried at all, *Cairel v. Alderden*, 821 F.3d 823, 831 (7th Cir. 2016). Note the qualifier. Fabricating evidence can harm a person charged with a crime "before and not just during the trial, [where] it was used to help indict him," and the indictment leads to a nontrivial period of pretrial detention, such as Rivera's approximate eighteen months of pretrial detention. *Fields II*, 740 F.3d at 1112 (citing *Julian v. Hanna*, 732 F.3d 842, 847 (7th Cir. 2013)). Rivera was not released on bond before trial or acquitted in 1990. Instead he spent over twenty years in prison—a paradigmatic liberty deprivation. Resp. to Pl. SAF ¶ 96.

Defendants' contentions regarding the introduction of evidence at trial fall under the heading of causation. Ordinary § 1983 causation principles apply in due process evidence fabrication cases, *Fields II*, 740 F.3d at 1112–13, as the following hypothetical from the case law illustrates. "If an officer (or investigating prosecutor) fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." *Bianchi*, 818 F.3d at 319 (quoting *Whitlock*, 682 F.3d at 582) (alteration omitted); *see also Fields II*, 740 F.3d at 1112–13, 1114; *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994), *on remand from* 509 U.S. 259 (1993).

An absence of causation evidence proved dispositive in *Boyd v. City of Chicago*, cited by defendants, where the summary judgment record showed that the allegedly fabricated police reports never found their way into evidence at trial and were not otherwise referenced. 225 F. Supp. 3d 708, 725 (N.D. Ill. 2016) (also granting summary judgment for independent reason that the claim that the record contradicted the contention that the reports were false). Under ordinary causation principles, then, the September 16, 1988, report cannot by itself support Rivera's due process fabrication claim since it was not used or mentioned at trial. *See id.*

Nor does Rivera argue that it does. Rather, he disavows seeking to hold Guevara liable for his testimony before the grand jury and at Lopez's trial, at least not in the relevant sense. Pl. Combined Resp. 18. He instead seeks to impose liability for creating the "false identification from Valentin and false identifications and testimony from Lopez—that was used to secure charges, obtain an indictment, and cause a conviction at trial, when the false evidence was introduced through testimony and exhibits." *Id.* As the Seventh Circuit recently put the matter, "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter." *Avery*, 847 F.3d at 441; *see also id.* at 437, 442 (denying absolute immunity to police officers who fabricated the defendant's confession by planting it with three jailhouse informants, described the fabricated confession in their reports, and testified about the confession at trial).

Although Lopez's identification of Rivera as the shooter can fairly be described as the centerpiece of the case against Rivera presented at his trial, Rivera identifies no evidence that the Valentin identification was introduced at trial or before the grand jury. Guevara's testimony before the grand jury that an "eyewitness" identified Rivera cannot be reasonably read as referring to the victim. *See* Pl. SAF ¶ 84; Lopez Trial Tr. at 57:5–13 (testimony of Letrich; stating only that Valentin was shown photos of Imperial Gangsters (Rivera was in the Latin Kings photo book) on one date). Rivera argues that the contents of the September 16 report, which included the false Valentin identification, would have been verbally recounted to the Assistant State's Attorney ("ASA") who approved the charges against Rivera, *see* Pl. SAF ¶¶ 82–83 (citing ASA's testimony that she would have discussed the investigations' history with investigating officers before approving charges), but the ASA could not recall what was

discussed before charging Rivera, *see* Resp. to Pl. SAF ¶ 82 and portion of deposition transcript cited therein. A witness's inability to recall a fact cannot be used to create a genuine dispute about it; no recollection yields no competent evidence. *See Brown v. Chicago Transit Auth. Retirement Plan*, 197 F. App'x 475, 481 (7th Cir. 2006) (citations omitted). Because the basis for an inference that the Valentin identification caused Rivera's liberty deprivation is too speculative, the court grants summary judgment on the portion of Rivera's fabrication claim based on the falsified Valentin identification. *See Boyd*, 225 F. Supp. 3d at 725.

## B. *Brady* Claims

In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Favorable evidence under *Brady* includes impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *see also Socha v. Richardson*, 874 F.3d 983, 988 (7th Cir. 2017), *petition for cert. filed* No. 17-8519 (Jan. 23, 2018) (citing *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999)) (other citations omitted) ("Indeed, a prosecutor must share impeachment evidence with the defense even if the evidence partly inculpates the defendant."). The *Brady* disclosure requirement does not stop at the prosecutor's door; it "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler*, 527 U.S. at 280–81 (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)); *accord Whitlock*, 682 F.3d at 572; *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011). "To prevail on a *Brady* claim for an officer's failure to disclose evidence, a plaintiff must show that (1) the evidence was favorable to him; (2) the officer concealed the evidence; and (3) the concealment prejudiced him." *Gill v. City of Milwaukee*, 850 F.3d 335, 343 (7th Cir. 2017) (citing *Cairel*, 821 F.3d at 832).

"Evidence is 'suppressed' for *Brady* purposes when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *United States v. Kimoto*, 588 F.3d 464, 492 (7th Cir. 2009) (quoting *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005)) (alteration omitted). All of the suppressed evidence must be considered cumulatively when asking whether it was material under *Brady*. *Wearry*, 136 S. Ct. at 1007 (citing *Kyles*, 514 U.S. at 441). To establish materiality, Rivera does not need to "show that he "more likely than not" would have been acquitted had the new evidence been admitted." *Id.* at 1006 (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)). Rather, "[e]vidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Id.* (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

Rivera contends that the officer defendants suppressed four types of favorable evidence: (1) the criminal history report stamped issued on inquiry on August 27, 1988; (2) the fabrication of Lopez's initial gang book identification and the subsequent alleged fabrication of the gold pony tail and Humboldt Park details; (3) evidence showing that the first lineup happened, which evidence could have supported an argument that Lopez picked a filler; and (4) Lopez's statement that Rivera was the "wrong guy" at the September 15, 1988, lineup. *See* Pl. Combined Resp. 20–23. Defendants argue that there is insufficient evidence for the jury to find that the final three things happened, so any related documents and evidence would not have helped Rivera. Officers Mem. Supp. Mot. Summ. J. 5–6 & n.4, 8, 9–10. The court has already found genuine fact disputes preclude summary judgment on that basis, however. *See supra* Part II. F. Furthermore, the table, *supra*, comparing what discovery material Wadas had to the police department's permanent retention file for the Valentin investigation, demonstrates the jury could reasonably

find that Wadas did not have, and the prosecution never produced, several investigative documents at trial. *See* Resp. to SAF ¶ 73.

1. <u>Reasonable Diligence</u>

Defendants submit that Rivera's *Brady* claims fail because Wadas did not act with reasonable diligence. As a former prosecutor, Wadas, defendants say, should have issued a subpoena to Area Five, where GPRs would have been kept at the time, to get the documents he now claims were withheld. *See* Officers SMF ¶ 44–45. But Wadas filed a motion generally requesting *Brady* material, Pl. Ex. 47 at RFC 282–86, and he testified at his deposition that he sought and obtained verbal assurances from the prosecutors handling the case (Wadas had been a prosecutor himself) that he had all of the investigative material they had. *See* Pl. SAF ¶ 74 and potions of Wadas Dep. cited therein. Those steps, if believed by the jury, suffice to allow it to find that Wadas made a specific request for the suppressed documents.[13] *See Agurs*, 427 U.S. at 106 (explaining that request made in *Brady* itself was specific because it "gave the prosecutor notice of exactly what the defense desired").

Given his client's claim to have participated in a first lineup, Resp. to Officers SMF ¶ 46, defendants also contend that Wadas was not reasonably diligent because he did not attempt to interview Lopez, attempt to interview the officers involved in the second lineup, and did not file a motion to suppress the identification at the second lineup (though he considered doing so but concluded he had no basis in the documents he then had, according to his testimony). *See id.* ¶¶ 46, 47, 49. To bolster their claim, defendants rely on an expert report opining that Wadas' failure to interview key witnesses violated the Illinois Code of Professional Responsibility.

---

[13]Also, Wadas testified that in 1988 police officers were still taking notes and destroying them rather than using the GPR form, so it was not uncommon for investigative files to have no GPRs at all. *See* Wadas Dep. at 87:17–22, 254:24–55:24 Pl. Ex. 19A.

Officers SMF ¶ 49 (citing Officer Defs. Tab 51 at 250) (other citations, including expert's deposition, omitted).  Filing a motion to suppress, contend defendants, would have allowed him to probe the circumstances of both lineups by questioning Lopez and the officers involved in the second lineup.  *See* Resp. to Officers SMF ¶ 49; Officers Mem. Supp. Mot. Summ. J. 11–13.

A defendant in a criminal case that actually goes to trial has the "responsibility to probe the witnesses and investigate their versions of the relevant evidence."  *Holland*, 643 F.3d at 256 (citing *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008)).  Nonetheless, as defendants acknowledge in their briefing, the "reasonable diligence" aspect of *Brady* does not extend to "inquiry into matters defense counsel could not have been expected to ask about," or to "information possessed by a defense witness [which] is available through the exercise of reasonable diligence where that information is not of a type defense counsel could reasonably expect that witness to possess."  *Boss v. Pierce*, 263 F.3d 734, 744 (7th Cir. 2001).  Noting that Lopez has never testified about what he would have said if asked by Wadas before trial, defendants speculate on the value of Wadas interviewing Lopez: "Perhaps Lopez would have recanted; perhaps not.  Perhaps he would have said something to lead Wadas to further investigate the identification procedures in which Lopez was involved."  Officers Mem. Supp. Mot. Summ. J. 11.

Facts material to whether Wadas acted with reasonable diligence are genuinely disputed.  The opinion that Wadas violated the Illinois Code of Professional Responsibility, Officers SMF ¶ 47, 49, does nothing to establish that Lopez would have coughed up exculpatory evidence had he been interviewed.  Defendants say that this case is like *Boyd v. City of Chicago*, 225 F. Supp. 3d 708 (N.D. Ill. 2016), but the eyewitness whom defense counsel failed to interview in *Boyd* had not been coerced or fed a story by the police, *see id.* at 722–723.  In situations like the one

the summary judgment record requires this court to find, where a witness has fabricated an identification with police, the witness might well view the consequences of revealing the truth to be dire. A reasonable jury could find from that fact alone that the witness and police officers involved would be "uncooperative or reluctant" if interviewed by defense counsel. *Boss*, 263 F.3d at 740 (stating that "it would be nearly impossible for defense counsel to discover" favorable evidence from such witnesses); *see also Hampton v. City of Chicago*, No. 12-cv-5650, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017) (distinguishing *Patrick v. City of Chicago*, 103 F. Supp. 3d 907, 915 (N.D. Ill. 2015) for similar reasons). Viewing the evidence in the light most favorable to Rivera, it would certainly be within the range of allowable fact finding for the jury to conclude that Lopez, having concocted the false identification with the police, would have identified with them and feared too much the consequences of telling the truth to have come clean if interviewed by defense counsel. *See Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 444–45 (N.D. Ill. 2011) ("Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense."); *Hampton*, 2017 WL 2985743, at *22.

