IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JACQUES RIVERA,<br>Plaintiff,<br>v.<br>REYNALDO GUEVARA, et al.<br>Defendants. | Case No. 12 C 4428<br>Judge Joan B. Gottschall<br>Mag. Judge Mary M. Rowland<br>JURY TRIAL DEMANDED |

**DEFENDANT CITY OF CHICAGO'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendant City of Chicago (the "City"), by and through its undersigned attorneys, moves this Court to enter judgment in its favor as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. In support of their motion, Defendant City states:

**LEGAL STANDARD**

Rule 50 authorizes the entry of judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "In other words, the question is simply whether the evidence as a whole, when combined with all reasonable inferences drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff." *Hall v. Forest River, Inc.*, 536 F. 3d 615, 619 (7th Cir. 2008). It is proper to enter judgment as a matter of law so long as it has become apparent that Plaintiff cannot prove his case with the evidence already submitted or with that which he plans to submit. *Green v. Potter*, 557 F. 3d 765, 768 (7th Cir. 2009). A mere scintilla of evidence will not suffice to overcome a motion for judgment as a matter of law. *Terrell v. Vill. of Univ. Park,* CIV. A. 92-C-3320, 1994 WL 30960, at *1 (N.D. Ill. Feb. 1, 1994). The motion should be granted when no rational jury could find in favor of the Plaintiff. *Venson v. Altamirano*, 749 F.3d 641, 646 (7th Cir. 2014).

Here, Plaintiff has alleged that the City had a practice of failing to document filler identifications for lineups and photo arrays and the City had a practice of systematically withholding investigative files from prosecutors and criminal defendants. Plaintiff also alleges the City's training regarding production of investigative material, writing reports, and conducting and documenting lineups was deficient. Finally, he alleges that the City had a pattern and practice of fabricating evidence. The evidence presented by Plaintiff at trial is insufficient to establish any of Plaintiff's *Monell* claims. Even accepting Plaintiff's version of the facts, no reasonable jury could find for Plaintiff on any of his claims against the City.

## ARGUMENT

Liability cannot be imposed against a municipality under Section 1983 pursuant to principles of *respondeat superior*; rather, Plaintiff must establish that an official "policy" of the City caused him to suffer a violation of his constitutional rights. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). A municipal policy may be established in three ways: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) the act of a person with final policy making authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

Under any theory, Plaintiff must demonstrate that the City of Chicago was "deliberately indifferent" to the "known or obvious consequences" of the alleged policy. *See, e.g.*, *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 407 (1997); *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008). Even more, Plaintiff must demonstrate the existence of a direct causal link between the municipal policy and the constitutional injury. *City of Canton*, 489 U.S. 378, 385 (1989); *Bryan County*, 520 U.S. at 400.

For the most part, Plaintiff attempted to prove each of his *Monell* claims under a "widespread practice" theory. A widespread practice is one in which, "although not authorized by written law or express municipal policy, [was] so permanent and well settled as to constitute a custom or usage with the force of law. *McTigue*, 60 F. 3d at 382. A custom "implies a habitual practice of a course of action that characteristically is repeated under the circumstances." *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990). It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. *Id.* Plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision." *Id.*; *see also Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("what is needed is evidence that there is a true policy at issue, not a random event").

## I. Plaintiff Failed to Present Sufficient Evidence of a Due Process Violation.

As an initial matter, to prove any *Monell* claim against the City, Plaintiff must first prove that he suffered a violation of his constitutional rights. *See Sallenger v. City of Springfield*, Ill., 630 F.3d 499, 504 (7th Cir.2010) (jury's conclusive verdict on the underlying constitutional claim means no *Monell* liability). In this case, Plaintiff alleged his right to due process was violated because Defendant Officers fabricated evidence and withheld material exculpatory evidence. As explained in Defendant Officers' Motions for Judgment as a Matter of Law, which Defendant City adopts and incorporate here, Plaintiff failed to present sufficient evidence that his rights to due process were violated. Plaintiff also alleged the City failed to produce the investigative file in his case, which, he alleges, resulted in the suppression of exculpatory evidence. Yet, Plaintiff failed to prove that any evidence in the file was exculpatory or that it was material to his case. Indeed, the only evidence Plaintiff identified in the file was the General Progress Report (GPR) that he

argued indicated Lopez stated he was "by the store" when he saw the shooter and the criminal history report with the date stamp August 27, 1988. Plaintiff failed to adduce evidence that those details were exculpatory or that the outcome of the case would have been different had he possessed them. Because Plaintiff failed to prove a constitutional violation, Plaintiff cannot prevail on any of his *Monell* claims against the City.

