# EXHIBIT E

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – CRIMINAL DIVISION

FILED
JUDGE CAROL M. HOWARD-1928
JUN 10 2016
DOROTHY BROWN
CLERK OF CIRCUIT COURT

PEOPLE OF THE STATE OF ILLINOIS )
       Respondent )
        )
        ) Case No. 97 CR 18961 (01)
       vs. )
        )
        ) HONORABLE CAROL HOWARD
ARIEL GOMEZ )
       Petitioner ) Judge Presiding
        )

## THE PEOPLE'S AMENDED REPLY TO PETITIONER'S RESPONSE TO THE PEOPLE'S MOTION TO DISMISS THE SUCCESSIVE POST-CONVICTION PETITION

Now come the Respondent, People of the State of Illinois, by and through Anita Alvarez, State's Attorney of Cook County, Illinois, through her assistants, Celeste Stewart Stack and Barbara Plitz, and respectfully submit the People's Amended Reply to Gomez' "Response" to the People's dismissal motion.

**OVERVIEW**

Petitioner Ariel Gomez ("Gomez") has filed a 40 page "Response" to the People's Motion to Dismiss. The People's dismissal motion contains their full arguments with record citations and case law. This filing will address comments in Gomez' Response as they apply to constitutional claims actually raised in Gomez' Amended Petition.

I.     **STATUTORY BARS REQUIRE DISMISSAL OF CLAIMS II, III, & IV, HOWEVER, THESE CLAIMS LACK MERIT AS WELL.**

The People's dismissal motion pointed out that three claims[1] were barred by express language in the Post Conviction Hearing Act itself. Gomez has failed again to satisfy or adequately plead the cause and prejudice test for any of the final three claims. The failure to

---

[1] Actual innocence claims may be raised at any time as can newly discovered evidence of a pattern and practice of misconduct claims. Both are based on evidence that could not have been discovered earlier.

satisfy the test required for successive claims (not based on new evidence) will be addressed with each claim below.

## II. GOMEZ IMPROPERLY RELIES ON REASONABLE DOUBT ARGUMENTS AND COLLATERAL IMPEACHMENT OF GUEVARA WHERE NEITHER SATISFIES AN ACTUAL INNOCENCE CLAIM. FREE-STANDING CONCLUSIVE NEW EVIDENCE OF ACTUAL INNOCENCE IS REQUIRED.

Gomez offers Antonetty's affidavit and pattern evidence from collateral cases against Guevara as the basis of his innocence claim. The People submit that Antonetty has been available since the night of the murder and that this evidence is not conclusive against the record as a whole including Antonetty's prior 2012 affidavit. Impeaching Guevara is not fatal to a case with eyewitnesses and a full confession.

### a. Antonetty

Antonetty was available at trial and her recent conflicting affidavits prevent her latest version of events from being conclusive as required by *Washington*. Antonetty is listed in the police reports and in the State's answer at trial, and her friends Castro and Daniels testified for the defense at trial. Antonetty was available with due diligence.[2] *Washington* requires the new evidence of innocence to be previously unavailable with due diligence and it requires the new evidence to be conclusive. 171 Ill.2d at 489.

The hallmark of actual innocence is a defendant's total vindication or exoneration. *People v. Anderson*, 402 Ill. App. 3d 1017, 1037, 931 N.E.2d 715, 341 Ill. Dec. 818 (2010), citing *People v. Savory*, 309 Ill. App. 3d 408, 414-15, 722 N.E.2d 220, 242 Ill. Dec. 731 (1999). Antonetty's affidavit is not conclusive evidence. Gomez' conviction and the evidence used to convict has been reviewed repeatedly. The evidence at trial was overwhelming, Gomez was seen several times by a number of people and he and three of his codefendants all gave full confessions admitting that Gomez shot into the crowd of people.

### b. Gomez' Alleged Impeachment Evidence Against Guevara Does Not Satisfy *Washington's* Actual Innocence Test.

---

[2] In *People v. Washington*, an eyewitness fled and lived out of state for years after the murder out of fear for her safety when she returned to Illinois and testified in a PC hearing, her testimony was so credible and convincing that a new trial was ordered and the actual innocence remedy was created. 171 Ill.2d 475, 489 (1996).

In the recent case of *People v. House*, 2015 IL App (1st) 110580 , Para.46, the appellate court noted that "[N]ewly discovered evidence which merely impeaches a witness will typically not be of such conclusive character as to justify postconviction relief. *Barnslater*, 373 Ill. App. 3d at 523." Gomez spends a great deal of time focused on Guevara, making allegations about the 2014 Lassar reports without actually providing any support. Gomez is insistent that impeachment of Guevara with prior bad acts is proof of actual innocence. Guevara is but one witness. Gomez failed to articulate any specific complaint about Guevara in his motion or trial. Multiple eyewitnesses from the crime scene testified, as did ASA Healy who took Gomez' full written confession. Overwhelming circumstantial and corroborative evidence exists. The evidence Gomez relies upon on at pages 9 & 10 is unsupported and collateral impeachment, not proof of innocence. *People v. Collier*, 387 Ill. App. 3d 630, 637-38 (2008) (noting that "reasonable doubt of a defendant's guilt is not a proper issue for a post-conviction proceeding").

**1. Guevara's invocation of the5th Amendment in a *totally unrelated proceeding*.**

Guevara testified in both in Gomez' motion and trial. Guevara never invoked the 5th amendment in any proceeding against Gomez. Therefore it is hard to envision how this fact is relevant to actual innocence especially where Gomez did not accuse Guevara via motion affidavit or testify in his own motion or at trial that Guevara committed any wrongdoing. Gomez never filed a complaint of any type against Guevara until very recently. Finally, while the trier of fact may take a negative inference from a witness' invocation of the 5th, it is not substantive evidence of innocence. Here, Guevara never invoked the 5th in any of Gomez' litigation.

**2&3. Gomez Has Not Presented Any Report as an Exhibit Nor Has He Produced 100 Cases Where Misconduct Was Established. Therefore, Gomez' Self-Serving Descriptions of Materials Not Produced Is Conclusory and Cannot Be Relied Upon to Show Innocence, Especially Where the Materials Are Directed At Impeachment of a Witness.**

Gomez contends that a report requested by the City of Chicago on Guevara supports his claims. However, Gomez' has not supplied this report to this Honorable Court. Gomez has not included the report as an exhibit. Therefore, this is a conclusory allegation that involves

impeachment of a witness, not innocence. The assertion must be disregarded. Every case stands on its own evidence. Gomez' vague reference to materials that have not been produced is not evidence of innocence, it fails to even impeach as it is not included.

In conclusion, this section (A) fails to allege anything that properly raises actual innocence. Gomez concludes by citing *Tyler,* where the Appellate Court found that *the facts in that case,* along with *new evidence of police misconduct* was sufficient for a hearing on an actual innocence claim. Gomez fails to discuss the facts of *Tyler* or demonstrate how they are analogous to Gomez case.

**1.a. Gomez Did Not Testify in Support of His Motion or Submit An Affidavit with the Suppression Motion, Nor did Gomez' Motion Specifically Accuse Guevara of Misconduct. Therefore, Impeaching Guevara Does Not Satisfy the Actual Innocence Elements Where Impeachment is Not Conclusive Evidence.**

One of the People's main points is the failure of Gomez to raise a complaint previously. Gomez is not just contending that he was denied his rights by Guevara, Gomez alleges *for the first time*, 20 years after arrest that he was *severely beaten.*

The People have attached the suppression motion filed as an exhibit. To the People's knowledge, the motion did not contain an affidavit from Gomez, nor did he make any other complaint of misconduct until very recently, after his pro se successive petition was filed.

The People concede that Guevara's name is included, one time, in the motion where it states the date, time and witnesses to his confession in paragraph 9. The motion's primary complaint in paragraph is that Gomez was questioned "without an attorney present which violates Illinois Statute..."

The motion states in paragraph 11 that Gomez "was coerced by both the Police and the Prosecutor and made to answer questions that he did not want to answer without having an

attorney present." People concede that the word "coerced" is included in the motion but "the Police" are not identified nor is the alleged coercion.

Gomez' attorney filed the motion but it does possess any specific complaint as to Guevara committing any specific act of misconduct. Nor does the motion have an affidavit attached. Nor did Gomez or anyone else testify in support of the suppression motion. Nor was there any testimony of misconduct presented at the trial, even though the defense called Antonetty's friends, Castro and Daniels.

At the motion, ASA Healey and Guevara testified. Both men denied that rights or food, drink or bathroom breaks were withheld. The written confession was admitted. It was signed and contains Miranda warnings and totally contradicts the motion. The motion was continued for the defense witnesses. On the next date, no defense witnesses were called. Gomez did not testify at his motion or at trial. Therefore, no specific complaint was ever levelled by Gomez against Guevara and nothing supports the belated innocence claim based upon collateral claims of police misconduct.

Gomez case is different from *Tyler* where police misconduct was allowed as part of an innocence claim. Here, there is no evidence or specific allegation of misconduct. Here, the bulk of the inculpatory evidence came from multiple witnesses and abundant circumstantial and corroborating evidence. Gomez gave a full written confession to an ASA. This is not a weak or circumstantial case. (See pages 34-36 for an overview of inculpatory evidence of multiple witnesses who saw Gomez shooting into the crowd and Gomez' own confession that he shot into the crowd.)

**1. b. Comments on Codefendants' Cases Does Not Satisfy The Actual Innocence Elements.**

Gomez states that he can "easily" meet the standards because the "State's case has always been lacking." (Resp. p. 9) Gomez continues by reviewing case dispositions of severed codefendants. Actual innocence is not another examination of reasonable doubt. *People v. Coleman*, 2013 IL

113307, paras. 94-97. As this Honorable Court is well aware; evidence varies from one codefendant to another. Where codefendants are severed as these codefendants were, evidence against one codefendant is not admissible against a severed codefendant. The codefendants' proceedings are not relevant to or supportive of, Gomez' actual innocence claim.

### III. ILLINOIS LAW IS CLEAR THAT THE BRADY CLAIMS SHOULD BE DISMISSED.

#### a. The Brady Claims do not Meet the Cause and Prejudice Test

This is obviously a successive petition, adding an additional layer of procedural bars as any claim not raised in the first petition is waived (Section 122-3). Also, in general claims that could or should have been made previously are barred. People v. Coleman, 183 Ill.2d 366 (1998) On page 21 of his Response, Gomez acknowledges that his "Brady and Self-Incrimination Claims" are subject to the cause and prejudice test but on the next page Gomez skips over the required test again.

On page 22, Gomez simply states that he "has satisfied both requirements." No analysis or explanation is provided to this Honorable Court except for a brief assertion that elements of a Brady claim already encompass the cause and prejudice test. As set out below, this contention is without merit and fails to include the cause prong.

For the third time, Gomez totally fails to offer this Honorable Court any analysis as to how these claims meet the cause and prejudice test. These claims, claims not based on new evidence, are waived and barred by two sections of the Act. Section 122-3 states any claim that could have been raised in the first petition is barred in the successive petition. Section 122-1.1(f) sets out the mandatory cause and prejudice test for "non-innocence" claims.

There is no cause here. No objective factor, external to the defense prevented these claims from being raised earlier. Secondly, prejudice is not as the errors have no basis in the record or in the law. Therefore could not "infect the entire trial" so that the conviction violates due process.

Gomez continues on page 22 by arguing the substance of his Brady claim and eventually argues that constitutional standards "overlap" with cause and prejudice test. Essentially it is a circular reasoning that states that by arguing the merits of the Brady claim, he is satisfying the cause and prejudice test.

Once again a blind eye is turned to the express requirement of the Act. (Resp. p 23)

- The Act  specifically states that the cause and prejudice test must be satisfied before the merits of the claim can be reviewed 725 ILCS  122-1.1(f);

- The Act only allows to *constitutional* claims;

- That Gomez successive claims are constitutional in nature cannot satisfy the cause and prejudice test;

Gomez arguments are circular. On page 24, he lists Brady allegations and federal habeas cases in support of argument that simply alleging a Brady violation by itself satisfies the cause and prejudice test. If the elements of Brady are interchangeable as Gomez claims, it should be a simple task to comply with the test, but Gomez does not. In any event, the remaining claims also have no substantive merit.

### b. The Listed Brady Violations Fail To Demonstrate That The People Had Knowledge Of, Withheld Or Suppressed Evidence. Nor Has Gomez Shown That "Material" Evidence Exists That Would Have Changed The Trial Results.

On page 24, Gomez lists Brady allegations. The problem with the lists is they are conclusory in nature and some items may not even exist. Specifically, the listed items

consistently fail to support the requirements that the evidence was withheld or suppressed by the State. The list consistently fails to demonstrate that allegedly withheld evidence was actually exculpatory. Nor does the list demonstrate that these items were material in that the result of the trial would be different if the items had been disclosed.

**1. Guevara suppressed evidence regarding the "real killer's" identity.**

No evidence supports this accusation. As for the Brady claim, there is no evidence that the People were (or are) aware that someone else committed this crime, in fact the opposite is true. This claim rests on a recent affidavit and there is no evidence that it is anything other than a recent fabrication. Antonetty is listed in the reports and the defense did call witnesses from the crime scene. In light of the extensive evidence of Gomez' guilt, this claim lacks materiality and evidence of suppression by the People.

**2. Brady Claims Cannot Be Based Upon An Allegation That An Officer (Guevara) "Suppressed His Own Misconduct In Attempting To Coerce (Sic) Intimidate Ruth Antonetty"..And Wrote Reports That Failed To Include Claims In Recent Affidavits Of Defense Witnesses Daniels And Castro.**

This is not a Brady claim, but is a claim of police misconduct. The People had no knowledge of the misconduct alleged as it is for the first time in recently filed affidavits. Therefore, it should be dismissed on this factor alone.