2. Suppression of First Lineup

Defendants argue that any evidence germane to the first lineup cannot be deemed suppressed because Rivera participated in it and therefore knew about it when he was tried. Wadas testified that Rivera told him about the first lineup, but he had no documentary evidence corroborating its existence to use at trial. *See* Resp. to Officers SMF ¶¶ 22, 46. That reasoning holds true for the bare fact that the lineup happened. *See Gauger v. Hendle*, 349 F.3d 354, 360

(7th Cir. 2003), *overruled in part on other grounds by Wallace v. City of Chicago*, 440 F.3d 421, 423 (7th Cir. 2006). But it does not hold for the withheld arrest reports, GPRs, and police paperwork. For summary judgment purposes, Wadas never received that paperwork, and defendants point to no evidence that Rivera knew about it. Because the reports and forms concerning the August 31, 1988, lineup could have been used as impeachment fodder and the jury could find that neither Rivera nor Wadas knew about them, the jury could properly deem them material and suppressed under *Brady*. *See Avery*, 847 F.3d at 443–44 (distinguishing *Gauger* and holding that evidence that informants were pressured was suppressed even though defendant knew what he said to informants because he did not know about documentary and other evidence that could have been used to impeach informants).

One might wonder how the police records could have been used to impeach Lopez's testimony. They all state that Lopez could not be located and the witnesses were released. Remember that the evidence must be considered cumulatively rather than piecemeal. *Weary*, 136 S. Ct. at 1007 (citation omitted). As already explained, the wider mosaic of suppressed evidence allows a finding that the statements that Lopez could not be found were fabricated to paper over a filler identification. That narrative would have been strong medicine for impeaching Lopez's testimony at trial.

Taking Rivera's allegedly suppressed evidence cumulatively, a jury could find that it was reasonably likely to have affected the fact finder's judgment at his trial. The trial hinged largely, if not exclusively, on the believability of Lopez's eyewitness account of the Valentin shooting and his identification of Rivera as the shooter. Because of the relative weakness of the prosecution's case and the centrality of Lopez's credibility, "additional evidence of relatively minor importance" impeaching him and undermining his narrative qualifies as material. *Weary*,

137 S. Ct. at 1006 (quoting *Agurs*, 427 U.S. at 113); *see also id.* at 1004–05, 1006–07 (holding undisclosed statements of witness tending to suggest a motive to fabricate testimony to curry favor with the prosecutor was material); *see also Smith*, 565 U.S. at 75 (holding that evidence impeaching only eyewitness to identify the defendant was material); *Fields v. Wharrie* ("*Fields I*"), 672 F.3d 505, 517 (7th Cir. 2012). At summary judgment, the jury could find it was favorable, for it could reasonably be seen as shedding light on how the officers "induced the witnesses to finger" Rivera, making it "information vital to probe whether manipulation occurred." *Newsome v. McCabe*, 319 F.3d 301, 302–05 (7th Cir. 2003).

Accordingly, the court must deny summary judgment on Rivera's *Brady* claims. The genuine factual disputes discussed above must be resolved by the jury. *Hampton*, 2017 WL 2985743, at *19.

## C. Claim for Use of Unduly Suggestive Identification Techniques

While the constitution does not prescribe a "particular standard of quality" for lineups, "[i]t does . . . guarantee the right to a fair trial[,] . . . and that right is violated if unduly suggestive identification techniques are allowed to taint the trial." *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006) (citing *Hensley v. Carey*, 818 F.2d 646, 648, 650 (7th Cir. 1987) for first quotation) (other citation omitted)); *see also Perry v. New Hampshire*, 565 U.S. 228, 239 (2012); *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014). The Seventh Circuit takes a "two-prong approach" to decide whether an identification procedure offends due process, asking: (1) "whether the defendant has established that the procedure was "both suggestive and unnecessary[;]"and (2) if so, whether in the "totality of the circumstances . . . other indicia of reliability outweigh the corrupting effect of law enforcement suggestion." *United States v. Jones*, 872 F.3d 483, 490–91 (7th Cir. 2017) (quoting *United States v. Sanders*, 708 F.3d 976, 983–84

(7th Cir. 2013)) (brackets in original).  This standard sets a high bar, for "a 'witness's identification violates a defendant's right to due process when the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'"  *Lee*, 750 F.3d at 691 (quoting *United States v. Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009)).  Furthermore, the use of an unduly suggestive identification procedure must make the trial unfair to violate due process.  *Alexander*, 433 F.3d at 555.

On the first prong, Rivera cites two things to show that the techniques used at the lineups were unduly suggestive in his response to the officer defendants' motion for summary judgment.  *See* ECF No. 321 at 34–36.  The first is the evidence—apparently the August 27, 1988, criminal history inquiry—that the police had preselected Lopez.  *Id.* at 34.  Inferring that unduly suggestive techniques must have been used from bare evidence that the police knew who they wanted Lopez to pick speculates too much even for summary judgment where Rivera gets the benefit of all reasonable inferences.  The Seventh Circuit has expressed a distinct preference for scientific evidence in this area.  *See Sanders*, 708 F.3d at 985 ("[S]cientific sources should generally accompany an argument that a particular procedure was unnecessarily suggestive.").  Rivera points to the report of his expert, Jennifer Dysart, *see* Resp. to Officers Mot. Summ. J. 35–36, which details a laundry list of problems ranging from Lopez's age at the time of the identifications, the unconscious transference effects from reviewing long mug books, the selection of the particular fillers used in Lopez's lineups and the fact that only some of them matched the shooter's description, and more.  *See* Pl. Ex. 21 at 9–16.  As the officer defendants note, Rivera does not cite Dysart's report in his Local Rule 56.1(b)(3) response to their statement of facts or his own statement of additional facts.  Citations to the Dysart report appear only in Rivera's response brief.  *See* ECF No. 321 at 34–36, 38 (last citation to establish that lineup was

unreliable). The court must disregard it, as it was not subjected to the established Local Rule 56.1 adversary process for testing and sifting factual disputes at summary judgment. *See supra* Part I. B; *Greene v. CCDN, LLC*, 853 F. Supp. 2d 739, 744 (N.D. Ill. 2011). That leaves Rivera with insufficient evidence to create a fact issue on the first prong of his suggestive lineup claim, and it must therefore be dismissed at summary judgment.

## D. Rivera's Fifth Amendment Claim

Defendants also move for summary judgment on Rivera's Fifth Amendment claim for violation of his right not to be compelled to be a witness against himself. As defendants note, no statement of Rivera's was used at his trial or criminal proceedings. That defeats this claim. *Ellwood v. City of Chicago*, No. 08 C 4586, 2014 WL 883553, at *11 (N.D. Ill. Mar. 6, 2014). Additionally, Rivera does not respond to this argument. *See, e.g.*, *Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 743 (N.D. Ill. 2016).

## E. Conspiracy and Failure to Intervene Claims

As the officer defendants argue, the conspiracy claims and claims for failure to intervene brought in Counts II and III rise and fall with the underlying constitutional violations. The court accordingly grants summary judgment dismissing those counts to the extent they derive from the § 1983 claims that are dismissed today. *See, e.g.*, *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (conspiracy); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *see also* Pl. Resp. to Officers Mot. Summ. J. 39–40 (not disputing this portion of defendants' argument).

Entering summary judgment on those claims in their entirety would be improper, however, because the briefing does not adequately develop the issues. In their opening memorandum, the officer defendants describe the elements of both claims and then assert that Rivera lacks evidence of a conspiracy. ECF No. 304 at 18, 19. Rivera complains in his response

that the opening memorandums' arguments are too perfunctory and underdeveloped to allow him to respond meaningfully. ECF No. 321 at 38, 40. The officer defendants reply as follows:

> Defendants' Memorandum of Law (at 18-19) concisely discussed the federal conspiracy and failure to intervene claims. Plaintiff claims this discussion is "cursory" and "not developed in a way that permits a response" (Pl. Brief, at 38, 40), yet responds in three pages. Defendants' brevity does not distract from the fact that these claims do not survive summary judgment.

ECF No. 333 at 24.

Rivera raises a close procedural question. As the parties moving for summary judgment, defendants must "identify[ ] each claim or defense . . . on which summary judgment is sought" and also "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also id.* R. 56(c)(1). In *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010), to which Rivera analogizes this issue, the Seventh Circuit found that an opening summary judgment memorandum did not shift the initial burden of production to the plaintiff because, though the motion sought judgment on all claims, it "made no mention whatsoever" of the particular claim at issue. The memorandum, the court explained, lacked "citation to relevant facts or authority pertaining to the" particular claim. *Id.* So the defendants' memorandum, ECF No. 304 at 18, 19, has authority but no facts. That is, it "identif[ies] the . . . defense . . . on which summary judgment is sought" but does not "show" why summary judgment should be granted on the facts of this particular case. *See* Fed. R. Civ. P. 56(a); *see also* 10A Wright & Miller, Federal Practice & Procedure § 2727.1 & n.18 (West 2018) ("[T]he party moving for summary judgment cannot sustain its burden . . . merely by asserting that the nonmovant lacks evidence to support its claim. The movant must show why the opponent's allegations of fact are insufficient to support the claim for

relief as a matter of law or why the court should conclude that its opponent lacks sufficient evidence.").

But even if the officer defendants' opening memorandum is sufficient, their reply abandoned their motion for summary judgment on conspiracy and failure to intervene claims by offering no analysis of the governing law or the evidence Rivera cites in his response. *See* Resp. 38–40. The court cannot tell whether the officer defendants agree that Rivera correctly articulated the governing legal principles. Nor do defendants offer any reason why they think the facts Rivera has cited are inadequate for trial. That is, nowhere in their opening memorandum or reply, on the conspiracy and failure to intervene claims, do defendants engage with Rivera's factual position as he articulates it in his response or even his complaint. *See, e .g.*, *Hodges v. US Bank Home Mortg.*, No. 10 C 5928, 2011 WL 211343, at *2 (N.D. Ill. Jan. 20, 2011) ("[S]ince [the defendant] abandoned the argument in its reply, [the defendant]'s motion is denied."); *Consumer Program Adm'rs, Inc. v. K.B. Parrish & Co.*, 2009 WL 4788681, at *4 (N.D. Ill. Dec. 9, 2009) (refusing to discuss argument moving party failed to discuss in reply); *see also Donaldson v. United States*, No. 91 C 7397, 1992 WL 122784, *1 (N.D. Ill. May 21, 1992) (characterizing party's abandonment of issue in reply and switching to new argument as "entirely improper").