## II. City's Practice Regarding Documentation of Filler Identifications.

Plaintiff claims the City's written policies regarding documentation of lineups were adequate, but the City nevertheless had a pattern and practice of failing to document filler identifications. According to Plaintiff, when a witness identified someone other than the suspect as the perpetrator, the Chicago Police Department (CPD) would not document it. The only evidence Plaintiff presented to support this theory was the expert testimony of Dr. Gary Wells, who claimed to review a collection of data prepared by Plaintiff's counsel ("the Chicago data") (*See* Exhibit A, Trial Tr. at 990). He accepted Plaintiff's counsel's conclusion that there were no documented filler identifications in the Chicago data and determined that such a result was statistically impossible in comparison to published field studies documenting the rate of filler identifications. (*Id.* at 966-967)

On summary judgment, the City admitted that if a witness identified a filler the result of the lineup would be recorded as negative, meaning the witness failed to make an identification, because the witness did not identify the suspect. This means the rate of "filler identifications" are indistinguishable amongst the "no identifications" in the spreadsheet Wells relied upon. This Court ruled that the data Wells relied on are reliable because a form showing the result of a lineup "borders on mechanical". (ECF 373, p. 89-90). The Court also assumed that the jury would have the files to verify every citation in the spreadsheet if it wishes. *Id.* The Court recognized the City's

4

admission regarding its categorization of filler identifications but concluded that Dr. Wells' testimony was necessary to explain the discrepancies between the differences in the Chicago data from the published field studies. *Id.* at 90. Nevertheless, at trial, Wells's testimony failed to establish any specific practice regarding the documentation of filler identifications that could have caused the constitutional violation Plaintiff alleged.

First, Plaintiff did not establish the data Wells relied on were reliable. Wells admitted he did not prepare the spreadsheet and could not vouch for its reliability. (Ex. A at 1113-14). He merely "spot checked" 15% of the files. (*Id.*). Further, despite this Court's finding on summary judgment, Plaintiff failed to establish that the process of coding the lineup reports was mechanical and could be completed by a non-expert. Indeed, Wells acknowledged several errors in the data, including the difficulty of drawing conclusions from redacted files, determining what qualified as a "tentative" identification, and whether, and to what extent, lineups where the witness was familiar with the perpetrator should have been included in the data set. (Ex. A at 993-997) What's more, Wells shifted the burden to the City, claiming it was up to the strong defense team to prove the data were not reliable. (*Id.* at 1233-34). Quite obviously, despite the Court's assumption, Plaintiff failed to provide the jury any way to verify the accuracy of the spreadsheet. As a result, the jury has no basis for which to assess the reliability of Wells's conclusions drawn from the data, and Wells' opinions are insufficient to establish a widespread practice or custom.

More importantly, Wells was equivocal in his conclusion. In his expert report, Wells decided that the fact that the spreadsheet contained zero "filler identifications" means that CPD treated filler identifications as a "non-event" and did not create a record of those lineups occurring at all. (*See* Exhibit B, Wells Report at p. 3). Then, at trial, Wells backtracked and claimed that the lack of filler identifications might be due to missing reports, but also could be because filler

5

identifications were documented as something else, such as no-identifications, as the City admits. (Ex. A at 1106). Critically, Wells could not state what proportion of the no-identifications were actually misreported filler identifications. (*Id.* at 1106-07). He merely concluded that the rate of no-identifications in the Chicago data was too low to include both the expected rate of filler identifications and no-identifications combined, so he surmised there may be approximately 100 reports documenting filler identifications that are missing from the Chicago data he reviewed. (*Id.* at 1107-08). Not only does his guess of 100 missing reports not appear anywhere in his report (thus making this "opinion" undisclosed), but Wells did not provide the jury with any methodology or analysis of how he reached that conclusion. Nor did he offer that conclusion to a reasonable degree of scientific certainty. (*Id.* at 1111). As a result, Wells's testimony is supported by his *ipse dixit* alone, and, therefore, does not establish that the City failed to create any report when a witness identified a filler. *See Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015) ("[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process").

Even if the Court finds the could jury could credit Wells's opinions, Plaintiff nevertheless failed to establish any causal connection between Wells's opinions and the constitutional violation he alleges here. In this case, Plaintiff claims that there was a so-called "first lineup" on August 31, 1988, where the witness, Orlando Lopez identified a filler. Plaintiff claims that the Defendant Officers withheld evidence of an alleged first lineup and then fabricated reports that suggested the lineup did not occur because the officers could not find Lopez that day. Neither of Wells's opinions provides a nexus to those facts.