The affidavits cannot support Brady claims where the People had no knowledge of the allegations before or during trial. There is no manner by which these are Brady claims. In light of the extensive evidence of Gomez' guilt, this claim lacks materiality as well as evidence of suppression by the People

**3. Guevara suppressed information as to where the ammo clip was recovered from and "its eventual destruction."**

This is also not a Brady claim, it's a claim of misconduct with no support as no evidence exists that even remotely supports this accusation. The clip was destroyed after trial and direct

appeal. The State had no art in the destruction as it was an administrative matter for the police. There is absolutely no evidence that Guevara lied about or was responsible for improperly destroying the clip. Nor is there any evidence that anything about the clip itself is material and would change the result of the trial as Brady requires.

Finally, there is no evidence that the People were (or are) aware that there was any exculpatory of material evidence concerning the clip. This claim lacks materiality as Brady requires as well as evidence of suppression by the People. Claims must be supported by evidence. This is pure conjecture.

### 4. The State Suppressed Evidence Regarding Guevara's Pattern of Coercing Witnesses.

The "new evidence of a pattern of misconduct" claims do not *support Brady because the misconduct evidence is both new and not previously available*. When Gomez concedes that his item 5 pattern claim cannot support a Brady violation under Illinois law, he also should concede that the pattern claims in items 4 and 6 are meritless. For Brady purposes, there is no distinction between police misconduct towards witnesses, suspects or anyone else, if it is newly discovered.

Illinois reviewing courts have held there is no Brady claim against the State when the defense alleges *newly discovered* evidence of a pattern and practice of police misconduct. The primary reason Brady does not apply to pattern claims is that they are based upon newly discovered evidence. Reviewing courts will not allow the defense to claim the pattern evidence is new while holding that the very same *new* evidence was withheld by the State when there is no evidence in the record that the State withheld. The *Tyler* Court explained:

> Second, we have found that this evidence is newly discovered sufficient to relax the requirements of *res judicata*, and that it is unreasonable to expect defense counsel to discover who these individual detectives were abusing unless counsel interviewed every suspect who was detained by them. **This same rationale applies to the State as well. There is nothing in the appellate record that shows this evidence was known and available to the prosecutor prior to trial, and defendant does not make an argument explaining how the prosecutor could have known of these prior allegations of abuse.**

As a result, **we cannot say that the evidence of systemic abuse was known and available to the State prior to trial and that it failed to disclose the evidence,** and the trial court did not err when it dismissed defendant's *Brady* claim at the second stage. (Emphasis added; *People v. Tyler*, 2015 IL App (1st) 123470; Paras. 210-211)

On page 26, Gomez contends that if the misconduct alleged involves witnesses instead of suspects that Brady is somehow supported. Gomez offers no support in the trial record for this contention. None exists.

Antonetty's recent affidavit does not support a Brady claim for the same reasons as other "new" evidence: there is nothing in the record to show that the People had knowledge, of suppressed or withheld information about Antonetty. Gomez' claim of witness mistreatment is made nearly 20 years after Gomez' arrest and has no basis in the record nor is there any evidence that the State had knowledge of the alleged misconduct.

**5. Gomez Concedes His is Not Entitled to a Hearing on This Claim, Which Alleges the State Suppressed Evidence Regarding Guevara's Alleged Pattern of Coercing Suspects.**

Gomez concedes he is not entitled to a hearing on this pattern claim on page 25, first paragraph. This is the same Brady claim as alleged in number 4 above and 6 below however.

**6. Gomez' Allegation that the People Suppressed Guevara's Misconduct "in General' is Also Totally Unsupported Especially Where there Are No IAD, OPS, or Court Findings for Mistreating Suspects or Witnesses against Guevara.**

Gomez' final Brady item does not even specify what the People withheld or offer support of any kind. This "Writ Large" Guevara misconduct Brady claim suffers the same defects as the other "Guevara" Brady claims as People could not be on notice that Gomez was raising abuse claims that were never made at the time of trial, There is no evidence here to support the People's alleged suppression of evidence. Further, Guevara has no OPS, IAD or court decisions finding he committed misconduct with suspects or witnesses.

**7. Antonetty's Most Recent Affidavit Accuses Guevara For the First Time and There is No Evidence That the People Had Knowledge, Suppressed or Withheld Anything About Antonetty.**

Gomez argues that Brady is implicated based upon Antonetty's most recent affidavit. This affidavit conflicts with her 2012 affidavit. There is no evidence that Antonetty accused Guevara of any misconduct until very recently. Therefore, there is no reason why the State would be on notice of these recent allegations. In fact, Antonetty was interviewed as recorded in police reports and her name appeared in the State's Answer to Discovery.

The bottom line is Illinois law does not acknowledge Brady claims under the bases offered by Gomez. Further, the record here is totally devoid of any thing that would support a Brady claim. The Brady claims should be dismissed.

## IV. THE VOLUNTARINESS OF GOMEZ' CONFESSION WAS ALREADY LITIGATED AND IS BARRED BY RES JUDICATA.

Gomez fails to cite any case law that allows him to relitigate his pretrial suppression motion. As the Illinois Supreme Court in *Patterson* noted, the issue is barred by res judicata at the post conviction stage. The *Patterson* ultimately held that where newly discovered evidence arose years after the suppression hearing that supports the allegations in the suppression motion, that an exception to the bar could be made. 192 Ill.2d 93, 139-146.

The *Patterson* Court relied on the fact that Patterson had consistently complained he was abused from the time of his bond hearing through his suppression motion and motion to reopen his suppression motion, through his appeal and post conviction petition. 192 Ill.2d at 138-145. Here, the opposite is true. Gomez failed to take the stand at his motion or at trial and accuse Guevara of the beating he now alleges for the first time ever.

While Patterson allows pattern of misconduct claims when newly discovered evidence is found, it in no way allows suppression motions to be litigated based solely on a change in the defendant's version of events many years later. Gomez cites case law appropriate for direct

appeal not for successive post conviction petitions. Again Gomez cites Tyler but fails to demonstrate that Gomez' case is analogous or that Gomez preserved any police misconduct complaints. Instead, Gomez simply asserts that the People are wrong about the content of his suppression motion. Gomez has offered no basis to overturn decades of jurisprudence and to allow him to reopen a suppression motion base upon a complaint first made almost 20 years after arrest.

## V. THERE IS NO SUPPORT FOR A CUMULATIVE EFFECT CLAIM

The Act is clear that Gomez has the burden of demonstrating a substantial constitutional violation occurred in his trial. 725 ILCS 5/122-1 (West 2015). Each claim must be constitutional in nature and each violation has elements that must be met. People v. Coleman 183 Ill.2d 366 (1998). Combining various constitutional complaints into a cumulative claim is untenable.

WHEREFORE, the People respectfully request that their dismissal motion be granted.


Most respectfully submitted,

Barbara Plitz

Celeste Stewart Stack

For the People

773 674 7628

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
      Respondent )
      )
      ) Case No. 97 CR 18961 (01)
   vs. )
      ) HONORABLE CAROL HOWARD
ARIEL GOMEZ ) Judge Presiding
      Petitioner )

### MOTION TO DISMISS PETITIONER ARIEL GOMEZ'S
### AMENDED SUCCESSIVE POST-CONVICTION PETITION

Now come the Respondent, People of the State of Illinois, by and through Anita Alvarez,

State's attorney of Cook County, Illinois, through her assistants, Barbara Plitz and Celeste

Stewart Stack, and respectfully requests that this Honorable Court grant the People's Motion to

Dismiss Petitioner Ariel Gomez's Amended Successive Post-Conviction Petition.  In further

support thereof, the People state as follows.

### INTRODUCTION

Ariel Gomez was convicted based on the testimony of several eyewitnesses, extensive

circumstantial and physical evidence, and a full, detailed written confession which he *never* has

alleged was the result of coercion or police misconduct… until his pending successive petition

was amended in 2015.  The People acknowledge that one of the most important duties of a

prosecutor is to objectively review claims of actual innocence and of police misconduct. No

matter when these issues are raised they must be scrutinized carefully, in order to insure that a

miscarriage of justice has not occurred. A post-conviction petitioner who is mistreated by police,

however, also possesses a duty to report the police misconduct *to someone* before 18 years

elapses. Gomez allegedly waited nearly two decades to make an outcry as to physical abuse,

despite engaging in almost continuous litigation since his arrest.

1

When Gomez was processed in the Area lockup and at the county jail in 1997, he never uttered a word complaining of police misconduct. Gomez filed a *pretrial suppression motion* but made *no claim of abuse or police misconduct*. When the trial court denied the motion it noted that there was no claim of coercion. Gomez never complained about the police misconduct throughout his trial or post-trial motions (with a newly retained attorney). Gomez never complained of misconduct in his appeal, in two federal habeas proceedings[1], and in a previous post-conviction petition.

Gomez did not allege any police abuse or misconduct in the original *pro se* version of *this very successive petition*, now pending before this Honorable Court. The very first time that police misconduct is mentioned in 18 years of litigation is when Gomez' pro se successive petition was *amended* in 2015. The *pro se* version of the *instant* successive petition did *not contain any claim of abuse by police*. Clearly there are multiple waivers that bar the contention, but there must be a constitutional violation in the court proceedings that resulted in the conviction and there simply is no mention of misconduct or abuse in the record here. 725 ILCS 5/122-1 (a) (West 2015).

The Illinois Supreme Court specifically commented on the duty of attorneys to refrain from arguing facts that are not supported by the record in <u>People v. Kliner</u>, 203 Ill. 2d 402, 408-409 (2002), where a woman was shot five times while seated in her car in a contract murder case. Years later, Kliner (the contract murderer) asked for DNA testing on hairs found on the victim's glove. The Court rejected defense counsel's baseless factual arguments:

> As a final matter, we note that in his brief and during oral argument, defense counsel insisted that the trial court's order granting defendant's motion must be affirmed and that to refuse to test the hairs would be to "stand in the way of the

---

[1] The People respectfully request that this Honorable Court review the history of the federal court litigation on pages 18-20 below, as Gomez has totally omitted significant events and rulings which discredit the rulings Gomez chose to share with this Court in his amended petition.

pursuit of justice." Defense counsel also likened the State's objection to the testing of the hairs as "turning a blind eye and deaf ear to Illinois' shameful history of mistake and caprice in death penalty case." We caution, however, that justice and integrity are *demanded of both defense counsel and the State* under our criminal justice system.

To that end, we note that defense counsel repeatedly mentioned that DNA testing was required of the hairs found "clutched" in Dana Rinaldi's hand. Despite this characterization of the hairs, defense counsel *has failed to point to a record citation indicating that the hairs were in fact found clutched in Dana's hand.* Our review of the record reveals only that hairs were found on Dana's glove as well as on the other items of clothing she was wearing when she was murdered. Indeed, the references to the hairs do not even indicate whether those hairs were found on the palm side or the back side of the glove.

To the extent that any shortcomings in our criminal justice system relate to convictions secured through questionable prosecutorial practices, *the answer certainly is not to give equal time to questionable practices of defense counsel.* Rather, the key to insuring that criminal justice in Illinois is administered in a fair and equitable manner is to demand the highest level of advocacy and integrity from every participant in the system. This court *requires that both the State and defense counsel accurately present the facts of a case.* (emphasis added)   203 Ill. 2d at 408-409.

Because Gomez has never alleged police misconduct in years of litigation in both state and federal court, the People maintain that this case is akin to the situation in <u>Kliner</u> and Gomez' recently added coerced confession claim is *not part of the proceedings that led to his conviction.*[2]

The same is true for the affidavit of Ms. Antonetty, a witness who never testified at trial. Ms. Antonetty's claim of coercion cannot support a *constitutional violation that occurred at Gomez trial,* as is specifically required by the Act governing postconviction relief. 725 ILCS 5/122-1(a) (West 2013). Because Gomez has never alleged police misconduct despite numerous opportunities to do so and because Ms. Antonetty never gave any testimony at trial[3], the People asking to dismiss this case, as opposed to filing an Answer and conducting a hearing.

---

[2] See, People v. Patterson, 192 Ill.2d 93, 144-145 (2000), this case created the "pattern and practice claim" based upon 60 strikingly similar complaints at Area 2, where the Court specifically relied on fact that Patterson had been consistently claiming, *from his first court appearance, that* he was threatened with a gun, among others things.
[3] The two other female witnesses who now offer affidavits, testified by stipulation in Gomez' defense at trial, therefore they never gave incriminating testimony that violated constitutional principles.

The Post Conviction Hearing Act requires the following in order for an inmate to seek relief under its authority:

> 725 ILCS 5/122-1 (a) Any person imprisoned in the penitentiary may institute a proceeding under this Article if the person asserts that:
> (1) in the **proceedings which resulted in his or her conviction there was a substantial denial of his or her rights** under the Constitution of the United States or of the State of Illinois or

The newly alleged coercion claims of Gomez and Antonetty are not cognizable here. Gomez' complaint is waived many times over by his silence through the years. Antonetty did not testify against Gomez at trial and her affidavit does not contain conclusive or newly discovered evidence of innocence. Indeed, Castro and Daniels, the two women who were with Antonetty at the crime scene actually testified in Gomez' *defense*. Therefore, their affidavits do not support any constitutional violation at trial.