## F. Personal Involvement of Officers

All but four of the officer defendants—all except Guevara, Gawrys, McLaughlin, and Leonard—seek summary judgment on personal involvement grounds. Officers Mem. Supp. Mot. Summ. J. 19–21. A police officer acting under color of state law can be liable under § 1983 for failing to intervene in a constitutional violation perpetrated by another person when the "defendant actually had notice, opportunity, and the ability to prevent the other person from

inflicting harm." *Sanchez v. City of Chicago*, 700 F.3d 919, 928 (7th Cir. 2012). Failing to

intervene in the suppression of evidence can give rise to liability for suppressing evidence in

contravention of *Brady*. *See Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988)

(finding evidence sufficient to impose liability on supervisors); *Marshall v. Buckley*, 696 F. Supp.

2d 964, 969 (N.D. Ill. 2010) (recognizing availability of theory but granting officers' motion for

summary judgment); *see also, e.g.*, *Colbert*, *supra*, 851 F.3d at 657 ("'Individual liability under §

1983,' however, 'requires personal involvement in the alleged constitutional deprivation.'"

(quoting *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (alteration omitted))). "Section

1983 creates a cause of action based on personal liability and predicated upon fault. An

individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged

constitutional deprivation. A causal connection, or an affirmative link, between the misconduct

complained of and the official sued is necessary." *Colbert*, 851 F.3d at 657 (quoting *Wolf-Lillie

v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)) (alteration and emphasis omitted).

Beginning with the three defendants who were sergeants in 1988, the reports in the

Valentin investigation show that Defendants Rinaldi, Weingart, and Mingey approved them. *See*

Pl. Ex. 4 at Wron 29-30, 34-36, 53-54, 68-69 (approved by Rinaldi); *id.* at Wron 49–50 (Sept. 15,

1988, lineup report approved by Weingart); *id.* at Wron 9–10 (Sept. 16 report approved by

Mingey), in Resp. to Officers SMF ¶¶ 65, 66, 72 (collecting these citations). Mingey's personal

involvement is the subject of a motion to supplement the summary judgment record filed May 7,

2018. The court reserves ruling on Mingey's involvement because the motion to supplement has

not been fully briefed. Rivera argues that the sergeant defendants supervised the investigation

during a "crucial period." Resp. to Officers SMF ¶¶ 65, 66, 72. That fact does not alone support

liability. To be held liable for something they did not personally do, *see id.* (not disputing this

portion of fact statement), "[t]he supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Jones*, 856 F.2d at 992–93 (citing *Duckworth v. Franzen*, 780 F.2d 645, 652–53 (7th Cir. 1985)) (other citation omitted). *Jones* affirmed a jury verdict holding three supervisory officers liable for railroading a defendant because the jury could "infer that [the supervisors] had known every false step taken by the subordinate officers, had approved every false step, and had done their part to make the scheme work." *Id.* at 993.

Even viewed in the light most favorable to Rivera, the summary judgment record does not permit the same conclusion about what Rinaldi and Weingart knew about their subordinates' chicanery. Rinaldi testified that he relied on the detectives to incorporate everything into their reports. Officer Defs. Tab 59 at 54:13–19 ("I wasn't part of the investigation."). Weingart admitted he would have been generally "ke[pt] apprised" of the Valentin investigation, Pl. Ex. 72A at 50:6–8, but that does not demonstrate knowledge of the specific steps his subordinates took to frame Rivera.[14] *See Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001); *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 870 (7th Cir. 2011); *Ott v. City of Milwaukee*, 48 F. Supp. 3d 1197, 1205–06 (E.D. Wis. 2014); *see also, e.g.*, *Chavez*, 251 F.3d at 651 (no liability for "failing to detect and prevent subordinate's misconduct"). Rivera points to various irregularities and defects in the reports approved by Rinaldi and Weingart, but at most, failing to notice them can be seen as negligent, which does not suffice to impose § 1983 damages liability on a supervisor. *Jones*, 856 F.2d at 992 (observing that even "[g]ross negligence is not enough").

---

[14] Guevara's invocation of his Fifth Amendment privilege in answer to a question about whether he told Weingart about Lopez saying he had the "wrong guy" cannot by itself form the link needed to impose liability, particularly someone else's liability.

The court therefore dismisses Rivera's § 1983 fabrication and *Brady* claims against defendants Rinaldi and Weingart.

The other five defendants were Gang Crimes Specialists. Each testified that he had minimal involvement in the Valentin investigation or could not recall it. *See* Resp. to Officers SMF ¶ 67 (Noon fetched a report on Aug. 27, 1988, and may have looked for Lopez for a lineup); *id.* ¶ 68 (Guzman looked for Rivera and Lopez; not present for physical lineup); *id.* ¶ 71 (Fallon has no recollection of Valentin investigation). But two GCS defendants, the jury could reasonably find, were personally involved in Lopez's initial gang book identification. Defendant Sparks recalls bringing the gang photo book to Lopez's home and partially observing the identification. *Id.* ¶ 69. Given the fact dispute about when that identification happened (Sparks places it on Aug. 27), the jury could find that he was personally involved in fabricating Lopez's identification from the gang book but not in any later conduct. *See id.* Zacharias testified to no specific recollection of the Valentin investigation but recalled riding with Sparks. *Id.* ¶ 70. To create a genuine dispute, Rivera points to the list of "Arresting Officers" on the September 16 report summarizing the Valentin investigation. *See id.* ¶¶ 65–71 (citing Pl. Ex. 4 at Wron 9–10); *see also id.* at Wron 34–36, 56 (specific arrest reports listing Guevara as arresting officer and Zacharias, Sparks, Fallon, Leonard, and McLaughlin as additional arresting officers). Unchallenged evidence in the record shows that at the time, it was common practice to list every police officer involved in the investigation as an arresting officer to give the widest possible credit—even if the officer rode along on only one night of the investigation. Sparks Dep. 116:5–118:14; Zacharias Dep. 125:6–126:11. Accordingly, the presence of these officers' names on lists of additional arresting officers in police reports does not, without more, create a fact issue on their personal involvement.

For these reasons, the § 1983 claims for fabrication and *Brady* violations against defendants Noon, Guzman, and Fallon are dismissed. The court partially dismisses the § 1983 claims against Sparks and Zacharias except as to the due process claim based on fabrication at the gang book identification.

## G. Qualified Immunity

The officer defendants argue that they are entitled to qualified immunity. Officer Defs.' Mem. Supp. Mot. Summ J. 21–22, ECF No. 304. The doctrine of qualified immunity shields police officers in § 1983 actions from liability for money damages unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "Though [qualified immunity] is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (citing *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)).

The two prongs of the qualified immunity inquiry may be addressed "in whatever order seems best for the case at hand." *Sebesta*, 878 F.3d at 233 (tracing this principle to *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The court has analyzed whether constitutional violations occurred, so for the fabrication and *Brady* due process claims that have survived, the question is whether the unlawfulness of the officers' conduct was clearly established.

A right is clearly established for qualified immunity purposes "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations

in original); *see also Wesby*, 138 S. Ct. at 589 (clearly established "must be 'settled law.'"

(quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991))); *Mullenix v. Luna*, 136 S. Ct. 305, 308

(2015) (stating that "qualified immunity protects 'all but the plainly incompetent or those who

knowingly violate the law'" (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).  The plaintiff

"need not point to an identical case finding the alleged violation unlawful, 'but existing

precedent must have placed the statutory or constitutional question beyond debate.'"  *Kemp v.

Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Mullenix*, 136 S. Ct. at 308).  The Seventh

Circuit first examines "controlling Supreme Court precedent and . . . [Seventh] circuit decisions

on the issue."  *Id.* (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000)).  In the

absence of controlling or persuasive authority from those sources, the search expands to "all

relevant case law in order to determine whether there was such a clear trend in the case law that

[the court] can say with fair assurance that the recognition of the right by a controlling precedent

was merely a question of time."  *Id.* (quoting *Jacobs*, 215 F.3d at 767); *accord Werner v. Wall*,

836 F.3d 751, 761 (7th Cir. 2016) (citing *Abbott v. Sangamon Cty.*, 705 F.3d 706, 731 (7th Cir.

2013)).  In the absence of controlling or persuasive cases, "plaintiffs can demonstrate clearly

established law by proving that the defendant's conduct was 'so egregious and unreasonable that

. . . no reasonable [official] could have thought he was acting lawfully.'"  *Kemp*, 877 F.3d at 351

(quoting *Abbott*, 705 F.3d at 724) (alterations in original) (other citation omitted) (cautioning that

these are "rare cases").

The right violated must not be defined at too high a level of generality.  *Wesby*, 138 S. Ct.

at 589 (citations omitted); *al-Kidd*, 563 U.S. at 742; *Kemp*, 877 F.3d at 351 (collecting authority

emphasizing that the Supreme Court has repeatedly made this point); *but see Gustafson v.

Adkins*, 803 F.3d 883, 892 (7th Cir. 2015) ("a broad constitutional test . . . is sufficient to clearly

establish the law 'in an obvious case . . . even without a body of relevant case law.'" (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)) (second ellipsis in original)).  For qualified immunity purposes, "[t]he dispositive question is whether the volatile nature of *particular* conduct is clearly established."  *Kemp*, 877 F.3d at 351 (quoting *Mullenix*, 136 S. Ct. at 308) (alteration in original); *see also Wesby*, 138 S. Ct. at 589 ("A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" (quoting *Anderson*, 483 U.S. at 641) (alteration in original).

Starting with the fabrication claims, "it was established law by 1985 (indeed long before), when the fabrication is alleged to have occurred, that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process."  *Fields II*, 740 F.3d at 1114 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)) (other citations dating to 1935 omitted).  The same went for police officers by 1988.  *See Patrick v. City of Chicago*, No. 14 C 3658, 2014 WL 7204501, at *7 (N.D. Ill. Dec. 17, 2014), *modified on reconsideration on other grounds*, 103 F. Supp. 3d 907 (N.D. Ill. 2015) (applying *Fields II*'s qualified immunity holding to police officers without comment).  In *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012), the Seventh Circuit began its qualified immunity analysis with the pronouncement, "We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way."  The court cited *Jones v. City of* Chicago, 856 F.2d 985, 993 (7th Cir. 1988), and *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008), to make its point.  The original opinion in *Jones* (the opinion was amended on petition for rehearing) was handed down on September 14, 1988, the day Valentin died and one day before Lopez says he made the "wrong guy" statement at a lineup at which he picked Rivera.  *See* Resp. to Pl. SAF ¶ 7 (stating date of death).  The facts of *Jones*

are very similar to those here, and the *Jones* decision more than suffices to show that by 1988 it was clearly established that due process would not tolerate a police officer fabricating evidence. *See Dominguez*, 545 F.3d at 588, 589; *Jones*, 856 F.2d at 953.