First, Wells claims that some of the filler identifications in the Chicago data could have been misreported as no-identifications. (Ex. A at 1104). Yet, there is no lineup report in this case documenting it as a no-identification. Undeniably, there is no report stating that the first lineup

6

occurred, but that Lopez could not make an identification. Second, Wells claims that the lack of filler identifications may be due to missing reports. (*Id.* at 1105-06). Yet, this not a case where Plaintiff claims a filler was picked, and the officers failed to create a report of that fact. Quite different, Plaintiff claims a report *was* made, but that it fraudulently stated that the witness could not be located to complete it. Further, Wells did not review, and did not offer any opinions about, the lineup reports in the Valentin case. Thus, whether the City failed to document filler identifications in the way Wells suggests is beside the point. Plaintiff failed to offer any evidence that the alleged practice was at all connected to his case, let alone the moving force behind his alleged constitutional violation.

Finally, Plaintiff failed to present any evidence of what, if anything, the City's policymakers knew about how the CPD documented lineups where a filler was picked. Indeed, Plaintiff claimed that the City's written policy regarding documenting lineups was a good policy; it was just the practice that was inadequate. (*Id.* at 1220). Plaintiff offered no evidence that the City's policymakers were aware of the practice as Wells describes, nor did Plaintiff offer any evidence that the City should have been aware of any risk of constitutional violations as a result of the practice like the one implicated by Wells in this case.

### III. City's Practice Regarding Disclosure of Investigative Files.

Throughout this litigation, Plaintiff claimed that the City withheld the Valentin investigative file from Plaintiff because of a pattern and practice of maintaining "street files". Now, at trial, Plaintiff claimed, instead, that the City routinely withheld investigative files. Plaintiff based this claim entirely on the expert opinion of Michael Brasfield, who opined that (1) the City's written policies allowing for the creation of "parallel files" were deficient on its face; (2) the City failed to include all investigatory documents in the Records Division files, which

7

Brasfield labels the permanent retention files; (3) the City had a practice of underproduction of documents, and (4) that the officers routinely failed to comply with the general orders. (*See* Exhibit C, Brasfield Report at pp. 15, 20, 31). Brasfield's opinions are insufficient to establish a widespread practice of withholding investigative files from criminal defendants.

As a preliminary matter, Plaintiff failed to establish *Monell* claim based on an express written policy. Brasfield claimed the written policies established after the *Jones* case were deficient because they allowed for the creation of "parallel files". (Ex. A at 2187-88). Brasfield claimed that the City's practice of not maintaining one single file for all investigatory documents deviates from standard police practices. Yet, he could not offer a single policy that he deemed adequate from any other jurisdiction, so the jury has no basis for which to assess his opinion. (*Id.* at 2322-24). He also claimed that the "parallel file" system created a risk that not all documents would be disclosed to a criminal defense attorney because it did not specify to specific steps to insure production, yet he admitted that documents contained in *both* the investigative files and Records Division files (commonly referred to the permanent retention file) were nevertheless produced to criminal defense attorneys. (*Id.* at 2296). He then claimed the written policies were deficient because they left too much discretion to the detectives of what they should write down in their reports. (*Id.* at 2447-48). Yet, Brasfield did not point to any evidence that any detective used his or her discretion improperly. (*Id.*). Even so, Brasfield did not point to any evidence to link the alleged deficiencies in the written policy to a constitutional violation in this case or any other.

In fact, the bulk of Brasfield's testimony concerned his view that detectives were not complying with special orders regarding investigative files. For instance, he noted several instances of handwritten notes not being taken on a formal General Progress Report, or instances

where the investigative file inventory was not located in the corresponding Records Division file. (*Id.* at 2175, 2193-94, 2212-13, 2222). None of those issues amount to constitutional violations. Nor did Brasfield identify any way in which the Valentin investigative file fails to comport to the special orders. As a result, this entire portion of Brasfield's testimony is inconsequential.