## FACTS FROM THE TRIAL RECORD

On June 13, 1997, Concepcion Diaz was shot and killed in a gang-related drive-by shooting that occurred on Chicago's west side at Cicero and Diversey. After an investigation of the shooting, petitioner and co-defendant's Jose Dominguez, Dragon Jovanovich, John Yacoub and Paul Yalda were arrested for the murder of Mr. Diaz. All five men were later charged with two counts of first degree murder. Prior to trial, the trial court granted a motion for severance with respect to all five defendants. (R. A10-11) The trial court then proceeded to conduct simultaneous but severed bench trials. At the conclusion of petitioner's trial, the trial judge found petitioner guilty of first degree murder. (R. D34-36) After a sentencing hearing, petitioner was sentenced to 35 years in the Illinois Department of Corrections. (R. D18)

Motion to Suppress Statements

Petitioner brought a pretrial motion to suppress his statements. Petitioner claimed that he was denied food and drink, was not properly Mirandized, was not allowed to make a phone call, was denied access to a bathroom facility, was coerced by "both the Police and the Prosecutor" and made to answer questions, and denied being treated fairly. (CL 34-36)

Detective Guevara testified that petitioner and his co-defendants were all brought to Area 5 after the shooting in the early morning hours of June 14, 1997. (1 Vol., at 9) Detective Guevara testified that after he introduced himself to petitioner, he read petitioner his Miranda rights, that petitioner indicated he understood the rights and was willing to be interviewed. (1 Vol. at 11-12) Detective Guevara was then present for a second interview with petitioner in the presence of Assistant State's Attorney William Healy. (1 Vol. at 19) ASA Healy introduced himself to petitioner, read petitioner his Miranda rights, and then interviewed petitioner after petitioner indicated he understood each of his rights and was willing to speak about the shooting. (1 Vol. at 20) After this interview, petitioner agreed to give a handwritten statement to the ASA. (1 Vol. at 21) After the ASA wrote out the statement, petitioner read the first paragraph out loud to ensure petitioner knew how to read and write. The entire statement was read and petitioner, the ASA, and the detective signed it. (1 Vol. at 23)

Detective Guevara denied telling petitioner he did not have to have an attorney present, denied that petitioner ever asked to make a phone call, or was denied the use of the bathroom. (1 Vol. at 23-24) Detective Guevara testified that neither he nor anyone else coerced petitioner into answering questions that he did not want to answer, and that no one forced petitioner to sign his handwritten statement. (1 Vol. at 24)

During cross-examination, Detective Guevara testified that petitioner was never handcuffed in his presence. (1 Vol. at 28) Petitioner's cross-examination of Detective Guevara included nothing about physical mistreatment.

Assistant State's Attorney William Healy testified that he spoke to petitioner at approximately 12:30 p.m. on June 14, 1997. (1 Vol at 57) ASA Healy testified that after he introduced himself, he read petitioner his Miranda rights. (1 Vol. at 58) After petitioner indicated that he understood his rights and was willing to be interviewed, the ASA spoke to petitioner about the shooting. (1 Vol at 58-59) After the interview, the ASA spoke to petitioner alone and asked petitioner "if he had any complaints about the way he had been treated, if he had had enough to eat, questions like that." Petitioner said he had been treated fine. (1 Vol. at 59) Petitioner agreed to give a handwritten statement. (1 Vol. at 59-60) After the statement had been written, petitioner read some of the first part out loud and then the ASA read the rest aloud. Petitioner, the ASA, and the detective each signed the statement. (1 Vol. at 61) The ASA read aloud in court the paragraph of the statement which reads:

> Ariel Gomez states that he has been treated well by the police and Assistant State's Attorney Healy. Ariel Gomez states that he was given soda to drink. Ariel Gomez states he was offered a Big Mac and fries but he was not hungry so he did not eat them. Ariel Gomez states he was allowed to use the bathroom any time he wanted to. Ariel Gomez states he was allowed to sleep at Area 4. Ariel Gomez states no threats or promises were made in exchange for his statement and that he was giving it freely. Ariel Gomez states he is not under the influence of alcohol or drugs while making this statement. Ariel Gomez states that he was given cigarettes to smoke."

(1 Vol. at 62) ASA Healy also explained that a part of the statement that petitioner read aloud was the pre-printed Miranda rights. (1 Vol. at 63) ASA Healy testified that neither he nor anyone else told petitioner that he did not have to have an attorney present during questioning.

6

Petitioner never asked permission to use the phone or indicated that he had been denied use of the bathroom. (1 Vol. at 63) ASA Healy testified that no one coerced petitioner into answering questions that he did not want to answer. (1 Vol. at 64)

On cross-examination, ASA Healy explained that the interview took place in an unlocked conference room, that there was food present for petitioner to eat if he wished, and that petitioner communicated well in English. (1 Vol. at 66-68)

At the close of the State's evidence, counsel for petitioner indicated that it had not yet been decided whether they would be putting on witnesses. (1 Vol.at 146) At the next court date, petitioner did rest without presenting any witnesses. (Supp. Vol. at 3) Counsel for petitioner argued that there were "some inconsistencies as to whether that statement was voluntary...Insofar as [petitioner] was held against his will, not accessible to food or to the bathroom." (Supp. Vol at 26) There was no argument by petitioner regarding any physical mistreatment by Detective Guevara. The People argued that "the clear and uncontroverted evidence was that he was in fact given those rights, and that he did agree to speak with the State's Attorneys, the State's Attorney and the police officer....He signed a statement in which his rights were given to him. And he – indicting that he waived those rights. It's clear that he was not mistreated in any way." (Supp. Vol. at 35-36)

In rejecting petitioner's motion to suppress statements, the trial court noted that it found the Assistant State's Attorney and the detective to be credible and noted that this was a motion in which there were "**No allegations of excessive force, anything like that in these cases**." (Supp. Vol. at 43-43)

The Trial

George Soria testified at trial on behalf of the State. Soria testified that he is a store detective for the Department of Defense and that he has had the occasion to become familiar with weapons and the sounds they make. (R. A77) Early in the evening of the shooting, Soria watched the Bulls championship game. (R. A71) After the game, Soria agreed to drive his friend home. During the car ride to his friend's home, Soria observed something unusual near the intersection of Cicero and Diversey. Soria was driving north on Cicero when he heard the screeching of car tires. He looked left and saw a red Pathfinder heading north in the southbound lanes of Cicero about ten feet from the intersection of Diversey. (R. A71) Soria then saw Gomez, the front seat passenger, sitting on the door jam with his whole body outside of the passenger window. Soria observed that Gomez had his arms out on the top of the vehicle and that he was holding a gun. (R. A72) Soria witnessed Gomez fire the gun in the direction of a crowd of people gathered on the northwest corner of Cicero and Diversey. Soria saw the first shot fired as the Pathfinder approached the crowd. He actually saw a spark coming out of the barrel of the gun. (R. A85-86) He also testified that he was sure a second shot was fired. (R. A86) Significantly, other than the shots that were fired from the Pathfinder, Soria heard no other shots being fired from the vicinity and saw no other shooters in the vicinity. (R. A77)

Soria saw the red Pathfinder travel approximately 70-80 feet in the northbound lane before it went into the parking lot. (R. A74) After the shooting, Soria wrote the license plate number with the tip of his finger in the windshield of his car and, when the police arrived, he showed that number to Detective Ruiz. (R. A76)

Sandra Rodriguez testified that she also witnessed the June 13, 1997 shooting while she was celebrating the Bulls victory with her friends on the northwest corner of Cicero and

Diversey. (R. 23-26) As a resident of the neighborhood, Rodriguez was very familiar with that Cicero and Diversey intersection. Just prior to the shooting, there were about 20 to 25 people standing on the northwest side of the corner and about 20 people of the northeast corner of Cicero and Diversey. (R. A28) At one point, she saw a red Pathfinder heading south on Cicero. Some of the guys standing in the parking lot started flashing gang signs at the Pathfinder. The occupants of the Pathfinder "represented stuff" back. (R. A27) The guys in the parking lot then started throwing bricks at the Pathfinder. The Pathfinder then headed south on Cicero and turned on a little street called Parker Street. (R. A29) When Rodriguez saw the Pathfinder again it was heading northbound on Cicero, but this time it was in the opposite lane of traffic just a few feet from the curb. (R. A29) She saw the back of petitioner as he stuck his body out of the Pathfinder's front passenger window. As the Pathfinder headed into the parking lot, it stopped and somebody from the Pathfinder started shooting at the crowd. The Pathfinder then exited the parking lot.

Rey Arroyo also celebrated the Bulls' victory at the intersection of Cicero and Diversey. (R. A40) He and five friends were at the northwest corner of the intersection. Arroyo did not know any of the other twenty to thirty people who had also gathered at the parking lot. (R. A43-44) Arroyo also testified that there is a bus stop at the corner of the intersection and that some people were waiting for a bus. (R. A43) At one point during the celebration, Arroyo could see that there were five male Hispanic passengers in the Pathfinder. Two individuals were standing out of the sunroof of the car. (R. A45) Arroyo heard some people in the parking lot exchange words with the passengers in the Pathfinder. One of the men who stood on the corner threw bricks at the Pathfinder. (R. A45) The bricks broke the windows on the back side of the Pathfinder. The Pathfinder then took off. (R. A46)

9

A short time later, Arroyo saw the Pathfinder heading north on Cicero. (R. A47) He saw petitioner sticking half of his body out from the window of the Pathfinder. The Pathfinder stopped at the light and petitioner fired one shot into the crowd. Arroyo could see the gun in the shooter's hand; it was chrome. When petitioner pointed the gun at the crowd, Arroyo hit the ground so he did not see the muzzle flash. (R. A48) However, he raised his head and faced the Pathfinder in enough time to see smoke coming from the gun. Arroyo testified that it was a big gun so the gunshot was real loud and powerful. (R. A49) After the first shot, petitioner drove the Pathfinder even closer toward the crowd. (R. A50) He then heard two more shots coming from the Pathfinder. (R. A51, 57, 66) Arroyo did not hear any shots other than those that came from the Pathfinder. (R. A53) Other than the passenger in the Pathfinder, Arroyo did not see anyone else with a gun. (R. A53)

The parties stipulated with regard to the autopsy findings that a bullet was recovered from the victim's right hand. The parties further stipulated that the cause of death was from a gunshot to the back that lacerated that victim's heart and lung and that manner of death was multiple gunshot wounds. (R. A92-95)

The parties stipulated that the bullet recovered from the victim's hand during the autopsy could not have been fired from the pistol recovered from petitioner's home. The parties further stipulated that petitioner's mom owned the vehicle used in the shooting to the various wounds suffered by the victim. (R. A96-98)

Detective Guevara testified that, after talking to witnesses on the scene, he learned that a red Pathfinder with broken windows was involved. (R. A118-119) Detective Guevara learned the license plate number of the Pathfinder and that it was registered to Celia Gomez, petitioner's mother. (R. A120-121) Thereafter, Detective Guevara also received a call about a red

Pathfinder involved in a traffic accident at 7125 West Gunnison. (R. A119) When he arrived, Detective Guevara saw a red Pathfinder with broken windows. (R. A120) There was a brick tied to the accelerator, a brick underneath the break, and a cord tied to the gearshift. (R. A121)

When Detective Guevara arrived at petitioner's house at 5524 West Grace, other police officers and detectives were already there. (R. A121-122) Mrs. Gomez signed a consent to search form. (R. A124) Detective Guevara testified that police recovered a Stern Luger .45 semi-automatic pistol. (R. A126)

Detective Guevara interviewed petitioner at Area 5. (R. A127) He read petitioner his Miranda rights and petitioner agreed to be interviewed. (R. A127-129) Detective Guevara then called for an Assistant State's Attorney to come to the station to interview petitioner. (R. A129) Assistant State's Attorney William Healy arrived at the station and interviewed petitioner in a conference room at the station. (R. A129-130) ASA Healy also read petitioner his Miranda rights. (R. A130) After speaking to the ASA, petitioner agreed to give a handwritten statement. (R. A131)

Petitioner's handwritten statement was introduced into evidence, and corroborated much of the witness testimony. In relevant part, petitioner's statement was:

> Ariel Gomez states that on June 13, 1997 he took his mom's truck at 10:00 p.m. Ariel Gomez states that he used a spare key he had made, and that he took the truck without his mom's permission. Ariel Gomez state's that his mom was sleeping when he took the truck. Ariel Gomez states that his mom's truck is a 1996 red Nissan Pathfinder. Ariel Gomez states that the license plate on the Pathfinder is B562253. Ariel Gomez states that he was shown Exhibit "A" and that picture is a photo of his mom's Pathfinder. Ariel Gomez states that he left his house in the Pathfinder with Dragon Jovanavic driving and Ariel sitting in the passenger seat. Ariel Gomez states that he and Dragon do not have drivers licenses. Ariel Gomez states he was shown Exhibit "B" which Ariel identified as a photo of Dragon Jovanavic. Ariel Gomez states that they drove over to his friend John Yacoubs house where

11

they picked up his cousin Jose Dominguez, Paul Yalda and John
Yacoubs. Ariel Gomez states that he was shown exhibit "C"
which he identified as a picture of his cousin Jose Dominguez.
Ariel Gomez states that he was shown exhibit "D" which he
identified as a photo of John Yacoub. Ariel Gomez states that he
was shown exhbit "E" which he identified as a photo of Paul
Yalda. Ariel Gomez states that he, Jose, John, Paul and Dragon all
were in the truck "cruising" the area looking for women. Ariel
Gomez states that they were listening to the Bulls final
championship game on the radio as they rode around. Ariel sates
that after the Bulls won the game he took a gun out from under the
hood of his moms truck. Ariel Gomez states that he had placed the
gun under the hood before he left his house. Ariel Gomez states
that he put the gun under the hood because he wanted it hidden if
they got stopped by the police. Ariel Gomez states that the gun he
put under the hood is a chrome .45 automatic pistol. Ariel Gomez
states that he took the gun out from under the hood and gave it to
Jose. Ariel Gomez states that Jose then fired the gun once in the
air to celebrate the Bulls' victory. Ariel Gomez states that Jose
gave Ariel the gun back and Ariel put it back under the hood of the
red Pathfinder. Ariel Gomez states that they all drove around for a
while and they ended up on Cicero Avenue. Ariel Gomez states
that they were driving south on Cicero toward Diversy. Ariel
Gomez states that at this point he was driving, Jose Dominguez
and Dragon Jovancovic were on the roof of the vehicle and Paul
Yalda was in the front passenger seat and John Yacoub was sitting
in the back seat.