As for the *Brady* claims, the Seventh Circuit held in *Newsome v. McCabe* that it was "clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about fingerprints and the conduct of a lineup." 256 F.3d 747, 752–53 (7th Cir. 2001), *abrogated on other grounds by Manuel v. City of Joliet*, 137 S. Ct. 911 (2017). *Jones* again furnishes the salient example. *See id.* The officer defendants again cite *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), for the proposition that it was not established, much less clearly, that they had to turn over anything if the person who ultimately stood trial was present at the lineup. Officers Mem. Supp. Mot. Summ. J. 21. But *Newsome* involved a lineup in which the wrongfully convicted person stood (so he knew about it), and the officers nevertheless had no qualified immunity for *Brady* claims that they did not tell the prosecutors or the defense that they encouraged witnesses to pick the § 1983 plaintiff from the lineup. 256 F.3d at 749. *Newsome*, therefore, clearly established that the *Brady* disclosure requirement expounded in *Jones* has full force when the person who later stands trial is in the lineup (which is usually the case since introducing evidence identifying someone else as the perpetrator of a crime is a poor strategy for winning a conviction). *See Ott v. City of Milwaukee*, 48 F. Supp. 3d 1197, 1207–08 (E.D. Wis. 2014) (denying qualified immunity to officers at summary judgment for disclosure of their coercion during lineup); *Hampton v. City of Chicago*, No. 12-cv-5650, 2017 WL 2985743, at *29 (N.D. Ill. July 13, 2017) (same result for withholding manipulation of photo array for identification in 1981).

Given the genuine fact issues, the court cannot say that Rivera is complaining of the nondisclosure of "little . . . tidbit[s]" of evidence whose value to the defense would not have been apparent to the officer defendants. *Newsome*, 260 F.3d at 825. As discussed extensively earlier, the jury could find that whole swaths of evidence that would have corroborated the existence of the first lineup were suppressed and that cumulatively the withheld evidence was an impeachment goldmine.

Based on the foregoing analysis, the court concludes that a jury viewing the summary judgment record most favorably to Rivera could find that his clearly established rights were violated.

## V. STATE LAW CLAIMS

This court has supplemental jurisdiction over Rivera's claims under Illinois law for conspiracy, malicious prosecution, and intentional infliction of emotional distress ("IIED"). *See* 28 U.S.C. § 1367(a). Defendants move for summary judgment on all three claims. The analysis turns on whether Rivera can maintain his malicious prosecution claim. Finding that the summary judgment record supports a malicious prosecution claim against Guevara but not the other defendants, the court dismisses the state law claims against all defendants except him. The conspiracy claim survives, however, because there is evidence from which the jury could find that Guevara took a step in furtherance of it.

"To establish a claim for malicious prosecution under Illinois law, plaintiffs must establish five elements: (1) commencement or continuation of an original proceeding by the defendant; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Colbert*, *supra*, 851 F.3d at 654–55 (quoting *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016)) (brackets omitted). Defendants seek summary

judgment on the first and third elements. Officers Mem. Sup. Mot. Summ. J. 22–24. The material fact disputes here amount to an absence of any probable cause; the jury could conclude that Rivera was targeted without suspicion on August 27, 1988. The malicious prosecution claim nevertheless fails at summary judgment for lack of evidence that any defendant commenced or continued Rivera's criminal proceedings.

While an arrest can be the first step toward prosecution, the police do not make charging decisions, so "the chain of causation [from the arrest to the conviction] is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements by the officers to the prosecutor." *Colbert*, 851 F.3d at 655 (quoting *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) (emphasis omitted)). Rivera must therefore point to evidence of "some postarrest action which influenced the prosecutor's decision to indict." *Id.* (quoting *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 902 (7th Cir. 2001)); *see also Mahoney v. Kesery*, 976 F.2d 1054, 1061 (7th Cir. 1992).

With the exception of Guevara, Rivera has not done so. The reports state that they were written pre- rather than post-arrest, as *Colbert* requires. Rivera points to evidence he contends shows that at least Guevara and Gawrys must have repeated the false Valentin and Lopez identifications described in the September 16 report to the Assistant State's Attorney who approved charges on September 15, 1988. *See* Pl. SAF ¶¶ 51–56, 80–83. The court has already found this inference to be too speculative to create a genuine dispute for trial because the ASA testified that she cannot recall what was discussed. *See* Part IV. A (citing *Brown v. Chicago Transit Auth. Retirement Plan*, 197 F. App'x 475, 481 (7th Cir. 2006)). There is no evidence of how, if at all, any officer's post-arrest activity influenced the ASA's decision. That gap in proof breaks the chain of causation. *See Colbert*, 851 F.3d at 655; *Reed*, 77 F.3d at 1053; *Cervantes v.*

*Jones*, 23 F. Supp. 2d 885, 891 (N.D. Ill. 1998) (holding chain of causation broken by prosecutor's independent decision to initiate and continue charges even though officer allegedly lied to grand jury). Rivera cites a number of district court cases and quotes general principles, but he does not attempt to distinguish the approach taken in *Colbert*. *See* Pl. Combined Resp. 42–45, ECF No. 321.

Unlike the other officer defendants, Guevara testified before the grand jury. On this record, the jury could reasonably find that Guevara fabricated his testimony that an eyewitness identified Lopez. *See* Pl. SAF ¶ 84; Grand Jury Tr. at JR1392:15–21. Put succinctly, "a police officer who procures a prosecution by lying to the prosecutor or to the grand jury can be sued for the consequences of the prosecution." *Mahoney*, 976 F.2d at 1061 (citing *Jones*, 856 F.2d at 993–94) (decided under Wisconsin law but relying on Illinois malicious prosecution law applied in *Jones*). The court therefore dismisses Rivera's malicious prosecution claims against all defendants except Guevara.

The officer defendants also argue that the other state law claims are derivative of Rivera's malicious prosecution claim and fail for want of proof of essential elements.[15] Officers Mem. Supp. Mot. Summ. J. 24, ECF No. 304. These arguments are no better developed through the opening motion and reply than was the § 1983 conspiracy claim, *see* Part IV. E, *supra*, and they need not be addressed. *See* ECF No. 304 at 24; Defs. Reply 27, ECF No. 333. Conspiracy liability remains available because a genuine dispute exists over whether Guevara acted to further its ends. *See Adcock v. Brakegate, Ltd.*, 645 N.E.2d 54, 63 (Ill. 1994) ("A cause of action

---

[15] According to Rivera, the arguments on this subject in the officer defendants' opening summary judgment memorandum are underdeveloped and too perfunctory to shift the summary judgments burden. ECF No. 321 at 47, 48. To the contrary, the opening memorandum cites specific case law for each proposition, including the case on which the court relies in the text for its disposition. *See* ECF No. 304 at 24. If anything, it is Rivera who has forfeited an argument by failing to respond to the officer defendants' contentions that the conspiracy and IIED claims are derivative. *See* ECF No. 321 at 47, 48.

for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." (citations omitted)).  Despite the lack of development, Rivera plainly relies on the same evidence to support his IIED claim as his malicious prosecution claim, so the IIED claims against all defendants except Guevara are dismissed as derivative.  *See Beaman v. Freesmeyer*, 82 N.E.3d 241, 255 (Ill. App. Ct. 2017) (affirming trial court's grant of summary judgment on IIED where that claim "was based and contingent upon his malicious-prosecution claims").

## VI. THE CITY'S LIABILITY UNDER *MONELL*

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691–95 (1978), the Supreme Court held that municipalities can be liable for damages under 42 U.S.C. § 1983 caused by constitutional violations, but not under the respondeat superior theory that the person who committed the violation was acting in the course and scope of employment with the municipality when the violation occurred.  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Monell*, 436 U.S. at 694) (other citation omitted).  Rivera proposes to use the final method here.

"Allowing plaintiffs to prove that a widespread practice has been established by custom or usage with the force of law" prevents "egregious attempts by local governments to insulate themselves from liability for unconstitutional policies."  *McMillian v. Monroe Cty.*, 520 U.S. 781, 796 (1997) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)) (internal quotations and alteration omitted).  In addition to having caused the violation, the custom or policy must be "the

moving force behind it." *Colbert v. City of Chicago*, 851 F.3d 649, 660 (7th Cir. 2017) (quoting

*Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007)). Before

discussing Rivera's *Monell* claims in detail, the court must settle a dispute over their scope and

breadth.

## A. The *Monell* Theories Listed in Plaintiff's Response

Rivera and the City disagree about what *Monell* theories are in play. The City moves for

summary judgment dismissing all of Rivera's § 1983 claims against it. Citing the complaint, the

City groups Rivera's *Monell* claims into the following categories: "(1) maintaining 'street files'

that were not routinely disclosed to prosecutors and criminal defendants; (2) failing to document

lineups in which a witness identified a 'filler,' meaning someone other than the suspect in the

lineup; and (3) failing to discipline officers in response to citizen complaints of misconduct."

ECF No. 306 at 1 (citing Compl. ¶¶ 37–38, 42–43, 46).

Rivera argues that the City missed five of his *Monell* theories in its motion for summary

judgment (the "disputed theories"):

> (1) the theory that the Chicago Police Department's express
> written policies governing the creation, maintenance, and
> production of investigative files were deficient (or non-existent)
> and caused the suppression of exculpatory investigative materials
> in this case;
>
> (2) the theory that the City's final policymakers, who admittedly
> were on notice of the problem of systemic suppression of
> investigative materials, chose not to adopt obviously needed
> policies to ensure transmission of police files, and in so doing
> made a decision that caused suppression of exculpatory materials
> in Rivera's case;
>
> (3) the theory that the City is liable for its failure to adequately
> train its officers: (a) to retain investigative materials, maintain
> investigative files, and produce those materials to the criminal
> justice system; (b) to properly conduct identification procedures
> and to accurately record the results of those identification

procedures; and (c) to write accurate police reports documenting their investigation regardless of the path the investigation takes;

(4) the theory that the City is liable for failing to adequately supervise or discipline employees to ensure disclosure of investigative files, given: (a) the lack of policies on supervision of file production; (b) the lack of any effort to audit the City's file-production procedures promulgated after *Jones* and *Palmer*; and (c) the lack of any training or policies governing the subpoena service unit, among other things; and,

(5) the theory that the City had notice of and was deliberately indifferent to a widespread practice among its police officers of fabricating false evidence, primarily through witness coercion and corrupt identification procedures, for use in criminal cases, which resulted in violations of due process and numerous wrongful convictions.