Another reason why Brasfield's testimony is insufficient to establish *Monell* liability is that his opinion is based entirely on the faulty premise that the City used the Records Division file as its basis for discovery in criminal cases. Brasfield testified multiple times that the permanent retention file is the file that is supposed to contain all the records in an investigation to be provided to a criminal defendant. (*Id.* at 2247-49, 2254-55, 2286). Yet, Brasfield did not, and cannot, provide any factual basis for that conclusion. To the contrary, all the evidence in this case establishes that his conclusion is incorrect. Since 1983, CPD has not intended the Records Division file to contain all the documents in an investigation. Indeed, it does not to this day. What's more, Brasfield conceded that 100% of the criminal defense attorney files he reviewed contained documents that are contained in the corresponding investigative files. This concession undermines his conclusion that CPD only produces the Records Division files in criminal cases. As a result, Brasfield's opinion that his review determined that the investigative material "did not make it into" the permanent retention file is unreliable and, therefore, insufficient to establish Plaintiff's claims. (*Id.* at 2420).

Despite this, Brasfield testified that the City had a practice of failing to disclose investigative files to criminal defendants. He based that opinion solely on his comparison of criminal defense attorney files with the investigative files produced in this case, concluding that any document in the investigative file that he could not find in the corresponding investigative file is "missing" and must not have been produced to the criminal defendant. On this point, his opinion

9

is wholly speculative. He did not determine that the criminal defense files as they exist today – 30 years after the fact – are complete or reflect what was disclosed to the criminal defendant. (*Id.* at 2446). Nor did he make comparisons for most of the Cook County State's Attorney's files to determine if the alleged "missing" documents were nevertheless produced by CPD in the criminal process. Further, while he testified that some of the documents he claimed were "missing" were also missing from State's Attorneys' Files could have been exculpatory, he did not explain or describe how that was the case or that in any case the alleged exculpatory information was nevertheless made known to the criminal defendant through other means, including other CPD documents. On this point, Brasfield's opinion was no more than "subjective belief or unsupported speculation" dressed up as an "expert" opinion, which the Seventh Circuit has long held inadmissible. *See e.g., Porter v. Whitehall Laboratories, Inc.,* 9 F.3d 607, 614 (7th Cir. 1993).

Nor did Plaintiff present any evidence that the City was on notice of the alleged "problem" Brasfield describes. Plaintiff claims that the *Jones* and *Palmer* cases establish that notice, but Brasfield did not tie any of his observations of his file review to those cases. For instance, he testified that after those cases CPD detectives continued to treat their notes as their "own personal property" but he did not point to any evidence of that. (Ex. A at p. 2192-93). In addition, Brasfield did not explain or describe how the alleged "street file" at issue in *Jones* equates with his speculation of underproduction from his review in this case. As a result, Plaintiff offered no evidence of a series of constitutional violations from which deliberate indifference can be inferred. *See Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000).

At most, Brasfield testified that random documents which may or may not have been important to a criminal case may or may not have been produced to a criminal defendant. That is not unlawful conduct. *See U.S. v. Agurs*, 427 U.S. 97, 111 (1976); *Kyles*, 514 U.S. at 436-37 ("The

10

Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense"). Further, that conclusion is insufficient to establish a practice of withholding exculpatory information. Isolated acts committed by non-policymaking officials do not amount to a "custom," which "implies a habitual practice of a course of action that characteristically is repeated under like circumstances." *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990) (quoting *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986)). Further, Plaintiff did not establish any other constitutional violations for which the City should have been aware. *See Whitaker v. Miami-Dade County*, 126 F. Supp. 3d 1313 (S.D. Fla. 2015) ("A plaintiff certainly cannot establish a widespread unconstitutional practice through prior constitutional actions. Plaintiffs have not offered any description of a prior incident involving a relevant constitutional violation").

Finally, Plaintiff failed to present any evidence that links Brasfield's testimony to any constitutional harm Plaintiff claims he suffered. In essence, Plaintiff claims that two pieces of evidence were withheld from him: the existence of a so-called first lineup and Orlando Lopez's alleged recant. There is no evidence of either in the Valentin investigative file that Plaintiff claims was withheld as a result of the City's practices. As to the documents that are in the file, the only evidence Plaintiff elicited that could have been exculpatory was the note on the GPR seeming to indicate that Lopez was "by the store" when he first saw the shooting and the criminal history report stamped August 27, 1988. Plaintiff failed to establish that either of the details were exculpatory or that they would have changed the outcome of the case. Further, Plaintiff failed to establish that Wadas's file as it exists today contains all the documents that were provided to him in discovery. Plaintiff also failed to establish that any documents Plaintiff claims were withheld

11

from him were nevertheless provided to the state's attorney, thus discharging CPD's *Brady* obligations.