Ariel states that as he drove toward Diversy he saw a group
of ten people on the corner by the bus stop. Ariel Gomez states
that the group displayed gang symbols toward the truck and
through {sic} rocks at the truck. Ariel Gomez states that the rocks
broke several of the trucks windows and one of the rocks hit Paul
in the back of the head. Ariel Gomez states that Jose yelled from
the top of the truck "Turn here, stop!" Ariel Gomez states that he
turned right on the next street south of Diversy. Ariel Gomez
states that he stopped the truck. Ariel Gomez states that Jose said
"get the gun," so Ariel pulled the hood release and got the gun out
from under the hood. Ariel Gomez states that he knew the gun was
loaded because he had put the bullets in the gun earlier and they
had not fired all of the bullets he put in the gun yet. Ariel Gomez
states that Jose got in the drivers seat, Ariel got in the passenger
seat, Paul got in the drivers side rear passenger seat, John got in the
rear passengers side seat and Dragon got in the space behind the
rear seat. Ariel Gomez states that once he got the gun he told Jose
to go back to where the people had thrown the rocks at the car.
Ariel Gomez states the Jose drove down Diversy heading east

toward Cicero. Ariel Gomez states that Jose turned north on
Cicero. Ariel Gomez states that he climbed up on the car door
through the window. Ariel Gomez states that he sat in the open
window space with his feet on the passenger seat and his face
looking over the top of the Pathfinder. **Ariel Gomez states that
he took the gun and pointed over the top of the Pathfinder at
the group of people who had thrown rocks at the Pathfinder.
Ariel Gomez states that the group began to scatter when they
saw him with the gun. Ariel Gomez states that he fired the gun
once in the direction of the group**. Ariel Gomez states that no
one in the group on the street had any guns or weapons. Ariel
Gomez states that he fired the gun because the group had broken
the windows of his mom's Pathfinder. Ariel Gomez states that he
crawled back inside the truck and Jose turned the truck into the
parking lot of a strip mall on Cicero. Ariel Gomez states that Jose
cut across the parking lot back to Diversey. Ariel Gomez states
that they agreed to go to Dragons house to get Dragon's car
because as Jose drove out of the parking lot Jose hit one of the
people who had thrown the rocks at the Pathfinder. Ariel Gomez
states that that person got up after being hit by the Pathfinder and
ran after the car. Ariel Gomez states that they were all worried that
the guy who Jose hit had seen the license plate. Ariel Gomez
states that Jose called the Pathfinder "Hot" because Ariel had fired
the weapon from the truck and Jose had hit someone with it. Ariel
Gomez states that they all went to Dragon's house in the
Pathfinder. Ariel Gomez states that he, Jose, John, Paul and
Dragon discussed how to get rid of the Pathfinder. Ariel Gomez
states that he came up with the idea that they would wreck the
truck and tell his mother that it was stolen. Ariel Gomez got into
the truck with Jose driving. Ariel Gomez states that John, Paul and
Dragon followed them in Dragon's car. Ariel Gomez states that
they took the Pathfinder to 7125 W. Gunnison. Ariel Gomez states
that he tied a brick to the gas pedal and Jose tied the gear-shift in
drive and they aimed the Pathfinder at a wall. Ariel states that Jose
shifted the gears and the car screeched away with no one driving.
Ariel Gomez states that he and Jose ran to Dragon's car and heard
the Pathfinder smash against the wall. Ariel Gomez states that he
had removed the gun from the truck prior to wrecking it (the
truck).

Ariel Gomez states that Dragon drove them all to Ariel's
house. Ariel states that he then hid the gun on the shelf above the
T.V. Ariel states that he told his mom that they were at the movie
theater and that someone hit Paul Yalda in the back of the head and
took the Pathfinder. Ariel Gomez states that he was on his front
port 10 minutes later smoking cigarettes with Jose, John, Paul and
Dragon when the police arrived and placed them under arrest.

13

> Ariel Gomez states that he has been treated well by the
> Police and Assistant State's Attorney Healy. Ariel Gomez states
> that he was given soda to drink. Ariel Gomez states that he was
> offered a Big Mac and fries, but that he was not hungry so he did
> not eat them. Ariel Gomez states that he was allowed to use the
> bathroom any time he wanted to. Ariel Gomez states that he was
> allowed to sleep at Area 4. Ariel Gomez states that no threats or
> promises were made to him in exchange for this statement and that
> he is giving it freely. Ariel Gomez states that he is not under the
> influence of alcohol or drugs while making this statement....

(R. A172-183) (emphasis added)

At the close of the State's evidence, counsel for petitioner brought a motion for a directed finding. Counsel argued that the bullet recovered from the victim was not fired from the gun recovered from petitioner's home, so the People had not shown that petitioner was the shooter. (R. B5-9) Petitioner's motion was denied. (R. B10)

Petitioner proceeded by way of stipulation, putting into evidence that Carlos Rodriguez would testify that he was in the area working as a pizza deliverer and heard probably three shots. He saw the red Pathfinder with a broken window pull away from the scene. (R. B11)

Petitioner also introduced the testimony of Orlando Scarrett, by way of stipulation, who was walking in the vicinity of the crime when he heard several shots – possibly five – and threw himself to the ground. He saw the red wine colored vehicle with a smashed rear window. (R. B12)

Petitioner introduced the testimony of Orlando Scarrett's sister, Marisol Ramos, also by way of stipulation. Marisol and Orlando went to Cicero and Diversey to celebrate with friends after the Bulls won their game. When she heard the gunshots, she ran for cover. She saw a red vehicle in the lot, but did not see where the shots came from. (R. B12-13)

**Also testifying on behalf of petitioner by way of stipulation was Debbie Daniels and Maria Castro**. Debbie Daniels and Maria Castro had parked their vehicle in the lot on the

northwest corner of Cicero and Diversey. They heard four to five shots, ran back to their vehicle, and saw a red vehicle spin in the middle of Diversey and go through the gas station on the southwest corner of Diversey and Cicero. Neither women saw the driver or the shooter. (R. B13)

In closing argument, counsel for petitioner stressed that prosecution witness Sandra Rodriguez had observed petitioner shoot upward, rather than at the crowd. Counsel also argued that based on the height of the vehicle and where petitioner was positioned on the door the trajectory of any bullet he fired could not be the one that struck the victim. Counsel argued that the witnesses presented by petitioner, including Debbie Daniels and Maria Castro, testified that there were numerous gunshots – four or five, which would indicate that petitioner was not the only one who fired a weapon that night. Additionally, counsel argued again that the recovered bullet did not come from the gun recovered from petitioner's home. (R. B21-24)

The People argued in closing that the evidence showed that petitioner had fired more than one shot into the crowd. (R. B32) The People argued that just as petitioner was smart enough to get rid of the car used in the crime, it could be inferred that he was smart enough to also get rid of the murder weapon gun. (R. B32) The People argued that the protocol suggested that the victim was turned away from petitioner as the fatal shot was fired. The People argued that witness testimony, the physical evidence, and petitioner's own statement supported a finding of guilty. (R. B33-34)

The trial court noted that numerous witnesses testified to seeing petitioner's vehicle at the scene of the murder. (R. B34-35) The court noted that petitioner admitted that he was upset about the vehicle having its windows broken out, that he retrieved the gun from where it was hidden, and that they drove back to the scene so that petitioner could fire at the group of people.

(R. B35)  The court noted that petitioner said in his statement and that the other witnesses testified that there were no other guns on the scene or anyone else firing a weapon.  (R. B35-36) The court agreed that the bullet that was recovered from the victim's hand was not fired from the gun recovered from petitioner's home.  However, the court agreed that it was reasonable to infer that petitioner had disposed of the murder weapon.  The court noted that petitioner knew how to dispose of the vehicle and rejected petitioner's argument that he would not have also disposed of the murder weapon.  (R. B36)

Before sentencing, petitioner's trial counsel asked leave to withdraw his appearance, advising the court that an "irreconcilable conflict" had arisen when petitioner's mom told counsel that "she was going to have this attorney killed" and fired him when petitioner was found guilty.  (CL 42-44 at Par. 6-7)

**Petitioner hired new counsel, who presented a motion for a new trial to the court,** which was rejected.  (R. D4)  **Petitioner's mother testified** in his behalf during mitigation.  (R. D10)  This counsel also argued that there was nothing to show that the gun recovered from petitioner's home was the murder weapon.  (R. D13)


## PROCEDURAL HISTORY

Petitioner was found guilty of first degree murder on August 11, 1998 by the trial court. He was sentenced to serve 35 years in the Illinois Department of Corrections on November 9, 1998.

**DIRECT APPEAL**

Petitioner filed a direct appeal.  People v. Ariel Gomez, 1-98-4474 (September 7, 2000). On appeal, petitioner argued that (1) **the State failed to prove him guilty beyond a reasonable**

**doubt**; (2) the trial court improperly shifted the burden of proof to petitioner regarding his motion to suppress statement; (3) petitioner did not knowingly or voluntarily waive his right to testify; and (4) his right to the effective assistance of counsel was violated "if defense counsel advised him not to testify." The appellate court rejected all of petitioner's claims. With regard to the reasonable doubt issue, the court found that:

> The evidence established that defendant fired a gun in the direction of the group of people standing on the corner of Cicero and Diversey. **Defendant admitted in his handwritten statement that he shot the gun at the group who had earlier thrown rocks at the Pathfinder**. He also admitted that no one on the street had any guns or weapons. Witnesses at the scene corroborated the series of events which defendant related in his statement, and there was no evidence that anyone else fired a weapon except defendant. George Soria, who witnessed the incident from his car stopped at the intersection, testified that there were no other shots fired except those fired from the Pathfinder....The trial court properly resolved any conflicts or discrepancies in the testimony and properly rejected the portion of defendant's statement regarding his disposition of the gun.
> **Moreover, contrary to defendant's assertion that Rey Arroyo said defendant shot "into the air,"** Arroyo actually testified that defendant's hand was raised over his head as he shot over the Pathfinder, and the gun was pointed "at the crowd." There was no discrepancy among the eyewitnesses that the front passenger (admittedly defendant) in the Pathfinder fired "at the crowd."

People v. Ariel Gomez, 1-98-4474 at Pages 5-6 (emphasis added). In rejecting petitioner's claim that the trial court had improperly shifted the burden regarding his motion to suppress statements, the appellate court took note of not only the fact that the trial court had found the detective and the Assistant State's Attorney to be credible, but also of the fact that the trial court had found that "there were no allegations of excessive force." Id. at 9.

With regard to petitioner's claim that counsel was ineffective for advising him not to testify, the appellate court noted that petitioner would not be able to satisfy either prong of the

Strickland test for determining ineffectiveness in that defendant had not shown that it would have

been unreasonable for counsel to advise petitioner not to testify.


## FEDERAL HABEAS CORPUS

Petitioner filed a federal writ of heabeas corpus pursuant to 28 U.S.C.S. Sec. 2254.

United States of America ex rel. Ariel Gomez v. James M. Schomig, 203 F. Supp. 2d 925 (May,

2002) and United States of America ex rel. Ariel Gomez v. Mark A. Pierson, 232 F. Supp.2d 888

(November, 2002). Petitioner asked for a new trial with a claim of actual innocence and

ineffective assistance of counsel. Petitioner claimed that he did not knowingly and voluntarily

waive his right to testify at trial and that counsel was ineffective in failing to advise him of that

right. Petitioner in the case before the bar *only references the first court ruling* with regard to

this habeas action: in Gomez v. Schomig, 203 F.Supp.2d 925, the court did acknowledge that it

would be an injustice if he were to sit in prison "**if**" he were innocent, but the court did **not** make

a finding that petitioner **was** innocent. Id. at 927. **Instead, the court found that before it could**

**look at petitioner's claim of actual innocence, it needed to review the complete state record.**

Accordingly, the court ordered that the record be produced and **the parties file additional briefs**

supporting their positions. Id. at 930.

Petitioner fails to cite to the follow-up opinion and order, in which the court found

his actual innocence claim and ineffective assistance claim to be "unavailing." Gomez v.

Pierson, 232 F.Supp.2d 888. The federal court acknowledged that co-defendant Dominguez's

murder conviction based on accountability had been reduced to an aggravated discharge of a

firearm by the state appellate court on direct appeal, but acknowledged that the evidence

introduced into the trials of petitioner and co-defendant Dominguez was not identical[4] and, in

any event, there was no right to consistent verdicts. Id. at 890-891. The court went on to reject

petitioner's ineffective assistance of counsel claim, reasoning:

> [Mr. Gomez] *admits to firing a gun in the direction of the victim.*
> He admits to crashing his mother's vehicle in an attempt to keep
> the police off his trail. Numerous witnesses, including Mr.
> Gomez's co-defendant's observed him firing toward the victim.
> Mr. Gomez himself stated that no one in the vicinity other than
> himself had a gun....**it is plausible that Mr. Gomez used a**
> **different gun to commit the murder....A reasonable juror could**
> **conclude that Mr. Gomez was lying on the stand, that he**
> **disposed of the murder weapon before his arrest, and that he**
> **was guilty of murder.**" (emphasis added)

Id. at 891.