Pl. Combined Resp. 51–52 (footnote and internal citations omitted). If Rivera is right, a trial must be held on those five theories regardless of what happens to the three listed in the City's motion because the City did not discharge its initial burden at summary judgment to "point out an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also, e.g.*, *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) ("The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts or authority pertaining to the [particular claim], the defendants sought summary judgment on all claims . . . .").

The City received ample notice that Rivera was pursuing the five disputed theories in this case. The complaint lays out his *Monell* theories in general terms. *See* ECF No. 1 ¶¶ 35–48. Rivera devoted all 43 pages of his response to defendants' fourth set of interrogatories to describing the basis of his *Monell* claims. *See* Pl. Ex. 153. An interrogatory response or expert report can put the defendant on notice of a plaintiff's theory; indeed, that is often the point of 'contention interrogatories.' *See Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009); *United States ex rel. McGee v. IBM Corp.*, No. 11-C-3482, 2017 WL 4467458, at *11 (N.D. Ill. Oct. 6, 2017);

73

*Abbott Labs. v. Sandoz, Inc.*, 743 F. Supp. 2d 762, 771 (N.D. Ill. 2010); *see also Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, No. 1:10–cv–01376–TWP–DKL, 2015 WL 735724, *3 (S.D. Ind. Feb. 20, 2015) (discussing "whether to apply an exclusion sanction under Rule 37" for a "Rule 26(a) violation").  Rivera's interrogatory response generally embraces the theories he now advances, *see* Pl. Ex. 153, and his expert reports gave detailed notice of the theories, *see* Pl. SAF ¶¶ 119–31 (discussing competing reports on these theories).  Given the volume and specificity of Rivera's disclosures and given that the parties conducted significant discovery on those theories, *see* Resp. to City SMF ¶¶ 13–15, the City's claim that the disputed theories took it by surprise rings hollow.

Nonetheless, as the City points out, some of the disputed theories depend on the existence of underlying widespread practices of maintaining street files and fabricating evidence, and as a result, they will fail for lack of evidence of causation if summary judgment is appropriate on Rivera's *Monell* claims as the City frames them.  *See Andersen v. City of Chicago*, No. 16 C 1963, 2016 WL 7240765, at *4 (N.D. Ill. Dec. 14, 2016) (stating that "any harm caused by an alleged street files policy or practice could only manifest itself through the Defendant Officers actually maintaining such files" (citing *Veal v. Kachiroubas*, No. 12 C 8342, 2014 WL 321708, at *4 (N.D. Ill. Jan. 29, 2014))).  But if the claims that the City has briefed survive summary judgment, the disputed theories will be in play at trial.

## B. Admissibility of Expert Opinions

One more general standard is important here.  Rivera cites the reports of expert witnesses to establish his *Monell* claims.  The City argues that several of the experts' opinions are unreliable, and therefore inadmissible, on several points key to Rivera's case because the expert used flawed methods to form the opinion.

74

At summary judgment, factual disputes must be resolved against the movant, "[b]ut the question of admissibility of expert testimony is not such an issue of fact." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) (holding that decision to admit scientific expert testimony at summary judgment is "reviewable under the abuse-of-discretion standard"); *see also Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704–05 (7th Cir. 2009) ("Although it is rarely a dispositive question, we have repeatedly affirmed district courts that have made evidentiary rulings on proposed expert testimony in conjunction with summary judgment orders . . . . [I]t is of no import that [the defendant] objected to the expert testimony only in its motion for summary judgment, as opposed to first filing a separate motion . . . ." (citations omitted)). Federal Rule of Evidence 702 allows opinion testimony by an expert "who is qualified . . . by knowledge, skill, experience, training, or education" to testify provided that four conditions are satisfied. In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the Supreme Court declined to adopt a "'general acceptance' standard" for expert opinion testimony because it "would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.'" *Daubert*, 509 U.S. at 588 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). Nevertheless, "the court must ensure that the evidence is relevant and reliable before admitting it." *Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 588–89). Rule 702 requires the court to ask the following questions before admitting expert testimony: (1) is the "expert . . . qualified by knowledge, skill, experience, training, or education[?]" (2) does "the proposed expert testimony . . . assist the trier of fact in determining a relevant fact at issue in the case[?]" (3) is "the expert's testimony . . . based on sufficient facts or data and reliable principles and methods[?]" and (4) has the expert "reliably applied the principles and methods to the facts of the case[?]" *Id.* at 521–22 (citing

Fed. R. Evid. 702 and *Smith v. Ford Motor Co.*, 215 F.3d 713, 717–19 (7th Cir. 2000)); *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 n.1 (7th Cir. 2017).

The City's *Daubert* challenges implicate the third and fourth questions. *Daubert* included a nonexhaustive list of factors courts may use when assessing whether an opinion is based on a sufficiently reliable methodology to be admitted. *See* 509 U.S. at 594; *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012). They include "whether it can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error," "the existence and maintenance of standards controlling the technique's operation," and "general acceptance" within an explicitly identified scientific community and the degree of acceptance within that community. *Daubert*, 509 U.S. at 594 (internal citations omitted) (emphasizing that "[t]he inquiry . . . is . . . a flexible one"); *Lapsley*, 689 F.3d at 810 (further emphasizing that "[t]he Rule 702 inquiry is fact-dependent and flexible" (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999))); *see also Gopalratnam*, 877 F.3d at 779–80 (quoting *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534–35 (7th Cir. 2005)) (listing additional factors which may be considered).

The court must remain vigilant not to overstep its place at summary judgment. Experts frequently opine on a hypothetical set of facts. An expert might, for instance, assume, as one set of witnesses testified, that a stoplight was green and offer an opinion in that scenario. So long as a reasonable jury could believe the witnesses who say the light was green (a genuine dispute exists), that is not a methodology problem. *See Gopalratnam*, 877 F.3d at 780; *Smith*, 215 F.3d at 718 (citing *Daubert*, 509 U.S. at 595 and *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000)). "The focus . . . 'must be solely on principles and methodology, not on the conclusions that they generate.'" *Gopalratnam*, 877 F.3d at 781 (quoting *Daubert*, 509 U.S. at

595).  "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment."  *Id.* (quoting *Smith*, 215 F.3d at 718) (other citation omitted).

## C. Maintaining Street Files

The City's memorandum in support of its motion for summary judgment begins its analysis of this issue with a review of litigation in the 1980's over Chicago's policies and practices regarding documenting and retaining notes and other material created and gathered during investigations.  The City argues that Rivera does not advance a true claim of a violation traceable to the "street file" practices discussed in the 1980's cases.  ECF No. 306 at 11–12.

The Seventh Circuit first considered a "street file" claim in *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985), a putative class action under 42 U.S.C. § 1983.  The litigation in *Palmer* grew out of the 1981 prosecution of George Jones for rape, murder, and aggravated battery.  *Id.* at 562–63.  Though Jones' lawyer subpoenaed "[a]ny material or information which tends to negate the guilt of the accused," he did not receive two reports written by a Chicago police detective.  *Id.* at 563.  Instead, defense counsel learned of those materials when the detective came forward after reading about the case in a newspaper.  *Id.*  This led the defense attorney to serve a second, more specific subpoena on the Watch Commander of CPD's Area Two.  *Id.* at 564.  "In response, the CPD produced a 'street file' consisting of additional memos not previously submitted to the defense counsel in response to their earlier subpoenas and discovery motions."  *Id.*  The production of the file and the detective's testimony resulted in a mistrial after which the prosecutor decided not to press the case further.  *See id.*  The complaint in *Palmer* alleged that the City maintained an "intentional double file system" to "conceal[ ]

77

basic investigative working files, known as 'street files,' 'running files,' or 'office files,' in order to restrict and prevent the flow of exculpatory evidence to criminal defendants." *Id.* at 565, 564. It alleged that this practice systematically thwarted the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83 (1963). *Palmer*, 755 F.2d at 565.

The *Palmer* litigation led to several changes in CPD policy. A temporary restraining order issued in 1982 requiring the CPD to "preserve intact all police department investigative, office or working files, some known as 'street files,' together with all of the contents of such files, and all other papers and documents belonging in such files." *Id.* The CPD issued Detective Division Notice 82-2 implementing the TRO's requirements, but, according to evidence later introduced at a preliminary injunction hearing, some detectives continued to withhold some notes they considered to be their personal property. *See id.* The court in *Palmer* noted the following regarding a preliminary injunction hearing before the late Judge Shadur:

> A six-day evidentiary hearing was conducted in the district court and based upon the evidence presented, Judge Shadur found that the detectives within the CPD's violent crimes unit "record the results of their investigations in documents that may be classified in two categories, 'Unofficial Reports' and 'Official Reports.'" According to the court, the unofficial reports consist of detectives' notes, typewritten witness statements or interviews, and major crime incident work sheets, all prepared contemporaneous with the detectives' obtaining of the information. These unofficial reports are commonly referred to as "street files," "running files," or "office files." In contrast, the official reports consist of "standardized incident, opening, supplementary and closing reports" that are typed, marked with the Record Division number assigned to the investigation, and subsequently transmitted to the CPD's Record Division headquarters.

*Id.* at 566 (quoting *Palmer v. City of Chicago*, 562 F. Supp. 1067, 1069, 1070 (N.D. Ill. 1983)) (internal citations omitted). Effective February 3, 1983, CPD Detective Division Special Order 83-1 required the use of a uniform "investigative file" folder, with an inventory sheet logging its contents; the order required the file to contain "all handwritten notes and investigative

documents generated or received" in the investigation. *Id.* at 568. The *Palmer* litigation ended in a preliminary injunction that required preservation of the 300 files, but a review of them disclosed no exculpatory material. *Palmer v. City of Chicago*, 806 F.2d 1316, 1317 (7th Cir. 1986) ("The lawyers say they think the files were 'stripped' of all exculpatory materials, but do not propose to try to prove this.").

In a separate suit brought under *Brady* and § 1983, George Jones won an $801,000 jury verdict against the City and several police officers. *Jones v. City of Chicago*, 856 F.2d 985, 988 (7th Cir. 1988). Affirming, the Seventh Circuit decided that the evidence was sufficient to hold the City liable under *Monell*. *Id.* at 995–96. The custom involved was "the maintenance of the 'street files,' police files withheld from the state's attorney and therefore unavailable as a source of exculpatory information that might induce him not to prosecute or, failing that, would at least be available to defense counsel under" *Brady*. *Id.* at 995. The evidence showed that a detective wrote two reports that would have been very helpful to Jones. *Id.* at 991. A superior rewrote the first to eliminate the helpful material, and another supervisor buried the second in a desk drawer. *Id. Brady*, the Seventh Circuit explained, "does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated.'" *Id.* at 995. The Seventh Circuit determined that "[t]here is little doubt that the clandestine character of the street files played a role in Jones's misfortunes." *Id.*

The *Palmer* and *Jones* cases give helpful background on the evolving practices of the CPD in the first half of the 1980's, but they do not purport to explore, much less settle, what the City's widespread practices were in 1988. On that score, the City directs the court to one more

written order, Special Order 86-3, which required periodic audits to ensure compliance with CPD's investigative files policy. Resp. to City SMF ¶ 30, ECF No. 315.