Nor do any of Brasfield's other opinions provide a nexus for any alleged constitutional violation here. For instance, Brasfield testified that CPD's policies regarding preservation of records were insufficient because they did not apply to the gang crimes unit. (Ex. A at p. 2186-87). But, Plaintiff did not produce evidence of any document created by gang crimes that should have been produced in his case. Plaintiff also claims that the Valentin investigative file was withheld from him in its entirely. Yet, Brasfield did not conclude that CPD withheld entire investigative files. (*Id.* at 2443). Finally, with all of Brasfield's criticisms of CPD's record keeping policies and practices, he never identified one that caused any documents to be withheld from Plaintiff in this case. As a result, Plaintiff failed to offer any evidence that CPD's record keeping practices were the moving force behind any alleged constitutional violation.

## IV. City's Training Policies.

Plaintiff also alleges City is liable for failing to provide adequate training to its employees regarding disclosure of investigative materials, writing accurate police reports, responding to subpoenas, and properly conducting and documenting lineups. Plaintiff failed to produce any evidence of these theories sufficient to establish liability.

In order to establish liability for failure to train, Plaintiff must have presented evidence that the failure to train was a deliberate or conscious choice by the municipality. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). It is a high burden, such that an otherwise sound program that occasionally has been negligently administered does not suffice to prove that the injury could have been avoided had better training been provided because such a claim could be made about any act causing an injury. *Id.* at 391.

As to disclosure of investigative materials, the only evidence Plaintiff offered to prove insufficient training was Brasfield's testimony. Yet, Brasfield merely concluded that training was inadequate. (Ex. A at 2448). He did not offer any description of how the training could have been better, nor did he explain how or why the City should have known its training was deficient. The same is true for Brasfield's opinion that the City should have conducted audits of its record keeping policies. He did not provide any evidence that the City did not conduct any audits, nor did he demonstrate that the City chose not to monitor its record keeping policies in any other way. Similarly, he concluded generally that training to the subpoena service unit was insufficient, but he did not identify or explain how it could have been improved. (*Id.* at 2189-90, 2381-82). All in all, Plaintiff offered no evidence that the City's training regarding record keeping was a conscious choice amounting to deliberate indifference. He seemly offered Brasfield's opinion that more training was needed. Yet, the need to do "more or better" is not itself sufficient to establish municipal liability. *See, e.g., Craft v. Flagg*, U.S. Dist. LEXIS 132982, *7-8 (N.D. Ill. Dec. 13, 2010) (evidence that a municipality "could have done something more or better is insufficient to establish causation in a §1983 claim"), citing *City of Canton*, 498 U.S. at 391-92. As the United States Supreme Court has explained:

> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under §1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. * * * Thus, permitting cases against cities for their "failure to train" employees to go forward under §1983 on a lesser standard of fault would result in de facto *respondeat superior* liability on municipalities – a result we rejected in *Monell*, 436 U.S. at 693-694. It would also engage the federal courts in an endless exercise of second-guessing municipal employee training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

*City of Canton,* 498 U.S. at 391-92.

Plaintiff also failed to adduce any evidence that the City did not provide adequate training regarding report writing. Indeed, Plaintiff presented no evidence on this topic.

Similarly, Plaintiff failed to present evidence regarding training pertaining to lineups. Plaintiff presented no evidence to establish that theory of liability.

## V. Plaintiff Failed to Prove a Widespread Practice of Fabricating Evidence

Plaintiff's last *Monell* claim is that the City had a policy and practice of fabricating evidence. Plaintiff did not even attempt to prove evidence fabrication in any other case besides the Valentin homicide. It is axiomatic that one instance does not establish a pattern or practice sufficient to amount to a custom for purposes of *Monell*. Nor can Plaintiff rely on any Defendants' assertion of the Fifth Amendment to establish this claim. There has been no substantive testimony to establish any other instance of fabricating evidence. For this reason, Plaintiff's claim fails.

Wherefore, Defendant City of Chicago, by and through its undersigned attorneys, moves this Court to enter judgment in its favor as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

|  |  |
|---|---|
| Dated: June 21, 2018 | Respectfully submitted,<br>City of Chicago |
|  | By: _/s/ *Eileen E. Rosen*_ |
| Eileen E. Rosen | One of its attorneys |
| Catherine M. Barber |  |
| Theresa Berousek Carney |  |
| ROCK FUSCO & CONNELLY, LLC |  |
| 321 N. Clark Street, Suite 2200 |  |
| Chicago, Illinois 60654 |  |
| (312) 494-1000 |  |
| erosen@rfclaw.com |  |