# APPEAL TO 7TH CIRCUIT COURT OF APPEALS

**Petitioner fails to advise this Honorable Court** that he appealed the above rejection of

his habeas petition. **Petitioner fails to advise this Honorable Court** *that the appeals court*

*affirmed the dismissal of the habeas action.* Ariel Gomez v. Danny Jaimet, 350 F.3d 673 (2003).

The federal Court of Appeals began its review of the lower court decision by specifically noting

that "the district court found that Gomez failed to remove the procedural bar to his claim by

proving that he was actually innocent of the crime." Id. at 677.

---

[4] For example, each of the defendants' statements were entered into their own cases in their entirety, but not into each other's cases. So, in co-defendant Dominguez case, the evidence entered in his case was different from petitioner's case in that his statement indicated that after the group at Cicero and Diversey flashed gang signs and threw rocks at the Pathfinder, the Pathfinder had driven away, but then petitioner "told everyone to get inside the car and said '[l]et's get 'em,' referring to the people on the corner who had thrown rocks at the Pathfinder." ... "As the Pathfinder approached the intersection of Cicero and Diversey Gomez told [co-defendant Dominguez] to 'get closer so I could shoot at 'em and so I could get a better aim.' [Co-defendant Dominguez] pulled the Pathfinder into the parking lot of a fruit store, as Gomez stuck half his body out of the window and pointed the gun at the group of people on the corner. The group began to scatter. According to [co-defendant Dominguez], no one in the group had a gun." People v. Jose Dominguez, 1-98-4519 at Pages 2-3.

The Court of Appeals agreed that "the constitution does not require that verdicts against an accomplice and his principal be consistent." Id at 679. **The Court of Appeals found that petitioner's actual innocence claim that was based on statements by his co-defendants and his own statement "fails to satisfy this stringent standard" required to set forth an actionable actual innocence claim**. Id. at 680. <u>**This court also agreed that it would "be reasonable for the trier of fact to conclude that Gomez covertly disposed of the gun used in the shooting without alerting his friends. Indeed, it is entirely possible that Gomez owned more than one chrome gun and that he led police to the one that he left at home on the night of the shooting."**</u> Id. (emphasis added)

## FIRST POST CONVICTION PETITION

Petitioner in the instant case filed a post-conviction petition with the assistance of prominent post-conviction counsel on or about May 17, 2004. Petitioner again tried to claim that since co-defendant Dominguez' conviction was reduced on direct appeal and based on language contained in the federal courts, as well as a "newly discovered" witness that would show he was actually innocent, his conviction should be vacated. The trial court dismissed the petition at the first stage of post-conviction proceedings and petitioner appealed. The appellate court upheld the summary dismissal of petitioner's post-conviction petition. People v. Ariel Gomez, 1-04-2701 (August 24, 2005).

## 1ST POST CONVICTION APPEAL

In his appeal, petitioner contended "that the trial court erred in dismissing his petition because he stated valid claims (1) that fundamental fairness requires reversal of his conviction

because a codefendant's conviction on the same evidence was reversed on direct appeal on the basis of insufficiency of the evidence, (2) that there was insufficient evidence to convict defendant beyond a reasonable doubt, on the same analysis as codefendant's direct appeal, (3) of ineffective assistance of counsel for failing to raise post-conviction claims based on the reversal of the codefendant's conviction, and (4) of actual innocence based on newly-discovered evidence; namely, an exculpatory affidavit by another codefendant." People v. Gomez, 1-04-2701 at Pages 1-2. In his affidavit, codefendant Jovanovic averred that petitioner only fired one shot, and that it was from the gun that police recovered in petitioner's home. Id. at Pages 6-7.

The appellate court expressly rejected the contentions, finding that: "Here, this court squarely considered the sufficiency of the evidence against defendant on direct appeal, and defendant was not a party to Dominguez's direct appeal. Therefore, the trial court did not err in summarily dismissing defendant's petition regarding the claim that defendant's conviction was inconsistent with the reversal of Dominguez's conviction on direct appeal." People v. Gomez, 1-04-2701 at Page 11. The court also found that **petitioner had failed to "produce newly-discovered evidence of his actual innocence,"** so the trial court had not erred in summarily dismissing that claim. Id. at Pages 12-13 (emphasis added). The court noted that codefendant Jovanovic's affidavit was "at least a partial recantation of his earlier statement," since he had **previously said that petitioner fired more than one shot** at the time of the crime, and then noted that recantations are "considered 'inherently unreliable'." Id. at 12. Since petitioner failed to satisfy the stringent requirements necessary to bring a cognizable actual innocence claim, the summary dismissal was upheld. Id. at Pages 12-13.

Although petitioner's claims of actual innocence have previously been rejected by the federal court and by the state court, petitioner has brought the instant successive post-conviction action with the same claim but asking this court to find a different result. Gomez' attempts to discredit the wealth of evidence of his guilt include:

- Reasonable doubt claim rejected on direct appeal;
- Federal habeas corpus actual innocence claim was rejected;
- 7th Circuit Court f Appeals also rejected innocence claim;
- Circuit Court rejected actual innocence claim in post conviction petition;
- Illinois Appellate Court rejected innocence claim on appeal.

Gomez offers this Honorable Court nothing new and nothing conclusive. Instead he

misrepresents the extensive procedural history and offers cumulative trial evidence.


### ARGUMENT

The Illinois Post-Conviction Hearing Act provides a defendant with a means to challenge

his conviction or sentence for violations of federal or state rights. 725 ILCS 5/122-1 et seq.;

People v. Towns, 182 Ill.2d 491, 502, 696 N.E.2d 1128 (1998). A post-conviction action is a

collateral proceeding and not an appeal from the underlying judgment. Id. at 502. The Act is

limited to allowing inquiry into constitutional issues that were not, and could not have been,

determined on direct appeal. People v. Griffin, 178 Ill.2d 65, 72-73, 687 N.E.2d 820 (1997).

The Act establishes a three-stage process for adjudicating a post-conviction action.

People v. Edwards, 197 Ill.2d 239, 244, 757 N.E.2d 442 (2001). At the first stage, the Act does

not permit any motions or responsive pleadings from the People. People v. Little, 335 Ill.App.3d

1046, 1050, 782 N.E.2d 957 (2003). Instead, the trial court determines whether the petition

alleges the "gist" of a constitutional claim, which is a very low standard. People v. Gaultney,

174 Ill.2d at 418. At the second stage of post-conviction proceedings, counsel is appointed on

behalf of indigent petitioners to review, and, if necessary, amend the petition. It is at the second

stage that the People have their first opportunity to respond to the petition, either by filing a
motion to dismiss or an answer.

It is well-established that a post-conviction petitioner is not entitled to a third stage
evidentiary hearing as a matter of right. Towns, 182 Ill.2d at 503. Rather, the petitioner has the
burden of establishing that he was deprived of a substantial constitutional right; where a
petitioner fails to make the requisite showing, he is not entitled to an evidentiary hearing on his
claim. People v. Sprietzer, 143 Ill.2d 210, 218, 572 N.E.2d 931 (1991). The Act requires that
the petition for post-conviction relief must "clearly set forth the respects in which petitioner's
constitutional rights were violated." 725 ILCS 5/122-2. Nonfactual and nonspecific assertions
amounting to mere conclusions are insufficient to require a hearing under the Act. People v.
Coleman, 183 Ill.2d 366, 381, 701 N.E.2d 1063. The Illinois Supreme Court has consistently
reaffirmed the long-standing rule that such a hearing should be held "only if [the petitioner] has
made a substantial showing, based on the record and supporting affidavits, that his constitutional
rights were violated." People v. Pecoraro, 175 Ill.2d 294, 304, 677 N.E.2d 875 (1997).
Furthermore, each allegation must stand uncontradicted and clearly be supported by either the
trial record or accompanying affidavits. People v. Coleman, 183 Ill.2d 366, 380-381, 701 N.E.2d
1063. Dismissals of post-conviction petitions have consistently been upheld when the trial court
record contradicts the allegations in the petition. Id.

## PROCEDURAL BARS

### The Petition Must Be Dismissed Because It Was Untimely Filed

The Illinois Post-Conviction hearing Act contains a statute of limitations that requires all
claims to be filed in a timely manner. The controlling statute is the one in effect at the time the

23

petition is filed.  <u>People v. Bates</u>, 124 Ill.2d 81, 529 N.E.2d 227 (1998).  The instant petition was filed on December 12, 2014.  The statute in effect at that time read, in pertinent part, that when a petitioner files a direct appeal:

> ...no proceedings under this Article shall be commenced more than 6 months after the conclusion of proceedings in the United States Supreme Court, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence. If a petition for certiorari is not filed, no proceedings under this Article shall be commenced more than 6 months from the date for filing a certiorari petition, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence.  725 ILCS 5/122-1(c).

In the instant case, petitioner's PLA was denied on January 29, 2001.  Petitioner does not claim to have filed a petition for certiorari in the United States Supreme Court.  Petitioner did not file the instant post-conviction action until December 12, 2014.  Accordingly, petitioner filed his petition approximately **13 years after the expiration of the statute of limitations.**  In the language provided by the Illinois Supreme Court in <u>People v. Rissley</u>, 206 Ill.2d 403, 414, 795 N.E.2d 174 (2003), because petitioner filed his petition beyond the statute of limitations, his "right to file a postconviction action [had] expired."

Petitioner has also failed to establish, as is his burden, a lack of culpable negligence for the late filing.  As the court explained in <u>People v. Gunartt</u>, 327 Ill.App.3d 550, 552, 763 N.E.2d 862 (2002):

> Lack of culpable negligence is very difficult to establish. A defendant bears a heavy burden to affirmatively show why the exception to the statute of limitations applies to his case. He cannot merely make vague or conclusory assertions, but must 'show clearly through factual allegations that he previously made diligent attempts to uncover matters he now purports entitle him to judicial relief or otherwise demonstrate in significant detail how he could not have obtained such information before the limitations period expired. (citations omitted)

In <u>Gunartt</u>, the court found it significant that the defendant did "not explain why he could not have brought this petition earlier than two years beyond the statute of limitations." <u>Id</u>. at 552-553. Significantly, the court ultimately found that because the post-conviction petition did not comply with the statute of limitations, "the trial court should have dismissed the petition and should not have heard arguments on its merits." <u>Id</u>. at 553. Petitioner fails to establish a lack of culpable negligence as the claims in the petition, and the support attached, were all available years ago. The petition should be dismissed as it is barred by the statute of limitations.

Petitioner does not refute that his petition was filed after the expiration of the statute of limitations. Instead, petitioner tries to take cover behind the exception to the statute of limitations that is granted to actual innocence claims. Because, as will be detailed in a following section, petitioner has failed to set forth a cognizable claim of actual innocence, the statute of limitations applies in this case and the petition should be dismissed.

### Section 122-3 of the Act Bars Claims That Could Have Been Raised In the First Petition.

The Illinois Post-Conviction Hearing Act contemplates the filing of only one post-conviction action, and a ruling on that initial petition has a *res judicata* effect with respect to all claims that were raised, and claims that were not raised are deemed waived. <u>People v. Jones</u>, 191 Ill.2d 194, 198, 730 N.E.2d 26 (2000). The Act itself mandates that:

> **Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived under 725 ILCS 5/122-3.**

Since the case at bar is a successive post-conviction petition, the issues are subject to the above-quoted statutory provision. *Every single issue* raised herein either could have been raised or were actually raised in petitioner's prior petition, so his claims are all barred and the petition

should be dismissed. Petitioner fails to set forth any reason as to why his claims should not be barred.

If Gomez' confession was actually coerced, he would have been aware of this for many years. Gomez has clearly waived this claim numerous times. See, *People v. Harris*, 206 Ill.2d at 301-302 (2002) (petitioner could not contend alibi evidence was "newly discovered" where petitioner obviously knew his own whereabouts at the time of murder). This Court may properly dismiss the innocence claim where if true, Gomez has possessed this information since 1997 and could have raised many times.

### Petitioner Fails To Apply the Cause and Prejudice Test to Claims II, III and IV, the "Non-Innocence" Claims.

As developed in Illinois case law (see, People v. Pitsonbarger, 205 Ill.2d 444, 793 N.E.2d 609) and then codified in 725 ILCS 122-1(f), a claim may be brought in a successive petition if the petitioner can satisfy the "cause-and-prejudice" test. Furthermore, it is incumbent upon the petitioner to "establish cause and prejudice **as to each individual claim** asserted in a successive petition". Pitsonbarger, 205 Ill.2d at 463. "Cause" refers to some objective factor external to the defense that impeded his ability to raise the claim in an earlier proceeding. People v. Davis, 2014 IL 115595 at Par. 14; Pitsonbarger, 205 Ill.2d at 464; 725 ILCS 5/122-1(f). "Prejudice" refers to a claimed constitutional error that so infected the entire trial that the resulting conviction or sentence violates due process. Davis, 2014 IL 115595 at Par. 14; Pitsonbarger, 205 Ill.2d at 464; 725 ILCS 5/122-1(f). It is incumbent upon petitioner to establish both cause and prejudice in order to prevail. Pitsonbarger, 205 Ill.2d at 463; 725 ILCS 5/122-1(f).

Petitioner has not even attempted to address the cause-and-prejudice test in order to escape application of statutory waiver. In fact, petitioner concedes that he "respectfully omits

from the instant successive petition for post-conviction relief any showing of 'cause and prejudice' as usually required by section 122-1(f) of the Post-Conviction Hearing Act". Successive Petition For Post Conviction Relief at Page 5. Retained counsel fails to remedy petitioner's intentional omission, which is fatal to the all the "non-innocence" claims in the petition.