1. The Jury Could Find That There Was a File the Police "Did Not Turn Over to the State's Attorney's Office as They Did with Their Regular Investigative Files"

The City first argues that Rivera has not come forward with sufficient evidence for the jury to conclude that a *Jones*-style street file was maintained in the Valentin investigation. City Mem. Supp. Mot. Summ. J. 11–12, ECF No. 306. This argument draws on the condition of the copy of the permanent retention file for the Valentin investigation produced during discovery. *See id.* The permanent retention file includes a folder cover, and the papers appear to be hole-punched at the top in the manner that CPD policy required investigative files to be kept. *See* Resp. to City SMF ¶¶ 41, 42; Pl. Ex. 4 at Wron 1–69; City Tab 43 (color copy). As with Wadas' records and many of the other historic documents in this case, the jury need not infer that the papers in the RD file produced in discovery were in the same condition at as they were in 1988–90. That is, they may have been kept somewhere other than the required folder when documents were gathered to be given to the prosecutors and then to Wadas. *See* Wadas Dep. 86:22–88:9, Pl. Ex. 19A (testifying that the prosecutors assured Wadas that he had everything they had). It would also be reasonable to infer on this record that the papers missing from the 2013 Wadas file had been kept in the folder, but someone culled them before giving them to prosecutors and defense counsel.

If consistent with a widespread practice, both possibilities fit the description of the practice in *Jones*.[16] The *Jones* and *Palmer* opinions do not say that street files were kept in any particular form. *Jones* describes the practice in terms of its consequences for the criminal justice

---

[16] On pages 12–14 of its memorandum in support of its motion for summary judgment, the City argues that the jury could not find that a *Brady* violation occurred because Wadas failed to subpoena the CPD, because the prosecutorial file is lost, and because any documents not produced were not material. The court addressed the substance of those arguments in Part IV. B, *supra*.

system and defense counsel in particular: street files "were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files" and "[a]s a result, the street files were not available to defense counsel even if they contained exculpatory material." 856 F.2d at 989. The jury could find that the *Jones* shoe fits here, and the jury must therefore decide whether the allegedly withheld papers produced during his case were in the same condition as they were kept before trial.[17] *See Tidemann v. Schiff, Hardin & Waite*, No. 03 C 998, 2005 WL 475163, at *1 (N.D. Ill. Feb. 28, 2005); *Grummons v. Zollinger*, 189 F. Supp. 64, 66 (N.D. Ind. 1960). The court now asks whether there is a genuine dispute material to whether a widespread practice existed.

2. No Issue Preclusion on the Existence of Widespread Practice

A similar question was tried to a jury in *Fields v. City of Chicago*. *See* No. 10 C 1168, 2017 WL 4553411, at *1 (N.D. Ill. Oct. 12, 2017). The plaintiff, Nathson Fields, spent 17 years in jail for two 1984 murders in Chicago. *Id.*; *Fields II*, 740 F.3d at 1109. A state court vacated his conviction when new evidence came to light; the jury acquitted him on retrial; and the court that convicted him issued him a certificate of innocence. *Fields II*, 740 F.3d at 1109. Fields then sued the city and police officers involved in the investigation under § 1983 and state law, claiming, among other things, that the officers withheld evidence that would have helped to exculpate him. *See Fields*, 2017 WL 4553411, at *2. The jury credited Fields' evidence that the officers who conducted the investigation fabricated evidence and identifications and buried unfavorable evidence in a street file. *See id.* Judge Kennelly held the evidence supported the jury's verdict against the City based on evidence of systematic underproduction of police reports,

[17] The City makes a similar point in its briefing regarding the methodology used by one of plaintiff's experts. *See* City Mem. Supp. Mot. Summ. J. 15–16 ("Brasfield's admission that he could not determine if the attorney files he reviewed were in the same condition as they were during the time of the criminal proceedings also renders any comparison devoid of any evidentiary meaning.").

was sufficient to show a systemic failing that went beyond his own case.  *Id.* at \*2–3.  The City

and police department were on notice, via the *Jones*/*Palmer* litigation and the department's own

subsequent internal inquiry, of deficiencies in its recordkeeping and record-production practices

that, at least in some situations, led to harm.  And Fields offered evidence that permitted a

reasonable jury to find that the policies instituted to deal with these problems were insufficient to

correct them.  *Id.* at \*3 (citing *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016)) (footnote

omitted).

      Invoking the doctrine of collateral estoppel, a.k.a. issue preclusion, Rivera argues that the

verdict in *Fields* prevents the City from relitigating in this case the existence of a widespread

CPD practice of keeping unofficial street files.  Last year Judge Lefkow reached just such a

conclusion, finding that the *Monell* verdict in *Fields* prevented the City from relitigating the

same *Monell* claim in a § 1983 action brought by a person wrongfully convicted of a 1984

murder.  *Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 775 (N.D. Ill. 2017).

      The times at which the underlying alleged constitutional violations occurred distinguish

this case.  "Under federal law, the doctrine of issue preclusion bars relitigating factual or legal

issues if '(1) the issue sought to be precluded is the same as that involved in the prior action;

(2) the issue was actually litigated; (3) the determination of the issue was essential to the final

judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior

action [i.e., their interests were represented even if they were not a party in the prior suit].'"

*United States ex rel. Conner v. Mahajan*, 877 F.3d 264, 270 (7th Cir. 2017) (quoting *Dexia Credit

Local v. Rogan*, 629 F.3d 612, 628 (7th Cir. 2010)) (alterations in original).  *Fields* and

*Kluppelberg* grew out of investigations culminating in trials held respectively in 1986 and 1984,

and *Jones* arose out of an investigation that occurred in 1980.  The Valentin investigation took

place in 1988, and Rivera was convicted in 1990. This passage of time, the court thinks, renders the issue in *Fields* sufficiently dissimilar to defeat collateral estoppel. Widespread practices do not necessarily persist indefinitely. And the gravamen of the City's position on this practice, pointing to the aspirations stated in the orders issued in the wake of the *Palmer/Jones* cases, is that the CPD was on a path of reform. Regardless of what the *Fields* jury decided when rendering its general verdict,[18] the difference means that the City did not fully litigate this practice. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 689–90 (7th Cir. 2012).

3.  The Jury Could Find That the Practice Was Widespread

In the early 1980's, James Hickey ("Hickey") conducted a review of CPD document retention practices and found pattern of retaining investigative documents in a decentralized manner. *See* Resp. to SAF ¶¶ 102–03 (disputed evidence characterized favorably to plaintiff). Even the City acknowledges that there was "a struggle" to implement the 1982 and 1983 general orders within the CPD. Resp. to SAF ¶ 102 (characterizing testimony of its Fed. R. Civ. P. 30(b)(6) witness, who investigated CPD practices at the time). Rivera calls this "resistance," *id.* ¶ 101, the City calls it "confusion." *Id.* The jury must decide which is correct.

At summary judgment, however, the *Jones/Palmer* litigation and the CPD's resistance become the prologue to the Valentin investigation. As the City acknowledges, Judge Shadur's opinion explicitly warned City officials of the risks the system posed: "any failure to retain Unofficial Reports creates a serious potential of deprivation of defendants' constitutional rights." *Palmer*, 562 F. Supp. at 1070; *see also* Resp. to SAF ¶ 104 (City response quoting this language). Yet the jury could conclude that the City took no affirmative steps to train its officers on

---

[18] After *Kluppelberg*, Judge Kennelly held on post-judgment motions that "[t]he verdict on the *Monell* claim is also sustainable on other bases." *Fields*, 2017 WL 4553411, at *4. Because it does need to, this court expresses no opinion on whether the alternate bases of the *Fields* verdict make collateral estoppel unavailable. *See Beard v. O'Neal*, 728 F.2d 894, 897 (7th Cir. 1984).

implementing the general orders meant to mitigate that risk and did not take steps to audit compliance with those directives. *See id.* ¶¶ 101–11. Indeed, Hickey testified that he viewed compliance responsibilities as the individual supervisor's problem. *Id.* ¶ 111 (citation to testimony omitted).

Even accepting the City's characterization of Hickey's testimony, CPD officials became aware that "sometimes some detectives [were] not signing out the investigative file and have personal copies of *some* of the documents." *Id.* ¶ 112 (alteration and emphasis in original). And it is undisputed that

> [Certain] Defendants in this case admit that they continued the practice of keeping street files containing personal notes and memoranda exchanged between investigators that were not preserved in any official file or disclosed, and instead were destroyed. For example, Defendant Leonard took notes on a pad (not GPRs), and then destroyed his notes. Defendant Gawrys took notes as a gang crimes officer, keeping the[m] in his own personal street file, and then shredding his street file at the end of each investigation. He also wrote notes to the next shift related to ongoing investigations, and at the end of an investigation would take those out of his files and destroy them. Defendant Guzman kept his own notes, would not transfer everything from his notes into his reports, and then would shred his notes. Defendant Fallon took notes in his own personal spiral notebook, and then threw away the notes. Defendant Zacharias would take notes on a piece of paper that was not an official police form of any kind, and then discard his notes. Defendant Mingey, a sergeant overseeing the gang crimes officers that investigated the Valentin homicide, testified that there was no centralized file for an investigation and the specialists instead kept files in their own lockers or elsewhere, and destroyed their notes.

Resp. to SAF ¶ 113 (citations omitted). Defendants' only response to these facts, aside from the claim that they are not material, is to argue (improperly in a Local Rule 56.1 response) that the general orders applied to detectives, not gang crimes investigators. *See id.* That does not create a genuine dispute, and it seems to imply that the practice of keeping and destroying personal notes remained unabated, at least in 1988 (and perhaps today, for the record does not say

anything about whether non-detectives are bound by CPD record policies today), among gang officers working gang crimes and there is evidence that Area Four (the defendants here worked in Area Five) utilized a practice of leaving notes about something needing follow up for the next shift; the notes never made it into investigative files. *See id.* ¶ 114 (citing Rinaldi Dep. 28:1–30:10, Pl. Ex. 77) (disputed fact).