Gomez most likely believes that attaching the phrase "newly discovered" will excuse him from the statute's requirements but this is not true for non-innocence claims. Petitioner does not attempt to show "cause" because everything alleged here clearly could have brought in previous proceedings. For example, petitioner concedes that Ruth Antonetty was listed in police reports. She was also listed as a potential witness for the prosecution's case in the People's Answer. There is absolutely nothing to demonstrate that she could not have provided her information earlier. Two of the "new" witnesses, Maria Castro and Debbie Daniels, actually provided stipulate testimony **for the defense <u>at trial</u>**. Also, documents describing the ammo clip were in the defense attorney's trial file and were tendered well before trial.

It is entirely absurd for petitioner to contend that his mother is just now able to provide "new" evidence that she and his deceased brother saw petitioner at the police station with a bloody face. **Petitioner never made such a claim in his Motion to Suppress Statements,** or in his Motion for a New Trial (in which he was represented by different counsel), or in his prior post-conviction petition, in any of his federal cases, or even in **his pro se successive post-conviction petition that was filed in 2013 and amended recently to include these claims.**

Gomez' mother's "new" evidence only came to light when current counsel amended the 2013 pro se petition which failed to include Gomez' mother's claim. The idea that Gomez and his mom *did not know* that he was beaten bloody *until current post-conviction counsel* began

27

representing him is truly an absurdity. See, Harris, 206 Ill.2d 300-302; People v. Orange, 195

Ill.2d 437, 452, 749 N.E.2d 932 (2001) (finding that "the affidavits of the defendant's friends and

family contain matters that could have been discovered prior to the defendant's trial through the

exercise of due diligence.")

Similarly, the ballistics expert's report cannot be construed as newly discovered.

Petitioner claims that he discovered "new" evidence that an ammo clip was recovered in this

case. However, he discovered this "new" to him evidence by looking through his trial attorney's

file. That evidence **always existed**. In fact, it is listed as an inventoried item in Exhibit "C" to

the pro se successive petition.

This is simply not new evidence. Petitioner completely fails to show why he was unable

to discover this allegedly new evidence earlier. See, People v. Patterson, 192 Ill.2d 93, 140, 735

N.E.2d 616 (2000) (finding that the report of the expert was based upon evidence available prior

to trial that defendant presented in his post-conviction petition was "clearly an examination that,

in the exercise of due diligence, could have been completed before defendant's trial.")

In rejecting a petitioner's claim of a newly found witness brought in a successive

petition, the Illinois Supreme Court in People v. Davis, 2014 IL 115595, Par. 55-56, 6 N.E.3d

709 (2014) stated:

> Before this court, defendant argues that juvenile court counsel's
> deficient representation was not discovered until his current
> postconviction counsel spoke with [the witness] in December
> 2010. We reject this argument. **Defendant fails to explain why
> he was unable to discover this allegedly *new* evidence earlier,
> or raise this or a similar claim in *any* of his earlier
> postconviction proceedings. A defendant is not permitted to
> develop the evidentiary basis for a claim in a piecemeal fashion
> in successive postconviction petitions, as defendant has
> attempted to do here**.

> We hold that defendant has failed to establish "cause" for failing to
> raise this claim earlier. [The witness's] affidavit testimony is not
> of such character that it could not have been discovered earlier by
> the exercise of due diligence. As both prongs of the cause and
> prejudice test must be satisfied, defendant's claim is barred.
> (citations omitted) (emphasis added)

In addition, the appellate court has already held that Jovanovic's affidavit was not newly-discovered evidence. People v. Ariel Gomez, 1-04-2701 at Pages 12-13. Res judicata, collateral estoppel and "law of the case" doctrines apply to post conviction matters and Gomez is not entitled to a hearing where he simply reiterates former claims with new titles. People v. Tenner, 206 Ill. 2d 381, 396-397 (2002).

In sum, there are several procedural bars that block the consideration of the successive claims. The claims are untimely and partially barred by res judicata. Matters previously omitted are waived under section 122-3. Gomez totally fails to apply the mandatory criteria for non-innocence claims in 122-1.1 (f)'s cause and prejudice test. Therefore, this Court can properly dismiss the petition on procedural bars alone.

## I. PETITIONER FAILS TO ESTABLISH A COGNIZABLE FREE STANDING, NEWLY DISCOVERED EVIDENCE OF ACTUAL INNOCENCE CLAIM WHERE THE ALLEGATIONS MADE HERE HAVE BEEN AVAILABLE SINCE 1997 .

In reviewing a successive petition with an actual innocence claim, the Illinois Supreme Court observed, "[w]e deem it appropriate to note here that the United States Supreme Court has emphasized that such claims must be supported 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.' " People v. Edwards, 2012 IL 111711, ¶ 32 (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)). " 'Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely

successful.' " *Id.* (quoting Schlup, 513 U.S. at 324). A claim of actual innocence is *not a challenge to whether the defendant was proved guilty beyond a reasonable doubt*, but rather an assertion of *total vindication or exoneration*. Barnslater, 373 Ill. App. 3d at 520.

To warrant a third stage hearing, the supporting evidence must be new such that it could not have been discovered by exercising due diligence, material and not merely cumulative, and so conclusive that it would probably change the result on retrial. People v. Hickey, 204 Ill.2d 585, 601-602, 92 N.E.2d 232 (201). All elements must be met for the claim to survive the second stage and claims of newly-discovered exonerating evidence should be "subjected to the closest scrutiny." People v. Williams, 295 Ill.App.3d 456, 462, 692 N.E.2d 723 (1998).

Petitioner claims that a witness who is listed in the original police reports, Ruth Antonetty, and ballistics expert's report estimating the trajectory of petitioner's line of gunfire establish an actual innocence claim worthy of further proceedings. Gomez is incorrect, his contentions fail on all three *Washington* elements.

### A. The Evidence Offered is Not "New" But Was Readily Available At Trial.

Petitioner fails, as a matter of law, to show that the evidence supporting his actual innocence claim is "newly discovered", that it is not cumulative, and that it is conclusive. A court should grant relief only where the petitioner presents supporting evidence that is new, material, noncumulative, and, critically, of a character so conclusive that it would probably change the result on retrial. People v. Coleman, 2013 IL 113307, ¶ 84.

Newly discovered evidence must consist of evidence that was not available at defendant's trial and that the defendant could not have discovered sooner through due diligence. People v. Barrow, 195 Ill.2d at 541. "Generally, evidence is not 'newly discovered' when it

presents facts already known to the defendant at or prior to trial, though the source of those facts may have been unknown, unavailable, or uncooperative." People v. Barnslater, 373 Ill.App.3d 512, 523-24, 869 N.E.2d 293 (2007). Neither Ms. Antonetty nor the ballistics expert can meet the definition of newly discovered evidence as both witnesses have been available since well *before* trial and their testimony could have been procured by diligence.

### 1. Ruth Antonetty

Petitioner concedes that he has known about Ruth Antonetty since before trial. See, Petitioner Ariel Gomez's Amended Successive Post-Conviction Petition at Paragraph 35. The People listed her in their Answer to Discovery as a possible prosecution witness. (C.L. at 21) Ms. Antonetty is listed in the first "beat" report filed by patrol police on the scene. (See. Defense Exh. 1) This is not petitioner's first post-conviction claim of actual innocence. The instant affidavit of Antonetty was inexplicably and inexcusably not obtained in a timely fashion[5].

In the exercise of even a modicum of diligence, the affidavit could have been available before trial, or at the time of the first post-conviction action. Again, the law clearly states that: "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." People v. Coleman, 2013 IL 113307, P. 96, 996 N.E.2d 617 (2013). Where petitioner has utterly failed to satisfy the requirement of showing that Ruth Antonetty constitutes newly discovered evidence, the claim must be dismissed.

In *People v. Harris*, 206 Ill.2d 293, 300-301 (2002), a death row inmate alleged he had several claims of actual innocence: " based upon the affidavits of (two) codefendants***who state that defendant was not present at the time of the crime and that they conspired to frame defendant. Defendant also bases his claim upon the affidavits of his brothers,*** who state that

---

[5] Although petitioner makes the entirely conclusory statement in his petition that this is "the first time" Ms. Antonetty has "been willing to admit that she knows who the real shooter is", there is absolutely nothing in her affidavit to support that statement. There is certainly nothing in the affidavit showing that she was unwilling to

defendant was at home with them in defendant's basement  apartment watching a movie at the time of the shooting."   The Harris Court held:

> We affirm the circuit court's dismissal of defendant's claim of actual innocence without an evidentiary hearing. First, the affidavits of defendant's brothers, Darrell and Rashid, *do not contain "newly discovered" evidence. This evidence could have been discovered before trial with the exercise of due diligence.* Despite defendant's contention that the evidence is newly discovered *because the alibi affidavits are dated after the time of trial, the mere fact that these affidavits are dated after the time of trial does not render the evidence newly discovered. Clearly, the fact that defendant was allegedly with his brothers on the night of the crime could have been discovered sooner. More importantly, defendant is the source of this information and was armed with this information at the time of trial.* Harris, 206 Ill.2d at 301.

Clearly, Antonetty could have been discovered earlier with due diligence. Furthermore, her testimony would merely be cumulative of her friend's Castro and Daniels, whose testimony was admitted at trial.  Most importantly, Antonetty's affidavit is not conclusive evidence. Gomez' conviction and the evidence used to convict has been reviewed repeatedly. The evidence at trial was overwhelming, Gomez was seen several times by a number of people and he and three of his codefendants all gave full confessions admitting that Gomez shot into the crowd of people.

Witnesses at the scene varied in stating how many gunshots they heard. This is nothing new.  Antonetty's affidavit is simply not exonerating when compared with the extensive evidence of guilt, the eyewitnesses, the confession, and the physical and circumstantial evidence. An affidavit from a single witness standing off to the side with a limited ability to view is not conclusive, exonerating evidence. At best, Antonetty's affidavit (which still fails to meet the due diligence rule) is cumulative of other defense witnesses. People v. Barnslater, 373 Ill. App. 3d at 520.

## 2. Ballistics Expert

For the very same reasons, petitioner's reliance on the ballistics report as new innocence evidence is unavailing. Petitioner could always have retained a ballistic expert. cannot in any way be considered newly discovered within the meaning of the law. Petitioner does not, and cannot show why this information could not have been submitted at trial, or in his first post-conviction petition.

The ballistics expert's examination of the crime scene, almost two decades after the shooting cannot produce reliable results. Nor can such an expert rule out the fact that the fatal bullet came from Gomez' moving car. The area is a densely populated urban neighborhood, a mixture of residences and small businesses. The witnesses acknowledge that several street gangs were on the corners and inhabit the neighborhood. The report simply is not conclusive (or unavailable at trial) and it would not change the trial's result.

The ammo clip was included in police reports tendered as a part of pretrial discovery, and reports detailing its recovery were clearly in defense counsel's possession. In fact, petitioner concedes he learned of this "new" evidence by looking through his defense counsel's file. Therefore, the clip is not newly discovered evidence.

Nor does the clip's existence constitute *conclusive* evidence as there is nothing to tie the clip to this particular murder case. No one testified about the clip . No one discussed the clip with police. Where the clip was found in a densely populated urban area that was home to several street gangs there is simply no way to determine if the clip is associated with this shooting or murder. Therefore it is neither new or conclusive and fails to support actual innocence.

As a matter of law, petitioner has not established that the trajectory and ballistics report fits within the definition of "newly discovered evidence" sufficient to support an actual innocence

claim.   In <u>People v. Patterson</u>, 192 Ill.2d 93, 140, 735 N.E.2d 616 (2000), the defendant contended that he had a newly discovered expert in the field of the psychology of torture victims. The Illinois Supreme Court rejected the expert's proposed testimony as "newy discovered" explaining that the observations that the expert relied upon *had been available from the time of Patterson's arrest* and testimony could have been provided at trial:

> With respect to the report of defendant's expert on the psychological effects of torture, this is clearly an examination that, in the exercise of due diligence, could have been completed before defendant's trial. Significantly, **the expert's conclusions do not rest on any evidence that was not available before defendant's trial**. Consequently, we are unable to conclude that the expert's opinion constitutes new evidence. (Emphasis added) 192 Ill.2d. at 140.

Here, a ballistics expert could have been procured to testify at trial.  The information a ballistics expert would rely upon from the various witnesses is not new and (as <u>Patterson</u> noted) "in the exercise of due diligence could have been completed before defendant's trial". 192 Ill.2d at 140. Although the actual innocence claim should be dismissed because petitioner fails to establish that his supporting evidence is not newly discovered, it should also be dismissed because he fails to establish that the evidence is so conclusive that it was probable that petitioner would have been acquitted had the evidence been presented at trial, or would be acquitted in the event of a retrial. <u>People v. Orange</u>, 195 Ill.2d 437, 455, 749 N.E.2d 932 (2001).

To recap, Ruth Antonetty's averments are contradicted by numerous witnesses who testified at trial and by petitioner's own statement, as well as the codefendants' confessions stating that Gomez fired into the crowd. **George Soria**, a detective for the Department of Defense testified that petitioner fired in the direction of the crowd of people – not up into the air. He also testified that, other than the shots fired from petitioner's vehicle, no other shots were fired. **Sandra Rodrigue**z testified that she also observed petitioner fire at the crowd – not up into the air. **Rey Arroyo** also testified that he observed petitioner point the gun at the crowd

before the shots were fired. Arroyo also testified that the only shots fired were from petitioner's car. **Petitioner himself** acknowledged in his statement that after retrieving his gun and directing his co-defendant to drive back to the location of the crowd, he fired the gun in direction of the group.