This evidence allows the jury to go well beyond a single incident; as a sergeant, Mingey's testimony, for instance would seem to apply to the practices throughout Gang Crimes North. *Cf. Calhoun v. Ramsey*, 408 F.3d 375, 380–81 (7th Cir. 2005) (single incident insufficient to show widespread practice). Taken together and viewed in the light most favorable to Rivera, this evidence alone suffices to allow the jury to conclude, as Judge Kennelly put it when denying summary judgment in *Fields*:

> the non-production of . . . documents in [this] case, together with the circumstances suggesting they were secreted beyond the reach of prosecutors and defense attorneys, took place on a backdrop of a previously-longstanding police department custom or practice, found to exist by the jury in the *Jones* case, that made withholding of such records part of a regular way of doing business.[19]

*Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394, at *11 (N.D. Ill. Feb. 6, 2014).

The report, Pl. Ex. 12, ECF No. 313-15, of plaintiff's expert on police practices, Michael Brasfield ("Brasfield"), lends further support to this *Monell* theory. *See also* Report of Jeff Nobel at 14, City Tab 24, ECF No. 307-2 (creating fact dispute with contrary opinion). Brasfield identifies several defects in the City's general and special orders issued in the wake of *Palmer* and *Jones* which in his opinion left the risk of nondisclosure unacceptably high. *See* Brasfield Report at 56–59. Those deficiencies include not keeping investigative records in a central place,

---

[19] The City objects that any documents produced in the *Fields* and *Kluppelberg* litigation may not be introduced here. The parties have not briefed this issue in their memoranda, and the court finds it unnecessary to address it now. It remains an open question for trial.

not covering gang crimes officers even though they participated substantially in investigations, leaving too much discretion on what goes in the file, and insufficient training and auditing, even after General Order 86-3's formal auditing requirement. *Id.* The City does not challenge the admissibility of those opinions. *See* Resp. to SAF ¶¶ 121–22.

The City does claim that Brasfield's analysis of several files produced in discovery is unreliable. Brasfield based his opinion on a comparison of files for homicide investigations for the three years surrounding the Valentin investigation. *See* Brasfield Report 41. The files came from three sources: (1) 38 "criminal defense files" produced by the Cook County Public Defender's Office;[20] (2) corresponding "permanent retention files" maintained at the CPD's warehouse; and (3) "investigative files" kept in filing cabinets at Gang Crimes North. *See id.*; *see also id.* Attachment F (summarizing files reviewed). Brasfield concluded that the criminal defense files were missing documents in the investigative files: (a) 74% were missing handwritten notes; (b) 10% were missing General Progress Reports; (c) 17% were missing memoranda. Brasfield Report 43; *see also* Brasfield Report Ex. F (summarizing files reviewed).

According to the City, Brasfield's analysis ignores the fact that permanent retention files were never supposed to contain GPRs, so their absence signifies nothing of evidentiary value. City Mem. Supp. Mot. Summ. J. 15; *see also* Resp. to City SMF ¶ 25. This seems to get the direction of comparison backwards. As the court understands Brasfield's comparison, *see* Report 41–49, some permanent retention files did contain handwritten notes, GPRs, and other documents not required by the governing general orders. Yet despite their sometimes gratuitous inclusion in the file in the CPD warehouse, they do not appear in the corresponding criminal defense attorney's file. *See id.*; *see also, e.g.*, Brasfield Attachment F at 5, 6, 8 (C. Lee, supplemental report ("SR") present in RD file but not in defense file; M. Green, SR, criminal

[20] Brasfield excluded files transferred to a private attorney. Brasfield Report 42.

history report, statements, handwritten notes not in defense file but in RD file; E. Madrid , same for SRs and lineup SRs). If anything, this seems to help plaintiff, not hurt him.

Nor is the age of the defense files and the lack of evidence of a full chain of custody for them fatal to Brasfield's methodology. Perhaps the documents were removed from the defense files later; perhaps they were lost or stolen; Brasfield cannot say for sure. *See* Resp. to City SMF ¶ 59 (statement of Brasfield that he could not confirm that the defense attorneys' files were in the same condition as they were when documents were produced to the defense attorney). Brasfield also reviewed only 6 Cook County State's Attorney's Office ("CCSAO") files when conducting his comparison, so the police might have given everything to the CCSAO, making it responsible for the gaps. *See Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015). Those possibilities provide ammunition on cross examination. Were Brasfield to just say that documents were withheld because he is an expert, his opinion would need to be excluded. But looking across all the files, Brasfield opines that he detects a pattern of excluding certain categories of documents. Brasfield Report 43–44. Systematic exclusion of certain categories of documents weakens the inference that the absences are the result of the files' age or something else equally innocuous, and that is what will aid the jury in weighing the facts. *See Fields*, 2017 WL 4553411, at *3 n.8 (overruling similar objections to analogous methodology to opinion that same widespread practice existed).

Finally, the City faults Brasfield's analysis because he did not determine whether any of the withheld documents were material in the *Brady* sense. *See* City SMF ¶ 63. Brasfield did not have to perform a materiality analysis. As the City observes, Mot. Sum. J. 17, Rivera must "demonstrate that a municipal decision reflects deliberate indifference to *the risk* that a violation of a particular constitutional or statutory right will follow the decision." *See Bd. of the Cty.*

*Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 411 (1997) (emphasis added).  The standard requires an awareness of the risk, which the court has already explained flowed from Judge Shadur's pronouncements in *Palmer* and other sources.  Rivera "need not present evidence that these systemic failings affected other specific [persons]."  *Fields*, 2017 WL 4553411, at *3 (quoting *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) (internal quotation marks omitted)) (holding evidence at trial sufficed to support jury verdict).

Though Brasfield's report is not required for the court to deny summary judgment, the City's *Daubert* challenge to his opinions fails.  The court denies summary judgment on Rivera's "street files" practice.

## D. Practice of Failing to Document Lineups at Which a Filler Was Picked

To establish the existence of a widespread practice of failing to document lineups in which a filler is picked, the City proffers the analysis of Gary Wells ("Wells"), a psychology professor at Iowa State specializing in eyewitness identifications.  *See* Resp. to SAF ¶ 138; Wells Report, Pl. Ex. 69.  During discovery, the parties reviewed all 435 homicide files from CPD Area Five stored in the CPD's warehouse.  Resp. to SAF ¶ 135.  "The parties agreed that these 435 files were a representative sample of the City's policies, practices, or customs for documenting live, in-person, and photographic lineups on a City-wide basis, including all of the Areas."  *Id.*; *see also id.* ¶ 136 (so stipulating).  One hundred thirty-eight files included evidence of a lineup, and the City produced those files in discovery.  *Id.* ¶ 135.  Plaintiff's attorneys then recorded the results of the lineups in the 138 files in a spreadsheet and gave it to Wells.  *Id.* ¶ 139.

After spot checking 30–35 files, *see id.* ¶ 139 (citation omitted), Wells concluded that no filler identifications had been recorded on forms provided for that purpose.[21]  *Id.* ¶ 140.  Wells

---

[21] Two pages, not forms, arguably mentioned filler identifications.  *See id.* ¶ 140 (collecting citations).  The lineup report forms for those incidents did not record a filler identification.

expressed his opinion that, based on field studies showing a 23.7% filler identification rate, the odds are less than 1 in 10,000 that the rate of filler identifications reported resulted from random chance. *See* Wells Report 4–8, 10.

The City first says that Wells relies on sketchy data because he relied on a spreadsheet of the lineups prepared by plaintiff's counsel. Plaintiff's counsel responds that this is routine practice. That does not make the expert's opinion *ipso facto* reliable; this court serves only as a gatekeeper under Rule 702. Concerns about relying on attorneys' summaries are legitimate, for the court must ensure that testimony comes from an independent expert rather than a "hired gun." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996); *see also, e.g.*, *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1026–27 (N.D. Ill. 2011); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321 (N.D. Ill. 2008). Of course, an expert may take one or the other party's version of disputed facts as true when offering an opinion. *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 1730608, at *6 (N.D. Ill. May 2, 2016) (St. Eve, J) (citing *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810 (N.D. Ill. 2013)) (allowing expert to presume that recantations would be considered credible by jury); *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006).

In its discretion, the court nevertheless determines that Wells based his opinion on reliable data. Coding a form showing the result of a lineup borders on the mechanical. Pick from one of three options: suspect, filler, or no identification. The task requires less subjective characterization than summarizing a deposition, for instance. *Cf. Obrycka*, 792 F. Supp. 2d at 1026–27 (excluding report in part for relying on attorneys' summary of depositions); *Sommerfield*, 245 F.R.D. at 321–22 (same). The City offers no analysis or citation suggesting that counsel mischaracterized the lineup forms, and even if it did, the court would be required to

resolve any genuine disputes about the characterizations as true at summary judgment. Because the City has not objected to them, the court assumes at summary judgment that the jury will have the files to verify every citation if it wishes.

The City also argues that Wells' analysis ignores the City's evidence that, at the time of the Valentin investigation, filler identifications were documented as negative (meaning no identification occurred) rather than as fillers, making it impossible to distinguish how many filler identifications were misdocumented. *See* City SMF ¶¶ 64–65 (citing testimony of Rule 30(b)(6) witness). But the City does not challenge Wells' opinion establishing a baseline rate of 23.7% filler identifications. Wells Report 4–5. If fillers were rolled into negative identifications, the jury could decide that it would expect to see a rate of negative identifications equaling the sum of expected fillers and negatives, but the observed rate of negative identifications is nearly half of what would be expected in that scenario, according to Wells' report. *See id.* at 7, 9–10 (filler negative identifications in field studies: 59.2%; negative rates here: 32.0%[22]). So Wells' report creates a genuine fact issue on how best to explain the discrepancies. Accordingly, the court denies summary judgment on the widespread practice of failing to document filler identifications.

## E. Failure to Discipline Guevara

The court begins its analysis of the final *Monell* theory on which the City seeks summary judgment by defining the widespread custom or practice the plaintiff contends was the moving force behind the constitutional violations. *See Barrios v. City of Chicago*, No. 15 C 2648, 2016 WL 164414, at *10–11 (N.D. Ill. Jan. 14, 2016) (Gottschall, J.). Rivera alleges in his complaint that in 1988 the City's disciplinary system for police officers was "dysfunctional." ECF No. 1 ¶

---

[22] Wells separately computed the rate of negative identifications for primary and ancillary lineup reports. His expert report lists the respective rates as 32.0% and 31.8%.

40.  He accuses the City, as a matter of custom and practice, of "condon[ing] and facilitat[ing] a code of silence within the Chicago Police Department."  *Id.* ¶ 41.  The constitutional violations here, Rivera pleads, resulted from the City's "established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department."  *Id.* ¶ 42.