Also operating against petitioner's claim that he is "actually innocent" is the statement of witness **Sandra Rodriguez**, who stated that although she could not identify the shooter because his back was to her, she witnessed the red Pathfinder "driving northbound on Cicero at Diversey in the southbound lane and a male Hispanic is sitting out of the window on the passenger side with his arms extended over the hood of the vehicle firing shots at the crowd". Successive Petition For Post Conviction Relief, Exhibit "C" at page 8. Also contrary to any actual innocence claim is the statement of witness **Anthony Quinones**, who observed the red Pathfinder "and a male white Hispanic in his 20's sitting out of the front passenger side window. He noticed the same person holding a chrome plated automatic pistol with his hands extended over the roof of the vehicle shooting into the crowd." Successive Petition For Post Conviction Relief, Exhibit "C" at pages 8-9. Also troublesome for petitioner's actual innocence claim is the statement **of David Rodriguez**, who observed a male Hispanic aged 18-20 seated on the door of a red Pathfinder who was "shooting across the vehicle's roof at the people in the Payless shoe store parking lot", and that as the vehicle turned into a lot, the same person "continued to shoot at the people in the parking lot." Successive Petition For Post Conviction Relief, Exhibit "C" at page 9. Yet another witness to the shooting, **Rey Arroyo**, provided a statement that although he could not identify the shooter, it was someone from the red vehicle who was "shooting into the crowd that was standing at the northwest corner of Cicero and Diversey", and that as the vehicle

entered the lot it "continued shooting." Successive Petition For Post Conviction Relief, Exhibit "C" at page 10.

Statements made by petitioner's co-defendants also operate against any actual innocence claim. Co-defendant **John Yacoub** stated that after petitioner retrieved his gun from under the hood of the car and told Jose Dominguez to drive back to the area where bricks had been thrown at them, petitioner "leaned out the window and shot at the people standing there." Successive Petition For Post Conviction Relief, Exhibit "C" at page 11. Co-defendant **Paul Yalda** stated that after retrieving the gun and telling Dominguez to drive back to where the bricks had been thrown, petitioner "leaned out the window and fired twice." Petitioner "fired into the crowd of people who had thrown rocks at the car." Successive Petition For Post Conviction Relief, Exhibit "C" at page 12. Co-defendant **Dragon Jovanovic** stated that after petitioner retrieved the gun from the hood, he told Dominguez to drive back to Cicero and Diversey and that he was going to "fuck them up." Successive Petition For Post Conviction Relief, Exhibit "C" at page 13. As the appellate court has previously pointed out with regard to co-defendant Jovanovic: "he averred that defendant fired two shots". People v. Ariel Gomez, 1-04-2701 at Page 12.

The affidavit provided by Ruth Antonetty, **which differs from the one she provided on October 5, 2012** (not provided to the court by counsel in the amended successive petition, but which is part of the record as Exhibit "J" of the *pro se* successive petition), is not newly discovered and is not of such a conclusive nature that it would likely change the result on retrial. In other words, the substance of the Antonetty affidavit given more than 17 years after the murder, with absolutely no reason given for not coming forward earlier, and no recantation from the witnesses who did come forward and testify that petitioner shot into the crowd, fails to set

forth a substantial showing that this evidence is of such a conclusive character that it would probably lead to a different result.

When the evidence is reviewed in its totality, it is clear that petitioner has failed to set forth a cognizable actual innocence claim as defined by law, and the claim should be dismissed.

### II. THE BRADY CLAIM IS STATUTORILY BARRED AND NONE OF THE ALLEGED "BRADY" EVIDENCE IS "MATERIAL"AS BRADY REQUIRES. PETITIONER TOTALLY FAILS TO SET FORTH A COGNIZABLE BRADY CLAIM WHERE ABSOLUTELY NO MISCONDUCT WAS ALLEGED BEFORE, DURING, OR AFTER TRIAL AND THE PATTERN EVIDENCE IS NEW TO BOTH SIDES; WHERE THE FEMALE WITNESSES AFFIDAVITS ARE NOT MATERIAL AND DID NOT EXIST AT TRIAL (2 OF THE 3 WOMEN TESTIFIED FOR THE DEFENSE); AND WHERE REPORTS ABOUT THE CLIP WERE PRODUCED BEFORE TRIAL AND THE CLIP IS NOT KNOWN TO BE LINKED TO THE CRIME.

This claim must also be dismissed as it could have been raised in the prior petition was not. This claim is satisfy the cause and prejudice test. Satisfying the test is a condition precedent expressly required by the Act and ignoring should result in dismissal.

Substantively the evidence complained of either did not exist, is not material, or is newly discovered for both sides. The People have a duty to disclose evidence to the defense that is both favorable to the accused and material as to either guilty or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194; People v. Hobley, 182 Ill.2d 404, 696 N.E.2d 313 (1998); People v. Mahaffey, 194 Ill.2d 154, 742 N.E.2d 251 (2000). In order to establish a Brady violation, the petitioner must show that the evidence was (1) suppressed by the prosecution; (2) that it was favorable to the petitioner; (3) that a specific request for it had been made; and (4) that the evidence is *material* to guilt or to punishment. Brady v. Maryland, 373 U.S. 83. "Materiality is a strict requirement and means that evidence withheld could affect the outcome of the trial." Id.

### a. Gomez Has Waived This Issue and Fails to Address or Satisfy the Mandatory Cause And Prejudice Test

As set out above, The People reiterate that the statute bars consideration of this issue.

Gomez has first waived this issue by failing to raise it in his prior post conviction petition. 725

ILCS 5/122-3; People v. Gillespie, 407 Ill.App.3d (2010). Gomez also has not and cannot satisfy

the cause and prejudice test for the *Brady* claim as required by the governing statute. 725 ILCS

5/122-1.1(f). Satisfying this test is a *mandatory* condition for review pursuant to two sections of

the statute. People v. Jones, 3 N.E.3d 891(December 31, 2013).

Second stage dismissals are required if successive "non-innocence" claims do not meet

the cause and prejudice test. People v. Jones, 3 N.E.3d 891(December 31, 2013). In Jones, the

court upheld the second stage dismissal for the failure of the petitioner to set out cause and

prejudice **for each individual claim.** It is in the plain language of the statute and supported by

precedent that this test applies to *individual successive claims* and not petitions. Section 122-1

(f)(West 2011) , See, Pittsonbarger, Id. Here, Gomez fails to even address the statute's express

requirements, therefore dismissal is required.

### b.Where There is No Evidence of Misconduct in the Record, There is No Basis To Admit Collateral Evidence. Therefore, There is No Duty for the People to Tender Collateral Evidence on a *Non-Existent* Issue.

Where Gomez failed to allege mistreatment through motions, trial, and many subsequent

filings, he has failed to provide any basis to admit collateral misconduct evidence to impeach a

detective who was never accused of wrongdoing. "The correct analysis, when determining

whether knowledge of the pattern and practice of police torture and coercion would have

significantly altered the outcome of [defendant's] trial, should be confined to *what was known to*

*the parties at the time of the trial*." People v. Gillespie, 407 Ill.App.3d. 113, 129 (2010). (Trial

court's second stage dismissal upheld where defendant raised pattern and practice evidence in

successive petition and claimed in was Brady evidence.)

Here, Gomez has waived his misconduct claim many times over and Gomez fails to make any independent showing of the veracity of his recently alleged misconduct claim. There is no evidence of outcry, no evidence of injury, and no complaint was made to OPS , IAD, or anyone else. With no evidence of any complaint, Gomez has failed to show that the pattern evidence is admissible as it is wholly irrelevant to the testimony actually adduced at trial, and the People cannot violate Brady on an Issue that they did not know existed at trial.

### c. Where Gomez Alleges Pattern and Practice of Misconduct Evidence is "Newly Discovered," This "New" Knowledge Cannot Simultaneously Be Attributed to the People At the Time of Trial, Especially Given these Facts.

Gomez also failed to show that if exculpatory evidence existed, that it was *in the State's possession prior to trial or thereafter*. *People v. Winchel*, 159 Ill. App. 3d 892 (1987); *People v. Brown*, 169 Ill. 2d 94 (1995). Again-**Gomez never raised any misconduct claims. Ms. Antonetty did not give testimony at the trial**, nor did she testify as to any kind of incriminating evidence that she now disavows. Gomez claims that there is "newly discovered" evidence of a pattern and practice of misconduct that the People withheld at trial.

In the recent case of *People v. Tyler*, 2015 IL App (1st) 123470 (Sept. 2015) the Appellate Court rejected this exact Brady argument in a case where the petitioner actually did allege his confession was coerced in motions and at trial. In denying the request to for a third stage hearing on the Brady claim based on the People's failure to tender pattern and practice materials the Appellate Court reasoned:

> To establish a *Brady* violation, a defendant must show that: "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." <u>People v. Beaman</u>, 229 Ill. 2d 56, 73-74, 890 N.E.2d 500, 321 Ill. Dec. 778 (2008).

In addition, "defendant must establish that he requested the evidence in question, and that the State in fact possessed it and failed to disclose it." People v. House, 141 Ill. 2d 323, 387, 566 N.E.2d 259, 152 Ill. Dec. 572 (1990).

\*\*\*

[\*P209] Defendant argues that he is entitled to a third-stage evidentiary hearing on his *Brady* claim because the State withheld evidence of systemic police misconduct, which is material and likely to change the result at trial. For the reasons we discussed earlier, the evidence of systemic abuse was material and of such conclusive character that it could reasonably change the result at trial, and the evidence supported a substantial showing of a constitutional violation. As such, this evidence satisfies the two of the *Brady* claim requirements that the evidence must be favorable to defendant and that he was prejudiced by its absence.

[\*P210] However, *defendant must also show that the evidence was suppressed by the State*. First, a number of the claims of abuse did not exist until after trial, so the State cannot have suppressed evidence that it was not aware of at that point in time. Second, we have found that *this evidence is newly discovered sufficient to relax the requirements of res judicata, and that it is unreasonable to expect defense counsel to discover who these individual detectives were abusing unless counsel interviewed every suspect who was detained by them. This same rationale applies to the State as well. There is nothing in the appellate record that shows this evidence was known and available to the prosecutor prior to trial, and defendant does not make an argument explaining how the prosecutor could have known of these prior allegations of abuse.*

[\*P211] As a result, we cannot say that the evidence of systemic abuse was known and available to the State prior to trial and that it failed to disclose the evidence, and the trial court did not err when it dismissed defendant's *Brady* claim at the second stage.

(Emphasis added) ( Tyler, 2015 IL App (1st) 123470 at Par's 206-211).

### d. The Affidavits from the Female Witnesses Do Not Contain Material Evidence: Evidence that Would Change the Trial Result as Brady Requires. Therefore, No Brady Violation Occurred.

Petitioner also claims that the People were in possession of knowledge of the exculpatory impeachment from three affidavits given by circumstantial witnesses who were at the scene. The People disagree as the affidavits in question are certainly not exculpatory or material, and the People were not in possession of recently created information in the affidavits, In any event, the

affidavits are irrelevant as the three affiants never gave inculpatory testimony and the affidavits contain nothing that challenges the wealth of incriminating trial evidence.

Two of the three witnesses that petitioner claims possess information withheld from the defense, Debbie Daniels and Maria Castro, **were actually petitioner's own witnesses at trial.** None of these women gave inculpatory evidence at trial, none of them testified that they identified Gomez as the shooter. The affidavits are not relevant or material as required by Brady.

They were many people at the crime scene. The police rounded up a large group and interviewed them. Antonetty, Castro, and Daniels were at the corner to celebrate and hang out with friends, some of whom were street gang members.

None of the women testified for the People or gave inculpatory evidence against Gomez. Therefore, taking their affidavits as true and accepting that Guevara was rude and had them look into an interview room window is irrelevant to any other evidence in the case. There is no eyewitness for the State who has recanted. These female affiants did not witness anything that is relevant.

For example, Gomez admitted shooting. That these women saw him shoot in the air only corroborates Gomez' confession. That they did not want to be at the station and waited a long time is irrelevant. That Antonetty believes her gang member friends fired a gun as well is not exculpatory. Numerous witnesses saw Gomez fire into the crowd, including his friends in the car with Gomez. See, Petitioner's Exhibit CPD Supp. Reports.

In these situations, witnesses usually vary in the number of shots they heard depending where they were located. Witnesses see different things and hear different things depending on their perspective and their reaction to a stressful, crowded and confusing situation. See, People

v. Brooks, 187 Ill 2d. 91, 97-99 (1999) (Variation is to be expected between testimony of
multiple witnesses to a shooting as they see different aspects of same event at different times).

As set out in the facts, the evidence is overwhelming. Looking at all the evidence the
police reports attached to the amended petition show that Gomez' codefendants confessed and
stated that Gomez fired into the crowd of people. The new affidavits did not exist at trial and do
not constitute material evidence as none of the three affidavits would change the trial's outcome.
*All three witnesses were listed in police reports. All the police reports were in the possession of
the defense.* Petitioner fails to show that any kind of report was withheld.

### e. The Existence Of the Ammo Clip Is Noted Throughout the Police Reports that were in Trial Defense Counsel's Possession Before Trial.

Petitioner's claim that "unknown CPD officers suppressed" the location of the ammo clip
found near the crime scene totally fails to implicate Brady. Discovery attached to petitioner's pro
se petition shows that information regarding the ammo clip *was tendered to defense counsel
before trial*. (See, *pro se* Succ. Pet. Exh. "A" and "C"). Petitioner even admits that he found
said police reports when he searched through *trial counsel's trial file*. Absolutely nothing is set
forth to indicate that anything was withheld from the defense regarding the ammo clip.