Rivera's response memorandum can be read as implying that the City has conceded that evidence of failure to discipline other officers exists.  In his response, Rivera characterizes the theory at issue more succinctly as "the City is liable for failing to discipline officers."  Pl. Combined Resp. 62, ECF No. 321.  He then appears to narrow the issue further but lays the blame at the City's feet.  *See id.*  He says he will focus on the failure to discipline Guevara because "[t]he City's motion focuses solely on Rivera's contention that it failed to discipline Guevara."  *Id.*

That fairly characterizes the arguments in the City's motion but not the reason given for their focus.  *See* City Mot. Summ. J. 21–24, ECF No. 306.  Plaintiff, not the City, bears the burden to come forward with enough evidence to create a fact issue on whether a widespread custom or practice was the moving force behind the constitutional violation.  *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016).  In its opening motion, the City argues that it focuses solely on Guevara because Brasfield, plaintiff's expert, reviewed citizen complaint registers (CRs) made against Guevara and no other officers.  City Mot. Summ. J. 21 (citing City SMF ¶ 75).  But the City then cites cases, *see id.* at 21–22, for the general proposition that isolated acts generally do not establish a widespread practice under *Monell*.  *E.g.*, *McNabola v. Chi. Transit*

*Auth.*, 10 F.3d 501, 511 (7th Cir. 1993); *Cornfield ex rel. Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993). Those citations and the accompanying argument give Rivera ample notice that the City contends he lacks evidence of failure to discipline officers other than Guevara. *See Celotex*, 477 U.S. at 325 (moving party carries initial summary judgment burden by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case" (internal punctuation omitted)); *Weeks v. Hodges*, 871 F. Supp. 2d 811, 825 (N.D. Ind. 2012) (applying rule at summary judgment). Accordingly, the court will not assume that Rivera could or would prove that the City failed to discipline other officers during the relevant time period.

The opinion in *Monell* defined a widespread practice as one that is "persistent," "widespread," "permanent," and "well-settled." *Monell*, 436 U.S. at 691. In his Local Rule 56.1(b)(3) statement of additional facts, Rivera cites Brasfield's analysis and evidence (viewed favorably to him) of a staggering number of exonerations in which Guevara was involved, other complaints against by Guevara brought in pending and former lawsuits, and complaints by private citizens and public officials made to the CPD–before and after the Valentin investigation– about Guevara. *See* Pl. SAF ¶¶ 154–60; *see also* Brasfield Report 23–30 (discussing records of CRs, complaints, exonerations, and investigations of Guevara and "find[ing] further support for the lack of investigation and/or supervision/discipline in both the sheer number of similar allegations lodged against Guevara as well as the confirmed acts of misconduct he committed" (p. 27)). In his response, Rivera points to Brasfield's report, the complaints and incidents of exonerations, the evidence of Guevara's misconduct in this case, and his invocation of his Fifth Amendment rights when asked questions about whether the City failed to discipline him. Pl. Combined Resp. 63–67; *but see* Resp. to City SMF ¶ 75 (not disputing that "[t]he totality of

Plaintiff's evidence to support his failure to discipline claim consists of seven pages of Brasfield's report").

Even viewed in the light most favorable to Rivera, what he cites does not create a fact issue for trial. Because Rivera relies on indirect proof of a widespread practice, he "must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon*, 819 F.3d 348 (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 790 (7th Cir. 2006)). Plaintiff does not articulate who he believes the pertinent final policymaker was in this case. The Seventh Circuit has declined to adopt any bright-line rules defining a "widespread custom or practice." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Nonetheless, "evidence of a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (citing *Bryan Cty.*, 520 U.S. at 409). And "there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability." *Thomas*, 604 F.3d at 303 (internal citations omitted) (noting consensus that more than one, or even three instances, is required).

Rivera cites three cases denying summary judgment on a widespread practice theory. Pl. Combined Resp. 68–69. In *Garcia v. City of Chicago*, the plaintiff presented statistical evidence tending to show a low rate (less than 1%) of civil rights complaints against Chicago police officers being sustained in the three years prior to the plaintiff's beating. No. 01 C 8945, 2003 WL 1715621, at *6–7 (N.D. Ill. Mar. 20, 2003). The record there also contained evidence that a police watch commander told the police officer involved "not to worry" about being arrested for battery. *Id.* at *3, 7. In the second two cases, the courts denied summary judgment on a theory

that the city had a widespread practice of failing to investigate excessive force complaints because the record showed that, in the three years leading up to the incident at issue in the suit, the "decision of whether to investigate excessive force complaints [were] often unreviewed and undocumented" and that 35 complaints of citizens against officers for using excessive force were filed "and no corrective action was ever taken on any of them." *Kindle v. City of Harvey*, No. 00 C 6886, 2002 WL 230779, at *4–5 (N.D. Ill. Feb. 15, 2002); *accord Robinson v. City of Harvey*, No. 99 C 3696, 2001 WL 138901, at *7 (N.D. Ill. Feb. 16, 2001).

The record here differs from the cases Rivera cites in a key respect.[23] In Rivera's cases, the pattern manifested across complaints against many officers. *Cf.* Pl. SAF ¶¶ 154–60. Here, in contrast, Brasfield opines on a widespread practice based on the alleged history of one officer. *See* Brasfield Report 23–30. That methodology does not establish that the practice extended beyond Guevara, so it renders his opinion unreliable. *See Dixon*, 819 F.3d at 349 ("a plaintiff cannot ultimately prove a *Monell* claim based on only his own case or even a handful of others . . . ."); *cf. Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 917 (N.D. Ill. 2016) (finding expert's opinions sufficient because they were based on "[t]he fact that the defendant officers are not clustered in a single unit or precinct, range widely in seniority and supervisory authority, and engaged in retaliatory acts against Plaintiffs over a lengthy period" (citing *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015))).

---

[23] The parties argue at length about whether evidence of post-event conduct is relevant to the *Monell* analysis. The reported conduct in *Garcia*, *Kindle*, and *Robinson* preceded the incident made the subject of the suit. Rivera relies on alleged conduct that occurred as late as 2001. *See* Pl. SAF ¶¶ 154–60. On a *Monell* claim, "post-event evidence is admissible if it 'sufficiently relates to the central occurrence.'" *Estate of Keys v. City of Harvey*, No. 92 C 2177, 1996 WL 34422, at *4 (N.D. Ill. Jan. 26, 1996) (quoting *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991)) (also citing *Sherrod v. Berry*, 827 F.2d 195 (7th Cir. 1987)). The post-event evidence can only be admitted on the limited theory that "there may be a continuity in municipal policy so that what happens after the event may case some light on what the policy was prior to the event." *Id.* (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 n.11 (1st Cir. 1989)). At this stage, the court has trouble seeing how evidence of complaints and conduct that occurred as much as 13 years after the Valentin investigation meets this standard. *See also* Fed. R. Evid. 403.

It bears emphasis that the parties do not litigate the adequacy of the CPD's written policies here or whether anyone deviated from them.  In *Woodward*, by contrast, the court found evidence of numerous deviations from written policies established a widespread practice.  *See* 368 F.3d at 929 (concluding that the multiple deviations showed that the case was not a single-incident case).

Furthermore, Brasfield offers no sufficient methodological basis for his opinion that Guevara engaged in misconduct and that the City mishandled or failed to discipline him in response to complaints lodged against him or misconduct about which City officials knew.  *See* Brasfield Report 24.  Typically, experts in this area offer an analysis of the CR files they have reviewed and why they think the investigator erred.[24]  *E.g.*, *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 988 (N.D. Ill. 2017); *Cazares v. Frugoli*, No. 13 C 5626, 2017 WL 1196978, at *9 (N.D. Ill. Mar 31, 2017).  As nearly as the court can tell, Brasfield appears to assume that all of the allegations are true.  *See* Brasfield Report 24.  But he disclaims reviewing any documents or having specific knowledge about the CPD disciplinary system.  Resp. to City SOF ¶ 77.  So Brasfield's analysis fails to offer a proper basis for his opinions that complaints against Guevara were mishandled.  *Cf. Cazares*, 2017 WL 1196978, at *6, 9 (expert ran "widely accepted statistical tests on the data to determine whether certain patterns involving CPD internal investigations of alcohol-related incidents" and another expert "reviewed a wide range of CR files and studied the historical presence and impact of the code of silence in the CPD").

---

[24] Rivera offers some argument on the insufficiency of the five complaints filed against Guevara before 1988 in his response to the City's Local Rule 56.1 statement of undisputed facts.  *See* Resp. to City SOF ¶ 76 (spanning two pages).  This is simply too much for a Local Rule 56.1 response, and the court disregards it, particularly because the City has not responded.  Moreover, Rivera admits that some discipline was imposed under two of the CR's.  *See id.* He argues that the discipline was woefully insufficient, however.  *See id.*  This further underscores the need for proper presentation of arguments like this.  Like Brasfield, who did not review City disciplinary policies, the court knows no more than what the record tells it about the City's disciplinary practices and policies in the 1980's.

The court does not mean to diminish the seriousness of the kind and number of allegations against Guevara reflected in the record amassed here. *See* Pl. SAF ¶¶ 154–60. The jury certainly could conclude, if it believes even a small fraction of these allegations, that something at the CPD was broken as to him. But as the Seventh Circuit recently explained, "the gravamen [of a *Monell* claim] is not individual misconduct by police officers (that is covered elsewhere under § 1983), but a widespread practice that permeates a critical mass of an institutional body." *Rossi*, 790 F.3d at 737. The court deems Brasfield's opinion unreliable on this issue. Even if the opinion was admissible, Rivera has not identified enough evidence to take the next step from one officer to a "critical mass." So the failure to discipline theory must be dismissed.

## VII. CONCLUSION

For the reasons stated, genuine issues of material fact require a trial. Defendants' motions for summary judgment are granted in part and denied in part. The motions are granted only to the following extent:

1. the § 1983 claims for fabrication and the claims under *Brady* against defendants Rinaldi, Weingart, Noon, Guzman, and Fallon are dismissed;

2. the § 1983 claims against defendants Sparks and Zacharias, with the exception of the due process fabrication claim based on conduct at the gang book identification, are dismissed;

3. the portion of Rivera's due process fabrication claim based on the falsified Valentin identification on September 10, 1988, is dismissed;

4. Rivera's claims premised on the use of improper identification procedures in violation of his right to due process are dismissed;

5.  Rivera's claims premised on a violation of his Fifth Amendment right not to be compelled to be a witness against himself are dismissed;

6.  Rivera's § 1983 conspiracy and failure to intervene claims are dismissed solely to the extent they derive from the claims dismissed in paragraphs 1–5;

7.  the malicious prosecution and intentional infliction of emotional distress claims against all defendants except Guevara are dismissed; and

8.  as discussed in Part VI. E, the *Monell* claim based on a failure to discipline Guevara and so much of the *Monell* theories articulated in plaintiff's combined response to the instant motions, ECF No. 321 at 51–52, as derive from that theory are dismissed.

Date: May 11, 2018

/s/Joan B. Gottschall
Joan B. Gottschall
United States District Judge