Gomez also complains that the ammo clip was destroyed some years after trial. First,
there is absolutely nothing that definitely links the clip with this particular shooting. This is
clearly an intersection in the city occupied by several different street gangs. Gomez has failed to
offer any evidence that the clip was actually his.

Secondly, trial counsel possessed the reports concerning the recovery of the ammo clip.
Therefore, no Brady violation occurred. Also, Gomez has not shown that the ammo clip is

42

*material* evidence, likely to change the trial outcome. It simply was not withheld and is not material, no Brady claim exists.

Finally, *both the trial court and the federal court* [6]opined that the gun left in the front room of Gomez' house on top of the television, was likely planted there to mislead police. All of the defendants gave statements admitting that they took steps to mislead both the police and Gomez' mother. Gomez admitted that he wrecked his mother's Pathfinder in order to mislead. The men realized that the car could be identified by numerous witnesses and that the license plate had likely been recorded. Gomez also knew he would be implicated in the shooting. The fact that Gomez would go to all the trouble of wrecking his mother's car and then just casually toss the murder weapon on top of the television in his mother's living room defies belief.

Regardless, Gomez' trial counsel had the reports concerning the ammo clip. No Brady violation occurred. Further, where the ammo clip was not used at trial, there was nothing nefarious about the clip later being destroyed. The ammo clip is a red herring, there is absolutely no evidence that it was even related to the murder weapon here.

### f. A Review of the Law Shows That No Brady violation Occurred.

None of evidence complained of here is material. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985); People v. Mahaffey, 734 Ill.2d 154. A "reasonable probability" of a different result is a "probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682. Gomez cannot meet any of the elements of a Brady claim.

---

[6] Please review the portion of the Facts section that details the federal court proceedings as petitioner's amended petition only discusses a portion, omitting important findings by both federal courts who rejected Gomez' claims.

43

Courts have held that a "prosecutor is not constitutionally obligated to obtain information dehors his files for the purposes of discovering information which defense counsel can use in impeaching the credibility of a prosecution witness." Morgan v. Salmack, 735 F.2d 354, 358 (2nd Cir. 1984). The federal court of appeals specifically rejected Brady implications in stating that the failure of the prosecutor to [search for impeachment outside of his files] "does not place him at risk of being charged with unfairness of the trial; such a failure to make a check does not amount to due process in the constitutional sense." Id. at 358.

The Morgan court found this to be particularly true where the evidence was equally available to the defense. Id. The Morgan court refused to hold the government responsible for evidence that it did not control and was never in possession of. Id. Likewise, in U.S. v. Quinn, 445 F.2d 940 (2nd Cir. 1971), the court refused to find that knowledge of any part of the government is equivalent to knowledge on the part of the prosecutor. Following petitioner's logic would lead to abuse if Brady violations could be based on collateral matters contained in files generated by outside agencies that are not affiliated with the prosecutor's office.

The defendant in People v. Orange, 195 Ill.2d 437, 749 N.E.2d 932 (2001), raised a Brady issue, arguing the People failed to disclose evidence of a pattern and practice of abuse at Area 2. The Court noted that the defendant's trial was in 1985, but that OPS investigations that culminated with the "Goldston Report" in 1990 did not begin until 1989. The Court found that Brady did not require "the prosecution to disclose information about misconduct in unrelated cases known only to individual officers where the nexus between the other cases of alleged abuse and the defendant's case was not known until years after the defendant's trial." People v. Orange, 195 Ill.2d at 458. (See, Also, Tyler, quoted above in section c., noting that pattern evidence is newly discovered for both the defense and the People.)

The Illinois Supreme Court quite specifically found that the defendant could therefore not establish a <u>Brady</u> violation or that he had suffered prejudice. <u>Id</u>. Accordingly, the Court upheld the circuit court's dismissal of the post-conviction claim because it was not only barred by waiver for the failure to raise it in an earlier proceeding, but also because the defendant failed to satisfy the requirements necessary for a <u>Brady</u> claim. Similarly, petitioner in the instant case has failed to show that the People had the information pertaining to Guevara at the time of his trial, and the claim must be dismissed.

### III. PETITIONER'S MUCH BELATED CLAIM THAT HIS STATEMENT WAS COERCED MUST BE DISMISSED, AS IT IS WAIVED AND TOTALLY LACKS SUBSTANTIVE MERIT.

As noted throughout this filing, Petitioner's amended successive petition claims for the first time ever, that his Gomez' confession resulted from physical coercion by Detective Guevara. This claim is an utterly baseless, recent fabrication. This claim is also barred by several layers of waiver.

Gomez offered no evidence at the suppression motion. Both Guevara and the ASA who took the confession testified. The trial court specifically noted that no coercion was alleged when it ruled and denied the motion.

Gomez did not complain about the failure to raise coercion in post trial motions. He could have alleged ineffectiveness of trial counsel, for failing to offer evidence that Gomez was physically abused, he did not do so. Gomez had a newly retained attorney who filed post trial motions but Gomez never complained about the failure to litigate a coerced confession claim.

Gomez did not complain in his direct appeal about physical abuse by police or his counsel's failure to litigate it. Gomez filed several pleadings in the federal district court and in the 7th Circuit Court of Appeals. Never once did Gomez complain of a coerced confession by Guevara.

Back in Illinois state courts, Gomez filed his first post conviction petition. No complaint against Guevara was made. Most disturbing is that the instant pro se successive petition, filed by Gomez himself without counsel and before this Honorable Court in 2013, contained absolutely no allegation against Guevara claiming abuse and coercion.

The People understand that suspects may be overwhelmed by the criminal justice system and that they may not understand the importance of a prompt outcry. The same is true for crime victims. Gomez, however, filed a suppression motion and his first attorney must have asked him about the circumstances surrounding the confession. That trial counsel failed to pursue a coerced confession complaint speaks volumes about the veracity of the current complaint as even the most inexperienced young attorney would inquire when filing a suppression motion.

### a. The Coercion Claim is Barred by Res Judicata and Waiver

The People do not ask this Honorable Court to make a credibility determination at this stage. As a matter of law, Gomez' coerced confession claim is barred by both res judicata and waiver. People v. Tenner, 206 Ill. 2d 381, 396-397 (2002).

The litigation of the suppression motions results in a bar due to the res judicata doctrine. Gomez litigated his motion and failed, somehow, to mention a physical beating. Gomez cannot relitigate that motion where he failed to complain at trial, at post trial motions or on appeal. The matter is barred by res judicata and should be dismissed. People v. Coleman, 183 Ill.2d 366 380-383 (1998).

Gomez has waived the suppression issue many times. Each litigation, from the trial through the most recent pro se petition filed before the Court without complaint against Guevara, is a waiver. People v. Coleman, 183 Ill.2d 366 380-383 (1998). As set ot above, the statute creating post conviction litigation contains three separate provisions that bar litigation of this belated complaint.

First, the initial portion of the statute which sets the parameters of this litigation states that:
Any person imprisoned in the penitentiary may institute a proceeding under this Article **if the person asserts** that:
(1) in the **proceedings which resulted in his or her conviction** there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both… 725 ILCS 5/122-1 (a).

The report of proceedings here contains absolutely no support for the coercion complaint.

Second, under 725 ILCS 122-1(f), a claim may be brought in a successive petition only if the petitioner can satisfy the "cause-and-prejudice" test. People v. Pitsonbarger, 205 Ill.2d 444 at 463. It is incumbent upon Gomez to establish both cause and prejudice in order to go forward. Pitsonbarger, 205 Ill.2d at 463; 725 ILCS 5/122-1(f). Gomez has not and cannot satisfy this test. There simply is no objectively reasonable explanation for Gomez' sudden realization that he was beaten. No explanations are offered. The required test is not met and the claim should ne dismissed per the statute.

Finally, Section 122-3 expressly states any claim that could have been raised in the first petition but was not is waived and barred. Gomez ignores his opportunity to explain how this alleged beating could possibly have been overlooked in all the prior litigations. Section 122-3 bars this claim from any further consideration and requires dismissal.

**b. Case Law Demonstrates That Gomez' Belated Coercion Claim Must Be Dismissed.**

Gomez wishes to assert that his coerced confession claim should open the gate to pattern and practice of police misconduct evidence, but Supreme Court precedent actually shows that this claim must be dismissed. While Gomez' situation and his failure to pursue a coercion complaint for 18 years is unusual, Orange and Hobley are instructive, both had defective Area 2 claims and in both the trial court's second stage dismissal of their coercion claims was upheld.

In People v. Orange, 195 Ill.2d 437. Orange claimed he was mistreated by police at Area 2, and the newly discovered materials described in Patterson became available after his trial. Orange failed to describe the mistreatment or identify or describe the officers, for that reason his coercion claim in his first petition was dismissed. In his successive petition, Orange alleged that he had looked at photos and identified Jon Burge as one of his abusers. The Orange Court refused to allow Orange to pursue the post conviction misconduct claim as Orange had only made generalized allegations and his subsequent attempts to cure that defect were unavailing. 195 Ill.2d at 455-456 .

In People v. Hobley, 182 Ill.2d 404, Hobley claimed that he was abused but that he refused to confess. Hobley claimed that the officers who testified that Hobley gave a verbal confession were lying. Hobley testified that he never admitted his guilt to officers, despite the abuse. In Hobley's successive petition, he too, wished to litigate a pattern and practice claim and the Supreme Court rejected the claim. The Supreme Court found that where Hobley claimed at trial that he did not confess, there was no basis to call collateral witnesses to testify about confessions that were coerced due to police abuse and misconduct where Hobley himself had not coerced as this collateral evidence would only confuse a jury. Thus, even where petitioners

made a complaint in motions or trial, the Supreme Court did not automatically allow the petitioners to reopen the matter due to newly discovered evidence concerning the police.

In Patterson, 192 Ill.2d 93, the Court created the pattern and practice claim to address evidence from Area 2. The Court's major hurdle was res judicata and how a pretrial motion could be reopened so much later in a post conviction setting.

The *Patterson* Court first noted that waiver and res judicata can be relaxed when fundamental fairness so dictates. The Court reviewed the new evidence and found it was material stating:

> In particular, we note that defendant *has consistently claimed that he was tortured*. In fact, he made *this claim during his first court appearance.* Moreover, defendant's claims are now and *have always been strikingly similar* to other claims involving the use of a typewriter cover to simulate suffocation. (Emphasis added) 192 Ill.2d 144-145.

It is clear that the Patterson Court granted this opportunity to Patterson based in large part on Patterson early and persistent complaints. Here Gomez' complaint is not supported by the record from his suppression motion or from the record of his trial. Nor is his recent coercion complaint supported in any of the pleadings he has filed consistently over the years since he lost his direct appeal.

Gomez' failure to pursue a coercion complaint for 18 years is simply not deserving of special treatment under the fundamental fairness doctrine that reopened Patterson's suppression motion. The history of Gomez' coercion complaint could not be more different than Patterson's. The high court opined that waiver and res judicata should be relaxed for Patterson in light of the new documents supporting his persistent claim. Here the opposite has occurred and Gomez should not be afforded any special treatment in relaxing the doctrines of waiver and res judicata.

In sum, Gomez is barred from raising a coerced confession claim for the first time at this late stage and after filing so many other petitions with no mention of coercion or police misconduct.. Fundamental fairness does not require removing procedural bars. Indeed, this claim is exactly the type of claim that should be barred by waiver and res judicata. *People v. Tenner*, 206 Ill. 2d 381, 396-397 (2002). The People respectfully request that belated coercion claim be dismissed.

## IV. THERE IS NO SUCH THING AS CUMULATIVE CONSTITUTIONAL VIOLATIONS AND WHERE ALL THE CLAIMS ARE INDIVIDUALLY MERITLESS, THEY GAIN NO LEGITIMACY BY CONSOLIDATING THEM.

Gomez' individual claims are unpersuasive. Lumping them together will not cure them of their defects. This simply cannot occur. This claim is illogical and without merit.

At this Honorable Court is well aware, each constitutional violation alleged has a set of elements that must be proven. If the individual claims do not satisfy the elements applicable to the claim, then the claim must be dismissed. Here, every claim fails to require to meet those elements and thus further review is not warranted.

In People v. Albanese, 102 Ill. 2d 54; 464 N.E.2d 206 (1984), the high court noted that the lack of logic behind these cumulative error arguments. The Albanese Court explained why cumulative error fails stating: "[T]his argument is without merit. The whole can be no greater than the sum of its parts, and defendant has failed to demonstrate anything approaching reversible error in the myriad of arguments offered to justify a new trial." 102 Ill.2d at 82-83.

This phrase: "the sum of its parts cannot be greater than the whole," is often used to reject cumulative effect arguments. None of Gomez' claims in this petition have merit. Therefore, adding the claims together equals zero plus in the meritorious claims column.

Gomez recognizes the problems in alleging misconduct for the first time, long after trial, as well as alleging Brady for documents tendered to trial counsel in pretrial discovery. This "cumulative error" is cannot remedy the defects in Gomez' claims. This Honorable Court should dismiss this claim and find that the defects in the claims cannot be remedied by viewing the claims as a group. People v. Evans, 186 Ill.2d 83, 103 (1999); People v. Peterson, 2015 Il.App. (3rd) 130157 Par.227; People v. Max, 2012 Il.App. (3rd) 110385 (2012).


WHEREFORE, the People respectfully request that Petitioner Ariel Gomez's Amended Successive Post-Conviction Petition be dismissed.


Respectfully submitted,

ANITA ALVAREZ
State's Attorney of Cook County

BY: _____

Barbara Plitz
Celeste Stewart Stack
Assistant State's Attorneys
2650 S. California #12C40
Chicago, Il 60608
773-674-7628